**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE BROILER CHICKEN ANTITRUST LITIGATION | Case No. 1:16-cv-8637<br>Judge Thomas M. Durkin<br>Magistrate Judge Jeffrey T. Gilbert |
| This Document Relates To:<br>*Track Two Direct Action Plaintiffs* | **[PUBLIC REDACTED VERSION]** |

**TYSON DEFENDANTS' ANSWER TO TRACK 2 DIRECT ACTION PLAINTIFFS'
SECOND AMENDED CONSOLIDATED COMPLAINT
AND COUNTERCLAIM/THIRD-PARTY COMPLAINT AGAINST
<u>CARINA VENTURES LLC AND BURFORD CAPITAL LLC</u>**

Defendants Tyson Foods, Inc., Tyson Chicken, Inc., Tyson Breeders, Inc., and Tyson Poultry, Inc. (collectively, "Tyson" or "Tyson Defendants"), by and through the undersigned counsel, submits their answer and affirmative defenses to Track 2 Direct Action Plaintiffs' ("Plaintiffs" or "DAPs") Second Amended Consolidated Complaint and Demand for Jury Trial (Dkt. 5455), dated February 28, 2022 ("Complaint") as follows:

## I.  **INTRODUCTION**[1]

*DAPs filed the original consolidated complaint [ECF Nos. 3924, 3922], an amended consolidated complaint [ECF Nos. 4243, 4244], and this amended consolidated complaint, in accordance with the Court's direction "to streamline the pleadings so that there is only one complaint and one answer on the docket for the Court and parties to reference, rather than over 100 separate direct-action complaints." [ECF No. 4139 at 5]. As the Court has explained, "the purpose of the consolidated complaint [was] not to force any individual plaintiff to concede or make any allegation or claim." Id. DAPs understand the Court's orders to preserve the independent legal existence of each DAP case.*

*Pursuant to the Court's order for Track Two DAPs to file "an amended consolidated complaint" that "will be the operative complaint for Track Two DAPs" [ECF No. 5306], Track Two Direct Action Plaintiffs ("DAPs" or "Plaintiffs")[1] submit this pleading to illustrate, but not exhaustively catalog, material allegations against the Defendants.[2]*

*FN 1: Given the consolidated nature of this complaint, the plural usage of the term "Plaintiffs" is used throughout to generally describe one or more DAPs but should not be construed to necessarily refer to all DAPs for purposes of all factual allegations or legal causes of action as explained infra in this document.*

*FN 2: DAPs objected to filing a consolidated complaint [ECF No. 3625, 4695], and maintain those objections for all purposes, including any appeals.*

*Because of differences in the underlying DAP complaints, certain factual allegations may only relate or be material to the claims of certain DAPs. A given DAP does not necessarily adopt the allegations, theories or legal positions of other DAPs.*

*The submission of this consolidated complaint should not be construed as a waiver or relinquishment of any DAP's rights, including the due-process right to proceed outside of the putative class in this case and to prosecute claims separately in a direct action with counsel of each*

---

[1] The Complaint's allegations are reproduced in italicized font below. Tyson includes the Complaint's titles, headings, footnotes, and introductory clauses to the Complaint's paragraphs for the convenience of the Court. The Complaint's allegations, including titles, headings, footnotes, and introductory clauses are not factual allegations to which a response is required. To the extent a response is required, Tyson denies all factual allegations contained in Plaintiffs' titles, headings, footnotes, and introductory clauses to the Complaint's paragraphs.

*DAP's choosing. DAPs have not filed identical complaints and, in many instances, have sued different defendants and asserted different claims.[3] By compiling the factual allegations and claims from the various complaints pursuant to this Court's order, DAPs do not concede that consolidation beyond that permitted by the Federal Rules of Civil Procedure would be proper, especially for trial.[4]*

> *FN 3: For example, some DAPs chose not to sue certain Defendants sued by other DAPs. Some DAPs decided to include RICO claims in their complaint; many did not. Many DAPs filed only Sherman Act claims. Others included state law claims, and some include indirect purchaser claims in their complaints. Each DAP has performed its own legal analysis of the causes of action applicable to it based on the facts specific to each DAP.*

> *FN 4: In submitting this pleading, DAPs continue to maintain their "separate legal existence" and object to any loss of their individual due process rights. In re Fluidmaster, 149 F.Supp.3d 940, 947 (N.D. Ill. 2016) (quoting In re Refrigerant Compressors Antitrust Litig., 731 F.3d 586, 590-91 (6th Cir. 2013)); In re Zimmer Nexgen Knee Implant Prods. Liab. Litig., MDL 2272, 2012 WL 3582708, at \*3 (N.D. Ill. Aug. 16, 2012) (collecting cases that state that "a master or consolidated complaint is a procedural device used to promote judicial efficiency and economy, not to be given the same effect as an ordinary complaint or considered to merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another.") (internal quotation marks omitted).*

*This Complaint is organized as follows: Section II sets out a chart identifying each Plaintiff and (1) the docket number on the consolidated docket for the underlying DAP complaint, (2) the Defendants named in the DAP complaint (if a Plaintiff has dismissed a Defendant, that Defendant is no longer listed in the Defendant column but in the named co-conspirator column), (3) the co-conspirators named in the DAP complaint, and (4) the causes of action asserted in the DAP complaint. Sections III through X set out the factual allegations. Section XI states all of the causes of action asserted by any DAP.*

**ANSWER**: DAPs' "Introduction" contains no factual allegations to which a response is required. Instead, it contains DAPs' legal conclusions and characterizations of this action, including their interpretation of orders of this Court and legal argument related to the scope and propriety of those orders. To the extent a response is required, Tyson denies all allegations in the Introduction, including those in the accompanying Footnotes.

## II.     CHART OF DIRECT ACTION PLAINTIFF CASES

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Sysco Corporation | ECF 4807; 4808 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone; Koch; Mar-Jac; Marshall Durbin; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Fieldale; George's; Peco; Rabobank[5] | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restrictions); Count 3 (Sherman Act for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid-Rigging) |
| US Foods, Inc. | ECF 4809; 4810 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Marshall Durbin; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Wayne | George's; Peco; Tyson; Keystone; Rabobank[6] | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restrictions); Count 3 (Sherman Act for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid-Rigging) |
| Jetro Holdings, LLC | ECF 2130 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods; Amick | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 4 (Sherman Act Claim for Bid-Rigging and Price-Fixing); Count 5 (Sherman Act Claim for Bid-Rigging); Count 6 (Sherman Act Claim for Bid-Rigging, GA Dock Manipulation) |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Ahold Delhaize USA, Inc. | ECF 2100 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Wayne | Amick; Tyson | Count 1 (Sherman Act, for all Anticompetitive Conduct); Count 2 (Sherman Act, for Output Restriction, Pled in the Alternative); Count 3 (Sherman Act, for Georgia Dock Price-Fixing, Pled in the Alternative); Count 4 (Sherman Act, for Bid-Rigging and Price-Fixing, Pled in the Alternative); Count 5 (Sherman Act, for Bid-Rigging, Pled in the Alternative); Count 6 (Sherman Act, for Price-Fixing, Pled in the Alternative); Count 7 (GA RICO Based on 16-14-4(a));  Count 8 (GA RICO Based on 16-14-4(b)); Count 9 (Federal RICO); Count 19 (Common Law Fraud Against the GA Dock Defendants); Count 20 (Breach of the Covenant of Good Faith and Fair Dealing Against the GA Dock Defendants); Count 21 (Negligent Misrepresentation, Pled in the Alternative to Count 19); Count 22  (Unjust Enrichment Against the GA Dock Defendants) |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| BJ's Wholesale Club, Inc. | ECF 2125 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods; Amick | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 4 (Sherman Act Claim for Bid-Rigging and Price-Fixing); Count 5 (Sherman Act Claim for Bid-Rigging); Count 6 (Sherman Act Claim for Bid-Rigging, GA Dock Manipulation) |
| Maximum Quality Foods, Inc. | ECF 2134 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Mar-Jac; O.K. Foods; Peco; Simmons; Tyson | Allen Harim; Amick; Keystone Foods; Koch; Mountaire; Perdue; Pilgrim's Pride; Sanderson; Wayne | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 4 (Sherman Act Claim for Bid-Rigging and Price-Fixing); Count 5 (Sherman Act Claim for Bid-Rigging); Count 6 (Sherman Act Claim for Bid-Rigging, GA Dock Manipulation) |
| United Supermarkets, LLC | ECF 2115 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Amick; Keystone Foods; Pilgrim's Pride | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid Rigging); Count 6 (Sherman Act Claim for Price Fixing) |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Krispy Krunchy Foods, LLC | ECF 2115 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Amick; Keystone Foods; Pilgrim's Pride | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid Rigging); Count 6 (Sherman Act Claim for Price Fixing) |
| Cheney Bros., Inc. | ECF 2115 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Amick; Keystone Foods; Pilgrim's Pride | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid Rigging); Count 6 (Sherman Act Claim for Price Fixing) |
| Shamrock Foods Company | ECF 2110 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Marshall Durbin; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Keystone Foods | Allen Harim; Amick | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count 1); Count 3 (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count 1); Count 4 (Violation Of 15 U.S.C. § 1 Against Bid-Rigging Defendants for Bid-Rigging and Price-Fixing); Count 6 (Violation Of 15 U.S.C. § 1 Against Georgia Dock Defendants And Bid-Rigging Defendants For Price-Fixing) |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| United Food Service, Inc. | ECF 2110 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Marshall Durbin; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Keystone Foods | Allen Harim; Amick | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count 1); Count 3 (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count 1); Count 4 (Violation Of 15 U.S.C. § 1 Against Bid-Rigging Defendants for Bid-Rigging and Price-Fixing); Count 6 (Violation Of 15 U.S.C. § 1 Against Georgia Dock Defendants And Bid-Rigging Defendants For Price-Fixing) |
| Quirch Foods, LLC, f/k/a Quirch Foods Co. | ECF 1519-1 | Agri Stats; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Marshall Durbin; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction, Pled in the Alternative); Count 3 (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative); Count 5 (Sherman Act Claim for Bid-Rigging Pled in the Alternative); Count 6 (Sherman Act Claim for Price Fixing, Pled in the Alternative) |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Sherwood Food Distributors, L.L.C. | ECF 2135 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods; Amick | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 4 (Sherman Act Claim for Bid-Rigging and Price-Fixing); Count 5 (Sherman Act Claim for Bid-Rigging); Count 6 (Sherman Act Claim for Bid-Rigging, GA Dock Manipulation) |
| Harvest Meat Company, Inc. | ECF 2135 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods; Amick | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 4 (Sherman Act Claim for Bid-Rigging and Price-Fixing); Count 5 (Sherman Act Claim for Bid-Rigging); Count 6 (Sherman Act Claim for Bid-Rigging, GA Dock Manipulation) |
| Western Boxed Meat Distributors, Inc. | ECF 2135 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods; Amick | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 4 (Sherman Act Claim for Bid-Rigging and Price-Fixing); Count 5 (Sherman Act Claim for Bid-Rigging); Count 6 (Sherman Act Claim for Bid-Rigging, GA Dock Manipulation) |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Hamilton Meat, LLC | ECF 2135 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods; Amick | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 4 (Sherman Act Claim for Bid-Rigging and Price-Fixing); Count 5 (Sherman Act Claim for Bid-Rigging); Count 6 (Sherman Act Claim for Bid-Rigging, GA Dock Manipulation) |
| Hooters of America, LLC | ECF 2109 | House of Raeford; Mar-Jac; Perdue; Tyson | Agri Stats; Allen Harim; Amick; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; Keystone Foods; Koch; Mountaire; O.K. Foods; Peco; Pilgrim's Pride; Sanderson; Simmons; Wayne | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid Rigging); Count 6 (Sherman Act Claim for Price Fixing) |
| Darden Restaurants, Inc. | ECF 2126 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Keystone Foods; Amick | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 4 (Sherman Act Claim for Bid-Rigging and Price-Fixing); Count 5 (Sherman Act Claim for Bid-Rigging); Count 6 (Sherman Act Claim for Bid-Rigging, GA Dock Manipulation) |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Checkers Drive-In Restaurants, Inc. | ECF 2113 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Amick; Keystone; Pilgrim's Pride | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid Rigging); Count 6 (Sherman Act Claim for Price Fixing); Count 10 (Violation of FDUTPA) |
| Conagra Brands, Inc. | ECF 2264 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Sanderson; Simmons; Tyson; Wayne | Pilgrim's Pride; Allen Harim; Rabobank | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count 1); Count 3 (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count 1); Count 4 (Sherman Act Claim for Bid-Rigging and Price-Fixing) Count 5 (Alternative Bid-Rigging, Pled in the Alternative to Count 4); Count 6 (Violation Of 15 U.S.C. § 1 Against Georgia Dock Defendants And Bid-Rigging Defendants For Price-Fixing) |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Pinnacle Foods, Inc. | ECF 2264 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Sanderson; Simmons; Tyson; Wayne | Fieldale; Pilgrim's Pride; Allen Harim; Rabobank | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count 1); Count 3 (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count 1); Count 4 (Sherman Act Claim for Bid-Rigging and Price-Fixing) Count 5 (Alternative Bid-Rigging, Pled in the Alternative to Count 4); Count 6 (Violation Of 15 U.S.C. § 1 Against Georgia Dock Defendants And Bid-Rigging Defendants For Price-Fixing) |
| Kraft Heinz Foods Company | ECF 2264 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Sanderson; Simmons; Tyson; Wayne | Fieldale; Pilgrim's Pride; Allen Harim; Rabobank | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count 1); Count 3 (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count 1); Count 4 (Sherman Act Claim for Bid-Rigging and Price-Fixing) Count 5 (Alternative Bid-Rigging, Pled in the Alternative to Count 4); Count 6 (Violation Of 15 U.S.C. § 1 Against Georgia Dock Defendants And Bid-Rigging Defendants For Price-Fixing) |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Nestlé USA, Inc. | ECF 2264 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Sanderson; Simmons; Tyson; Wayne | Fieldale; Pilgrim's Pride; Allen Harim; Rabobank | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count 1); Count 3 (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count 1); Count 4 (Sherman Act Claim for Bid-Rigging and Price-Fixing) Count 5 (Alternative Bid-Rigging, Pled in the Alternative to Count 4); Count 6 (Violation Of 15 U.S.C. § 1 Against Georgia Dock Defendants And Bid-Rigging Defendants For Price-Fixing) |
| Nestlé Purina PetCare Company | ECF 2264 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Sanderson; Simmons; Tyson; Wayne | Fieldale; Pilgrim's Pride; Allen Harim; Rabobank | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count 1); Count 3 (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count 1); Count 4 (Sherman Act Claim for Bid-Rigging and Price-Fixing) Count 5 (Alternative Bid-Rigging, Pled in the Alternative to Count 4); Count 6 (Violation Of 15 U.S.C. § 1 Against Georgia Dock Defendants And Bid-Rigging Defendants For Price-Fixing) |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Walmart Inc. | ECF 2260-2 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Sanderson; Wayne | Amick, Peco, Pilgrim's Pride, and all other individuals/entities whose conspiratorial conduct is described in this Complaint. | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 4 (Sherman Act Claim for Bid-Rigging); Count 5 (Sherman Act Claim for Bid-Rigging) |
| Wal-Mart Stores East, LP | ECF 2260-2 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Sanderson; Wayne | Amick, Peco, Pilgrim's Pride, and all other individuals/entities whose conspiratorial conduct is described in this Complaint. | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 4 (Sherman Act Claim for Bid-Rigging); Count 5 (Sherman Act Claim for Bid-Rigging) |
| Wal-Mart Stores Arkansas, LLC | ECF 2260-2 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Sanderson; Wayne | Amick, Peco, Pilgrim's Pride, and all other individuals/entities whose conspiratorial conduct is described in this Complaint. | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 4 (Sherman Act Claim for Bid-Rigging); Count 5 (Sherman Act Claim for Bid-Rigging) |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Wal-Mart Stores Texas, LLC | ECF 2260-2 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Sanderson; Wayne | Amick, Peco, Pilgrim's Pride, and all other individuals/entities whose conspiratorial conduct is described in this Complaint. | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 4 (Sherman Act Claim for Bid-Rigging); Count 5 (Sherman Act Claim for Bid-Rigging) |
| Wal-Mart Louisiana, LLC | ECF 2260-2 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Sanderson; Wayne | Amick, Peco, Pilgrim's Pride, and all other individuals/entities whose conspiratorial conduct is described in this Complaint. | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 4 (Sherman Act Claim for Bid-Rigging); Count 5 (Sherman Act Claim for Bid-Rigging) |
| Sam's West, Inc. | ECF 2260-2 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Sanderson; Wayne | Amick, Peco, Pilgrim's Pride, and all other individuals/entities whose conspiratorial conduct is described in this Complaint. | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 4 (Sherman Act Claim for Bid-Rigging); Count 5 (Sherman Act Claim for Bid-Rigging) |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Sam's East, Inc. | ECF 2260-2 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Sanderson; Wayne | Amick, Peco, Pilgrim's Pride, and all other individuals/entities whose conspiratorial conduct is described in this Complaint. | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 4 (Sherman Act Claim for Bid-Rigging); Count 5 (Sherman Act Claim for Bid-Rigging) |
| Services Group of America, Inc. | ECF 2274-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; George's; Peco | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act for GA Dock Manipulation); Count 4 Count 4 (Sherman Act Claim for Bid-Rigging and Price-Fixing); Count 5 (Sherman Act Claim for Bid-Rigging); Count 6 (Violation Of 15 U.S.C. § 1 Against Georgia Dock Defendants and Bid-Rigging Defendants For Price-Fixing) |

15

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Restaurants of America, Inc. | ECF 3068 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Amick; Keystone Foods; Pilgrim's Pride | Count 1 (Sherman Act Claim for all Anticompetitive Conduct) [ROA seeks injunctive and equitable relief in Counts 1, 2, and 3; ROA seeks damages except against Fieldale in Counts 1, 2, and 3]; Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid Rigging); Count 6 (Sherman Act Claim for Price Fixing); Count 11 (Violation of Arizona's Antitrust Act); Count 13 (Violation of the Minn. Antitrust Law); Count 18 (Unjust Enrichment) [Arizona, Minnesota, New Mexico]; Count 23 (Violation of New Mexico Antitrust Act); Count 24 (Violation of the Minn. Consumer Fraud Act); Count 25 (Violation of New Mexico Unfair Practices Act) |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| LTP Management Group, Inc. | ECF 3068 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Amick; Keystone Foods; Pilgrim's Pride | Count 1 (Sherman Act Claim for all Anticompetitive Conduct) [LTP seeks injunctive and equitable relief only in Counts 1, 2, and 3]; Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid Rigging); Count 6 (Sherman Act Claim for Price Fixing); Count 10 (Violation of FDUTPA); Count 18 (Unjust Enrichment) [Florida] |
| Gibson, Greco & Wood, Ltd. | ECF 3068 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Amick; Fieldale; Keystone Foods; Pilgrim's Pride | Count 1 (Sherman Act Claim for all Anticompetitive Conduct) [GGW seeks injunctive and equitable relief in Counts 1, 2, and 3; GGW seeks damages except against Fieldale in Counts 1, 2, and 3]; Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid Rigging); Count 6 (Sherman Act Claim for Price Fixing) |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Hooters Management Corporation | ECF 3068 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Amick; Keystone Foods; Pilgrim's Pride | Count 1 (Sherman Act Claim for all Anticompetitive Conduct) [HMC seeks injunctive and equitable relief only in Counts 1, 2, and 3]; Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid Rigging); Count 6 (Sherman Act Claim for Price Fixing); Count 10 (Violation of FDUTPA); Count 12 (Violation of Illinois Antitrust Act); Count 14 (Violation of NY General Business Law); Count 15 (Violation of the Illinois Fraud Act); Count 18 (Unjust Enrichment) [Florida, Illinois] |
| Anaheim Wings, LLC, d/b/a Hooters of Anaheim | ECF 3066 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Amick; Keystone Foods; Pilgrim's Pride | Count 1 (Sherman Act Claim for all Anticompetitive Conduct) [Anaheim Wings seeks injunctive and equitable relief only in Counts 1, 2, and 3]; Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid Rigging); Count 6 (Sherman Act Claim for Price Fixing); Count 16 (Violation of California's Cartwright Act); Count 17 (Violation of California's UCL); Count 18 (Unjust Enrichment) [California] |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Gaslamp Wings, LLC, previously d/b/a Hooters of San Diego | ECF 3066 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Amick; Keystone Foods; Pilgrim's Pride | Count 1 (Sherman Act Claim for all Anticompetitive Conduct) [Gaslamp Wings seeks injunctive and equitable relief only in Counts 1, 2, and 3]; Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid Rigging); Count 6 (Sherman Act Claim for Price Fixing); Count 16 (Violation of California's Cartwright Act); Count 17 (Violation of California's UCL); Count 18 (Unjust Enrichment) [California] |
| Mission Valley Wings, LLC, d/b/a Hooters of Mission Valley | ECF 3066 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Amick; Keystone Foods; Pilgrim's Pride | Count 1 (Sherman Act Claim for all Anticompetitive Conduct) [Mission Valley Wings seeks injunctive and equitable relief only in Counts 1, 2, and 3]; Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid Rigging); Count 6 (Sherman Act Claim for Price Fixing); Count 16 (Violation of California's Cartwright Act); Count 17 (Violation of California's UCL); Count 18 (Unjust Enrichment) [California] |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Oceanside Wings, LLC, previously d/b/a Hooters of Oceanside | ECF 3066 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Amick; Keystone Foods; Pilgrim's Pride | Count 1 (Sherman Act Claim for all Anticompetitive Conduct) [Oceanside Wings seeks injunctive and equitable relief only in Counts 1, 2, and 3]; Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid Rigging); Count 6 (Sherman Act Claim for Price Fixing); Count 16 (Violation of California's Cartwright Act); Count 17 (Violation of California's UCL); Count 18 (Unjust Enrichment) [California] |
| Costa Mesa Wings, LLC, d/b/a Hooters of Costa Mesa | ECF 3066 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Amick; Keystone Foods; Pilgrim's Pride | Count 1 (Sherman Act Claim for all Anticompetitive Conduct) [Costa Mesa Wings seeks injunctive and equitable relief only in Counts 1, 2, and 3]; Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid Rigging); Count 6 (Sherman Act Claim for Price Fixing); Count 16 (Violation of California's Cartwright Act); Count 17 (Violation of California's UCL); Count 18 (Unjust Enrichment) [California] |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Rancho Bernardo Wings, LLC, d/b/a Hooters of San Marcos | ECF 3066 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Amick; Keystone Foods; Pilgrim's Pride | Count 1 (Sherman Act Claim for all Anticompetitive Conduct) [Rancho Bernardo Wings seeks injunctive and equitable relief only in Counts 1, 2, and 3]; Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid Rigging); Count 6 (Sherman Act Claim for Price Fixing); Count 16 (Violation of California's Cartwright Act); Count 17 (Violation of California's UCL); Count 18 (Unjust Enrichment) [California] |
| Ontario Wings, LLC, d/b/a Hooters of Ontario | ECF 3066 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Amick; Keystone Foods; Pilgrim's Pride | Count 1 (Sherman Act Claim for all Anticompetitive Conduct) [Ontario Wings seeks injunctive and equitable relief only in Counts 1, 2, and 3]; Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid Rigging); Count 6 (Sherman Act Claim for Price Fixing); Count 16 (Violation of California's Cartwright Act); Count 17 (Violation of California's UCL); Count 18 (Unjust Enrichment) [California] |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Hollywood Wings, LLC, d/b/a Hooters of Hollywood | ECF 3066 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Amick; Keystone Foods; Pilgrim's Pride | Count 1 (Sherman Act Claim for all Anticompetitive Conduct) [Hollywood Wings seeks injunctive and equitable relief only in Counts 1, 2, and 3]; Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid Rigging); Count 6 (Sherman Act Claim for Price Fixing); Count 16 (Violation of California's Cartwright Act); Count 17 (Violation of California's UCL); Count 18 (Unjust Enrichment) [California] |
| South Gate Wings, LLC, d/b/a Hooters of South Gate | ECF 3066 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Amick; Keystone Foods; Pilgrim's Pride | Count 1 (Sherman Act Claim for all Anticompetitive Conduct) [South Gate Wings seeks injunctive and equitable relief only in Counts 1, 2, and 3]; Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid Rigging); Count 6 (Sherman Act Claim for Price Fixing); Count 16 (Violation of California's Cartwright Act); Count 17 (Violation of California's UCL); Count 18 (Unjust Enrichment) [California] |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Wings Over Long Beach, LLC, d/b/a Hooters of Long Beach | ECF 3066 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Amick; Keystone Foods; Pilgrim's Pride | Count 1 (Sherman Act Claim for all Anticompetitive Conduct) [Wings Over Long Beach seeks injunctive and equitable relief only in Counts 1, 2, and 3]; Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid Rigging); Count 6 (Sherman Act Claim for Price Fixing); Count 16 (Violation of California's Cartwright Act); Count 17 (Violation of California's UCL); Count 18 (Unjust Enrichment) [California] |
| Bonita Plaza Wings, LLC, d/b/a Hooters of Plaza Bonita | ECF 3066 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Amick; Keystone Foods; Pilgrim's Pride | Count 1 (Sherman Act Claim for all Anticompetitive Conduct) [Bonita Plaza Wings seeks injunctive and equitable relief only in Counts 1, 2, and 3]; Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid Rigging); Count 6 (Sherman Act Claim for Price Fixing); Count 16 (Violation of California's Cartwright Act); Count 17 (Violation of California's UCL); Count 18 (Unjust Enrichment) [California] |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Downtown Wings, LLC, previously d/b/a Hooters of Downtown LA | ECF 3066 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Amick; Keystone Foods; Pilgrim's Pride | Count 1 (Sherman Act Claim for all Anticompetitive Conduct) [Downtown Wings seeks injunctive and equitable relief only in Counts 1, 2, and 3]; Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid Rigging); Count 6 (Sherman Act Claim for Price Fixing); Count 16 (Violation of California's Cartwright Act); Count 17 (Violation of California's UCL); Count 18 (Unjust Enrichment) [California] |
| Amigos Meat Distributors, LP | ECF 3074-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; George's; Peco | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count 1); Count 3 (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count 1) |
| Amigos Meat & Poultry, LLC | ECF 3074-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; George's; Peco | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count 1); Count 3 (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count 1) |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Amigos Meat Distributors East LP | ECF 3074-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; George's; Peco | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count 1); Count 3 (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count 1) |
| Amigos Meat Distributors West, LP | ECF 3074-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; George's; Peco | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count 1); Count 3 (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count 1) |
| PJ Food Service, Inc. | ECF 3086-1 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Fieldale; Keystone; Amick | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 4 (Sherman Act Claim for Bid-Rigging and Price-Fixing); Count 5 (Sherman Act Claim for Bid-Rigging); Count 6 (Sherman Act Claim for Bid-Rigging, GA Dock Manipulation) |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| El Pollo Loco, Inc. | ECF 4359 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Marshall Durbin; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Keystone Foods | Allen Harim; Amick | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count 1); Count 3 (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count 1); Count 4 (Violation Of 15 U.S.C. § 1 Against Bid-Rigging Defendants for Bid-Rigging and Price-Fixing); Count 6 (Violation Of 15 U.S.C. § 1 Against Georgia Dock Defendants And Bid-Rigging Defendants For Price-Fixing) |
| Independent Purchasing Cooperative, Inc. | ECF 3717 | Agri Stats; Amick; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Marshall Durbin; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Fieldale | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction, Pled in the Alternative); Count 3 (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count 1); Count 5 (Sherman Act Claim for Bid-Rigging Pled in the Alternative); Count 6 (Sherman Act Claim for Price Fixing, Pled in the Alternative) |
| Kraft Heinz Foods | ECF 3572 | Amick, Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Keystone Foods; Fieldale Farms | Count 1 (Sherman Act Claim for all Anticompetitive Conduct) |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Barbecue Integrated, Inc. (d/b/a/ Smokey Bones, Inc.) | ECF 4407 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Marshall Durbin; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Keystone Foods | Allen Harim; Amick | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count 1); Count 3 (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count 1); Count 4 (Violation Of 15 U.S.C. § 1 Against Bid-Rigging Defendants for Bid-Rigging and Price-Fixing); Count 6 (Violation Of 15 U.S.C. § 1 Against Georgia Dock Defendants And Bid-Rigging Defendants For Price-Fixing) |
| The Johnny Rockets Group, Inc. | ECF 4406 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Marshall Durbin; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Keystone Foods | Allen Harim; Amick | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count 1); Count 3 (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count 1); Count 4 (Violation Of 15 U.S.C. § 1 Against Bid-Rigging Defendants for Bid-Rigging and Price-Fixing); Count 6 (Violation Of 15 U.S.C. § 1 Against Georgia Dock Defendants And Bid-Rigging Defendants For Price-Fixing) |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| FIC Restaurants, Inc. (d/b/a Friendly's) | ECF 4404 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Marshall Durbin; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Keystone Foods | Allen Harim; Amick | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count 1); Count 3 (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count 1); Count 4 (Violation Of 15 U.S.C. § 1 Against Bid-Rigging Defendants for Bid-Rigging and Price-Fixing); Count 6 (Violation Of 15 U.S.C. § 1 Against Georgia Dock Defendants And Bid-Rigging Defendants For Price-Fixing) |
| Boston Market Corporation | ECF 4401 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Marshall Durbin; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Wayne; Keystone Foods | Allen Harim; Keystone Foods; Tyson; Amick | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count 1); Count 3 (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count 1); Count 4 (Violation Of 15 U.S.C. § 1 Against Bid-Rigging Defendants for Bid-Rigging and Price-Fixing); Count 6 (Violation Of 15 U.S.C. § 1 Against Georgia Dock Defendants And Bid-Rigging Defendants For Price-Fixing) |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Bob Evans Farms, Inc. | ECF 3818-1 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire Farms; O.K. Foods; Peco; Perdue; Sanderson Farms; Simmons; Tyson; Wayne Farms | Allen Harim; Amick; Fieldale Farms; Keystone Foods; Pilgrim's Pride | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid Rigging); Count 6 (Sherman Act Claim for Price Fixing) |
| The Fresh Market, Inc. | ECF 3819-1 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire Farms; O.K. Foods; Peco; Perdue; Sanderson Farms; Simmons; Tyson; Wayne Farms | Allen Harim; Amick; Fieldale Farms; Keystone Foods; Pilgrim's Pride | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid Rigging); Count 6 (Sherman Act Claim for Price Fixing) |
| Wawa, Inc. | ECF 3820-1 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire Farms; O.K. Foods; Peco; Perdue Sanderson Farms; Simmons; Tyson; Wayne Farms | Allen Harim; Amick; Fieldale Farms; Keystone Foods; Pilgrim's Pride | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid Rigging); Count 6 (Sherman Act Claim for Price Fixing) |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| White Castle Purchasing Co. | ECF 4408 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Marshall Durbin; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Keystone Foods | Allen Harim; Amick | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count 1); Count 3 (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count 1); Count 4 (Violation Of 15 U.S.C. § 1 Against Bid-Rigging Defendants for Bid-Rigging and Price-Fixing); Count 6 (Violation Of 15 U.S.C. § 1 Against Georgia Dock Defendants And Bid-Rigging Defendants For Price-Fixing) |
| Captain D's LLC | ECF 4402 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Marshall Durbin; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Keystone Foods | Allen Harim; Amick | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count 1); Count 3 (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count 1); Count 4 (Violation Of 15 U.S.C. § 1 Against Bid-Rigging Defendants for Bid-Rigging and Price-Fixing); Count 6 (Violation Of 15 U.S.C. § 1 Against Georgia Dock Defendants And Bid-Rigging Defendants For Price-Fixing) |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Cracker Barrel Old Country Store, Inc. and CBOCS Distribution, Inc. | ECF 4403 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Marshall Durbin; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Keystone Foods | Allen Harim; Amick; George's; Peco | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count 1); Count 3 (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count 1); Count 4 (Violation Of 15 U.S.C. § 1 Against Bid-Rigging Defendants for Bid-Rigging and Price-Fixing); Count 6 (Violation Of 15 U.S.C. § 1 Against Georgia Dock Defendants And Bid-Rigging Defendants For Price-Fixing) |
| Golden Corral Corporation | ECF 4405 | Claxton; Pilgrim's Pride; George's; Agri Stats; Case; Fieldale; Foster Farms; Harrison; Koch; Mountaire; O.K. Foods; Peco; Perdue; Sanderson; Simmons; Wayne; Fieldale; Tyson; Keystone Foods | Allen Harim; Marshall Durbin; Amick; House of Raeford; Mar-Jac | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count 1); Count 3 (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count 1); Count 4 (Violation Of 15 U.S.C. § 1 Against Bid-Rigging Defendants for Bid-Rigging and Price-Fixing); Count 6 (Violation Of 15 U.S.C. § 1 Against Georgia Dock Defendants And Bid-Rigging Defendants For Price-Fixing) |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| WZ Franchise Corporation | ECF 4409 | Agri Stats; Case; Claxton; Fieldale; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Marshall Durbin; Mountaire; O.K. Foods; Perdue; Pilgrim's; Sanderson; Simmons; Tyson; Wayne; Keystone Foods | Amick; Peco; George's | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count 1); Count 3 (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count 1); Count 4 (Violation Of 15 U.S.C. § 1 Against Bid-Rigging Defendants for Bid-Rigging and Price-Fixing); Count 6 (Violation Of 15 U.S.C. § 1 Against Georgia Dock Defendants And Bid-Rigging Defendants For Price-Fixing)) |
| EMA Foods Co., LLC | ECF 1 in 1:20-cv-06347 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Amick; Fieldale; George's; Marshall Durbin; Peco; Pilgrim's; Rabobank; Tip Top; Southern Hens | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count 3 (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count 5 (Bid-rigging; Pled in the Alternative to Count I); Count 6 (Georgia Dock and Bid Rigging). |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| L. Hart, Inc. | ECF 1 in 1:20-cv-06347 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue;;; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Amick; Fieldale; George's; Marshall Durbin; Peco; Pilgrim's; Rabobank; Tip Top; Southern Hens | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); ; Count 3 (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count 5 (Bid-rigging; Pled in the Alternative to Count I); Count 6 (Georgia Doc and Bid Rigging). |
| R & D Marketing, LLC | ECF 1 in 1:20-cv-06347 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Amick; Fieldale; George's; Marshall Durbin; Peco; Pilgrim's; Rabobank; Tip Top; Southern Hens | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I) ; Count 3 (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count 5 (Bid-rigging; Pled in the Alternative to Count I); Count 6 (Georgia Doc and Bid Rigging). |
| Timber Lake Foods, Inc. | ECF 1 in 1:20-cv-06347 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Amick; Fieldale; George's; Marshall Durbin; Peco; Pilgrim's; Rabobank; Tip Top; Southern Hens | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count 3 (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count 5 (Bid-rigging; Pled in the Alternative to Count I); Count 6 (Georgia Doc and Bid Rigging). |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Campbell Soup Company; Campbell Soup Supply Company, L.L.C. | ECF 4801; 4802 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone; Koch; Mar-Jac; Marshall Durbin; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Fieldale; George's; Peco; Rabobank[7] | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restrictions); Count 3 (Sherman Act for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid-Rigging) |
| ALDI, Inc. | ECF 4056 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; Fieldale; George's; Marshall Durbin; Peco | Count 1 (Sherman Act, for all Anticompetitive Conduct); Count 2 (Sherman Act, for Output Restriction, Pled in the Alternative); Count 3 (Sherman Act, for Georgia Dock Price-Fixing, Pled in the Alternative); Count 4 (Sherman Act, for Bid-Rigging and Price-Fixing, Pled in the Alternative); Count 5 (Sherman Act, for Bid-Rigging, Pled in the Alternative); Count 6 (Sherman Act, for Price-Fixing, Pled in the Alternative); Count 7 (GA RICO Based on 16-14-4(a)); Count 8 (GA RICO Based on 16-14-4(b)); Count 9 (Federal RICO) |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Chick-fil-A, Inc. | ECF 4237 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; Fieldale; George's; Marshall Durbin; Peco | Count 1 (Sherman Act, for all Anticompetitive Conduct); Count 2 (Sherman Act, for Output Restriction, Pled in the Alternative); Count 3 (Sherman Act, for Georgia Dock Price-Fixing, Pled in the Alternative); Count 4 (Sherman Act, for Bid-Rigging and Price-Fixing, Pled in the Alternative); Count 6 (Sherman Act, for Price-Fixing, Pled in the Alternative) |
| Target Corporation | ECF 4805; 4806 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone; Koch; Mar-Jac; Marshall Durbin; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; Fieldale; George's; Peco; Rabobank[8] | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restrictions); Count 3 (Sherman Act for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid-Rigging) |
| Carl Buddig & Co. | Dkt No. 1 Case No: 1:20-cv-07419 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; JCG Foods; Mar-Jac Poultry; Mountaire; Koch; O.K. Foods; Pilgrim; Perdue; Simmons; Tyson; Tyson Sales and Distribution, Inc.; Wayne Farms | Allen Harim Foods; Keystone Foods; Fieldale Farms; Amick Farms; Peco Foods; George's Farms | Count 1 (Sherman Act); Count 2 (Sherman Act for Output Restriction); Count 3 (Sherman Act for GA Dock Manipulation); Count 4 (Sherman Act for Bid Rigging, Price Fixing); Count 5 (Sherman Act for Bid Rigging); Count 6 (Sherman Act for Bid Rigging, Price Fixing); Count 12 (Illinois Antitrust Act); Count 15 (Illinois Consumer Fraud And Deceptive Business Practices Act) |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Caesars Enterprise Services, LLC | Dkt No. 1 Case No: 1:20-cv-07423 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; JCG Foods; Mar-Jac Poultry; Mountaire; Koch; O.K. Foods; Pilgrim; Perdue; Simmons; Tyson; Tyson Sales and Distribution, Inc.; Wayne Farms | Allen Harim Foods; Keystone Foods; Fieldale Farms; Amick Farms; Peco Foods; George's Farms | Count 1 (Sherman Act); Count 2 (Sherman Act for Output Restriction); Count 3 (Sherman Act for GA Dock Manipulation); Count 4 (Sherman Act for Bid Rigging, Price Fixing); Count 5 (Sherman Act for Bid Rigging); Count 6 (Sherman Act for Bid Rigging, Price Fixing); Count 10 (Florida DUTPA); Count 11 (AZ State Antitrust Law); Count 12 (Illinois Antitrust Act); Count 13 (Minn. Antitrust Law); Count 14 (NY Gen. Bus. Law); Count 15 (Illinois Consumer Fraud And Deceptive Business Practices Act); Count 16 (CA Cartwright Act); Count 17 (CA UCL); Count 26 (Michigan Antitrust Reform Act); Count 27 (Missouri Merchandising Practices); Count 28 (Nev. UTPA); Count 29 (Nev. DTPA); 30 (NC Unfair Trade and Bus. Prac. Act); Count 31 (Kansas Restraint of Trade Act); Count 32 (Nebraska Junkin Act); Count 33 (Breach of Contract, Unjust Enrichment Against Tyson); Count 34 (Neb. Consumer Protection Act); Count 35 (Miss. Antitrust Stat.); Count 36 (Tenn. Trade Practices Act) |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Bojangles' Restaurants, Inc. and Bojangles Opco, LLC | ECF 4000 | Claxton; Mar-Jac; Marshall Durbin; George's; Agri Stats; Case; Foster Farms; Fieldale; Harrison; House of Raeford, Peco; Koch; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride, Sanderson; Simmons; Tyson, Wayne; Keystone Foods | Allen Harim; Amick | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count 1); Count 3 (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count 1); Count 4 (Violation Of 15 U.S.C. § 1 Against Bid-Rigging Defendants for Bid-Rigging and Price-Fixing); Count 6 (Violation Of 15 U.S.C. § 1 Against Georgia Dock Defendants And Bid-Rigging Defendants For Price-Fixing) |
| Pollo Operations, Inc | ECF 4227 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; Fieldale; George's; Marshall Durbin; Peco, Tip Top Poultry, Southern Hens, Rabobank | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count 1); Count 3 (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count 1); Count 4 (Sherman Act Claim for Bid Rigging, Pled in the Alternative to Count 1) |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| McLane Company, Inc.; McLane/Mid-Atlantic, Inc.; McLane/Midwest, Inc.; McLane Minnesota, Inc.; McLane New Jersey, Inc.; McLane/Eastern, Inc.; McLane/Suneast, Inc.; McLane Ohio, Inc.; McLane/Southern, Inc.; McLane/Western, Inc.; McLane Express, Inc.; Kinexo, Inc.; McLane Foodservice Distribution; Inc.; McLane Foodservice, Inc. | ECF 4133-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone; Koch; Mar-Jac; Marshall Durbin; Mountaire; O.K. Foods; Perdue Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne Fieldale; George's; Peco | Amick; Rabobank | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restrictions); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid-Rigging) |
| John Soules Foods, Inc. and John Soules Acquisitions LLC | ECF4803; 4804 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone; Koch; Mar-Jac; Marshall Durbin; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; Fieldale; George's; Peco; Rabobank[9] | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restrictions); Count 3 (Sherman Act for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid-Rigging) |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Red Bird Farms Distribution Company | ECF 1 in 1:21-cv-00261 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; ; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Amick; Fieldale; George's; Marshall Durbin; Peco; Pilgrim's; Rabobank; Tip Top; Southern Hens | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count I); Count 3 (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count I); Count 5 (Bid-rigging; Pled in the Alternative to Count I); Count 6 (Georgia Doc and Bid Rigging) |
| Restaurant Services, Inc. | ECF 4180 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire Farms; O.K. Foods; Peco; Perdue; Sanderson Farms; Simmons; Tyson; Wayne Farms | Allen Harim; Amick; Fieldale Farms; Keystone Foods; Pilgrim's Pride | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid Rigging); Count 6 (Sherman Act Claim for Price Fixing) |
| Supply Management Services, Inc. | ECF 4385 | Agri Stats; Amick; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Keystone; Koch; Mar-Jac; Marshall Durbin; Mountaire; O.K. Foods; Peco; Perdue; Sanderson; Simmons; Tyson; Wayne | Allen Harim; Pilgrim's Pride | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction, Pled in the Alternative); Count 3 (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative) ; Count 4 (Sherman Act Claim for Bid-Rigging); Count 6 (Sherman Act Claim for Price-Fixing, Pled in the Alternative) |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Zaxby's Franchising LLC | ECF 4410 | Claxton; Mar-Jac; Marshall Durbin; Agri Stats; Case; Foster Farms; Harrison; House of Raeford; Koch; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride, Sanderson; Simmons; Tyson; Wayne; Fieldale; Keystone Foods | Amick; George's; Peco; Allen Harim | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count 1); Count 3 (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count 1); Count 4 (Violation Of 15 U.S.C. § 1 Against Bid-Rigging Defendants for Bid-Rigging and Price-Fixing); Count 6 (Violation Of 15 U.S.C. § 1 Against Georgia Dock Defendants And Bid-Rigging Defendants For Price-Fixing) |
| Domino's Pizza LLC and Domino's Pizza Distribution LLC | ECF 4958-1 | Claxton; Mar-Jac; Marshall Durbin; Agri Stats; Case; Foster Farms; Harrison; House of Raeford; Koch; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride, Sanderson; Simmons; Tyson; Wayne; Keystone Foods | Amick; George's; Peco; Fieldale; Allen Harim | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count 1); Count 3 (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count 1); Count 4 (Violation Of 15 U.S.C. § 1 Against Bid-Rigging Defendants for Bid-Rigging and Price-Fixing); Count 6 (Violation Of 15 U.S.C. § 1 Against Georgia Dock Defendants And Bid-Rigging Defendants For Price-Fixing) |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Amory Investments LLC | ECF 4799; 4800 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone; Koch; MarJac; Marshall Durbin; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Amick; Fieldale; George's; Peco; Rabobank[10] | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restrictions); Count 3 (Sherman Act for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid-Rigging) |
| Compass Group USA, Inc. | ECF 5420 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne | Fieldale; George's; Peco; Allen Harim | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction, Pled in the Alternative to Count 1); Count 3 (Sherman Act Claim for GA Dock Manipulation, Pled in the Alternative to Count 1); Count 4 (Sherman Act Claim for Bid-Rigging and Price-Fixing) Count 5 (Alternative Bid-Rigging, Pled in the Alternative to Count 4); Count 6 (Violation Of 15 U.S.C. § 1 Against Georgia Dock Defendants And Bid-Rigging Defendants For Price-Fixing) |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Aramark Food and Support Services Group, Inc. | ECF 4844-1 | Agri Stats; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Case | Fieldale; Amick; George's; Keystone; Allen Harim | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 4 (Sherman Act Claim for Bid-Rigging and Price-Fixing); Count 5 (Sherman Act Claim for Bid-Rigging); Count 6 (Sherman Act Claim for Bid-Rigging, GA Dock Manipulation) |
| Costco Wholesale Corporation | ECF 5013-1 | Agri Stats; Claxton; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Sanderson; Simmons; Amick; George's; Peco; Case | Fieldale; Pilgrim's; Tyson; Foster Farms; Perdue; Wayne; Keystone; Allen Harim | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 4 (Sherman Act Claim for Bid-Rigging and Price-Fixing); Count 5 (Sherman Act Claim for Bid-Rigging); Count 6 (Sherman Act Claim for Bid-Rigging, GA Dock Manipulation) |
| Feeser's, Inc. | ECF 4501 | Agri Stats; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Case | Fieldale; Amick; George's; Peco; Keystone; Allen Harim | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 4 (Sherman Act Claim for Bid-Rigging and Price-Fixing); Count 5 (Sherman Act Claim for Bid-Rigging); Count 6 (Sherman Act Claim for Bid-Rigging, GA Dock Manipulation) |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Gordon Food Service, Inc. | ECF 4973-1 | Agri Stats; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Sanderson; Simmons; Tyson; Wayne; Case | Fieldale; Amick; George's; Peco; Keystone; Pilgrim's Pride; Allen Harim | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 4 (Sherman Act Claim for Bid-Rigging and Price-Fixing); Count 5 (Sherman Act Claim for Bid-Rigging); Count 6 (Sherman Act Claim for Bid-Rigging, GA Dock Manipulation) |
| Glazier Foods Company | ECF 4973-1 | Agri Stats; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Sanderson; Simmons; Tyson; Wayne; Case | Fieldale; Amick; George's; Peco; Keystone; Pilgrim's Pride; Allen Harim | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 4 (Sherman Act Claim for Bid-Rigging and Price-Fixing); Count 5 (Sherman Act Claim for Bid-Rigging); Count 6 (Sherman Act Claim for Bid-Rigging, GA Dock Manipulation) |
| McDonald's Corporation | ECF 4956-1 | Agri Stats; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Wayne; Case | Fieldale; Amick; George's; Peco; Tyson; Keystone; Allen Harim | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 4 (Sherman Act Claim for Bid-Rigging and Price-Fixing); Count 5 (Sherman Act Claim for Bid-Rigging); Count 6 (Sherman Act Claim for Bid-Rigging, GA Dock Manipulation) |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Panda Restaurant Group, Inc. | ECF 4843-1 | Agri Stats; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Case | Fieldale; Amick; George's; Peco; Keystone; Allen Harim | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 4 (Sherman Act Claim for Bid-Rigging and Price-Fixing); Count 5 (Sherman Act Claim for Bid-Rigging); Count 6 (Sherman Act Claim for Bid-Rigging, GA Dock Manipulation) |
| Poultry Products Company of New England, LLC | ECF 4954-1 | Agri Stats; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Case | Fieldale; Amick; George's; Peco; Keystone; Allen Harim | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 4 (Sherman Act Claim for Bid-Rigging and Price-Fixing); Count 5 (Sherman Act Claim for Bid-Rigging); Count 6 (Sherman Act Claim for Bid-Rigging, GA Dock Manipulation) |
| Poultry Products Company, LLC | ECF 4954-1 | Agri Stats; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Case | Fieldale; Amick; George's; Peco; Keystone; Allen Harim | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 4 (Sherman Act Claim for Bid-Rigging and Price-Fixing); Count 5 (Sherman Act Claim for Bid-Rigging); Count 6 (Sherman Act Claim for Bid-Rigging, GA Dock Manipulation) |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Poultry Products Company of Connecticut, LLC | ECF 4954-1 | Agri Stats; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Case | Fieldale; Amick; George's; Peco; Keystone; Allen Harim | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 4 (Sherman Act Claim for Bid-Rigging and Price-Fixing); Count 5 (Sherman Act Claim for Bid-Rigging); Count 6 (Sherman Act Claim for Bid-Rigging, GA Dock Manipulation) |
| Poultry Products Company of Maine, LLC | ECF 4954-1 | Agri Stats; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Case | Fieldale; Amick; George's; Peco; Keystone; Allen Harim | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 4 (Sherman Act Claim for Bid-Rigging and Price-Fixing); Count 5 (Sherman Act Claim for Bid-Rigging); Count 6 (Sherman Act Claim for Bid-Rigging, GA Dock Manipulation) |
| Quality Supply Chain Co-op, Inc. | ECF 4842-1 | Agri Stats; Amick; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Peco; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Case | Fieldale; Keystone; Allen Harim | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 4 (Sherman Act Claim for Bid-Rigging and Price-Fixing); Count 5 (Sherman Act Claim for Bid-Rigging); Count 6 (Sherman Act Claim for Bid-Rigging, GA Dock Manipulation) |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Thurston Foods, Inc. | ECF 4816 | Agri Stats; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Case | Fieldale; Amick; George's; Peco; Keystone; Allen Harim | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 4 (Sherman Act Claim for Bid-Rigging and Price-Fixing); Count 5 (Sherman Act Claim for Bid-Rigging); Count 6 (Sherman Act Claim for Bid-Rigging, GA Dock Manipulation) |
| Wood-Fruitticher Grocery Company, Inc. | ECF 4845-1 | Agri Stats; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Tyson; Wayne; Case | Fieldale; Amick; George's; Peco; Keystone; Allen Harim | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 4 (Sherman Act Claim for Bid-Rigging and Price-Fixing); Count 5 (Sherman Act Claim for Bid-Rigging); Count 6 (Sherman Act Claim for Bid-Rigging, GA Dock Manipulation) |
| Cajun Operating Company d/b/a Church's Chicken | ECF 4253-1 | Agri Stats; Case; Claxton; Foster Farms; George's; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire Farms; O.K. Foods; Peco; Perdue; Sanderson Farms; Simmons; Tyson; Wayne Farms | Allen Harim; Amick; Fieldale Farms; Keystone Foods; Pilgrim's Pride; | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid Rigging); Count 6 (Sherman Act Claim for Price Fixing) |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| Buffalo Wild Wings, Inc. | ECF 4276-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Koch; Mar-Jac; Mountaire Farms; O.K. Foods; Perdue; Sanderson Farms; Simmons; Tyson; Wayne Farms | Allen Harim; Amick; Fieldale Farms; George's; Keystone Foods; Peco; Pilgrim's Pride; | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid Rigging); Count 6 (Sherman Act Claim for Price Fixing) |
| Sonic Industries Services Inc. | ECF 4277-1 | Agri Stats; Case; Claxton; Fieldale Farms; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire Farms; O.K. Foods; Peco; Perdue; Sanderson Farms; Simmons; Tyson; Wayne Farms | Allen Harim; Amick; Pilgrim's Pride | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid Rigging); Count 6 (Sherman Act Claim for Price Fixing) |
| CKE Restaurants Holdings, Inc. | ECF 4298-1 | Agri Stats; Case; Claxton; Fieldale Farms; Foster Farms; George's; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire Farms; O.K. Foods; Peco; Perdue; Sanderson Farms; Simmons; Tyson; Wayne Farms | Allen Harim; Amick; Pilgrim's Pride | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid Rigging); Count 6 (Sherman Act Claim for Price Fixing) |
| Focus Brands, LLC | ECF 4309-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire Farms; O.K. Foods; Perdue; Sanderson Farms; Simmons; Tyson; Wayne Farms | Allen Harim; Amick; Fieldale Farms; George's; Peco; Pilgrim's Pride | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid Rigging); Count 6 (Sherman Act Claim for Price Fixing) |

| Plaintiff Name | Underlying Complaint (Reference is to Sealed Version, if applicable) | Named Defendants (Not Previously Dismissed) | Named Co-Conspirators (if any) | Causes of Action |
|---|---|---|---|---|
| The Cheesecake Factory Incorporated | ECF 4412-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire Farms; O.K. Foods; Perdue; Sanderson Farms; Simmons; Tyson; Wayne Farms | Allen Harim; Amick; Fieldale Farms; George's; Peco; Pilgrim's Pride | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid Rigging); Count 6 (Sherman Act Claim for Price Fixing) |
| Whatabrands LLC; Whataburger Restaurants LLC | ECF 4716-1 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire Farms; O.K. Foods; Perdue; Sanderson Farms; Simmons; Tyson; Wayne Farms | Allen Harim; Amick; Fieldale Farms; George's; Peco; Pilgrim's Pride | Count 1 (Sherman Act Claim for all Anticompetitive Conduct); Count 2 (Sherman Act Claim for Output Restriction); Count 3 (Sherman Act Claim for GA Dock Manipulation); Count 5 (Sherman Act Claim for Bid Rigging); Count 6 (Sherman Act Claim for Price Fixing) |
| Sodexo, Inc. and Sodexo Operations, LLC | ECF 5290 | Agri Stats; Case; Claxton; Foster Farms; Harrison; House of Raeford; Keystone Foods; Koch; Mar-Jac; Mountaire; O.K. Foods; Perdue; Pilgrim's Pride; Sanderson; Simmons; Wayne | Amick; Fieldale; George's; Marshall Durbin; Peco; Tyson | Count 1 (Sherman Act, for all Anticompetitive Conduct); Count 2 (Sherman Act, for Output Restriction, Pled in the Alternative); Count 3 (Sherman Act, for Georgia Dock Price-Fixing, Pled in the Alternative); Count 4 (Sherman Act, for Bid-Rigging and Price-Fixing, Pled in the Alternative); Count 5 (Sherman Act, for Bid-Rigging, Pled in the Alternative); Count 6 (Sherman Act, for Price-Fixing, Pled in the Alternative). |

*FN 5: Claims against the Rabobank Defendants were dismissed with prejudice. [ECF No. 5429]. A motion for entry of judgment under Fed. R. Civ. P. 54(b) has been filed. [ECF No. 5441].*

*FN 6: Claims against the Rabobank Defendants were dismissed with prejudice. [ECF No. 5429]. A motion for entry of judgment under Fed. R. Civ. P. 54(b) has been filed. [ECF No. 5441].*

*FN 7: Claims against the Rabobank Defendants were dismissed with prejudice. [ECF No. 5429]. A motion for entry of judgment under Fed. R. Civ. P. 54(b) has been filed. [ECF No. 5441].*

*FN 8: Claims against the Rabobank Defendants were dismissed with prejudice. [ECF No. 5429]. A motion for entry of judgment under Fed. R. Civ. P. 54(b) has been filed. [ECF No. 5441].*

*FN 9: Claims against the Rabobank Defendants were dismissed with prejudice. [ECF No. 5429]. A motion for entry of judgment under Fed. R. Civ. P. 54(b) has been filed. [ECF No. 5441].*

*FN 10: Claims against the Rabobank Defendants were dismissed with prejudice. [ECF No. 5429]. A motion for entry of judgment under Fed. R. Civ. P. 54(b) has been filed. [ECF No. 5441].*

**ANSWER**: Plaintiffs' "Chart of Direct Action Plaintiffs Cases" and accompanying Footnotes contain no factual allegations to which a response is required. Instead, this chart contains Plaintiffs' characterizations of named parties and claims included in more than 50 complaints filed by more than 85 DAPs or groups of DAPs. To the extent a response is required, Tyson admits that Plaintiffs purport to bring their actions against Defendants under various legal theories but deny that Plaintiffs accurately state those claims and/or are entitled to any of the requested relief. Tyson further denies each statement in the Chart that purports to describe a Claim or Count of the Complaint as being asserted against Tyson that is not named in the specific allegations of such Count. Tyson denies any remaining allegations in Plaintiffs' chart and accompanying Footnotes.

## III.    SUMMARY OF DAP FACTUAL ALLEGATIONS

### A.    Overview of the Broiler Industry

1.    *This is a case about a long-running and unlawful conspiracy in restraint of trade among some of America's largest broiler chicken producers. The conspiracy, which began at least as early as 2008 and continued through at least 2019, was multi-faceted and effectuated*

*through numerous inter-related unlawful contracts, combinations, agreements, and other instances of anticompetitive conduct. Through each of these unlawful agreements and anticompetitive acts – which are independently actionable in and of themselves – Defendants and their co-conspirators carried out an overarching conspiracy, the purpose and effect of which was to fix, raise, stabilize, and maintain prices of broiler chicken meat throughout the United States.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson denies any remaining allegations in this Paragraph.

2. *Defendants' multi-faceted conspiracy manifested itself in many different ways and was implemented through various inter-related overt acts, each of which had the effect of unreasonably restraining trade, artificially inflating and maintaining prices, and reducing competition in the broiler chicken industry. They reduced the supply of broiler chickens into the market. They rigged bids on broiler chicken sales. They manipulated both individual customer price matrixes as well as an industry price index – specifically, the Georgia Dock price index – with respect to the prices of chicken they sold to purchasers such as Plaintiffs. They shared confidential and competitively sensitive information regarding production, capacity, and pricing. These and other unlawful agreements and anticompetitive acts were undertaken in furtherance of the overarching conspiracy and shared the common goal of fixing, raising, stabilizing, and maintaining prices of broiler chicken meat throughout the United States.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson denies any remaining allegations in this Paragraph.

3. *Eight of the participants in the alleged conspiracy – Fieldale Farms, Peco, George's, Amick, Tyson, Pilgrim's Pride, Mar-Jac, and Harrison Poultry – have already agreed to pay over $180 million to settle claims by a putative class of direct purchasers alleging that they participated in this conspiracy.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. To the extent the allegations in this Paragraph purport to quote, characterize, or

50

describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson admits that it has settled claims by a putative class of direct purchasers. Tyson denies any remaining allegations in this Paragraph.

4. *Fourteen senior executives from at least five of the Defendants, as well as Defendants Claxton and Koch, are already under criminal indictment by the United States Department of Justice in connection with their roles in the conspiracy, and the Department of Justice also made clear that its investigation is ongoing. The Department of Justice's investigation has already resulted in a guilty plea by Defendant Pilgrim's for charges of price-fixing and bid-rigging. Pilgrim's was fined $107.9 million by to the Department of Justice for its criminal violations of the Sherman Act. Defendant Tyson is also cooperating with the Department of Justice's investigation and has applied for leniency under the Antitrust Division's corporate leniency program.[11] Other federal agencies, such as the United States Department of Agriculture, and several state Attorneys General, including Florida, Washington, and Alaska, have also launched investigations and separate lawsuits aimed at Defendants' conspiracy.*

*FN 11: Tyson, by seeking leniency, had to admit to the Department of Justice that it had committed a criminal violation of the federal antitrust laws:*

*Does a leniency applicant have to admit to a criminal violation of the antitrust laws before receiving a conditional leniency letter? Yes. The Division's leniency policies were established for corporations and individuals 'reporting their illegal antitrust activity,' and the policies protect leniency recipients from criminal conviction. Thus, the applicant must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes, before it will receive a conditional leniency letter.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. To the extent the allegations in this Paragraph, including in the footnote, purport to quote, characterize, or describe documents or other sources, such documents and sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson admits it applied for leniency for certain conduct pursuant to the United States DOJ Antitrust Division's Corporate Leniency Policy in 2019.

Tyson denies that such reported conduct extended to the scope of the conspiracy as alleged in the Complaint and that such reported conduct affected any DAPs with active claims against Tyson.

5.     *Broilers," "chickens," or "broiler chickens" are chickens raised for meat consumption to be slaughtered before the age of 13 weeks, and which may be sold in a variety of forms, including fresh or frozen, raw or cooked, whole or in parts, or as a meat ingredient in a value added product, but excluding chicken that is grown, processed, and sold according to kosher, free range, or organic standards. Broiler chickens constitute approximately 98% of all chicken meat sold in the United States. The broiler industry is a highly concentrated market with over $30 billion in annual wholesale revenue.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. This Paragraph contains Plaintiffs' explanation of a defined term used in their Complaint, to which no response is required. To the extent a response is required, Tyson admits that Plaintiffs have defined "Broilers" in their Complaint as described in this Paragraph. Tyson admits that Broilers[2] constitute a substantial portion of all chicken meat sold in the United States, but lacks knowledge or information sufficient to form a belief as to the precise percentage alleged in this Paragraph and therefore denies those allegations. Tyson denies the allegation that the "broiler industry is a highly concentrated market" and lacks knowledge or information sufficient to form a belief as to the precise dollar amount of annual wholesale revenue alleged in this Paragraph and therefore denies those allegations. Tyson denies any remaining allegations in this Paragraph.

6.     *Defendants own or tightly control all aspects of broiler chicken production, including the laying of eggs; the hatching of chicks; the raising of chicks; the slaughtering of chickens; and processing and distributing the meat. The technology and process of industrial-scale broiler chicken production is well known among Defendants, and all Defendants use the same types of equipment and processes.*

---

[2] To the extent Tyson refers to "Broilers" in this Answer, Tyson refers to Broilers as defined by Plaintiffs in the Complaint.

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that it has ownership and control over aspects of its production, including processing and selling. Tyson denies any remaining allegations in this Paragraph.

7. *High barriers to entry exist in the broiler chicken market. Entry into the market would cost in excess of $100 million, and no company has created a new poultry company from scratch in decades.*

**ANSWER:** As the term "high barriers" is imprecise, Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations. To the extent that the allegations in this Paragraph relate to barriers or costs that third parties would face in entering the Broiler market, Tyson lacks knowledge or information sufficient to form a belief as to the truth of those allegations and therefore denies those allegations. Tyson denies any remaining allegations in this Paragraph.

**B.    Summary of Defendants' Conspiracy**

8. *Defendants implemented their conspiracy through multiple means and methods. For example:*

- *Defendants coordinated unprecedented cuts in the supply of broiler chickens, including the purposeful destruction of breeder hens and eggs;*

- *Defendants collusively and fraudulently manipulated the Georgia Dock price index in order to raise prices to customers;*

- *Defendants rigged bids submitted to customers through multiple avenues, including the exchange of confidential information regarding the bids they were submitting, or intended to submit, so that supposedly competitive bids were aligned;*

- *Defendants shared confidential and competitively sensitive information regarding production, capacity, and pricing through direct communications and intermediaries such as Agri-Stats, under the cover of M&A activity, and during discussions about sale/purchase transactions with each other;*

- *Defendants utilized so-called strategic alliances and joint ventures, including the Tip Top Alliance and Southern Hens, to further restrict broiler chicken supply and share confidential and competitively sensitive information;*

- *Defendants coordinated direct purchases of broiler chickens from one another and from smaller producers in order to soak up excess supply that could potentially depress market prices, including the adoption of "Buy vs. Grow" strategies;*

- *Defendants exported hatching eggs to Mexico and other foreign countries against their own self-interest with the intent of artificially reducing supply and increasing the price of broiler chicken in the United States;*

- *Defendants coordinated a move away from annual fixed-price contracts for some customers to contracts that allowed Defendants to take advantage of price fluctuations from market indices that could be manipulated; and*

- *Defendants coordinated denial of letters of credit requested by customers.*

*While Defendants may have utilized multiple avenues, they all had the common goal of fixing, raising, stabilizing, and maintaining prices of broiler chicken meat throughout the United States.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph

contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no

response is required. To the extent a response is required, Tyson denies such characterizations

and/or conclusions. Tyson denies any remaining allegations in this Paragraph.

*9. Numerous "plus factors" also existed in the broiler industry during the relevant period. "Plus factors" are economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are generally inconsistent with unilateral conduct but largely consistent with explicitly coordinated action. The "plus factors" present in the broiler industry during the relevant period include, but are not limited to: (i) direct communications between Defendants regarding confidential production information which allowed Defendants to disseminate actual and false information regarding supply reductions to purchasers of broilers; (ii) coordinated manipulation by Defendants of the Georgia Dock price index; (iii) Defendants' coordinated conduct to rig bids to purchasers of broilers; (iv) extensive information sharing through Agri Stats and other means; (v) numerous opportunities for Defendants to collude in a variety of forums; (vi) inter-Defendant trades and purchases that often were against independent self-interest; (vii) increased exports of broilers to other countries that were also often against independent self-interest; and (viii) multiple industry characteristics that facilitated collusion, such as high vertical integration, high barriers to entry, high industry consolidation and concentration, inelastic supply and demand, a lack of significant substitutes for chicken,*

*depressed economic conditions, and a history of government investigations and collusive conduct.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson denies any remaining allegations in this Paragraph.

### C. Defendants' Coordinated Supply Restrictions

10. *Defendants curtailed the supply of chickens in the market on the front end via coordinated and unprecedented cuts at the top of the supply chain. This included the coordinated and collusive reduction of production capacity and jointly and collusively reducing "breeder flocks" that produce chickens ultimately slaughtered for meat consumption.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that it plans and executes its Broiler production each year based on its own, unilateral business judgment of what is in its independent interest. Tyson denies that any such production decisions were coordinated or made pursuant to a conspiracy or agreement. Tyson denies any remaining allegations in this Paragraph.

11. *Historically, when faced with low market prices, Defendants relied primarily on mechanisms that temporarily reduced production at the middle or end of the supply chain, such as reducing eggs placements, killing newly-hatched chicks, or idling processing plants. These mechanisms still allowed Defendants to ramp up production within weeks if market conditions changed.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that Tyson plans and executes its Broiler production each year based on its own, unilateral business judgment of what is in its independent interest. Tyson denies that any such production decisions were coordinated or made pursuant to a conspiracy or agreement. Tyson denies any remaining allegations in this Paragraph.

12.     *Prior to the relevant period, Defendants' pattern of annual increases in chicken production became so entrenched over decades of experience that by the 2000s, a widely-repeated industry quip was that life only held three certainties: death, taxes, "and 3% more broilers."*

**ANSWER:** To the extent this Paragraph purports to quote, characterize, or describe a document, such document speaks for itself, and Tyson denies any characterization or description inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph, and therefore denies those allegations.

13.     *A leading industry publication noted in early 2009 that chicken "production in the U.S. used to be just like government spending, it never went down and cutbacks only resulted in slowing the rate of growth, but not anymore," because for "the first time in decades, total broiler production in 2008 remained virtually unchanged from the year before."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

14.     *In 2008, faced with dropping prices and low profits, Defendants collectively began cutting their ability to ramp up production by materially reducing their breeder flocks.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those

allegations. Tyson admits that Tyson plans and executes its Broiler production each year based on its own, unilateral business judgment of what is in its independent interest. Tyson denies that any such production decisions were coordinated or made pursuant to a conspiracy or agreement. Tyson denies any remaining allegations in this Paragraph.

15.     *Defendants abandoned their traditional, short-term production cuts and instituted material changes that increased ramp-up times by up to 18 months. This was a significant shift in their behavior and signaled their commitment to the conspiracy.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that it plans and executes its Broiler production each year based on its own, unilateral business judgment of what is in its independent interest. Tyson denies that any such production decisions were coordinated or made pursuant to a conspiracy or agreement. Tyson denies any remaining allegations in this Paragraph.

16.     *Defendants' collective market-changing cuts to breeder flocks – a first round from 2008 to early 2009, and a subsequent round from 2011 to 2012 as the conspiracy continued into the next decade – effectively eliminated each Defendant's ability to meaningfully increase supply for years.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that Tyson plans and executes its Broiler production each year based on its own, unilateral business judgment of what is in its independent interest. Tyson denies that

57

any such production decisions were coordinated or made pursuant to a conspiracy or agreement.

Tyson denies any remaining allegations in this Paragraph.

17.     *Defendants' joint efforts to impose supply-side "discipline" included, among other things, open signaling in the form of public statements by their senior executives about their individual commitment to production cuts as well as the importance of instituting and maintaining this "discipline" across the industry as a whole. Defendants' public statements on the need for, and benefits of, industry-wide supply "discipline" marked a significant departure from past industry practice. Indeed, Defendants continuously urged one another to "lower supply in order to offset reduced demand and to support higher market prices."*

**ANSWER:** Tyson denies the allegations in this Paragraph.

18.     *Defendants were able to facilitate, monitor and police their coordinated output restriction scheme by, among other things, communicating through third parties including Agri Stats and Urner Barry (a private commodity price reporting service).*

**ANSWER:** Tyson denies the allegations in this Paragraph.

19.     *Defendants also were able to facilitate, monitor and police their coordinated output restriction scheme by using reports purchased, at significant cost, from Agri Stats, a former subsidiary of global pharmaceutical company Eli Lilly & Co.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

20.     *Agri Stats collected detailed, proprietary data from all Defendants, including data detailing the housing used, breed of chicks, average size, and production and breeder flock levels.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that, at certain times during the relevant period, Agri Stats collected information from Tyson, and that Agri Stats reported anonymized and historical information to Tyson for pro-competitive benchmarking purposes. Tyson refers to Agri Stats reports for their contents and denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

21.     *The Agri Stats data was in theory supposed to be anonymized. But by design, Defendants could identify and track their purported competitors' production and output activities to ensure that others were following suit on implementing the coordinated output*

58

*restrictions. Defendants devoted significant time and resources to working collectively to de-anonymize Agri Stats data.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiff's characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that Agri Stats reported anonymized and historical information to Tyson for pro-competitive benchmarking purposes. Tyson refers to Agri Stats reports for their contents and denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

22. *Defendants' coordinated effort reflected their expectation that higher profit margins would result from coordinated production cuts. Defendants expected that coordinated production cuts would also allow them to more quickly capitalize on those inflated non-competitive prices.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

### D. Defendants' Manipulation of the Georgia Dock Price Index

23. *Another aspect of Defendants' conspiracy to illegally increase and maintain chicken prices was the manipulation and artificial inflation of prices on the "Georgia Dock," a widely used weekly benchmark price compiled and published by the Poultry Market News division (the "PMN") of the Georgia Department of Agriculture (the "GDA").*

**ANSWER:** Tyson denies the conspiracy alleged in this Paragraph. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson admits that the Georgia Department of Agriculture published the Georgia Dock index at certain times during the relevant period. Tyson further admits that the Court found that the Georgia Department of Agriculture is a government entity and the Poultry

Market News is a department of a government entity. *In re Broiler Chicken Antitrust Litig.*, 702 F. Supp. 3d 635, 682, 687 (N.D. Ill. 2023) (hereinafter "*Broilers*") Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

24.     *Starting in 2008, the Defendants, with respect to some customers, also began moving away from long-term fixed- price contracts to shorter-term contracts with variable pricing pegged to one of several purportedly "fair" price indices. They made this move away from fixed-price contracts particularly with respect to certain distributor and grocer customers.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants, and/or third parties, and therefore Tyson denies those allegations. To the extent this Paragraph purports to quote, characterize, or describe any documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson admits that the pricing mechanisms under contracts with customers are negotiated vigorously and change over time based upon the interests of the customer and Tyson's own judgment of its independent business interests. Tyson denies any remaining allegations in this Paragraph.

25.     *Many chicken buyers across the nation paid prices based on the Georgia Dock, while many more paid prices that were influenced by the Georgia Dock.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that certain "chicken buyers" may have purchased chicken from Tyson on terms related to the Georgia Dock. Tyson denies any remaining allegations in this Paragraph.

26.     *Unlike other price indices available to chicken buyers, the Georgia Dock benchmark price was a self-reported number from a group of chicken producers – Defendants*

*Pilgrim's Pride, Tyson, Sanderson Farms, Koch Foods, Claxton Poultry, Harrison Poultry, Mar-Jac, Wayne Farms, and Fieldale (collectively, the "Georgia Dock Defendants").*

**ANSWER:** Tyson admits that in the past it submitted requested information to the Georgia Department of Agriculture for the Department's use in compiling the Georgia Dock Index, but denies any characterization thereof. Tyson further admits that the Court found that the Georgia Department of Agriculture only collected information from the nine chicken producers listed in this Paragraph, and no other Defendant submitted information. *Broilers*, 702 F. Supp.3d at 682-83. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

27.     *Senior executives from at least seven of the Georgia Dock Defendants were members of a private-sector "Poultry Market News Advisory Committee," which played a role in the compilation and manipulation of the Georgia Dock benchmark price.*

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson admits that at various points in the relevant period, at the request of the Georgia Department of Agriculture, Tyson had an employee representative on the Poultry Market News Advisory Committee. Tyson further admits that the Court found that the Georgia Department of Agriculture created the Poultry Market News Advisory Committee, and it was comprised of representatives from certain of Georgia Dock Defendants. *Broilers*, 702 F. Supp.3d at 682-83. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

28.     *Defendants – including both the Georgia Dock Defendants and the other Defendants – took advantage of the inflated, non-competitive prices reported on the Georgia Dock index. They used the inflated Georgia Dock prices to achieve higher prices for those purchasers who set their prices on purportedly "fair" price indices. Defendants also used the inflated prices reported on the Georgia Dock index to justify the higher prices they charged to their contract purchasers.*

61

**ANSWER:** Tyson denies the allegations in this Paragraph.

29.     In addition to their fraudulent submissions to the PMN, all of the Georgia Dock
Defendants that sold chicken to Plaintiffs fraudulently misrepresented, omitted, and failed to
disclose critical, non-public information about the Georgia Dock. In particular, they
misrepresented that the Georgia Dock was or indicated the "market" price for broiler chicken,
when in fact they knew they did not submit their own actual offering prices to the PMN. They
also failed to disclose to Plaintiffs their ability to control the PMN by virtue of the Advisory
Committee (which consisted solely of executives of Georgia Dock Defendants), the fact that the
Georgia Dock price each week was based solely on Defendants' bald assertions with no
verification, and the fact that Defendants were manipulating the Georgia Dock price.

**ANSWER:** Tyson denies the allegations in this Paragraph.

**E.     Defendants' Big-Rigging Conduct**

30.     Defendants engaged in bid-rigging and price-fixing targeted at customers that
purchased Broilers in large volumes. Starting at least as early as August 2011 and continuing
until at least 2019 (the "Bid-Rigging Conduct Period"), Defendants conspired to fix prices and
rig and submit artificially high bids to purchasers in order to increase prices, and in turn,
Defendants' profits.

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph

contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no

response is required. To the extent a response is required, Tyson denies such characterizations

and/or conclusions. Tyson admits it applied for leniency for certain conduct pursuant to the

United States DOJ Antitrust Division's Corporate Leniency Policy in 2019. Tyson denies that

such reported conduct extended to the scope of the conspiracy as alleged in the Complaint and

that such reported conduct affected any DAPs with active claims against Tyson. Tyson denies

any remaining allegations in this Paragraph.

31.     As a result of Defendants' price-fixing and bid-rigging conduct, Defendants were
able to exact significantly higher prices from purchasers than they otherwise would have in an
honest, competitive market.

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or

legal conclusions to which no response is required. To the extent a response is required, Tyson

denies such characterizations and/or conclusions. Tyson denies any remaining allegations in this

Paragraph.

32. *As alleged in more detail herein, the Department of Justice, after investigating and criminally prosecuting Defendants' bid-rigging and price-fixing scheme, determined that victims of the bid-rigging conspiracy included "[r]estaurants, grocery retailers and others who purchased large volumes of broiler chicken" who "received bids from or negotiated prices and other price-related terms, including discount levels, with Suppliers directly" and that these victims included "[h]undreds—if not thousands—of companies [that] directly purchased broiler chicken products from the conspirators in this case during the conspiracy."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize

or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson denies any remaining

allegations in this Paragraph.

**F.** **Defendants' Other Anticompetitive Conduct, Industry Characteristics That Facilitate Collusion, and the Effect of Defendants' Conspiracy**

33. *All aspects of Defendants' conspiracy were instigated in a market with numerous characteristics making it highly susceptible to collusion, including: (a) a highly-concentrated market dominated by vertically integrated producers; (b) high barriers to market entry; (c) a standardized, commodity product where competition is based principally on price; (d) inelastic demand for the product; (e) numerous opportunities for cartel members to conspire through a number of regularly scheduled trade association meetings; (f) extensive sharing about Broiler breederstock supply and slaughter levels, forecasting data, pricing inventory, and exports through the Strategic Alliance and Southern Hens, Inc.; and (g) access to competitors' data through Agri Stats.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph

contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no

response is required. To the extent a response is required, Tyson denies such characterizations

and/or conclusions. Tyson denies any remaining allegations in this Paragraph.

34. *Defendants' collusive agreements, anticompetitive acts, and understandings throughout the relevant period enabled Defendants, directly and through their wholly-owned or controlled subsidiaries and affiliates, to reap the benefits of their illegal conduct through the sale of broiler chickens at inflated non-competitive prices. Defendants continuously urged one another to "lower supply in order to offset reduced demand and to support higher marker prices."*

63

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

35.     *Through their collusive, coordinated anticompetitive actions, Defendants negated the economic benefits of increased competition. Defendants' conduct resulted in their customers, including all DAPs, paying at least hundreds of millions of dollars in overcharges to Defendants.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson denies any remaining allegations in this Paragraph.

## IV.     PARTIES

### A.     Plaintiffs[12]

> *FN 12: Each DAP is the sole proponent of the paragraphs in this section describing itself. No other DAP necessarily agrees with or adopts the descriptions or allegations contained therein.*

36.     *Each DAP along with its place of incorporation, principal place of business, and other information pertinent to its claims is listed as follows in alphabetical order:*

**ANSWER:** This Paragraph contains no factual allegations to which a response is required. To the extent a response is required, Tyson admits that Plaintiffs purport to list each DAP along with its place of incorporation, principal place of business, and other information pertinent to its claims in alphabetical order, but denies any remaining allegations in this Paragraph.

37. *Plaintiff Ahold Delhaize USA, Inc. is a Delaware corporation with a principal place of business in Quincy, Massachusetts. Ahold Delhaize is the direct or indirect parent company of several local retail companies (including, without limitation, Food Lion, Giant Martin's, Giant Food, Hannaford, Peapod, Stop & Shop, Bottom Dollar, Harvey's, and Sweetbay) that own and operate retail grocery businesses and sell and sold Broiler chicken and other products. Ahold Delhaize brings this action on its own behalf and on behalf of its assignors (including, without limitation, Delhaize America, LLC; Food Lion, LLC; Hannaford Bros. Co., LLC; Bottom Dollar Food Northeast, LLC; Retained Subsidiary One, LLC; Delhaize America Distribution, LLC; Ahold U.S.A., Inc.; Giant Food Stores, LLC; Giant of Maryland LLC; Peapod, LLC; The Stop & Shop Supermarket Company LLC; Retail Business Services LLC; and C & S Wholesale Grocers, Inc.), each of which directly purchased Broiler chicken from one or more Defendants and their co-conspirators during the relevant period. The references in this Complaint to "Ahold Delhaize" or "Plaintiffs" includes Ahold Delhaize's assignors.*

**ANSWER:** The Plaintiff listed in this Paragraph has not named Tyson as a Defendant in the Track 2 Direct Action Plaintiffs' Second Amended Consolidated Complaint ("Track 2 SACC") and therefore has no active claims against Tyson. This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that it sold chicken products to the Plaintiff listed in this Paragraph during the relevant period. Tyson denies any remaining allegations in this Paragraph.

38. *Plaintiff ALDI, Inc. ("ALDI") is an Illinois corporation with a principal place of business in Batavia, Illinois. During the time relevant to Plaintiff's claims, Plaintiff directly purchased Broiler chicken in the United States from one or more of the Defendants and/or their co-conspirators and sustained injury and damage to its business as a proximate result of the antitrust violations and other unlawful activities alleged in this Complaint.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this Paragraph has no active claims against Tyson. This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in

this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that it sold the Plaintiff listed in this Paragraph chicken products during the relevant period. Tyson denies any remaining allegations in this Paragraph.

39. *Plaintiff Amigos Meat Distributors, LP is a Texas limited partnership with its principal place of business in Houston, Texas.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

40. *Plaintiff Amigos Meat Distributors East, LP is a Texas limited partnership with its principal place of business in Atlanta, Georgia.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

41. *Plaintiff Amigos Meat Distributors West, LP is a Texas limited partnership with its principal place of business in Phoenix, Arizona.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

42. *Plaintiff Amigos Meat & Poultry, LLC is a Texas limited-liability company with its principal place of business in Chicago, Illinois.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the Paragraph and therefore denies those allegations.

43. *Plaintiff Amory Investments LLC is a Delaware limited liability company which, on or around March 31, 2021, acquired various assets of Maines Paper & Food Service, Inc., and its affiliates (collectively "Maines"), including the claims that are the subject of this action. Maines was a direct purchaser of Broilers from several Producer Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.*

**ANSWER:** This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants

and/or third parties, and therefore Tyson denies those allegations. Tyson admits that it sold

chicken products to Maines Paper & Food Service, Inc. during the relevant period. Tyson denies

those allegations. Tyson denies any remaining allegations in this Paragraph.

44. *Plaintiff Anaheim Wings, LLC d/b/a Hooters of Anaheim, is a Kansas limited liability company doing business in Anaheim, California. Plaintiff Anaheim Wings, LLC purchased chicken indirectly from Defendants and/or their co-conspirators including Tyson and Perdue in California during the relevant period. As such, during the time period relevant to Plaintiff's claims, Anaheim Wings, LLC, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. Anaheim Wings, LLC is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this

Paragraph has no active claims against Tyson. This Paragraph contains Plaintiff's

characterizations of its claims and/or legal conclusions to which no response is required. To the

extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson

lacks knowledge or information sufficient to form a belief as to the truth of any allegations in

this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies

those allegations. Tyson denies any remaining allegations in this Paragraph.

45. *Plaintiff Aramark Food and Support Services Group, Inc. ("Aramark") is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania. Aramark is a food service provider operating in all fifty states and in 19 countries around the world. Aramark brings this action on its own behalf and pursuant to assignments with Sysco Corporation, Single Source, Inc. and their affiliates and predecessors with respect to direct purchases from Defendants made for Aramark's food services. Sysco Corporation and Single Source, Inc. on behalf of themselves and their affiliates and predecessors have assigned federal antitrust claims based on those direct purchases to Aramark.*

**ANSWER:** This Paragraph contains Plaintiff's characterizations of its claims and/or

legal conclusions to which no response is required. To the extent a response is required, Tyson

denies such characterizations and/or conclusions. Tyson lacks knowledge or information

sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other

Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that it sold chicken products to the Plaintiff listed in this Paragraph and to certain of its purported assignors during the relevant period. Tyson denies any remaining allegations in this Paragraph.

46. *Plaintiff Barbeque Integrated, Inc. d/b/a Smokey Bones Bar & Fire Grill is a Delaware corporation with its principal place of business in Aventura, Florida. During the Conspiracy period, Smokey Bones operated over 70 restaurants in multiple states. Restaurants like Smokey Bones serve their proprietary chicken products in multiple locations throughout the country. During the Conspiracy Period, Smokey Bones purchased Broilers directly from Defendants and their co-conspirators, Defendants' and their co-conspirators' subsidiaries and affiliates, entities owned or controlled by Defendants and their co-conspirators, or agents controlled by Defendants, Defendants' subsidiaries and affiliates, and their co-conspirators. To ensure consistency in taste and quality of its products across its locations, Smokey Bones, like many restaurants, negotiated and contracted directly with Defendants for the production and supply of its chicken, according to Smokey Bones' unique recipes and specifications. These negotiations and contracts governed the price and quantity at which Defendants would supply Smokey Bones with Broilers. Smokey Bones provided Defendants with instructions regarding each step of the preparation and packaging process for its chicken products, including the recipe for Smokey Bones' products and specific requirements for packaging and labeling Smokey Bones' products. The contracts entered into between Smokey Bones and Defendants set forth the agreed price and volume of chicken products to be sold to Smokey Bones. Smokey Bones brings this action on its own behalf, and additionally and alternatively, as assignee of McLane Foodservice, Inc. f/k/a MBM Corporation and its affiliates ("McLane" or "Assignor"). Smokey Bones purchased millions of dollars' worth of Broilers directly from Defendants and their co-conspirators at artificially inflated prices throughout the Conspiracy Period. Smokey Bones has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct. Smokey Bones was damaged by Defendants' anticompetitive and illegal conduct by paying artificially inflated prices for Broilers. Smokey Bones brings this action to recover the overcharges it paid for Broilers purchased during the Conspiracy Period.*

**ANSWER:** This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that it sold chicken products to the purported assignor of the Plaintiff listed in this Paragraph during the relevant period. Tyson denies any remaining allegations in this Paragraph.

47. *Plaintiff BJ's Wholesale Club, Inc.is a Delaware corporation with its principal place of business in Westborough, Massachusetts. BJ's brings this action on its own behalf and as the assignee of Burris Logistics, a food-service redistributor that, during the relevant period, purchased chicken directly from Defendants for resale to BJ's.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

48. *Plaintiff Bob Evans Farms, Inc. ("Bob Evans") is a Delaware Corporation with its principal place of business in New Albany, Ohio. Bob Evans brings this action on its own behalf and as assignee of Gordon Food Service, Inc., who purchased chicken on Bob Evans' behalf directly from Defendants and/or their co-conspirators during the relevant time period and assigned its claims arising out of these purchases to Bob Evans. During the time period relevant to Bob Evans' claims, Bob Evans and/or its assignors directly purchased chicken in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damages as a proximate result of the antitrust violations alleged in this Complaint. Both Bob Evans and Gordon Food Service, Inc. are a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1. The references in this Complaint to "Bob Evans" refer collectively to Bob Evans Farms, Inc. and its assignor.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this Paragraph has no active claims against Tyson. This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that it sold chicken products to the Plaintiff listed in this Paragraph and to its purported assignor during the relevant period. Tyson denies any remaining allegations in this Paragraph.

49. *Plaintiff Bojangles' Restaurants, Inc. ("BRI") is a North Carolina corporation with its principal place of business in Charlotte, North Carolina. Plaintiff Bojangles Opco, LLC is a Delaware limited liability company with its principal place of business in Charlotte, North Carolina ("Opco", and together with BRI these parties are referred to herein as ("Bojangles"). Bojangles owns, operates, or alternatively is the franchisor (and trademark licensor) of, more than 700 Bojangles branded restaurants in the United States (the "Bojangles Branded Restaurants"). Restaurants like Bojangles serve their proprietary chicken products in multiple locations throughout the country. To ensure consistency in taste and quality of its products*

*across hundreds of locations, Bojangles', like many restaurants, negotiated and contracted directly with Defendants for the production and supply of chicken for the Bojangles Branded Restaurants, according to Bojangles' unique recipes and specifications. These negotiations and contracts governed the price and quantity at which Defendants would supply the Bojangles Branded Restaurants with Broilers (as that term is defined in the Consolidated Complaint). Bojangles provided Defendants with instructions regarding each step of the preparation and packaging process for its chicken products, including the recipe for Bojangles' products and specific requirements for packaging and labeling Bojangles' proprietary products. The contracts entered into between Bojangles and Defendants and co-conspirators set forth the agreed price and volume of chicken products to be sold to Bojangles. Bojangles brings this action on its own behalf, and additionally and alternatively, as assignee of McLane Foodservice, Inc. f/k/a MBM Corporation and its affiliates ("McLane"), as well as the assignee of various franchisee owners and operators of franchised Bojangles Branded Restaurants ("Franchisee Assignors"). Bojangles purchased millions of dollars' worth of Broilers directly from Defendants and co-conspirators at artificially inflated prices throughout the Conspiracy Period. Bojangles has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct. Bojangles has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct. Bojangles was damaged by Defendants' anticompetitive and illegal conduct by paying artificially inflated prices for Broilers. Bojangles brings this action to recover the overcharges it paid for Broilers purchased during the Conspiracy Period.[13]*

> *FN 13: Bojangles' antitrust claims are predicated on all elements of Defendants' collusive conduct, including the bid-rigging that is the subject of the DOJ indictment. As alleged in the Indictment and recited in the Consolidated Complaint, Defendants engaged in bid-rigging conduct specifically targeted at Bojangles and other contract based customers. Bojangles solicited bids, negotiated terms, and contracted directly with Defendants for their proprietary chicken products, and assumed full responsibility to pay the contract obligations. Bojangles used distributors, including Pate Dawson Company ("Pate Dawson"), as purchasing agents, and the distributors were paid a set fee by Bojangles for their services. Bojangles understands that Direct Action Plaintiff Cheney Brothers, Inc. ("Cheney Brothers") is attempting to assert claims based on Bojangles' direct purchases. By joining in this consolidated pleading, Bojangles reserves all of its rights on this issue. Cheney Brothers is not a party to this footnote.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph and Footnote contain Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph and Footnote purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this

Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the Plaintiff listed in this Paragraph and to certain of its purported assignors during the relevant period. Tyson denies any remaining allegations in this Paragraph.

50. *Plaintiff Bonita Plaza Wings, LLC, doing business as Hooters of Plaza Bonita, is a California limited liability company doing business in National City, California. Plaintiff Bonita Plaza Wings, LLC purchased chicken indirectly from Defendants and/or their co-conspirators including Tyson and Perdue in California during the relevant period. As such, during the time period relevant to Plaintiff's claims, Bonita Plaza Wings, LLC, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. Bonita Plaza Wings, LLC is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this Paragraph has no active claims against Tyson. This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson denies any remaining allegations.

51. *Plaintiff Boston Market Corporation is a Delaware corporation with its principal place of business in Golden, Colorado. During the Conspiracy period, Boston Market operated over 450 stores across the country. Restaurants like Boston Market serve their proprietary chicken products in multiple locations throughout the country. During the Conspiracy Period, Boston Market purchased Broilers directly from Defendants and their co-conspirators, Defendants' and their co-conspirators' subsidiaries and affiliates, entities owned or controlled by Defendants and their co-conspirators, or agents controlled by Defendants, Defendants' subsidiaries and affiliates, and their co-conspirators. To ensure consistency in taste and quality of their products across hundreds of locations spanning multiple states, Boston Market, like many restaurants, negotiates and contracts directly with Defendants for the production and supply of their proprietary chicken according to Boston Market's unique recipes and specifications. These negotiations and contracts governed the price and quantity at which Defendants would supply Boston Market with Broilers. Boston Market provided Defendants with instructions regarding each step of the preparation and packaging process for its chicken*

*products, including the recipe for Boston Market products and specific requirements for packaging and labeling Boston Market products. The contracts entered into between Boston Market and Defendants set forth the agreed price and volume of chicken products to be sold to Boston Market. The agreements also state that should the agreement end, Boston Market must purchase all inventory of finished proprietary items and true up feed expenses purchased at Boston Market's direction. These provisions are put in place because the proprietary product Defendants produce and sell to Boston Market cannot be sold to any other customer. Boston Market brings this action on its own behalf, and additionally and alternatively, as assignee of Ben E. Keith Company d/b/a Ben E. Keith Foods, HAVI Global Solutions, Mattingly Foods, Inc., and McLane Foodservice, Inc. f/k/a MBM Corporation, Willow Run Foods, Inc., Sysco Corporation and the SYGMA Network, Inc., and their respective affiliates. Boston Market purchased millions of dollars' worth of Broilers directly from Defendants and their co-conspirators at artificially inflated prices throughout the Conspiracy Period. Boston Market has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct. Boston Market was damaged by Defendants' anticompetitive and illegal conduct by paying artificially inflated prices for Broilers. Boston Market brings this action to recover the overcharges it paid for Broilers purchased during the Conspiracy Period.[14]*

> *FN 14: DAPs Boston Market and Friendly's antitrust claims are predicated on all elements of Defendants' collusive conduct, including the bid-rigging that is the subject of the DOJ indictment. As alleged in the Indictment and recited in this Consolidated Complaint, Defendants engaged in bid-rigging conduct specifically targeted at Boston Market and Friendly's and other contract based customers. Boston Market and Friendly's solicited bids, negotiated terms, and contracted directly with Defendants for their proprietary chicken products, and assumed full responsibility to pay the contract obligations. Boston Market and Friendly's used distributors, including Maines Paper & Food Service, Inc., and its affiliates (collectively "Maines"), Systems Services of America, Inc ("SSA"), Services Group of America, Inc. ("SGA"), and US Foods (collectively "Certain Distributors"), as purchasing agents, and the Certain Distributors were paid a set fee by Boston Market and Friendly's for their services. Boston Market and Friendly's understand that Certain Distributors are attempting to assert claims based on Boston Market and Friendly's direct purchases. By joining in this consolidated pleading, Boston Market and Friendly's reserve their respective rights on this issue. US Foods, SSA, SGA, and Maines are not parties to this footnote.*

**ANSWER:** The Plaintiff listed in this Paragraph and Footnote has not named Tyson as a Defendant in the Track 2 SACC and therefore has no active claims against Tyson. Tyson denies the conspiracy alleged in the Complaint. This Paragraph and Footnote contain Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph and Footnote purport to quote, characterize, or describe

documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph and Footnote that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the Plaintiff listed in this Paragraph and to certain of its purported assignors during the relevant period. Tyson denies any remaining allegations in this Paragraph and Footnote.

52. *Plaintiff Carl Buddig & Co., Inc. is an Illinois corporation with its principal place of business in Homewood, Illinois. Throughout the relevant period, Buddig purchased chicken at artificially inflated prices directly from various Defendants, and their affiliates and co-conspirators, and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this Paragraph has no active claims against Tyson. This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson denies any remaining allegations in this Paragraph.

53. *Plaintiff Buffalo Wild Wings, Inc. ("BWW") is a Minnesota corporation with its headquarters in Atlanta, Georgia. BWW is a casual-dining restaurant chain with locations across the United States and other countries. During the relevant time period, BWW negotiated and contracted with Defendants for the production and supply of Broilers. BWW also utilized distributors to supply its restaurants in the United States with Broilers purchased on their behalf pursuant to these negotiations and contracts. BWW's distributors include McLane Company, Inc. and its subsidiaries ("McLane"), who purchased chicken from Defendants and/or their co-conspirators on BWW's behalf during the relevant time period, and assigned its claims arising out of these purchases to BWW. BWW brings this action on its own behalf, and as assignee of McLane. During the time period relevant to BWW's claims, BWW and/or its assignor directly purchased Broilers in the United States from Defendants and/or their co-conspirators, and sustained injury and damages as a proximate result of the antitrust violations and other unlawful activities alleged here. BWW is a "person" with standing to sue Defendants for damages and*

73

*other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1. The references in this Complaint to BWW refer collectively to BWW and its assignor.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this Paragraph has no active claims against Tyson. The Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the Plaintiff listed in this Paragraph and to its purported assignor during the relevant period. Tyson denies any remaining allegations in this Paragraph.

54.     *Plaintiff Caesars Enterprise Services, LLC is a Delaware corporation with its principal place of business in Las Vegas, Nevada. Throughout the relevant period, Caesars purchased chicken at artificially inflated prices directly from various Defendants, and their affiliates and co-conspirators, and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this Paragraph has no active claims against Tyson. This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson denies any remaining allegations in this Paragraph.

55.     *Plaintiff Cajun Operating Company d/b/a Church's Chicken ("Church's") is a Delaware corporation with its headquarters in Atlanta, Georgia. Church's owns and operates a*

*chain of quick service restaurants in the United States. During the relevant time period, Church's negotiated and contracted with Defendants for the production and supply of Broilers. Church's also utilized distributors to supply its restaurants with Broilers purchased on their behalf pursuant to these negotiations and contracts. These distributors include Performance Food Group, Inc. ("PFG") and Southwest Traders Inc. ("Southwest Traders") who have assigned their claims arising out of these transactions to Church's. Church's brings this action on its own behalf, and as assignee of PFG and its affiliates and Southwest Traders. During the time period relevant to Church's claims, Church's and/or its assignors directly purchased Broilers in the United States from Defendants and/or their co-conspirators, and sustained injury and damages as a proximate result of the antitrust violations and other unlawful activities alleged here. Church's is a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1. The references in this Amended Complaint to Church's refer collectively to Church's and its assignors.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this Paragraph has no active claims against Tyson. This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the Plaintiff listed in this Paragraph during the relevant period. Tyson denies any remaining allegations in this Paragraph.

56.     *Plaintiff Campbell Soup Company, is a New Jersey corporation with its principal place of business in Camden, New Jersey; Plaintiff Campbell Soup Supply Company L.L.C., is a Delaware corporation with its principal place of business in Camden, New Jersey (together, "Campbell"). Campbell is a manufacturer and marketer of high-quality, branded food and beverage products. Campbell was a direct purchaser of Broilers from several Producer Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this Paragraph has no active claims against Tyson. This Paragraph contains Plaintiff's

characterizations of its claims and/or legal conclusions to which no response is required. To the

extent a response is required, Tyson denies such characterizations and/or conclusions.  Tyson

lacks knowledge or information sufficient to form a belief as to the truth of any allegations in

this Paragraph that relate to other Defendants and/or third parties, and therefore denies those

allegations. Tyson denies any remaining allegations in this Paragraph.

57. *Plaintiff Captain D's LCC is a Delaware corporation with its principal place of business in Nashville, Tennessee. During the Conspiracy Period, over 500 Captain D's restaurants operated in multiple states. Restaurants like Captain D's serve their proprietary chicken products in multiple locations throughout the country. During the Conspiracy Period, Captain D's purchased Broilers directly from Defendants and their co-conspirators, Defendants' and their co-conspirators' subsidiaries and affiliates, entities owned or controlled by Defendants and their co-conspirators, or agents controlled by Defendants, Defendants' subsidiaries and affiliates, and their co-conspirators. To ensure consistency in taste and quality of its products across hundreds of locations spanning multiple states, Captain D's, like many restaurants, negotiated and contracted directly with Defendants for the production and supply of its chicken, according to Captain D's unique recipes and specifications. These negotiations and contracts governed the price and quantity at which Defendants would supply Captain D's with Broilers. Captain D's provided Defendants with instructions regarding each step of the preparation and packaging process for its chicken products, including the recipe for Captain D's products and specific requirements for packaging and labeling Captain D's products. The contracts entered into between Captain D's and Defendants set forth the agreed price and volume of chicken products to be sold to Captain D's. Captain D's brings this action on its own behalf, and additionally and alternatively, as assignee of McLane Foodservice, Inc. f/k/a MBM Corporation and its affiliates ("McLane" or "Assignor"). Captain D's purchased millions of dollars' worth of Broilers directly from Defendants and their co-conspirators at artificially inflated prices throughout the Conspiracy Period. Captain D's has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct. Captain D's was damaged by Defendants' anticompetitive and illegal conduct by paying artificially inflated prices for Broilers. Captain D's brings this action to recover the overcharges it paid for Broilers purchased during the Conspiracy Period.*

**ANSWER:** This Paragraph contains Plaintiff's characterizations of its claims and/or legal

conclusions to which no response is required. To the extent a response is required, Tyson denies

such characterizations and/or conclusions. To the extent the allegations in this Paragraph

purports to quote, characterize, or describe documents or other sources, such sources speak for

themselves, and Tyson denies any characterization or description that is inconsistent therewith.

Tyson lacks knowledge or information sufficient to form a belief as to the truth of any

allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the purported assignor of the Plaintiff listed in this Paragraph during the relevant period. Tyson denies any remaining allegations in this Paragraph and therefore denies those allegations.

58. *Plaintiff Checkers Drive-In Restaurants, Inc. ("Checkers") is a Delaware corporation with its principal place of business in Tampa, Florida. Checkers owns and operates restaurants that sell chicken. Checkers brings this action on its own behalf for chicken purchased from Defendants and/or their co-conspirators for its entire system during the relevant period, and additionally and alternatively, as assignee of its purchasing agents, who assigned their claims to Checkers. During the relevant period, McLane Company, Inc. and its affiliates, purchased chicken on Checkers' behalf from Defendants and/or their co-conspirators including, Koch Foods, Inc., OK Foods, Inc., Tyson Foods, Inc., and Wayne Farms, LLC, and assigned their claims arising out of these purchases to Checkers. Additionally, during the relevant time period, I Supply Company and its affiliates, and Customized Distribution, LLC (CDI) and its affiliates, purchased chicken on Checkers' behalf from Defendants and/or their co-conspirators including, Koch Foods, Inc., OK Foods, Inc., Tyson Foods, Inc., Wayne Farms, LLC, Case Farms, LLC, and Pilgrim's Pride Corporation, and assigned their claims arising out of these purchases to Checkers. As such, during the time period relevant to Plaintiffs' claims, Checkers and/or its assignors directly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damages as a proximate result of the antitrust violations alleged here. Checkers is a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this Paragraph has no active claims against Tyson. This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson admits that it sold chicken products to the Plaintiff listed in this Paragraph and to certain of its purported assignors during the relevant period. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson denies any remaining allegations in this Paragraph.

59. *Plaintiff Cheney Bros., Inc. ("Cheney") is a Delaware corporation with its principal place of business in Riviera Beach, Florida. Cheney is a food service distributor that*

77

*sells and distributes chicken to members of the food service industry. During the time period relevant to Plaintiffs' claims, Cheney directly purchased chicken in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. The references in this Complaint to Checkers refers collectively to Checkers and its assignors. Cheney is a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this Paragraph has no active claims against Tyson. This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the Plaintiff listed in this Paragraph during the relevant period. Tyson denies any remaining allegations in this Paragraph.

60.    *Plaintiff Chick-fil-A, Inc. ("CFA, Inc.") is a Georgia corporation with its principal place of business in Fulton County, Georgia. CFA, Inc. develops and supports a chain of retail quick-service restaurants specializing in a boneless breast of chicken sandwich, known as the Chick-fil-A® Chicken Sandwich. Since CFA, Inc. was founded by Truett Cathy in 1964, it has endeavored to conduct business with an emphasis on business ethics such as fairness, honesty, loyalty, and respect. The majority of Chick-fil-A branded restaurant businesses are owned and operated by independent franchisees, known as Operators. CFA, Inc. also operates various Chick-fil-A and other restaurants itself from time to time. Certain affiliates of Chick-fil-A operate certain Dwarf House restaurants and Truett's Grill restaurants, which are licensed to sell Chick-fil-A products. CFA, Inc. has also granted licenses to certain Chick-fil-A licensees. Collectively, these Chick-fil-A branded restaurants make up the "CFA Restaurant Group." Broiler chicken is the central ingredient in many of the proprietary products served at each Chick-fil-A branded restaurant, which include, but are not limited to, the Chick-fil-A® Chicken Sandwich, the Grilled Chicken Sandwich, the Spicy Chicken Sandwich, and the Chick-fil-A® Nuggets. These proprietary chicken products have directly contributed to the success and growth of the CFA Restaurant Group into one of the nation's largest quick service restaurant chains. To ensure consistency in taste and quality of products served across multiple locations spanning multiple states, CFA, Inc. negotiated and contracted directly with certain Defendants for the production and supply of its chicken according to CFA, Inc.'s unique recipes and specifications. These negotiations and contracts governed the price at which certain Defendants agreed to supply the CFA Restaurant Group with broiler chicken. CFA, Inc. provided certain Defendants with instructions regarding each step of the preparation and packaging process for the chicken products sold by the CFA Restaurant Group, including the recipe for those products and specific*

*requirements for packaging and labeling those products. CFA, Inc. also utilized distributors as Armada Supply Chain Solutions, LLC and Armada Warehouse Solutions, LLC (collectively "Armada"), Golden State Foods Corp. and Quality Custom Distribution Services, Inc. (collectively "GSF/QCD"), and Meadowbrook Meat Company, Inc. and McLane Foodservice, Inc. (collectively "MBM/McLane"), to serve the CFA Restaurant Group. For purposes of this action, Armada, GSF/QCD, and MBM/McLane have all assigned their claims arising out of these transactions to CFA, Inc. CFA, Inc. brings this action on its own behalf, and additionally and alternatively, as assignee of Armada, GSF/QCD, MBM/McLane, and their affiliates (collectively "Assignors"). All references in this Complaint to "CFA, Inc." or "Plaintiff" include Chick-fil-A, Inc.'s Assignors. CFA, Inc. and/or its Assignors purchased billions of dollars' worth of broiler chicken from Defendants and/or their co-conspirators throughout the relevant period at prices that were artificially inflated due to the conduct outlined below. As such, CFA, Inc. and the CFA Restaurant Group sustained injury and damages to their businesses as a proximate result of the antitrust violations and other unlawful activities alleged in this Complaint.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this Paragraph has no active claims against Tyson. This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the Plaintiff listed in this Paragraph during the relevant period. Tyson deniesany remaining allegations in this Paragraph.

61. *Plaintiff CKE Restaurants Holdings, Inc. ("CKE") is a Delaware corporation with its headquarters in Franklin, Tennessee. CKE runs and operates two quick service restaurant brands: Carl's Jr. and Hardee's, which together have more than 3,800 restaurants in 44 states. During the relevant time period, CKE negotiated and contracted with Defendants for the production and supply of Broilers. CKE also utilized distributors to supply its restaurants with Broilers purchased on their behalf pursuant to these negotiations and contracts. These distributors include McLane Company, Inc. and its affiliate Meadowbrook Meat Company (collectively, "McLane"), who has assigned its claims arising out of these transactions to CKE. CKE brings this action on its own behalf, and as assignee of McLane. During the time period*

79

*relevant to CKE's claims, CKE and/or its assignors directly purchased Broilers in the United States from Defendants and/or their co-conspirators, and sustained injury and damages as a proximate result of the antitrust violations and other unlawful activities alleged here. CKE is a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1. The references in this Amended Complaint to CKE refer collectively to CKE and its assignors.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this Paragraph has no active claims against Tyson. This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the Plaintiff listed in this Paragraph and to its purported assignor during the relevant period. Tyson denies any remaining allegations in this Paragraph.

62.     *Plaintiff Compass Group USA, Inc., is a Delaware corporation with its principal place of business in Charlotte, North Carolina. Compass Group USA, Inc. brings this action on behalf of itself and its subsidiaries, affiliates and divisions, including but not limited to Foodbuy, LLC (collectively, "Compass Group" or "Plaintiff"), and including as an assignee from Sysco Corporation, and its affiliates, subsidiaries, and predecessors (collectively referred to as "Sysco"), with respect to Sysco's direct purchases of Broilers from Defendants made for Compass Group. Based on those direct purchases, Sysco has assigned its federal antitrust claims to Compass Group. Even with regard to those Broiler purchases that are the subject of those claims assigned to it by Sysco, Compass Group often negotiated Broiler purchase prices and other material Broiler purchase terms directly with Defendants.*

**ANSWER:** This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants

and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the Plaintiff listed in this Paragraph and to its purported assignor during the relevant period. Tyson denies any remaining allegations in this Paragraph.

63. *Plaintiff Conagra Brands, Inc. is a Delaware corporation with its principal place of business in Chicago, Illinois. Conagra Brands, Inc. is one of North America's leading branded food companies. Its brands include Healthy Choice, Marie Callender's, Banquet, P.F. Chang's, Bertolli, Chef Boyardee, and Frontera, among others. Conagra directly purchased broiler chicken from Defendants, often subject to a bidding process by which Defendants and co-conspirators submitted proposed pricing and other material sales terms.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the Plaintiff listed in this Paragraph during the relevant period. Tyson denies any remaining allegations in this Paragraph.

64. *Plaintiff Costa Mesa Wings, LLC, d/b/a Hooters of Costa Mesa, is a Kansas limited liability company doing business in Costa Mesa, California. Plaintiff Costa Mesa Wings, LLC purchased chicken indirectly from Defendants and/or their co-conspirators including Tyson and Perdue in California during the relevant period. As such, during the time period relevant to Plaintiff's claims, Costa Mesa Wings, LLC, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. Costa Mesa Wings, LLC is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this Paragraph has no active claims against Tyson. This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson denies any remaining allegations in this Paragraph.

81

65.     Plaintiff Costco Wholesale Corporation ("Costco") is a Washington corporation with its principal place of business in Issaquah, Washington. Costco is a multinational corporation which operates a chain of membership-only warehouse retail stores.

**ANSWER:** The Plaintiff listed in this Paragraph has not named Tyson as a Defendant in the Track 2 SACC and therefore has no active claims against Tyson. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph and therefore denies those allegations.

66.     Plaintiff Cracker Barrel Old Country Store, Inc. is a Tennessee corporation with its principal place of business in Lebanon, Tennessee. Plaintiff CBOCS Distribution, Inc. is a Tennessee corporation and is the wholly-owned subsidiary of Cracker Barrel Old Country Store, Inc. Cracker Barrel Old Country Store, Inc. and CBOCS Distribution, Inc. are together referred to as "Cracker Barrel." During the Conspiracy Period, Cracker Barrel operated over 600 restaurants in multiple states. Restaurants like Cracker Barrel serve their proprietary chicken products in multiple locations throughout the country. To ensure consistency in taste and quality of its products across hundreds of locations spanning multiple states, Cracker Barrel, like many restaurants, negotiated and contracted directly with Defendants for the production and supply of its chicken according to Cracker Barrel's unique recipes and specifications. These negotiations and contracts governed the price and quantity at which Defendants would supply Cracker Barrel with Broilers. Cracker Barrel provided Defendants with instructions regarding each step of the preparation and packaging process for its chicken products, including the recipe for Cracker Barrel's products and specific requirements for packaging and labeling Cracker Barrel products. The contracts entered into between Cracker Barrel and Defendants set forth the agreed price and volume of proprietary chicken products to be sold to Cracker Barrel. Cracker Barrel brings this action on its own behalf, and additionally and alternatively, as assignee of Performance Food Group, Inc. and its affiliates ("PFG" or "Assignor"). Cracker Barrel purchased millions of dollars' worth of Broilers directly from Defendants and their co-conspirators at artificially inflated prices throughout the Conspiracy Period. Cracker Barrel purchased millions of dollars' worth of Broilers directly from Defendants and their co-conspirators at artificially inflated prices throughout the Conspiracy Period. Cracker Barrel has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct. Cracker Barrel was damaged by Defendants' anticompetitive and illegal conduct by paying artificially inflated prices for Broilers. Cracker Barrel brings this action to recover the overcharges it paid for Broilers purchased during the Conspiracy Period.

**ANSWER:** This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for

themselves, and Tyson denies any characterization or description that is inconsistent therewith.
Tyson lacks knowledge or information sufficient to form a belief as to the truth of any
allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore
denies those allegations. Tyson admits that it sold chicken products to the Plaintiff listed in this
Paragraph during the relevant period. Tyson denies any remaining allegations in this Paragraph.

67. *Plaintiff Darden Restaurants, Inc. is a Florida corporation with its principal place of business in Orlando, Florida. Darden is the world's largest company-owned and operated full-service restaurant company. Through various subsidiaries, Darden operates over 1,750 restaurants in the United States and Canada, including Olive Garden, LongHorn Steakhouse, The Capital Grille, Yard House, Seasons 52, Bahama Breeze, Eddie V's Prime Seafood, and Cheddar's Scratch Kitchen-brand restaurants.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the
truth of the allegations in this Paragraph and therefore denies those allegations.

68. *Plaintiff Domino's Pizza LLC is a Michigan limited liability company and Domino's Pizza Distribution LLC is a Delaware limited liability company (collectively, "Domino's"), both with their principal place of business in Ann Arbor, Michigan. Domino's owns, operates, or performs the functions and obligations of the franchisor under the Domino's system of more than 6,000 Domino's branded restaurants in the United States (the "Domino's Branded Restaurants"). Restaurants like the Domino's Branded Restaurants serve their proprietary chicken products in multiple locations throughout the country. During the Conspiracy Period, Domino's purchased Broilers directly from Defendants and their co-conspirators, Defendants' and their co-conspirators' subsidiaries and affiliates, entities owned or controlled by Defendants and their co-conspirators, or agents controlled by Defendants, Defendants' subsidiaries and affiliates, and their co-conspirators. To ensure consistency in taste and quality of its products across hundreds of locations, Domino's negotiated and contracted directly with Defendants for the production and supply of chicken for the Domino's Branded Restaurants, according to Domino's unique recipes and specifications. These negotiations and contracts governed the price and quantity at which Defendants would supply the Domino's Branded Restaurants with Broilers. Domino's provided Defendants with instructions regarding each step of the preparation and packaging process for its chicken products, including the recipe for Domino's products and specific requirements for packaging and labeling Domino's proprietary products. The contracts entered into between Domino's and Defendants and co-conspirators set forth the agreed price and volume of chicken products to be sold to Domino's. Domino's purchased over a billion dollars' worth of Broilers directly from certain Defendants and co-conspirators at artificially inflated prices throughout the Conspiracy Period. Domino's has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct. Domino's was damaged by Defendants' anticompetitive and illegal conduct by paying artificially inflated prices for Broilers. Domino's brings this action to recover the overcharges it paid for Broilers purchased from Defendants and co-conspirators during the Conspiracy Period.*

**ANSWER:** This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the Plaintiff listed in this Paragraph during the relevant period. Tyson denies any remaining allegations in this Paragraph and therefore denies those allegations.

69. *Plaintiff Downtown Wings, LLC, previously doing business as Hooters of Downtown LA, is a California Limited-liability company that did business in Los Angeles, California. Plaintiff Downtown Wings, LLC purchased chicken indirectly from Defendants and/or their co-conspirators including Tyson and Perdue in California during the relevant period. As such, during the time period relevant to Plaintiff's claims, Downtown Wings, LLC, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. Downtown Wings, LLC is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this Paragraph has no active claims against Tyson. This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson denies any remaining allegations in this Paragraph.

70. *Plaintiff El Pollo Loco, Inc. ("EPL") is a Delaware corporation with its principal place of business in Costa Mesa, California. During the Conspiracy Period, EPL over 480 El*

84

*Pollo Loco restaurants operated in multiple states. Restaurants like EPL serve their proprietary chicken products in multiple locations throughout the country. During the Conspiracy Period, EPL purchased Broilers directly from Defendants and their co-conspirators, Defendants' and their co-conspirators' subsidiaries and affiliates, entities owned or controlled by Defendants and their co-conspirators, or agents controlled by Defendants, Defendants' subsidiaries and affiliates, and their co-conspirators. To ensure consistency in taste and quality of its products across hundreds of locations spanning multiple states, EPL, like many restaurants, negotiated and contracted directly with Defendants for the production and supply of its chicken, according to EPL's unique recipes and specifications. These negotiations and contracts governed the price and quantity at which Defendants would supply EPL with Broilers. EPL provided Defendants with instructions regarding each step of the preparation and packaging process for its chicken products, including the recipe for EPL's products and specific requirements for packaging and labeling EPL's products. The contracts entered into between EPL and Defendants set forth the agreed price and volume of chicken products to be sold to EPL. EPL brings this action on its own behalf and as the assignee of suppliers/distributors McLane Foodservice, Inc. and Testa Produce, Inc. (collectively, "Supplier/Distributor Assignors"), as well as the assignee of franchisee owner/operators of franchised EPL Branded Restaurants. EPL purchased millions of dollars' worth of Broilers directly from Defendants and their co-conspirators at artificially inflated prices throughout the Conspiracy Period. EPL has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct. EPL was damaged by Defendants' anticompetitive and illegal conduct by paying artificially inflated prices for Broilers. EPL brings this action to recover the overcharges it paid for Broilers purchased during the Conspiracy Period.*

**ANSWER:** This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the Plaintiff listed in this Paragraph and to certain of its purported assignors during the relevant period. Tyson denies any remaining allegations in this Paragraph.

71.     *Plaintiff EMA Foods Co., LLC is a Mississippi limited liability company with its principal place of business in Tupelo, Mississippi.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

72. *Plaintiff Feeser's Inc. ("Feeser's") is a Pennsylvania corporation with its principal place of business in Harrisburg, Pennsylvania. Feeser's is an independent food distribution company serving the Mid-Atlantic region, with product lines including meat, seafood, beverages, and produce. Feeser's brings this action on its own behalf and as the assignee of Holly Poultry LLC; State Street Poultry & Provisions LLC; A. Esposito Inc.; Hanover Foods Corp.; Burris Philadelphia, Inc,; and Dot Foods, Inc. food-service redistributors that, during the relevant period, purchased Broilers directly from Defendants for resale to Feeser's. Holly Poultry LLC; State Street Poultry & Provisions LLC; A. Esposito Inc.; Hanover Foods Corp.; Burris Philadelphia, Inc.; and Dot Foods, Inc. have assigned claims arising out of those purchases to Feeser's.*

**ANSWER:** This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the Plaintiff listed in this Paragraph during the relevant period. Tyson denies any remaining allegations in this Paragraph and therefore denies those allegations.

73. *Plaintiff FIC Restaurants, Inc. is a Delaware corporation with its principal place of business in Wilbraham, Massachusetts. During the Conspiracy period, Friendly's operated over 150 restaurants in multiple states. Restaurants like Friendly's serve their proprietary chicken products in multiple locations throughout the country. During the Conspiracy Period, Friendly's purchased Broilers directly from Defendants and their co-conspirators, Defendants' and their co-conspirators' subsidiaries and affiliates, entities owned or controlled by Defendants and their co-conspirators, or agents controlled by Defendants, Defendants' subsidiaries and affiliates, and their co-conspirators. To ensure consistency in taste and quality of their products across hundreds of locations spanning multiple states, Friendly's, like many restaurants, negotiates and contracts directly with Defendants for the production and supply of their proprietary chicken according to Friendly's unique recipes and specifications. These negotiations and contracts governed the price and quantity at which Defendants would supply Friendly's with broilers. Friendly's provided Defendants with instructions regarding each step of the preparation and packaging process for its chicken products, including the recipe for Friendly's products and specific requirements for packaging and labeling Friendly's products. The contracts entered into between Friendly's and Defendants set forth the agreed price and volume of chicken products to be sold to Friendly's. Friendly's purchased millions of dollars' worth of Broilers directly from Defendants and their co-conspirators at artificially inflated*

*prices throughout the Conspiracy Period. Friendly's has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct. Friendly's was damaged by Defendants' anticompetitive and illegal conduct by paying artificially inflated prices for Broilers. Friendly's brings this action to recover the overcharges it paid for Broilers purchased during the Conspiracy Period.*

**ANSWER:** This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson denies any remaining allegations.

74.     *Plaintiff Focus Brands LLC ("Focus") is a Delaware corporation with its headquarters in Atlanta, Georgia. Focus runs and operates seven brands, including well known restaurant brands like Moe's Southwest Grill, McAlister's Deli, and Schlotzsky's. During the relevant time period, Focus negotiated and contracted with Defendants for the production and supply of Broilers. Focus also utilized distributors to supply its restaurants with Broilers purchased on their behalf pursuant to these negotiations and contracts. These distributors include Reinhart Foodservice LLC and Performance Food Group, Inc. (collectively, "PFG"), Gordon Food Service, Inc. ("GFS"), and Ben E. Keith Company ("BEK"), who have each assigned their claims arising out of these transactions to Focus. Focus brings this action on its own behalf, and as assignee of PFG, GFS, and BEK, and their affiliates (collectively, "Assignors"). During the time period relevant to Focus' claims, Focus and/or its Assignors directly purchased Broilers in the United States from Defendants and/or their co-conspirators, and sustained injury and damages as a proximate result of the antitrust violations and other unlawful activities alleged here. Focus is a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1. The references in this Amended Complaint to Focus refer collectively to Focus and its assignors.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this Paragraph has no active claims against Tyson. This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the

extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the Plaintiff listed in this Paragraph and to certain of its purported assignors during the relevant period. Tyson denies any remaining allegations in this Paragraph.

75.     *Plaintiff Gaslamp Wings, LLC, previously doing business as Hooters of San Diego, is a Kansas limited liability company that previously did business in San Diego, California. Plaintiff Gaslamp Wings, LLC purchased chicken indirectly from Defendants and/or their co-conspirators including Tyson and Perdue in California during the relevant period. As such, during the time period relevant to Plaintiff's claims, Gaslamp Wings, LLC, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. Gaslamp Wings, LLC is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this Paragraph has no active claims against Tyson. This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson denies any remaining allegations in this Paragraph.

76.     *Plaintiff Gibson, Greco & Wood, Ltd. is a Louisiana corporation with its principal place of business in East Baton Rouge Parish, Baton Rouge, LA. Plaintiff Gibson, Greco & Wood, Ltd. brings this action on its own behalf and as assignee of the following entities, who have assigned their claims to Gibson, Greco & Wood, Ltd.: Blue Sky Management Company, LLC Wings-Up of Siegen, LLC; Wings-Up of West Monroe, LLC; Wings-Up of Baton Rouge, LLC; Wings-Up on the Westbank, LLC; Wings-Up of Lafayette, LLC; Wings-Up of Denham, LLC; Wings-Up of Slidell, LLC; Wings-Up of Boardwalk, LLC; and Wings-Up of Houma, LLC (collectively, "Gibson, Greco &Wood, Ltd. Assignors"). Gibson, Greco & Wood,*

*Ltd. brings this action on its own behalf for its purchases of chicken during the relevant time period. In addition, and alternatively, Gibson, Greco & Wood, Ltd. brings this action as assignee of its purchasing agents, Ben E. Keith Company and Bay Valley Foods, LLC (itself and as successor to Naturally Fresh, Inc.), who purchased chicken on Gibson, Greco & Wood, Ltd. Assignors' behalf during the relevant time period, from Defendants and/or their co-conspirators including Tyson, George's, and OK Foods, and who assigned their claims arising out of these purchases to Hooters of America, LLC, who subsequently assigned those claims to Plaintiff Gibson, Greco & Wood, Ltd. During the time relevant to Plaintiff's claims, Gibson, Greco & Wood, Ltd. and/or its assignors, directly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. The references in this Complaint to "Gibson, Greco & Wood, Ltd." refer collectively to Gibson, Greco & Wood, Ltd. and its assignors. Each of Plaintiff Gibson, Greco & Wood, Ltd., the Gibson, Greco & Wood, Ltd. Assignors, Bay Valley Foods, LLC, Naturally Fresh, Inc., Ben E. Keith Company, and Hooters of America, LLC, is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this Paragraph has no active claims against Tyson. This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the Plaintiff listed in this Paragraph during the relevant period. Tyson denies any remaining allegations in this Paragraph.

77. *Plaintiff Golden Corral Corporation is a North Carolina corporation with its principal place of business in Raleigh, North Carolina. During the Conspiracy Period, over 400 Golden Corral branded restaurants operated in multiple states. Restaurants like Golden Corral serve their proprietary chicken products in multiple locations throughout the country. During the Conspiracy Period, Golden Corral purchased Broilers directly from Defendants and their co-conspirators, Defendants' and their co-conspirators' subsidiaries and affiliates, entities owned or controlled by Defendants and their co-conspirators, or agents controlled by Defendants, Defendants' subsidiaries and affiliates, and their co-conspirators. To ensure consistency in taste and quality of its products across hundreds of locations spanning multiple states, Golden Corral, like many restaurants, negotiated and contracted directly with Defendants for the production and supply of its chicken, according to Golden Corral's unique recipes and specifications. These negotiations and contracts governed the price and quantity at which Defendants would supply Golden Corral with Broilers. Golden Corral provided Defendants with instructions regarding each step of the preparation and packaging process for its chicken products, including the recipe*

*for Golden Corral's products and specific requirements for packaging and labeling Golden Corral proprietary products. The contracts entered into between Golden Corral and Defendants and co-conspirators set forth the agreed price and volume of chicken products to be sold to Golden Corral. Golden Corral brings this action on its own behalf, and additionally and alternatively, as assignee of McLane Foodservice, Inc. f/k/a MBM Corporation and its affiliates ("McLane" or "Assignor"). Golden Corral purchased millions of dollars' worth of Broilers directly from Defendants and co-conspirators at artificially inflated prices throughout the Conspiracy Period. Golden Corral has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct. Golden Corral was damaged by Defendants' anticompetitive and illegal conduct by paying artificially inflated prices for Broilers. Golden Corral brings this action to recover the overcharges it paid for Broilers purchased during the Conspiracy Period.*

**ANSWER:** This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the purported assignor of the Plaintiff listed in this Paragraph during the relevant period. Tyson denies any remaining allegations in this Paragraph.

78. *Plaintiffs Gordon Food Service, Inc. and Glazier Foods Company (together, "GFS" or "Plaintiffs") bring this action under the federal antitrust laws against the Defendants identified below and incorporate by reference the factual allegations and reservations of rights contained in the Direct Action Plaintiffs' Amended Consolidated Complaint and Demand for Jury Trial, filed in In re Broiler Antitrust Litigation, Civil Action No. 1:16-cv-08637 (ECF 4243; ECF 4244). Gordon Food Service, Inc. is a Michigan corporation with its principal place of business in Wyoming, Michigan. Gordon Food Service, Inc. is the largest family-operated broadline food distribution company in North America. Glazier Foods Company is a Texas corporation with its principal place of business in Houston, Texas, which was acquired by Gordon Food Service, Inc. in 2014. Glazier Foods Company is a leading foodservice provider and one of the largest full-line independent food distributors in the United States.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiffs listed in this Paragraph have no active claims against Tyson. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the Plaintiffs listed in this Paragraph during the relevant period. Tyson denies any remaining allegations in this Paragraph.

79.     *Plaintiff Hollywood Wings, LLC, d/b/a Hooters of Hollywood, is a Kansas limited liability company doing business in Hollywood, California. Plaintiff Hollywood Wings, LLC purchased chicken indirectly from Defendants and/or their co-conspirators including Tyson and Perdue in California during the relevant period. As such, during the time period relevant to Plaintiff's claims, Hollywood Wings, LLC, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. Hollywood Wings, LLC is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this Paragraph has no active claims against Tyson. This Paragraph contains Plaintiff's characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions.  Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson denies any remaining allegations in this Paragraph.

80. *Plaintiff Hooters of Americat, LLC is a Georgia limited-liability company with its principal place of business in Atlanta, Georgia. Hooters of America, through its affiliates, owns and operates restaurants that sell chicken. Hooters of America brings this action on its own behalf for its purchases of chicken during the relevant time period. In addition, and alternatively, Hooters of America brings this action as assignee of its purchasing agent, Ben E. Keith who purchased chicken on Hooters of America's behalf during the relevant time period, from Defendants and/or their co-conspirators including Tyson and Pilgrim's Pride, and who assigned its claims arising out of these purchases to Hooters of America; and as assignee of its purchasing agent, Naturally Fresh, Inc., who purchased chicken on Hooters of America's behalf during the relevant time period from Defendants and/or their co-conspirators including Tyson, Pilgrim's Pride and Perdue, and who assigned its claims arising out of these purchases to Hooters of America. During the time period relevant to Plaintiff's claims, Hooters of America and/or its assignors, directly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. The reference in this Complaint to "Hooters of America" refer collectively to Hooters of America, LLC and its assignors. Hooters of America is a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this Paragraph has no active claims against Tyson. This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson denies any remaining allegations in this Paragraph.

81. *Plaintiff Hooters Management Corporation is a Florida corporation with its principal place of business in Clearwater, Florida. Hooters Management Corporation brings this action on its own behalf and as assignee of the following entities, which have assigned their claims to Hooters Management Corporation: Hooters of Clearwater, Inc.; Hooters II, Inc.; Hooters III, Inc.; Hooters of Port Richey, Inc.; Hooters of Brandon, Inc.; Hooters of North Tampa, Inc.; Hooters of Spring Hill, Inc.; Hooters of South Tampa, Inc.; Hooters on 4th Street, Inc. (f/k/a Hooters on Roosevelt, Inc.); Hooters of Channelside, Inc.; Hooters of John's Pass, Inc.; Hooters of Clearwater Beach, Inc.; Hooters of Wells Street, Inc.; Hooters of Downers Grove, Inc.; Hooters of Orland Park, Inc.; Hooters on Golf, Inc.; Hooters on Golf Holding Co.; Hooters of Oak Lawn, Inc.; Hooters of Lansing, Inc.; Hooters on Higgins, Inc.; Hooters of Aurora, Inc.; Hooters of Joliet, Inc.; Hooters of Melrose Park, Inc.; Hooters of Countryside, Inc.; Hooters of Gurnee, Inc.; Hoots of Cicero, Inc.; Hooters of 33rd Street, Inc.; Hooters of Manhattan, Ltd.; Hooters of Manhattan Inc.; Tyrone Hooters, Ltd.; Hooters of Vernon Hills, Inc.; Hooters of Crystal Lake, Inc.; Hooters of Palm Harbor, Inc.; Hooters Management*

*Holding Co.; and Hooters Foods, Inc. These entities purchased chicken indirectly from Defendants and/or their co-conspirators including Koch, Tyson, and Pilgrim's Pride in Florida, New York, and Illinois, and assigned their claims arising out of these purchases to Hooters Management Corporation. As such, during the time period relevant to Plaintiff's claims, Hooters Management Corporation and/or its assignors, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. Each of Plaintiff Hooters Management Corporation and its assignors is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein. The references in this Complaint to Hooters Management Corporation refer collectively to Hooters Management Corporation and its assignors.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this Paragraph has no active claims against Tyson. This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson denies any remaining allegations in this Paragraph.

82.     *Plaintiff Independent Purchasing Cooperative, Inc. ("IPC") is a Delaware non-profit purchasing cooperative headquartered within Miami-Dade County, Florida. IPC is a cooperative purchasing agent for its members, which are Subway® franchisees. Throughout the relevant period, IPC and its assignors sought bids from and contracted with Defendants for the production and supply of chicken products to be delivered to its members by certain distributors. IPC brings this action regarding Broilers purchased for its members as assignee of those distributors and processors who assigned their claims to IPC for Broilers purchases that IPC coordinated. During the conspiracy period, IPC or its assignors purchased chicken at artificially inflated prices directly from one or more of the Defendants and co-conspirators (as defined herein), and suffered injury to its business or property as a direct or proximate result of Defendants' and co-conspirators' wrongful conduct.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this Paragraph has no active claims against Tyson. This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in

this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the Plaintiff listed in this Paragraph during the relevant period.  Tyson denies any remaining allegations in this Paragraph.

83.     *Plaintiff Jetro Holdings, LLC is a Delaware limited-liability company with its principal place of business in College Point, New York. JRD Holdings, LLC, a Delaware limited liability holding company also located in College Point, New York, is the sole member of Jetro. Jetro is the nation's leading wholesale grocer. Jetro operates its wholesale grocery business through two divisions: Jetro Cash and Carry Enterprises, LLC and Restaurant Depot, LLC. Jetro Cash and Carry Enterprises, LLC is a wholesale supplier that manages "cash-and-carry" warehouses (i.e., a system of trading in which purchasers pay for goods in full in cash and carry them away at the time of purchase), which stock a broad variety of items, including both perishable and nonperishable bulk foods, food preparation equipment, and take-out containers. Restaurant Depot, LLC is a similar wholesale cash-and-carry operation with warehouses selling food, paper supplies, and tabletop items to independent food businesses nationwide.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

84.     *Plaintiff John Soules Foods, Inc., is a Texas corporation with its principal place of business in Tyler, Texas; Plaintiff John Soules Acquisitions, LLC, is a Georgia limited liability company with its principal place of business in Gainesville, Georgia, which on or around November 17, 2014, acquired the assets of Pro View Foods, LLC, and its affiliates, including claims that are the subject of this action (collectively "John Soules Foods"). John Soules Foods was a direct purchaser of Broilers from several Producer Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.*

**ANSWER:** This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson admits that it sold chicken products to the Plaintiff listed in this Paragraph during the relevant period.  Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson denies any remaining allegations in this Paragraph.

85.     *Plaintiff Kraft Heinz Foods Company is a Pennsylvania limited-liability company co-headquartered in Pittsburgh, Pennsylvania and Chicago, Illinois. Kraft Heinz is the third largest food and beverage company in the United States and the fifth largest in the world. In*

94

*October 2012, Kraft Foods, Inc. spun off Kraft Foods Group, Inc., as a North American grocery business, before changing its name from Kraft Foods, Inc. to Mondelez International, Inc. On July 2, 2015, through a series of transactions, Kraft Foods Group, Inc. merged with and into Kraft Heinz Foods Company (formerly known as H.J. Heinz Company). The Kraft Heinz Company is the parent company of operating entity Kraft Heinz Foods Company. In addition to the well-known Kraft and Heinz brands, Kraft Heinz's U.S. food brands include, among others, Oscar Mayer, Lunchables, Smart Made, and Smart Ones. Kraft Heinz directly purchased broiler chicken from Defendants, often subject to a bidding process by which Defendants and co-conspirators submitted proposed pricing and other material sales terms.*

**ANSWER:** This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the Plaintiff listed in this Paragraph during the relevant period. Tyson denies any remaining allegations in this Paragraph.

*86. Plaintiff Krispy Krunchy Foods, LLC ("Krispy Krunchy") is a Louisiana limited liability company with its principal place of business in Alexandria, Louisiana. Krispy Krunchy licenses its brand and fried chicken program to various retail outlets. During the time period relevant to Plaintiffs' claims, Krispy Krunchy directly purchased chicken in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the antitrust violations alleged here. Krispy Krunchy is a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this Paragraph has no active claims against Tyson. This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those

allegations. Tyson admits that it sold chicken products to the Plaintiff listed in this Paragraph

during the relevant period. Tyson denies any remaining allegations in this Paragraph.

87.     *Plaintiff L. Hart, Inc. is a Mississippi corporation with its principal place of
business in Water Valley, Mississippi.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in this Paragraph and therefore denies those allegations.

88.     *Plaintiff LTP Management Group, Inc. is a Florida corporation with its principal
place of business in Fort Myers, Florida. LTP Management Group, Inc. brings this action on its
own behalf and as assignee of the following entities, which have assigned their claims to LTP
Management Group, Inc.: Lags Enterprises, Inc. d/b/a Hooters of Ft Myers; Country Bumpkins,
Inc. d/b/a Hooters of Sunrise; Hooters of Sarasota, Inc.; Hooters of Bayside, Inc.; Hooters of
Pembroke Pines, Inc.; Waterfront Concepts, Inc. d/b/a Hooters of Ft Myers Beach; Hooters of
Doral, Inc.; Hooters of Cape Coral, Inc.; Hooters of BeachPlace, Inc.; Hooters of Cypress
Creek, Inc.; Hooters of Port Charlotte, Inc.; Hooters of Bradenton, Inc.; Hooters of Naples, Inc.;
Wings of Boca, Inc. d/b/a Hooters of Boca; Hooters of Miami, Inc. d/b/a Hooters of Coral
Gables; Wings of Hialeah, Inc. d/b/a Hooters of Hialeah; Hooters of Hollywood, Inc.; Lag's
Drinks of Orlando, Inc. d/b/a Adobe Gila's of Orlando; Lulu's Bait Shack of Fort Lauderdale,
Inc. d/b/a Lulus of Fort Lauderdale; Pigs Galore, LLC d/b/a The Royal Pig Pub and Kitchen.
These entities purchased chicken indirectly from Defendants and/or their co-conspirators
including Perdue, Amick, Tyson, Koch and Pilgrim's Pride in Florida and assigned their claims
arising out of these purchases to LTP Management Group, Inc. As such, during the time period
relevant to Plaintiff's claims, LTP Management Group, Inc. and/or its assignors, indirectly
purchased chicken in the United States from one or more Defendants and/or their co-
conspirators, and sustained injury and damages as a proximate result of the antitrust violations
alleged in this Complaint. Each of Plaintiff LTP Management Group, Inc. and its assignors is a
"person" with standing to sue Defendants for damages and/or other relief under Section 1 of the
Sherman Act, 15 U.S.C. § 1, and under the state laws referenced herein. Reference in this
Complaint to LTP Management Group, Inc. refers collectively to LTP Management Group, Inc.
and its assignors.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this

Paragraph has no active claims against Tyson. This Paragraph contains Plaintiff's

characterizations of its claims and/or legal conclusions to which no response is required. To the

extent a response is required, Tyson denies such characterizations and/or conclusions.  Tyson

lacks knowledge or information sufficient to form a belief as to the truth of any allegations in

this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson denies any remaining allegations in this Paragraph.

89. *Plaintiff Maximum Quality Foods, Inc. is a New Jersey corporation with its principal place of business in Linden, New Jersey.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

90. *Plaintiff McDonald's Corporation ("McDonald's") is a Delaware corporation with its principal place of business in Chicago, Illinois. McDonald's Corporation has established a global quick-service restaurant business operating under the McDonald's brand with over 39,000 restaurants in over 100 countries, including over 13,000 restaurants in the United States. McDonald's brings this action pursuant to assignments with The HAVI Group LP, HAVI Global Solutions LLC, Lopez Foods, Inc., Dorada Poultry LLC, DeOro Foods LLC, Armada Supply Chain Solutions, LLC, ATEC Systems, Ltd., and their affiliates and predecessors with respect to direct purchases made in the United States for McDonald's company-owned, franchised and developmental licensee locations in the United States, U.S. territories, and Latin America. The HAVI Group LP, HAVI Global Solutions LLC, Lopez Foods, Inc., Dorada Poultry LLC, DeOro Foods LLC, Armada Supply Chain Solutions, LLC and ATEC Systems, Ltd. on behalf of themselves and their affiliates and predecessors have assigned federal antitrust claims based on those direct purchases to McDonald's.*

**ANSWER:** The Plaintiff listed in this Paragraph has not named Tyson as a Defendant in the Track 2 SACC and therefore has no active claims against Tyson. This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the Plaintiff listed in this Paragraph during the relevant period. Tyson denies any remaining allegations in this Paragraph .

91. *Plaintiff McLane Company, Inc., d/b/a McLane/Southwest, McLane/Southeast, McLane Southeast, McLane/Northwest, McLane/Southeast – Dothan, McLane/ High Plains, and McLane/North Texas is a leading supply chain services company providing grocery and foodservice supply chain solutions to convenience stores, discount retailers, wholesale clubs,*

*drug stores, military bases, and restaurants throughout the United States. McLane Company, Inc. is a Texas corporation with its principal place of business in Temple, Texas. It, along with its subsidiaries and affiliates, purchased Broilers directly from one or more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.*

**ANSWER:** This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the Plaintiff listed in this Paragraph during the relevant period. Tyson denies any remaining allegations in this Paragraph.

92. *Plaintiff McLane/Mid-Atlantic, Inc., d/b/a McLane/Carolina and McLane Mid-Atlantic, is a Texas corporation with its principal place of business in Temple, Texas. It is a wholly-owned subsidiary of McLane Company, Inc. It purchased Broilers directly from one or more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.*

**ANSWER:** This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the parent company of the Plaintiff listed in this Paragraph during the relevant period. Tyson denies any remaining allegations in this Paragraph.

93. *Plaintiff McLane/Midwest, Inc., d/b/a McLane/Cumberland, McLane/Midwest, McLane Midwest, and McLane/Ozark is a Texas corporation with its principal place of business in Temple, Texas. It is a wholly-owned subsidiary of McLane Company, Inc. It purchased Broilers directly from one or more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.*

**ANSWER:** This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the parent company of the Plaintiff listed in this Paragraph during the relevant period. Tyson denies any remaining allegations in this Paragraph.

94. *Plaintiff McLane Minnesota, Inc. is a Texas corporation with its principal place of business in Temple, Texas. It is a wholly-owned subsidiary of McLane Company, Inc. It purchased Broilers directly from one or more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.*

**ANSWER:** This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the parent company of the Plaintiff listed in this Paragraph during the relevant period. Tyson denies any remaining allegations in this Paragraph.

95. *Plaintiff McLane New Jersey, Inc. is a Delaware corporation with its principal place of business in Temple, Texas. It is a wholly-owned subsidiary of McLane Company, Inc. It purchased Broilers directly from one or more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.*

**ANSWER:** This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken

products to the parent company of the Plaintiff listed in this Paragraph during the relevant period.

Tyson denies any remaining allegations in this Paragraph.

96. *Plaintiff McLane/Eastern, Inc., d/b/a McLane/Northeast, McLane/Northeast-Concord, and McLane PA is a Texas corporation with its principal place of business in Temple, Texas. It is a wholly-owned subsidiary of McLane Company, Inc. It purchased Broilers directly from one or more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.*

**ANSWER:** This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the parent company of the Plaintiff listed in this Paragraph during the relevant period.

Tyson denies any remaining allegations in this Paragraph.

97. *Plaintiff McLane/Suneast, Inc., d/b/a McLane/Pacific, McLane/Southern California, McLane/Sunwest, McLane Sunwest, McLane/Suneast, and McLane Ocala is a Texas corporation with its principal place of business in Temple, Texas. It is a wholly-owned subsidiary of McLane Company, Inc. It purchased Broilers directly from one or more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.*

**ANSWER:** This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the parent company of the Plaintiff listed in this Paragraph during the relevant period.

Tyson denies any remaining allegations in this Paragraph.

98. *Plaintiff McLane Ohio, Inc. is a Texas corporation with its principal place of business in Temple, Texas. It is a wholly-owned subsidiary of McLane Company, Inc. It*

100

*purchased Broilers directly from one or more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.*

**ANSWER:** This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the parent company of the Plaintiff listed in this Paragraph during the relevant period. Tyson denies any remaining allegations in this Paragraph.

99. *Plaintiff McLane/Southern, Inc. is a Mississippi corporation with its principal place of business in Temple, Texas. It is a wholly-owned subsidiary of McLane Company, Inc. It purchased Broilers directly from one or more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.*

**ANSWER:** This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the parent company of the Plaintiff listed in this Paragraph during the relevant period. Tyson denies any remaining allegations in this Paragraph.

100. *Plaintiff McLane/Western, Inc. is a Colorado corporation with its principal place of business in Temple, Texas. It is a wholly-owned subsidiary of McLane Company, Inc. It purchased Broilers directly from one or more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.*

**ANSWER:** This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to

101

form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the parent company of the Plaintiff listed in this Paragraph during the relevant period. Tyson denies any remaining allegations in this Paragraph.

101.    *Plaintiff McLane Express, Inc., d/b/a C.D. Hartnett Company, Inc. is a Texas corporation with its principal place of business in Weatherford, Texas. It is a wholly-owned subsidiary of McLane Company, Inc. It purchased Broilers directly from one or more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.*

**ANSWER:** This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the parent company of the Plaintiff listed in this Paragraph during the relevant period. Tyson denies any remaining allegations in this Paragraph.

102.    *Plaintiff Kinexo, Inc. is a North Carolina corporation with its principal place of business in Rocky Mount, North Carolina. It is a wholly-owned subsidiary of McLane Company, Inc. It purchased Broilers directly from one or more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.*

**ANSWER:** This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the parent company of the Plaintiff listed in this Paragraph during the relevant period. Tyson denies any remaining allegations in this Paragraph.

103. *Plaintiff McLane Foodservice Distribution, Inc. is a North Carolina corporation with its principal place of business in Rocky Mount, North Carolina. It is a wholly-owned subsidiary of McLane Company, Inc. It purchased Broilers directly from one or more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.*

**ANSWER:** This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the parent company of the Plaintiff listed in this Paragraph during the relevant period. Tyson denies any remaining allegations in this Paragraph.

104. *Plaintiff McLane Foodservice, Inc. is a Texas corporation with its principal place of business in Temple, Texas. It is a wholly-owned subsidiary of McLane Company, Inc. It purchased Broilers directly from one or more Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.*

**ANSWER:** This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the parent company of the Plaintiff listed in this Paragraph during the relevant period. Tyson denies any remaining allegations in this Paragraph.

105. *Plaintiff Mission Valley Wings, LLC, d/b/a Hooters of Mission Valley, is a Kansas limited liability company doing business in San Diego, California. Plaintiff Mission Valley Wings, LLC purchased chicken indirectly from Defendants and/or their co-conspirators including Tyson and Perdue in California during the relevant period. As such, during the time period relevant to Plaintiff's claims, Mission Valley Wings, LLC, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. Mission Valley Wings, LLC is a "person" with standing to sue Defendants for damages and/or*

103

*other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this Paragraph has no active claims against Tyson. This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson denies any remaining allegations in this Paragraph.

106. *Plaintiff Nestlé Purina PetCare Company is a Missouri corporation with its principal place of business in St. Louis, Missouri. Nestlé Purina is one of the world's largest producers of pet food. Nestlé Purina directly purchased broiler chicken from Defendants, often subject to a bidding process by which Defendants and co-conspirators submitted proposed pricing and other material sales terms.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the Plaintiff listed in this Paragraph during the relevant period. Tyson denies any remaining allegations in this Paragraph.

107. *Plaintiff Nestlé USA, Inc. is a Delaware corporation with its principal place of business in Arlington, Virginia. Nestlé USA has manufacturing facilities across the U.S. and its brands include, Stouffer's, Lean Cuisine, DiGiorno, Buitoni, Hot Pockets, Nescafe, Nestlé Toll House, and Coffee Mate. Nestlé USA directly purchased broiler chicken from Defendants, often subject to a bidding process by which Defendants and co-conspirators submitted proposed pricing and other material sales terms.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the Plaintiff

listed in this Paragraph during the relevant period. Tyson denies any remaining allegations in this

Paragraph..

108.    *Plaintiff Oceanside Wings, LLC, previously doing business as Hooters of Oceanside, is a Kansas limited liability company that did business in Oceanside, California. Plaintiff Oceanside Wings, LLC purchased chicken indirectly from Defendants and/or their co-conspirators including Tyson and Perdue in California during the relevant period. As such, during the time period relevant to Plaintiff's claims, Oceanside Wings, LLC, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. Oceanside Wings, LLC is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this

Paragraph has no active claims against Tyson. This Paragraph contains Plaintiff's

characterizations of its claims and/or legal conclusions to which no response is required. To the

extent a response is required, Tyson denies such characterizations and/or conclusions.  Tyson

lacks knowledge or information sufficient to form a belief as to the truth of any allegations in

this Paragraph that relate to other Defendants and/or third parties, and therefore denies those

allegations. Tyson denies any remaining allegations in this Paragraph.

109.    *Plaintiff Ontario Wings, LLC, d/b/a Hooters of Ontario, is a Kansas limited liability company doing business in Ontario, California. Plaintiff Ontario Wings, LLC purchased chicken indirectly from Defendants and/or their co-conspirators including Tyson and Perdue in California during the relevant period. As such, during the time period relevant to Plaintiff's claims, Ontario Wings, LLC, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. Ontario Wings, LLC is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this

Paragraph has no active claims against Tyson. This Paragraph contains Plaintiff's

characterizations of its claims and/or legal conclusions to which no response is required. To the

extent a response is required, Tyson denies such characterizations and/or conclusions.  Tyson

lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson denies any remaining allegations in this Paragraph.

110.     *Plaintiff Panda Restaurant Group, Inc. ("Panda") is a California corporation with its principal place of business in Rosemead, California. Panda has established a global fast casual restaurant business with over 2,300 restaurants worldwide, with over 2,200 of them in United States. Panda brings this action on its own behalf and pursuant to assignments with The SYGMA Network, Inc., Sysco Corporation, McLane Foodservice, Inc., Y. Hata & Company, Limited, Nicholas and Company, Plaza Warehouse & Realty Corporation d/b/a Plaza Food Systems, Overhill Farms, Inc., K2D, Inc. d/b/a Colorado Premium Foods and their affiliates and predecessors with respect to direct purchases from Defendants made for Panda. The SYGMA Network, Inc., Sysco Corporation, McLane Foodservice, Inc., Y. Hata & Company, Limited, Nicholas and Company, Plaza Warehouse & Realty Corporation d/b/a Plaza Food Systems, Overhill Farms, Inc., and K2D, Inc. d/b/a Colorado Premium Foods on behalf of themselves and their affiliates and predecessors have assigned federal antitrust claims based on those direct purchases to Panda.*

**ANSWER:** This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the Plaintiff listed in this Paragraph and to certain of its purported assignors during the relevant period. Tyson denies any remaining allegations in this Paragraph.

111.     *Plaintiff Pinnacle Foods, Inc. ("Pinnacle Foods") was a Delaware corporation with its principal place of business in Parsippany, New Jersey. Pinnacle Foods was acquired by Conagra in October 2018 and is no longer in operation. As an independent public company, Pinnacle Foods was a leading packaged foods company. Pinnacle Foods' brands include Hungry-Man, Birds Eye, Armour, and Mama Celeste pizza, among others. Pinnacle directly purchased broiler chicken from Defendants, often subject to a bidding process by which Defendants and co-conspirators submitted proposed pricing and other material sales terms.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the Plaintiff

listed in this Paragraph during the relevant period. Tyson denies any remaining allegations in this

Paragraph.

112. *Plaintiff PJ Food Service, Inc. is a Kentucky corporation with its principal place of business in Louisville, Kentucky.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in this Paragraph and therefore denies those allegations.

113. *Plaintiff Pollo Operations, Inc. ("Pollo") is a Florida corporation with its principal place of business in Miami, Florida. During the Conspiracy Period, Pollo operated restaurants under the Pollo Tropical banner. Restaurants like Pollo serve their proprietary chicken products in multiple locations throughout the country. To ensure consistency in taste and quality of its products across hundreds of locations spanning multiple states, Pollo, like many restaurants, negotiated and contracted directly with Defendants for the production and supply of its chicken, according to Pollo's unique recipes and specifications. These negotiations and contracts governed the price and quantity at which Defendants would supply Pollo with Broilers. Pollo brings this action on its behalf and on behalf of its affiliates and wholly-owned subsidiaries and as assignee of Kelly's Foods Inc. ("Kelly's") for overcharges on direct purchases of Broilers by Pollo, and by Kelly's that were sold to Pollo during the Conspiracy Period. During the Conspiracy Period, Kelly's purchased Broilers on Pollo's behalf from Defendants and/or their co-conspirators. Kelly's has assigned its claims arising out of these purchases to Pollo. Pollo was damaged by Defendants' anticompetitive and illegal conduct by paying artificially inflated prices for Broilers. Pollo's claims are based on Defendants' collusive conduct, including, without limitation, bid-rigging that is the subject of the Superseding Indictment. As alleged in the Superseding Indictment and herein, Defendants' bid-rigging conduct targeted Pollo.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this

Paragraph has no active claims against Tyson. This Paragraph contains Plaintiff's

characterizations of its claims and/or legal conclusions to which no response is required. To the

extent a response is required, Tyson denies such characterizations and/or conclusions. To the

extent the allegations in this Paragraph purport to quote, characterize, or describe documents or

other sources, such sources speak for themselves, and Tyson denies any characterization or

description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to

form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants

107

and/or third parties, and therefore denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*114.     Plaintiffs Poultry Products Company of New England LLC (formerly known as Poultry Products Company of New England, Inc.), Poultry Products Company, LLC (formerly known as Poultry Products Company, Inc.), Poultry Products of Connecticut, LLC (formerly known as Poultry Products of Connecticut, Inc.), and Poultry Products of Maine, LLC (formerly known as Poultry Products of Main, Inc.), (collectively, "Poultry Products") are related New Hampshire corporations with a principal place of business in Londonderry, New Hampshire. Poultry Products is a foodservice distributor servicing New England and eastern New York. Poultry Products does business under the trade name Prime Source Foods. Poultry Products brings this action under the federal antitrust laws against the Defendants identified below and incorporates by reference the factual allegations and reservations of rights contained in the Direct Action Plaintiffs' Amended Consolidated Complaint and Demand for Jury Trial, filed in In re Broiler Antitrust Litigation, Civil Action No. 1:16-cv-08637 (ECF 4243; ECF 4244).*

**ANSWER:** This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*115.     Plaintiff Quality Supply Chain Co-op, Inc. ("QSCC") is a Delaware corporation with its principal place of business in Dublin, Ohio. QSCC is an independent purchasing cooperative for Wendy's supply chain in North America. QSCC is the third-largest purchasing cooperative in the quick-service restaurant industry. QSCC brings this action on its own behalf and pursuant to assignments with The SYGMA Network, Inc., The Sysco Corporation, Performance Food Group, Quality Custom Distribution Services, Inc., Southeastern Food Merchandisers, LP, Shamrock Food Company, Upper Lake Foods, Inc., ULF Janesville, LLC, Willow Foods Run, Inc., Harvest Distribution, Inc. and their affiliates and predecessors with respect to direct purchases from Defendants made for the Wendy's system, supply chain and operators. The SYGMA Network, Inc., The Sysco Corporation, Performance Food Group, Quality Custom Distribution Services, Inc., Southeastern Food Merchandisers, LP, Shamrock Food Company, Upper Lake Foods, Inc., ULF Janesville, LLC, Willow Foods Run, Inc., and Harvest Distribution, Inc. on behalf of themselves and their affiliates and predecessors have assigned federal antitrust claims based on those direct purchases to QSCC.*

**ANSWER:** This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the Plaintiff listed in this Paragraph and to certain of its purported assignors during the relevant period. Tyson denies any remaining allegations in this Paragraph.

116. *Plaintiff Quirch Foods, LLC f/k/a Quirch Foods Co. ("Quirch") is a Florida limited-liability company with its principal place of business in Coral Gables, Florida. Quirch brings this action on its own behalf and as assignee of Butts Foods, L.P. f/k/a Butts Foods, Inc. ("Butts Foods"). During the conspiracy period, Quirch and its affiliate and assignor Butts Foods purchased chicken at artificially inflated prices directly from one or more of Defendants and co-conspirators (as defined herein), and suffered injury to their business or property as a direct or proximate result of Defendants' and co-conspirators' wrongful conduct. In addition, Quirch's affiliate and assignor Butts Foods purchased broiler chicken products from one or more of Defendants for delivery to one or more Bid Customers (as defined below). On information and belief, the artificially inflated prices paid by Butts Foods for those purchases were the result of wrongful conduct by the Bid-Rigging Defendants (as defined below).*

**ANSWER:** This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the Plaintiff listed in this Paragraph during the relevant period. Tyson denies any remaining allegations in this Paragraph.

117. *Plaintiff R & D Marketing, LLC is a Mississippi limited liability company with its principal place of business in Tupelo, Mississippi.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

118.    *Plaintiff Rancho Bernardo Wings, LLC, d/b/a Hooters of San Marcos, previously doing business as Hooters of Rancho Bernardo, is a California limited liability company doing business in San Marcos, California. Plaintiff Rancho Bernardo Wings, LLC purchased chicken indirectly from Defendants and/or their co-conspirators including Tyson and Perdue in California during the relevant period. As such, during the time period relevant to Plaintiff's claims, Rancho Bernardo Wings, LLC, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. Rancho Bernardo Wings, LLC is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this Paragraph has no active claims against Tyson. This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson denies any remaining allegations in this Paragraph.

119.    *Plaintiff Red Bird Farms Distribution Company is a Colorado corporation with its principal place of business in Englewood, Colorado.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

120.    *Plaintiff Restaurants of America, Inc. is a Texas corporation with its principal place of business in Centennial, Colorado. Restaurants of America, Inc. brings this action on its own behalf and as assignee of the following entities, who have assigned their claims to Restaurants of America, Inc.: Albuquerque Hooters, Inc.; Albuquerque West Hooters, LLC; Bloomington Hooters, Inc.; Colorado Springs Hooters, Inc.; Fiesta Mall Hooters, Inc.; Las Cruces Hooters, Ltd.; Lone Tree Hooters, Inc.; Metro Center Hooters, Inc.; Parker Road Hooters, Inc.; Hooters of Peoria, LP; Peoria Hooters, Inc.; Phoenix Hooters, Inc.; Scottsdale Hooters, Inc.; 8909 Indian Bend Hooters, LP; Thunder Mountain Hooters, LLC; Yuma Hooters, Inc.; West Phoenix Hooters, Inc.; Hooters of Westminster, LP; Westminster Hooters, Inc.; Bell Canyon Hooters, Inc.; Colorado Blvd. Hooters, Inc.; Colorado Springs North Hooters, Inc.; Chandler Hooters, Inc.; Southwest Hooters, Ltd.; Grand Junction Hooters, LP; Kipling Hooters, Ltd.; Mesa Hooters Inc.; Tucson Northwest Hooters Ltd.; Marana Hooters, Inc.; Tucson Hooters, Inc.; and Tempe Hooters, Inc. These entities purchased chicken indirectly from Defendants and/or their co-conspirators, including Tyson and George's, in Arizona, New Mexico, Colorado and Minnesota and assigned their claims arising out of these purchases to*

110

*Restaurants of America, Inc. Plaintiff Restaurants of America, Inc. also brings claims on behalf of itself as assignee of Ben E. Keith Company and Bay Valley Foods, LLC (itself and as successor to Naturally Fresh, Inc.), who directly purchased chicken from Defendants and/or their co-conspirators, including Tyson and George's, on Restaurants of America Assignors' behalf during the relevant time period, and assigned their claims arising out of these purchases to Hooters of America, LLC, who subsequently assigned those claims to Plaintiff Restaurants of America, Inc. Each of Plaintiff Restaurants of America, Inc., Restaurant of America Assignors, Ben E. Keith Company, Bay Valley Foods, LLC, Naturally Fresh, Inc., and Hooters of America, LLC, is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein. The references in this Complaint to "Restaurant of America" refer collectively to Restaurants of America, Inc. and its assignors.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this

Paragraph has no active claims against Tyson. This Paragraph contains Plaintiff's

characterizations of its claims and/or legal conclusions to which no response is required. To the

extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson

lacks knowledge or information sufficient to form a belief as to the truth of any allegations in

this Paragraph that relate to other Defendants and/or third parties, and therefore denies those

allegations. Tyson denies any remaining allegations in this Paragraph.

*121.    Plaintiff Restaurant Services, Inc. ("RSI" or "Plaintiff") is a Delaware corporation with its principal place of business in Miami, Florida. RSI serves as the exclusive supply chain management and distribution cooperative for the BURGER KING® system of company-owned and franchisee-owned restaurants in the United States ("BK Restaurants"). BURGER KING® is the second largest fast food hamburger chain in the world. As the purchasing agent for BK Restaurants, RSI negotiates contracts and purchases products and distribution services on their behalf. During the relevant time period, RSI contracted with Defendants for the production and supply of Broilers. RSI also utilized distributors to supply BK Restaurants with Broilers purchased on their behalf pursuant to these negotiations and contracts. These distributors include McLane Company, Inc. ("McLane"), Nicholas and Company, Performance Food Group, Inc. ("PFG"), Reinhart Foodservice, LLC ("Reinhart"), Shamrock Foods Company ("Shamrock"), Sygma Network ("Sygma"), Sysco Montana, Inc. ("Sysco Montana"), and Maines Paper & Food Service, Inc., including its wholly-owned subsidiaries, Maines Paper & Food Service - Maryland, Inc., Maines Paper & Food Service - New England, Inc., Maines Paper & Food Service - Ohio, Inc., Maines Paper & Food Service - NY Metro, Inc., Maines Paper & Food Service - Mid-Atlantic, Inc., and Maines Paper & Food Service - Tennessee, Inc. (collectively "Maines"), who have each assigned their claims arising out of these transactions to RSI. RSI brings this action on its own behalf, and as assignee of McLane, Nicholas and Company, PFG, Reinhart, Shamrock, Sygma, Sysco Montana, Maines,*

*and their affiliates (collectively, "Assignors"). The references in this Complaint to "RSI" include RSI's Assignors.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this Paragraph has no active claims against Tyson. This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purports to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the Plaintiff listed in this Paragraph and to certain of its purported assignors during the relevant period. Tyson deniesany remaining allegations in this Paragraph.

*122.     During the time period relevant to RSI's claims, RSI and/or its Assignors directly purchased Broilers in the United States from Defendants and/or their co-conspirators, and sustained injury and damages as a proximate result of the antitrust violations and other unlawful activities alleged in this Complaint. RSI's claims are based on all elements of Defendants' collusive conduct, including specifically, the bid-rigging that is the subject of the Superseding indictment. As alleged in the Superseding Indictment and herein, Defendants engaged in bid-rigging conduct specifically targeted at RSI and other customers with whom they entered into contracts for the supply of Broilers.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this Paragraph has no active claims against Tyson. This Paragraph contains Plaintiffs' characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to

112

form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants

and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken

products to the Plaintiff listed in this Paragraph and to certain of its purported assignors during

the relevant period. Tyson denies any remaining allegations in this Paragraph.

123. *Plaintiff Sam's East, Inc. is an Arkansas corporation with its principal place of business in Bentonville, Arkansas.*

**ANSWER:** The Plaintiff listed in this Paragraph has not named Tyson as a Defendant in

the Track 2 SACC and therefore has no active claims against Tyson. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of the allegations in this Paragraph and

therefore denies those allegations.

124. *Plaintiff Sam's West, Inc. is an Arkansas corporation with its principal place of business in Bentonville, Arkansas.*

**ANSWER:** The Plaintiff listed in this Paragraph has not named Tyson as a Defendant in

the Track 2 SACC and therefore has no active claims against Tyson. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of the allegations in this Paragraph and

therefore denies those allegations.

125. *Plaintiff Services Group of America, Inc. is a Delaware corporation with its principal place of business in Scottsdale, Arizona. SGA is one of the nation's leading marketers and distributors of food products and food services throughout the United States. On information and belief from 2008 through September 13, 2019, SGA's former subsidiaries, Food Services of America, Inc., a Delaware Corporation ("FSA"), Systems Services of America, Inc., a Delaware corporation ("SSA"), and Ameristar Meats, Inc., a Delaware Corporation ("Ameristar"), purchased chicken on behalf of SGA at artificially inflated prices, caused by Defendants' anticompetitive and illegal conduct, directly from Defendants, their affiliates, and co-conspirators. During the relevant time period, SGA also requested proposals of bids from Defendants for the volume and type of Broilers it needed. Certain Defendants responded to and engaged with SGA's requests for proposals ("RFP"), including but not limited to Defendants Pilgrims, Koch, Wayne, House of Raeford, Simmons, and Tyson. SGA alleges on information and belief that the purchases it made subject to these RFP responses were at artificially high prices. Because of the functional and economic unity of SGA with its wholly-owned subsidiaries, FSA, SSA, and Ameristar, in the purchase of chicken from Defendants, any antitrust injury suffered by FSA, SSA, or Ameristar was passed on to, and absorbed by, SGA. Regardless of SGA's individual standing as a direct purchaser or as a result of its ownership or control of, or*

113

*principal-agent relationship with, FSA, SSA, and Ameristar as direct purchasers from Defendants, FSA, SSA, and Ameristar have expressly assigned to SGA all claims and causes of action that FSA, SSA, or Ameristar could assert in this lawsuit through September 13, 2019.[15]*

> *FN 15: SGA is the sole direct purchaser with regard to all purchases made by SSA, FSA, or Ameristar regardless of whether chicken products were purchased and then resold or otherwise delivered to Boston Market, Friendly's, or any other restaurant. Further, SGA also specifically denies that any valid assignment obligation applies to the purchases at issue in footnote 14. SGA reserves all rights on this issue.*

**ANSWER:** This Paragraph and Footnote contain Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph and Footnote purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph and Footnote that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson denies any remaining allegations in this Paragraph and Footnote.

126.    *Plaintiff Shamrock Foods Company is an Arizona corporation with its principal place of business in Phoenix, Arizona.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

127.    *Plaintiff Sherwood Food Distributors, L.L.C. is a Michigan limited-liability company with its principal place of business in Detroit, Michigan; Plaintiff Harvest Meat Company, Inc. is a Delaware corporation with its principal place of business in National City, California; Plaintiff Western Boxed Meats Distributors, Inc. is an Oregon corporation with its principal place of business in Portland, Oregon; and Hamilton Meat, LLC is a California limited-liability company with its principal place of business in Chula Vista, CA. These Plaintiffs are large affiliated distributors in the meat and food industry which service thousands of customers including retailers, wholesalers, institutional accounts, further processors, food service accounts, and cruise lines.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in this Paragraph and therefore denies those allegations.

128. *Plaintiffs Sodexo, Inc. and Sodexo Operations, LLC (collectively, "Sodexo") bring this action as a direct purchaser of broiler chickens, and additionally and alternatively, as an assignee of Ben E. Keith Company; Gold Star Foods, Inc.; Gordon Food Service, Inc.; Performance Food Group, Inc.; Suisan Company, LTD; and Sysco Corporation. Sodexo, Inc. is a Delaware corporation with its principal place of business in Gaithersburg, Maryland. Sodexo Operations, LLC's principal place of business is in Maryland.*

**ANSWER:** The Plaintiff listed in this Paragraph has not named Tyson as a Defendant in

the Track 2 SACC and therefore has no active claims against Tyson. This Paragraph contains

Plaintiff's characterizations of its claims and/or legal conclusions to which no response is

required. To the extent a response is required, Tyson denies such characterizations and/or

conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of

any remaining allegations in this Paragraph and therefore denies those allegations.

129. *Plaintiff Sonic Industries Services Inc. ("Sonic") is a Delaware corporation with its headquarters in Oklahoma City, Oklahoma. Sonic is the largest drive-in chain in the United States, well-known for its unique drive-in format, carhop service model, and broad menu of food and beverages. During the relevant time period, Sonic negotiated and contracted with Defendants for the production and supply of Broilers. Sonic also utilized distributors to supply its restaurants with Broilers purchased on their behalf pursuant to these negotiations and contracts. These distributors include McLane Company, Inc. ("McLane"), Merchants Foodservice ("MF"), Ben E. Keith ("BEK"), Gordon Food Service, Inc. ("GFS"), Nicholas and Company, Performance Food Group, Inc. and Reinhart Foodservice LLC (collectively, "PFG"), and Shamrock Foods Company ("Shamrock"), who have each assigned their claims arising out of these transactions to Sonic. Sonic brings this action on its own behalf, and as assignee of McLane, MF, BEK, GFS, Nicholas and Company, PFG, and Shamrock, and their affiliates. During the time period relevant to Sonic's claims, Sonic and/or its assignors directly purchased Broilers in the United States from Defendants and/or their co-conspirators, and sustained injury and damages as a proximate result of the antitrust violations and other unlawful activities alleged in this Complaint. Sonic is a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1. The references in this Amended Complaint to Sonic refer collectively to Sonic and its assignors.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this

Paragraph has no active claims against Tyson. This Paragraph contains Plaintiff's

characterizations of its claims and/or legal conclusions to which no response is required. To the

extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson

lacks knowledge or information sufficient to form a belief as to the truth of any allegations in

this Paragraph that relate to other Defendants and/or third parties, and therefore denies those

allegations. Tyson admits that it sold chicken products to the Plaintiff listed in this Paragraph and

to certain of its purported assignors during the relevant period. Tyson denies any remaining

allegations in this Paragraph.

130.    *Plaintiff South Gate Wings, LLC, d/b/a Hooters of South Gate, is a California limited liability company doing business in South Gate, California. Plaintiff South Gate Wings, LLC purchased chicken indirectly from Defendants and/or their co-conspirators including Tyson and Perdue in California during the relevant period. As such, during the time period relevant to Plaintiff's claims, South Gate Wings, LLC, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. South Gate Wings, LLC is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this

Paragraph has no active claims against Tyson. This Paragraph contains Plaintiff's

characterizations of its claims and/or legal conclusions to which no response is required. To the

extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson

lacks knowledge or information sufficient to form a belief as to the truth of any allegations in

this Paragraph that relate to other Defendants and/or third parties, and therefore denies those

allegations. Tyson denies any remaining allegations in this Paragraph and therefore denies those

allegations.

131.    *Plaintiff Supply Management Services, Inc. ("SMS") is a Georgia non-profit corporation headquartered in Atlanta, Georgia. SMS is a cooperative purchasing agent for its members, which are Popeye's Restaurants® and Popeye's Louisiana Kitchen® (together "Popeye's") owners. Throughout the relevant period, SMS sought bids from and contracted with Defendants for the production and supply of Broilers to its members. In some instances the broilers were delivered directly to individual stores. For the remainder, SMS contracted with distributors to supply its members with Broilers purchased pursuant to the above-referenced contracts with Defendants. SMS brings this action regarding Broilers purchased for its members on its own behalf; as assignee of those individual stores receiving direct shipments; and as*

116

*assignee of certain distributors, and their affiliates, that have assigned their claims to SMS for Broiler purchases that SMS coordinated (collectively, "Assignors"). The references in this Complaint to "SMS" and "Plaintiff" include SMS's Assignors. During the relevant period, SMS or its Assignors purchased chicken at artificially inflated prices directly from one or more of the Defendants and co-conspirators (as defined herein), and suffered injury to its business or property as a direct or proximate result of Defendants' and Co-Conspirators' wrongful conduct.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this Paragraph has no active claims against Tyson. This Paragraph contains Plaintiffs' characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the Plaintiff listed in this Paragraph during the relevant period. Tyson denies any remaining allegations in this Paragraph.

*132.	Plaintiff Sysco Corporation ("Sysco") is a Delaware corporation with its principal place of business in Houston, Texas. Sysco is a broadline foodservice distributor with facilities located throughout the United States. Sysco was a direct purchaser of Broilers from several Producer Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.*

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold

chicken products to the Plaintiff listed in this Paragraph during the relevant period. Tyson denies

any remaining allegations in this Paragraph.

*133.    Plaintiff Target Corporation ("Target"), is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota. Target operates approximately 1900 retail stores throughout the United States and also engages in internet sales via Target.com. Target was a direct purchaser of Broilers from several Producer Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.*

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of its claims and/or

legal conclusions to which no response is required. To the extent a response is required, Tyson

denies such characterizations and/or conclusions. Tyson lacks knowledge or information

sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other

Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold

chicken products to the Plaintiff listed in this Paragraph during the relevant period. Tyson denies

any remaining allegations in this Paragraph and therefore denies those allegations.

*134.    Plaintiff The Cheesecake Factory Incorporated ("TCF") is a Delaware corporation with its headquarters in Calabasas Hills, California. TCF owns and operates 294 restaurants throughout the United States and Canada under brands including The Cheesecake Factory® and North Italia®. During the relevant time period, TCF negotiated and contracted with Defendants for the production and supply of Broilers. TCF also utilized distributors to supply its restaurants with Broilers purchased on its behalf pursuant to these negotiations and contracts. These distributors include Nealy Foods, Inc. ("Nealy") and Halperns' Steak and Seafood Company, LLC ("Halperns'"), who have assigned their claims arising out of these transactions to TCF. TCF brings this action on its own behalf, and as assignee of Nealy and Halperns'. During the time period relevant to TCF's claims, TCF and/or its assignors directly purchased Broilers in the United States from Defendants and/or their co-conspirators, and sustained injury and damages as a proximate result of the antitrust violations and other unlawful activities alleged here. TCF is a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1. The references in this Amended Complaint to TCF refer collectively to TCF and its assignors.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this

Paragraph has no active claims against Tyson. This Paragraph contains Plaintiffs'

characterizations of its claims and/or legal conclusions to which no response is required. To the

extent a response is required, Tyson denies such characterizations and/or conclusions. To the

extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith.  Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson denies any remaining allegations.

135.    *Plaintiff The Fresh Market, Inc. ("Fresh Market") is a Delaware corporation with its principal place of business in Greensboro, North Carolina. Fresh Market owns and operates grocery stores that sell chicken. Fresh Market brings this action on its own behalf, and as assignee of its purchasing agent, Burris Logistics, who purchased chicken from Defendants and/or their co-conspirators on Fresh Market's behalf during the relevant time period, and assigned their claims arising out of these purchases to Fresh Market. During the time period relevant to Fresh Market's claims, Fresh Market and/or its assignors, directly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damages as a proximate result of the antitrust violations alleged in this Complaint. Both Fresh Market and Burris Logistics are a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1. The references in this Complaint to "Fresh Market" refer collectively to The Fresh Market, Inc. and its assignor.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this Paragraph has no active claims against Tyson. This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith.  Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson denies any remaining allegations.

119

136. *Plaintiff The Johnny Rockets Group, Inc. d/b/a Johnny Rockets is a Delaware corporation with its principal place of business in Wilbraham, Massachusetts. During the Conspiracy period, Johnny Rockets operated over 450 stores across the country. Restaurants like Johnny Rockets serve their proprietary chicken products in multiple locations throughout the country. During the Conspiracy Period, Johnny Rockets purchased Broilers directly from Defendants and their co-conspirators, Defendants' and their co-conspirators' subsidiaries and affiliates, entities owned or controlled by Defendants and their co-conspirators, or agents controlled by Defendants, Defendants' subsidiaries and affiliates, and their co-conspirators. To ensure consistency in taste and quality of their products across hundreds of locations spanning multiple states, Johnny Rockets, like many restaurants, negotiates and contracts directly with Defendants for the production and supply of their proprietary chicken according to Johnny Rockets unique recipes and specifications. These negotiations and contracts governed the price and quantity at which Defendants would supply Johnny Rockets with Broilers. Johnny Rockets provided Defendants with instructions regarding each step of the preparation and packaging process for its chicken products, including the recipe for Johnny Rockets products and specific requirements for packaging and labeling Johnny Rockets products. The contracts entered into between Johnny Rockets and Defendants set forth the agreed formula pricing and the volume of chicken products to be sold to Johnny Rockets. Johnny Rockets brings this action on its own behalf, and additionally and alternatively, as assignee of Sysco Corporation and its respective affiliates ("Assignor"). Johnny Rockets purchased millions of dollars' worth of Broilers directly from Defendants and their co-conspirators at artificially inflated prices throughout the Conspiracy Period. Johnny Rockets has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct. Johnny Rockets was damaged by Defendants' anticompetitive and illegal conduct by paying artificially inflated prices for Broilers. Johnny Rockets brings this action to recover the overcharges it paid for Broilers purchased during the Conspiracy Period.*

**ANSWER:** This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the Plaintiff listed in this Paragraph and to its purported assignor during the relevant period. Tyson denies any remaining allegations in this Paragraph.

137.     Plaintiff Thurston Foods, Inc. ("Thurston") is a Connecticut corporation with its *principal place of business in Wallingford, Connecticut. Thurston is a fullservice broadline distributor and bakery supplier, with product lines ranging from fresh meats, frozen, grocery and fresh produce, paper, disposables, cleaning supplies, equipment and small wares. Thurston brings this action on its own behalf and as the assignee of Prime Source Foods and Dot Foods, Inc. food-service redistributors that, during the relevant period, purchased Broilers directly from Defendants for resale to Thurston. Prime Source Foods and Dot Foods, Inc. have assigned claims arising out of those purchases to Thurston.*

**ANSWER:** This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the Plaintiff listed in this Paragraph during the relevant period. Tyson denies any remaining allegations in this Paragraph.

138.     *Plaintiff Timber Lake Foods, Inc. is a Mississippi corporation with its principal place of business in Tupelo, Mississippi.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

139.     *Plaintiff United Food Service, Inc. is a Colorado corporation with its principal place of business in Commerce City, Colorado. United Food Service, Inc. is a wholly-owned subsidiary of Shamrock Foods Company.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

140.     *Plaintiff United Supermarkets, LLC ("United Supermarkets") is a Texas limited liability company with its principal place of business in Lubbock, Texas. United Supermarkets owns and operates retail stores that sell chicken. During the time period relevant to Plaintiffs' claims, United Supermarkets directly purchased chicken in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the antitrust violations alleged here. United Supermarkets is a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this Paragraph has no active claims against Tyson. This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the Plaintiff listed in this Paragraph during the relevant period. Tyson denies any remaining allegations in this Paragraph.

141.    *Plaintiff US Foods, Inc. ("US Foods") is a Delaware corporation with its principal place of business in Rosemont, Illinois. US Foods is a broadline foodservice distributor with facilities located throughout the United States. US Foods was a direct purchaser of Broilers from several Producer Defendants during the relevant period and suffered injury as a result of the violations alleged in this Amended Complaint.*

**ANSWER:** The Plaintiff listed in this Paragraph has not named Tyson as a Defendant in the Track 2 SACC and therefore has no active claims against Tyson. This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the Plaintiff listed in this Paragraph during the relevant period. Tyson denies any remaining allegations in this Paragraph.

142.    *Plaintiff Walmart Inc. is a Delaware corporation with its headquarters in Bentonville, Arkansas. Walmart Inc. is a retail corporation that operates grocery, department, and warehouse stores across the United States and internationally.*

**ANSWER:** The Plaintiff listed in this Paragraph has not named Tyson as a Defendant in the Track 2 SACC and therefore has no active claims against Tyson. Tyson lacks knowledge or

122

information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

143.    *Plaintiff Wal-Mart Stores Arkansas, LLC is an Arkansas limited-liability company with its principal place of business in Bentonville, Arkansas.*

**ANSWER:** The Plaintiff listed in this Paragraph has not named Tyson as a Defendant in the Track 2 SACC and therefore has no active claims against Tyson. Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

144.    *Plaintiff Wal-Mart Stores East, LP (f/k/a Wal-Mart Stores East, Inc.) is a Delaware limited partnership with its principal place of business in Bentonville, Arkansas.*

**ANSWER:** The Plaintiff listed in this Paragraph has not named Tyson as a Defendant in the Track 2 SACC and therefore has no active claims against Tyson. Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

145.    *Plaintiff Wal-Mart Louisiana, LLC is a Delaware limited-liability company with its principal place of business in Bentonville, Arkansas.*

**ANSWER:** The Plaintiff listed in this Paragraph has not named Tyson as a Defendant in the Track 2 SACC and therefore has no active claims against Tyson. Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

146.    *Plaintiff Wal-Mart Stores Texas, LLC (f/k/a/ Wal-Mart Stores Texas, LP) is a Delaware limited-liability company with its principal place of business in Bentonville, Arkansas.*

**ANSWER:** The Plaintiff listed in this Paragraph has not named Tyson as a Defendant in the Track 2 SACC and therefore has no active claims against Tyson. Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

147.    Plaintiff Wawa, Inc. ("Wawa") is a New Jersey corporation with its principal place of business in Wawa, Pennsylvania. Wawa owns and operates a chain of convenience stores and dispensing facilities in the United States. Wawa brings this action on its own behalf, and as assignee of its purchasing agents, Taylor Fresh Foods, Inc., Taylor Farms, Florida, Inc., Taylor Farms New Jersey, Inc. and Safeway Fresh Foods LLC, all of whom purchased chicken on Wawa's behalf directly from Defendants and/or their co-conspirators during the relevant time period and assigned their claims arising out of these purchases to Wawa. During the time period relevant to Wawa's claims, Wawa and/or its assignors directly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damages as a proximate result of the antitrust violations alleged in this Complaint. Wawa and its assignors are each a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1. The references in this Complaint to "Wawa" refer collectively to Wawa, Inc. and its assignors.

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this Paragraph has no active claims against Tyson. This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the Plaintiff listed in this Paragraph during the relevant period. Tyson l denies any remaining allegations in this Paragraph.

148.    Plaintiffs Whatabrands LLC and Whataburger Restaurants LLC (collectively, "WAB") are Texas limited liability companies with their headquarters in San Antonio, Texas. WAB owns, operates, and franchises more than 800 restaurants in Texas, New Mexico, and the southern United States under the "Whataburger" brand. During the relevant time period, WAB negotiated and contracted with Defendants for the production and supply of Broilers. WAB also utilized distributors to supply their restaurants with Broilers purchased on their behalf pursuant to these negotiations and contracts. These distributors include Sysco Corporation ("Sysco") and The SYGMA Network, Inc., ("SYGMA") who have each assigned their claims arising out of these transactions to WAB. WAB brings this action on their own behalf, and as assignee of Sysco and SYGMA. During the time period relevant to WAB's claims, WAB and/or its assignors directly purchased Broilers in the United States from one or more of the Defendants and/or their co-conspirators, and sustained injury and damages as a proximate result of the antitrust violations and other unlawful activities alleged here. WAB is a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1. The references in this Amended Complaint to WAB refer collectively to WAB and its assignors.

124

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this Paragraph has no active claims against Tyson. This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purports to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the purported assignor of the Plaintiff listed in this Paragraph during the relevant period. Tyson denies any remaining allegations in this Paragraph.

*149. Plaintiff White Castle Purchasing Co. is a Delaware corporation with its principal place of business in Columbus, Ohio. During the Conspiracy Period, White Castle operated over 400 restaurants in multiple states. Restaurants like White Castle serve their proprietary chicken products in multiple locations throughout the country and the world. To ensure consistency in taste and quality of its products across hundreds of locations spanning multiple states, White Castle, like many restaurants, negotiated and contracted directly with Defendants for the production and supply of its chicken, according to White Castle's unique recipes and specifications. These negotiations and contracts governed the price and quantity at which Defendants would supply White Castle with Broilers. White Castle provided Defendants with instructions regarding each step of the preparation and packaging process for its chicken products, including the recipe for White Castle's products and specific requirements for packaging and labeling White Castle products. The contracts entered into between White Castle and Defendants set forth the agreed price and volume of chicken products to be sold to White Castle. White Castle brings this action on its own behalf, and additionally and alternatively, as assignee of McLane Foodservice, Inc. f/k/a MBM Corporation and its affiliates ("McLane" or "Assignor"). White Castle purchased millions of dollars' worth of Broilers directly from Defendants and their co-conspirators at artificially inflated prices throughout the Conspiracy Period. White Castle has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct. White Castle was damaged by Defendants' anticompetitive and illegal conduct by paying artificially inflated prices for Broilers. White Castle brings this action to recover the overcharges it paid for Broilers purchased during the Conspiracy Period.*

**ANSWER:** This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson

denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph

purports to quote, characterize, or describe documents or other sources, such sources speak for

themselves, and Tyson denies any characterization or description that is inconsistent therewith.

Tyson lacks knowledge or information sufficient to form a belief as to the truth of any

allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore

denies those allegations. Tyson admits that it sold chicken products to the Plaintiff listed in this

Paragraph and to its purported assignor during the relevant period. Tyson denies any remaining

allegations in this Paragraph.

150. *Plaintiff Wings Over Long Beach, LLC, d/b/a Hooters of Long Beach, is a Kansas limited liability company doing business in Long Beach, California. Plaintiff Wings Over Long Beach, LLC purchased chicken indirectly from Defendants and/or their co-conspirators including Tyson and Perdue in California during the relevant period. As such, during the time period relevant to Plaintiff's claims, Wings Over Long Beach, LLC, indirectly purchased chicken in the United States from one or more Defendants and/or their co-conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. Wings Over Long Beach, LLC is a "person" with standing to sue Defendants for damages and/or other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and the state laws referenced herein.*

**ANSWER:** Pursuant to a stipulated order of dismissal, the Plaintiff listed in this

Paragraph has no active claims against Tyson. This Paragraph contains Plaintiff's

characterizations of its claims and/or legal conclusions to which no response is required. To the

extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson

lacks knowledge or information sufficient to form a belief as to the truth of any allegations in

this Paragraph that relate to other Defendants and/or third parties, and therefore denies those

allegations. Tyson denies any remaining allegations in this Paragraph.

151. *Plaintiff Wood-Fruitticher Grocery Company, Inc. ("Wood-Fruitticher") is an Alabama corporation with its principal place of business in Birmingham, Alabama. Wood-Fruitticher is a foodservice distributor and wholesale company servicing the Southeast United States. Wood-Fruitticher brings this action under the federal antitrust laws against the Defendants identified below and incorporates by reference the factual allegations and reservations of rights contained in the Direct Action Plaintiffs' Amended Consolidated*

*Complaint and Demand for Jury Trial, filed in In re Broiler Antitrust Litigation, Civil Action No. 1:16-cv-08637 (ECF 4243; ECF 4244).*

**ANSWER:** This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*152. Plaintiff WZ Franchise Corporation ("Wing Zone") is a Georgia corporation with its principal place of business in Atlanta, GA. During the Conspiracy Period, Wing Zone operated over 90 restaurants in multiple states. Restaurants like Wing Zone serve their proprietary chicken products in multiple locations throughout the country and the world. To ensure consistency in taste and quality of its products across hundreds of locations spanning multiple states, Wing Zone, like many restaurants, negotiated and contracted directly with Defendants for the production and supply of its chicken, according to Wing Zone's unique recipes and specifications. These negotiations and contracts governed the price and quantity at which Defendants would supply Wing Zone with Broilers. Wing Zone provided Defendants with instructions regarding each step of the preparation and packaging process for its chicken products, including the recipe for Wing Zone products and specific requirements for packaging and labeling Wing Zone products. The contracts entered into between Wing Zone and Defendants set forth the agreed price and volume of chicken products to be sold to Wing Zone. Wing Zone brings this action on its own behalf, and additionally and alternatively, as assignee of Gordon Food Service ("GFS"), and Performance Group Inc. and its subsidiaries and affiliated ("PFG") (together, the "Assignors"). Wing Zone purchased millions of dollars' worth of Broilers directly from Defendants and their co-conspirators at artificially inflated prices throughout the Conspiracy Period. Wing Zone has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct. Wing Zone was damaged by Defendants' anticompetitive and illegal conduct by paying artificially inflated prices for Broilers. Wing Zone brings this action to recover the overcharges it paid for Broilers purchased during the Conspiracy Period.*

**ANSWER:** This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for

themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the Plaintiff listed in this Paragraph and to certain of its purported assignors during the relevant period. Tyson denies any remaining allegations in this Paragraph.

*153. Plaintiff Zaxby's Franchising LLC ("Zaxby's") is a Georgia corporation with its principal place of business in Athens, Georgia. During the Conspiracy Period, over 500 Zaxby's branded restaurants operated in multiple states (the "Zaxby's Branded Restaurants"). Restaurants like Zaxby's serve their proprietary chicken products in multiple locations throughout the country. During the Conspiracy Period, Zaxby's purchased Broilers directly from Defendants and their co-conspirators, Defendants' and their co-conspirators' subsidiaries and affiliates, entities owned or controlled by Defendants and their co-conspirators, or agents controlled by Defendants, Defendants' subsidiaries and affiliates, and their co-conspirators. To ensure consistency in taste and quality of its products across hundreds of locations, Zaxby's, like many restaurants, negotiated and contracted directly with Defendants for the production and supply of chicken for the Zaxby's Branded Restaurants, according to Zaxby's unique recipes and specifications. These negotiations and contracts governed the price and quantity at which Defendants would supply the Zaxby's Branded Restaurants with Broilers. Zaxby's provided Defendants with instructions regarding each step of the preparation and packaging process for its chicken products, including the recipe for Zaxby's products and specific requirements for packaging and labeling Zaxby's proprietary products. The contracts entered into between Zaxby's and Defendants and co-conspirators set forth the agreed price and volume of chicken products to be sold to Zaxby's. Zaxby's brings this action on its own behalf, and additionally and alternatively, as assignee of Gordon Food Service ("GFS") and Performance Food Group, Inc. ("PFG"). Zaxby's purchased hundreds of millions of dollars' worth of Broilers directly from Defendants and co-conspirators at artificially inflated prices throughout the Conspiracy Period. Zaxby's has suffered antitrust injury as a result of Defendants' anticompetitive and unlawful conduct. Zaxby's was damaged by Defendants' anticompetitive and illegal conduct by paying artificially inflated prices for Broilers, and therefore has suffered antitrust injury as a result of Defendants' conduct. Zaxby's brings this action to recover the overcharges it paid for Broilers purchased during the Conspiracy Period.*

**ANSWER:** This Paragraph contains Plaintiff's characterizations of its claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for

themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that it sold chicken products to the Plaintiff listed in this Paragraph and to certain of its purported assignors during the relevant period. Tyson denies any remaining allegations in this Paragraph.

**B.** **Defendants**

*154.    Below is a list of the Defendants (in alphabetical order by Defendant family name) named in any DAP complaint. This does not mean that each Defendant has been named by each DAP. Additionally, some Defendants listed below may be named by certain DAPs as co-conspirators. The chart in Section 2 summarizes the Defendants and co-conspirators named by each DAP to date.*

**ANSWER:** This Paragraph contains no factual allegations to which a response is required. To the extent a response is required, Tyson admits that Plaintiffs purport to list each Defendant in alphabetical order, but denies any remaining allegations in this Paragraph.

**1.** **Agri Stats**

*155.    Defendant Agri Stats, Inc. ("Agri Stats") is an Indiana corporation headquartered in Fort Wayne, Indiana, and a former subsidiary of Eli Lilly & Co., a publicly-held Indiana corporation headquartered in Indianapolis.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

*156.    Agri Stats has knowingly played an important and active role in Defendants' collusive scheme detailed in this Complaint. All of Agri Stats' wrongful actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, or engaged in by Agri Stats' various officers, agents, employers or other representatives while actively engaged in the management and operation of Agri Stats' business affairs within the course and scope of their duties and employment, or with Agri Stats' actual apparent or ostensible authority. Agri Stats used the instrumentalities of interstate commerce to facilitate the conspiracy, and its conduct was within the flow of, was intended to, and did have, a substantial effect on the interstate commerce of the United States, including in this District.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

157.     In 2008 and 2010, a representative from Agri Stats was elected to the board of the *National Chicken Council, one of the industry's most important trade associations. Those were key years in the conspiracy alleged in this Complaint. Several Defendants, including Wayne Farms and Pilgrim's, also have hired former Agri Stats executives to work in senior sales positions, and Agri Stats employs or has employed several former executives of the Defendants. These facts highlight the unique and symbiotic relationship between Agri Stats and the other Defendants.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in this Paragraph and therefore denies those allegations.

## 2.   **Amick**

158.     *Defendant Amick Farms, LLC ("Amick Farms") is a limited-liability company organized in Delaware with its headquarters located in Batesburg-Leesville, South Carolina. Amick Farms is a producer of fresh and frozen chicken products and operates facilities in South Carolina, Maryland, and Delaware.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in this Paragraph and therefore denies those allegations.

159.     *Amick Farms is a wholly-owned subsidiary of OSI Group, LLC, a privately held Delaware corporation with its headquarters in Aurora, Illinois.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in this Paragraph and therefore denies those allegations.

160.     *During the relevant period, Amick Farms and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in this Paragraph and therefore denies those allegations.

161.     *Amick Farms reports a wide variety of data to Agri Stats, including, without limitation, highly detailed, confidential information regarding its production and sales of broilers.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in this Paragraph and therefore denies those allegations.

### 3. <u>Case</u>

162.    *Case Foods, Inc. is a privately held Delaware corporation with its corporate headquarters in Troutman, North Carolina. During the time period relevant to Plaintiffs' claims, Case Foods, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**<u>ANSWER:</u>** Tyson lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in this Paragraph and therefore denies those allegations.

163.    *Case Farms, LLC is a privately held Delaware limited liability company with its corporate headquarters in Troutman, North Carolina, and with facilities and operations in Ohio and North Carolina. Case Farms, LLC is a wholly-owned subsidiary of Case Foods, Inc. During the time period relevant to Plaintiffs' claims, Case Farms, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**<u>ANSWER:</u>** Tyson lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in this Paragraph and therefore denies those allegations.

164.    *Case Farms Processing, Inc. is a privately held North Carolina corporation with its corporate headquarters in Troutman, North Carolina, and with facilities and operations in North Carolina. Case Farms Processing, Inc. is a wholly-owned subsidiary of Case Foods, Inc. During the time period relevant to Plaintiffs' claims, Case Farms Processing, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**<u>ANSWER:</u>** Tyson lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in this Paragraph and therefore denies those allegations.

165.    *Case Foods reports a wide variety of data to Agri Stats, including, without limitation, highly detailed, confidential information regarding its production and sales of broilers.*

**<u>ANSWER:</u>** Tyson lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in this Paragraph and therefore denies those allegations.

166.    *Defendants Case Foods, Inc., Case Farms, LLC and Case Farms Processing, Inc. are collectively referred to as "Case Foods."*

131

**ANSWER:** This Paragraph contains no factual allegations to which a response is required.

### 4. Claxton

167. *Defendant Claxton Poultry Farms, Inc. is a Georgia corporation headquartered in Claxton, Georgia. Norman W. Fries, Inc. d/b/a Claxton Poultry Farms, Inc. is a Georgia corporation located in Claxton, Georgia. During the relevant time period, Norman W. Fries, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, in the United States. Defendants Claxton Poultry Farms, Inc. and Norman W. Fries, Inc. are collectively referred to as "Claxton." Claxton reports to Agri Stats a wide variety of data, including information about its breeder flocks and hatchery capacity and its Claxton, Georgia complex. Until the Georgia Dock benchmark price stopped being published by the GDA in late November 2016, Claxton was one of the Defendants that submitted false and artificially inflated price quotes to the GDA. Its CEO also served on the Georgia Dock Advisory Committee. Claxton is a Georgia Dock Defendant and during the relevant period sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

### 5. Fieldale

168. *Fieldale Farms Corporation ("Fieldale") is a privately held Georgia corporation headquartered in Baldwin, Georgia. Fieldale reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and its Gainesville, Georgia complex. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Fieldale submitted false and artificially inflated price quotes to the GDA. Its owner and CEO also served on the Georgia Dock Advisory Committee. During the relevant period, Fieldale sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

### 6. Foster Farms

169. *Defendant Foster Farms, LLC is a privately held California corporation headquartered in Modesto, California. Foster reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Fresno, California, Livingston, California, and the Pacific Northwest.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

*170.    Defendant Foster Poultry Farms is a privately held California corporation headquartered in Livingston, California. Foster Poultry Farms is a related entity of Foster Farms, LLC. During the relevant period, Foster Poultry Farms and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates was engaged in the processing, distribution, sale, pricing, and/or marketing of broilers, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States. Defendants Foster Farms, LLC and Foster Poultry Farms are collectively referred to as "Foster" or "Foster Farms."*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

### 7.    **George's**

*171.    Defendant George's Inc. is a privately held Arkansas corporation headquartered in Springdale, Arkansas.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

*172.    Defendant George's Farms, Inc., is a privately held Arkansas corporation headquartered in Springdale, Arkansas. It is a wholly-owned subsidiary of George's, Inc. Defendants George's Inc. and George's Farms, Inc. are together referred to as "George's" in this Complaint. George's reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Harrisonburg, Virginia and Springdale, Arkansas. During the relevant period, George's sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

### 8.    **Harrison**

*173.    Defendant Harrison Poultry, Inc. ("Harrison") is a Georgia corporation headquartered in Bethlehem, Georgia. Harrison reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its Bethlehem, Georgia complex. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Harrison was one of the Defendants that submitted false and artificially inflated price quotes to the GDA. Its owner and CEO served on the Georgia Dock Advisory Committee. Harrison is a Georgia Dock Defendant.*

133

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

### 9. House of Raeford

*174. Defendant House of Raeford Farms, Inc. ("Raeford") is a privately held North Carolina corporation headquartered in Rose Hill, North Carolina. Raeford reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its North Carolina and Louisiana complexes.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

### 10. Keystone Foods

*175. Keystone Foods LLC was formerly a subsidiary of Marfrig Alimentos, S.A., a Brazilian company ("Marfrig"). On November 30, 2018, Defendant Tyson Foods, Inc. ("Tyson Foods") announced it had completed its acquisition of Keystone Foods LLC from Marfrig. Tyson Foods characterized the acquisition of Keystone Foods LLC as Tyson Foods' latest investment in furtherance of its growth strategy and expansion of its value-added protein capabilities. Tyson Foods' acquisition of Keystone Foods LLC (and the three affiliated Equity Group entities listed below) was structured as a stock acquisition, which resulted in Tyson Foods' acquisition of all Keystone Foods, LLC's assets and liabilities, and Keystone Foods continued to exist as an operating entity subsequent to the acquisition.*

**ANSWER:** Tyson admits that it acquired Keystone Foods, LLC in 2018. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, Tyson notes that such sources speak for themselves and denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*176. Equity Group Eufaula Division, LLC is a Delaware limited-liability company with its headquarters in Bakerhill, Alabama and is a wholly-owned subsidiary of Keystone Foods LLC.*

134

**ANSWER:** Tyson admits that Equity Group Eufaula Division, LLC is a Delaware limited liability company with its headquarters in Eufaula, Alabama and a wholly owned subsidiary of Keystone Foods, LLC. Tyson denies any remaining allegations in this Paragraph.

177.    *Equity Group Kentucky Division LLC, formerly known as Cagle's-Keystone Foods, L.L.C., is a Delaware limited liability company with its headquarters in Franklin, Kentucky, and is a wholly-owned subsidiary of Grow-Out Holdings LLC. During the relevant period, Equity Group Kentucky Division LLC sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**ANSWER:** Tyson admits that Equity Group Kentucky Division, LLC is a Delaware limited liability company with its headquarters in Franklin, Kentucky and a wholly owned subsidiary of Keystone Foods, LLC. Tyson admits the remaining allegations in this Paragraph.

178.    *Equity Group - Georgia Division LLC is a Delaware limited liability company with its headquarters in Camilla, Georgia, and is a wholly-owned subsidiary of Keystone Foods LLC. During the relevant period, Equity Group - Georgia Division LLC sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**ANSWER:** Tyson admits that Equity Group Georgia Division, LLC is a Delaware limited liability company with its headquarters in Camilla, Georgia and a wholly owned subsidiary of Keystone Foods, LLC. Tyson admits the remaining allegations in this Paragraph.

179.    *As a result of Tyson Foods' acquisition of Keystone Foods LLC, Tyson also acquired all of the assets and liabilities of Equity Group Eufaula Division, LLC, Equity Group Kentucky Division LLC, and Equity Group - Georgia Division LLC.*

**ANSWER:** Tyson admits it acquired the assets and liabilities of Equity Group Eufaula Division, LLC, Equity Group Kentucky Division LLC, and Equity Group – Georgia Division LLC. Tyson denies any remaining allegations in this Paragraph.

180.    *Keystone Foods LLC, Equity Group Eufaula Division, LLC, Equity Group Kentucky Division LLC, and Equity Group - Georgia Division LLC are collectively referred to as "Keystone Foods" in this Complaint.*

**ANSWER:** This Paragraph contains no factual allegations to which a response is required.

181. *Keystone Foods reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Alabama, Georgia, and Kentucky.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, Tyson notes that such sources speak for themselves and denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

182. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, Tyson notes that such sources speak for themselves and denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

### 11. Koch

183. *Defendant Koch Foods, Inc. is a privately held Illinois corporation headquartered in Park Ridge, Illinois.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

184. *Defendant JCG Foods of Alabama, LLC, an Alabama limited liability corporation headquartered in Park Ridge, Illinois, is a wholly-owned subsidiary of Defendant Koch Foods, Inc.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

185.    *Defendant JCG Foods of Georgia, LLC, a Georgia limited liability corporation headquartered in Park Ridge, Illinois, is a wholly-owned subsidiary of Defendant Koch Foods, Inc.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

186.    *Defendant Koch Meat Co., Inc., an Illinois corporation headquartered in Chicago, is a wholly-owned subsidiary of Defendant Koch Foods, Inc.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

187.    *Defendants Koch Foods, Inc., JCG Foods of Alabama, LLC, JCG Foods of Georgia, LLC and Koch Meat Co., Inc. are collectively referred to as "Koch" in this Complaint. Koch reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Georgia, Tennessee, and Alabama. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Koch, through JCG Foods of Georgia, LLC, was one of the Defendants that submitted false and artificially inflated price quotes to the GDA. Its vice-president of sales served on the Georgia Dock Advisory Committee. Koch is a Georgia Dock Defendant.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

## 12.    **Mar-Jac**

188.    *Defendant Mar-Jac Poultry, Inc. is a Delaware corporation headquartered in Gainesville, Georgia. Defendant Mar-Jac Poultry AL, LLC is an Alabama limited liability corporation located in Gainesville, Georgia. Defendant Mar-Jac AL/MS, Inc. is a Delaware corporation located in Gainesville, Georgia. Defendant Mar-Jac Poultry MS LLC is a Mississippi limited liability company located in Hattiesburg, Mississippi. Defendant Mar-Jac Poultry, LLC is a Delaware corporation located in Gainesville, Georgia. Defendant Mar-Jac Holdings, LLC is a Delaware corporation located in Gainesville, Georgia and is the parent company of Mar-Jac Poultry, Inc., Mar-Jac Poultry MS LLC, Mar-Jac AL, LLC, Mar-Jac AL/MS, Inc., and Mar-Jac Poultry, LLC. Defendants Mar-Jac Poultry, Inc., Mar-Jac Poultry MS, LLC, Mar-Jac Poultry AL, LLC, Mar-Jac AL/MS, Inc., Mar-Jac Poultry, LLC and Mar-Jac Holdings, LLC are collectively referred to as "Mar-Jac Poultry" or "Mar-Jac." Mar-Jac reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its Gainesville, Georgia complex. Until the Georgia Dock*

*benchmark price index stopped being published by the GDA in late November 2016, Mar-Jac was one of the Defendants that submitted false and artificially inflated price quotes to the GDA. Its vice president of operations served on the Georgia Dock Advisory Committee. Mar-Jac is a Georgia Dock Defendant. During the relevant period, Mar-Jac sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in this Paragraph and therefore denies those allegations.

### 13. **Marshall Durbin**

*189. Defendant Marshall Durbin Food Corporation and Marshall Durbin Companies ("Marshall Durbin") is a poultry company headquartered in Birmingham, Alabama. Its facilities include a poultry processing plant in Hattiesburg, Mississippi, and Jasper, Alabama; feed mills in Haleyville, Alabama, and Waynesboro, Mississippi; hatcheries in Moulton, Alabama, and Waynesboro, Mississippi; a laboratory in Jackson, Mississippi; and a distribution center in Tarrant, Alabama.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in this Paragraph and therefore denies those allegations.

*190. On January 24, 2014, Defendant Mar-Jac announced that it had acquired the assets of Marshall-Durbin. Mar-Jac stated that its management team "expects a smooth transition with no disruption of operations." Marshall Durbin is currently a subsidiary of Mar-Jac Poultry, Inc. During the Conspiracy Period, Defendant Marshall Durbin, its predecessors, subsidiaries, or affiliates sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in this Paragraph and therefore denies those allegations.

### 14. **Mountaire**

*191. Defendant Mountaire Farms, Inc. is a privately held Delaware corporation headquartered in Millsboro, Delaware.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in this Paragraph and therefore denies those allegations.

*192. Defendant Mountaire Farms, LLC, a privately held Arkansas limited liability corporation headquartered in Little Rock, Arkansas, is a wholly-owned subsidiary of Defendant Mountaire Farms, Inc.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

193.     *Defendant Mountaire Farms of Delaware, Inc., a privately held Delaware corporation headquartered in Millsboro, Delaware, is a wholly-owned subsidiary of Defendant Mountaire Farms, Inc.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

194.     *Defendants Mountaire Farms, Inc., Mountaire Farms, LLC and Mountaire Farms of Delaware, Inc. are collectively referred to as "Mountaire Farms" in this Complaint. Mountaire reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Delaware and North Carolina.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

### 15.     O.K. Foods

195.     *Defendant O.K. Foods, Inc. is an Arkansas corporation headquartered in Fort Smith, Arkansas.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

196.     *O.K. Farms, Inc., is an Arkansas corporation headquartered in Fort Smith, Arkansas, and is a wholly-owned subsidiary of Defendant O.K. Foods, Inc.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

197.     *O.K. Industries, Inc., an Arkansas corporation headquartered in Fort Smith, Arkansas, is a wholly-owned subsidiary of Defendant O.K. Foods, Inc.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

198.     *Defendants O.K. Foods, Inc., O.K. Farms, Inc., O.K. Industries, Inc., and their predecessors, subsidiaries, and affiliates, including Albertville Quality Foods, are collectively referred to as "O.K. Foods." In this Complaint, O.K. Foods are subsidiaries of the Mexican*

*poultry conglomerate Industrias Bachoco, which reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its Fort Smith, Arkansas complex.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in this Paragraph and therefore denies those allegations.

### 16. **Peco**

*199. Defendant Peco Foods, Inc. ("Peco Foods") is a privately held Alabama corporation headquartered in Tuscaloosa, Alabama. Peco Foods reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Gordo, Alabama and Sebastopol, Louisiana.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in this Paragraph and therefore denies those allegations.

### 17. **Perdue**

*200. Defendant Perdue Farms, Inc. is a privately held Maryland corporation headquartered in Salisbury, Maryland.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in this Paragraph and therefore denies those allegations.

*201. Defendant Perdue Foods, LLC, a privately held Maryland limited liability corporation headquartered in Salisbury, Maryland, is a subsidiary of Defendant Perdue Farms, Inc.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in this Paragraph and therefore denies those allegations.

*202. Defendants Perdue Farms, Inc. and Perdue Foods, LLC are together referred to as "Perdue" in this Complaint. Perdue reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Delaware, Maryland, North Carolina, South Carolina, Florida, and Kentucky.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in this Paragraph and therefore denies those allegations.

### 18. **Pilgrim's Pride**

203.    Defendant Pilgrim's Pride Corporation ("Pilgrim's" or "Pilgrim's Pride") is a *publicly held Delaware corporation headquartered in Greeley, Colorado. Pilgrim's Pride reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Virginia, West Virginia, North Carolina, Georgia, Tennessee, Florida, South Carolina, Alabama, Texas, Arkansas, and Kentucky. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Pilgrim's Pride was one of the Defendants that submitted false and artificially inflated price quotes to the GDA. Its executive vice president of sales and operations served on the Georgia Dock Advisory Committee. Pilgrim's Pride is a Georgia Dock Defendant.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

204.    Defendant Pilgrim's Pride is liable for all conspiratorial acts undertaken while it *was in bankruptcy proceedings during 2009, and reentered, and reaffirmed its commitment to, the conspiracy following its discharge from bankruptcy on December 29, 2009.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

## 19.    **Sanderson**

205.    Defendant Sanderson Farms, Inc. is a publicly held Mississippi corporation *headquartered in Laurel, Mississippi.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

206.    Defendant Sanderson Farms, Inc. (Foods Division), a Mississippi corporation *headquartered in Laurel, Mississippi, is a wholly-owned subsidiary of Defendant Sanderson Farms, Inc.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

207.    Defendant Sanderson Farms, Inc. (Production Division), a Mississippi *corporation headquartered in Laurel, Mississippi, is a wholly-owned subsidiary of Defendant Sanderson Farms, Inc.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

208.    Defendant Sanderson Farms, Inc. (Processing Division), a Mississippi corporation headquartered in Laurel, Mississippi, is a wholly-owned subsidiary of Defendant Sanderson Farms, Inc.

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

209.    Defendants Sanderson Farms, Inc., Sanderson Farms, Inc. (Foods Division), Sanderson Farms, Inc. (Production Division) and Sanderson Farms, Inc. (Processing Division) are collectively referred to as "Sanderson Farms" in this Complaint. Sanderson reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Georgia, Mississippi, and Texas. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Sanderson Farms was one of the Defendants that submitted false and artificially inflated price quotes to the GDA. Sanderson Farms is a Georgia Dock Defendant.

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

## 20.    **Simmons**

210.    Defendant Simmons Foods, Inc. is a privately held Arkansas corporation headquartered in Siloam Springs, Arkansas. Simmons Foods, Inc. reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its two Siloam Springs, Arkansas complexes.

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

211.    Simmons Prepared Foods, Inc. is a privately held Arkansas company headquartered in Siloam Springs, Arkansas. Simmons Prepared Foods, Inc. is a wholly-owned subsidiary of Simmons Foods, Inc. During the relevant time period, Simmons Foods, Inc. exclusively sold the chicken it produced to Simmons Prepared Foods, Inc., which in turn resold the chicken in various forms to its customers. Simmons Prepared Foods, Inc. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates was engaged in the processing, distribution, sale, pricing, and/or marketing of broilers, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States. Defendants Simmons Foods, Inc. and Simmons Prepared Foods, Inc. are collectively referred to as "Simmons" or "Simmons Foods."

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

21. **Tyson**

*212.   Defendant Tyson Foods, Inc. is a publicly held Delaware corporation headquartered in Springdale, Arkansas.*

**ANSWER:** Tyson admits the allegations in this Paragraph.

*213.   Defendant Tyson Chicken, Inc., a Delaware corporation headquartered in Springdale, Arkansas, is a wholly-owned subsidiary of Defendant Tyson Foods, Inc.*

**ANSWER:** Tyson admits the allegations in this Paragraph.

*214.   Defendant Tyson Breeders, Inc., a Delaware corporation headquartered in Springdale, Arkansas, is a wholly-owned subsidiary of Defendant Tyson Foods, Inc.*

**ANSWER:** Tyson admits the allegations in this Paragraph.

*215.   Defendant Tyson Poultry, Inc., a Delaware corporation headquartered in Springdale, Arkansas, is a wholly-owned subsidiary of Defendant Tyson Foods, Inc.*

**ANSWER:** Tyson admits that Tyson Poultry, Inc. is a Delaware corporation

headquartered in Springdale, Arkansas. Tyson denies that Tyson Poultry, Inc. is a wholly-owned

subsidiary of Tyson Foods, Inc.

*216.   Defendant Tyson Sales And Distribution, Inc., a Delaware corporation headquartered in Springdale, Arkansas, is a wholly owned subsidiary of Defendant Tyson Foods, Inc.*

**ANSWER:** Tyson admits the allegations in this Paragraph.

*217.   Defendants Tyson Foods, Inc., Tyson Chicken, Inc., Tyson Breeders, Inc. and Tyson Poultry, Inc. are collectively referred to as "Tyson" in this Complaint. Tyson reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in Virginia, Pennsylvania, North Carolina, Georgia, Alabama, Mississippi, Texas, Arkansas, Missouri, Indiana, Tennessee, and Kentucky. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Tyson was one of the Defendants that submitted false and artificially inflated price quotes to the GDA. One of its plant managers served on the Georgia Dock Advisory Committee. Tyson is a Georgia Dock Defendant.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize,

or describe documents or other sources, Tyson notes that such sources speak for themselves and

denies any characterization or description that is inconsistent therewith. Tyson admits that, at

143

certain times during the relevant period, it directly submitted certain information to Agri Stats

about its Broiler operations for pro-competitive benchmarking purposes. Tyson further admits

that the Georgia Dock was discontinued in 2016. Tyson further admits that the manager of its

Cumming, Georgia complex, who had no pricing authority, was a representative on the Georgia

Dock Advisory Committee but denies that his role on that Committee enabled him to control the

Georgia Dock price. Tyson denies any remaining allegations in this Paragraph.

### 22. **Wayne**

*218.    Defendant Wayne Farms, LLC ("Wayne Farms") is a Delaware limited liability corporation headquartered in Oakwood, Georgia. Wayne Farms reports a wide variety of data to Agri Stats, including information about its breeder flocks and hatchery capacity, and data for its complexes in North Carolina, Georgia, Alabama, Mississippi, and Arkansas. Until the Georgia Dock benchmark price index stopped being published by the GDA in late November 2016, Wayne Farms was one of the Defendants that submitted false and artificially inflated price quotes to the GDA. Its vice president of fresh sales served on the Georgia Dock Advisory Committee. Wayne Farms is a Georgia Dock Defendant.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in this Paragraph and therefore denies those allegations.

*219.    Defendant" or "Defendants" as used herein, includes, in addition to those named specifically above, all of the named Defendants' predecessors, including broilers companies that merged with or were acquired by the named Defendants and each named Defendant's wholly-owned or controlled subsidiaries or affiliates that sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States during the relevant period. To the extent the term "Producer Defendants" is used herein, it refers to all Defendants other than Agri Stats.*

**ANSWER:** This Paragraph contains Plaintiffs' explanation of defined terms used in their

Complaint, to which no response is required. To the extent a response is required, Tyson admits

that Plaintiffs have defined "Defendant" or "Defendants" and "Producer Defendants" as

described in this Paragraph.

*220.    To the extent that subsidiaries and divisions within each Defendant's corporate family sold or distributed broilers to direct purchasers, these subsidiaries played a material role in the conspiracy alleged in this Complaint because Defendants wished to ensure that the prices paid for such broilers would not undercut the artificially raised and inflated pricing that was the*

144

*aim and intended result of Defendants' coordinated and collusive behavior as alleged herein. Thus, all such entities within the corporate family were active, knowing participants in the conspiracy alleged herein, and their conduct in selling, pricing, distributing, and collecting monies from Plaintiff for broilers was known to and approved by their respective corporate parent named as a Defendant in this Complaint. For the avoidance of doubt, several previously unnamed subsidiaries for Defendants are specifically identified as coconspirators below.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

## V.    PRODUCER CO-CONSPIRATORS

### A.    Producer Co-Conspirator Allen Harim

*221.    Harim USA, Ltd. is a privately held Delaware corporation with its corporate headquarters in Seaford, Delaware. During the relevant period, Harim USA Ltd. and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in this Paragraph and therefore denies those allegations.

*222.    Allen Harim Foods, LLC is a privately held Delaware limited-liability company with its corporate headquarters in Seaford, Delaware, and with facilities and operations in Delaware, Maryland and North Carolina. Allen Harim Foods, LLC is a wholly-owned subsidiary of Harim USA Ltd. During the relevant period, Allen Harim Foods, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in this Paragraph and therefore denies those allegations.

*223.    Allen Harim Farms, LLC is a privately held Delaware limited-liability company with its corporate headquarters in Seaford, Delaware, and with facilities and operations in Delaware, Maryland and North Carolina. Allen Harim Farms, LLC is a wholly-owned subsidiary of Harim USA Ltd. During the relevant period, Allen Harim Farms, LLC and/or its predecessors, wholly-owned or controlled subsidiaries, or affiliates sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in this Paragraph and therefore denies those allegations.

*224. Producer co-conspirators Harim USA, Ltd., Allen Harim Foods, LLC, and Allen Harim Farms, LLC are collectively referred to as "Allen Harim" or the "Producer Co-Conspirators" in this Complaint.*

**ANSWER:** This Paragraph contains no factual allegations to which a response is required.

*225. All of the Defendants' and/or co-conspirators' wrongful actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or engaged in by Defendants' or co-conspirators' various officers, agents, employees, or other representatives within the course and scope of their duties and employment, or with Defendants' or co-conspirators' actual, apparent or ostensible authority. Defendants and co-conspirators' used the instrumentalities of interstate commerce to facilitate the conspiracy, and their conduct was within the flow of, was intended to, and did have, a substantial effect on the interstate commerce of the U.S., including in this District.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

### B. The Defendant Family Co-Conspirators

*226. Various subsidiaries and related entities of the Defendant families named herein actively participated in the conspiracy/conspiracies described in this Complaint and therefore are co-conspirators, including the following:*

**ANSWER:** Tyson denies the allegations in this Paragraph.

### 1. Foster Farms

*227. Foster International Trading Company, Inc. is a corporation affiliated with Foster Farms, LLC and/or Foster Poultry Farms. During the Conspiracy Period, Foster International Trading Company, Inc. sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

*228. Napoleon Poultry Supply LLC is a Delaware limited-liability company with its headquarters in Livingston, California and is a wholly-owned subsidiary of Defendant Foster Farms, LLC. During the relevant period, Napoleon Poultry Supply LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

### 2. **George's**

229.    *George's Chicken, LLC is a Virginia limited-liability company with its headquarters in Edinburg, Virginia, and is a wholly-owned subsidiary of Defendant George's, Inc. During the relevant period, George's Chicken, LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in this Paragraph and therefore denies those allegations.

230.    *George's Family Farms, LLC is a Virginia limited-liability company with its headquarters in Edinburg, Virginia and is a wholly-owned subsidiary of Defendant George's, Inc. During the relevant period, George's Family Farms, LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in this Paragraph and therefore denies those allegations.

231.    *George's Foods, LLC is a Virginia limited-liability company with its headquarters in Edinburg, Virginia, and is a wholly-owned subsidiary of Defendant George's, Inc. During the relevant period, George's Foods, LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in this Paragraph and therefore denies those allegations.

232.    *George's of Missouri, Inc. is a Missouri corporation with its headquarters in Springdale, Arkansas, and is a wholly-owned subsidiary of Defendant George's, Inc. During the relevant period, George's of Missouri, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in this Paragraph and therefore denies those allegations.

233.    *George's Processing, Inc. is an Arkansas corporation with its headquarters in Springdale, Arkansas, and is a wholly-owned subsidiary of Defendant George's, Inc. During the relevant period, George's Processing, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

147

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

### 3. House of Raeford

234. *House of Raeford Farms of Louisiana, L.L.C. is a Louisiana limited-liability company with its headquarters in Shreveport, Louisiana and is a wholly-owned subsidiary of Defendant House of Raeford Farms, Inc. During the relevant period, House of Raeford Farms of Louisiana, L.L.C. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

235. *Johnson Breeders, Inc. is a North Carolina corporation with its headquarters in Rose Hill, North Carolina and is a wholly-owned subsidiary of Defendant House of Raeford Farms, Inc. During the relevant period, Johnson Breeders, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

236. *Columbia Farms of Georgia, Inc. is a South Carolina corporation with its headquarters in Batesburgh-Leesville, South Carolina and is a wholly-owned subsidiary of Defendant House of Raeford Farms, Inc. During the relevant period, Columbia Farms of Georgia, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

237. *Raeford Farms of Louisiana, L.L.C. is a Louisiana limited-liability company with its headquarters in Arcadia, Louisiana and is a wholly-owned subsidiary of Defendant House of Raeford Farms, Inc. During the relevant period, Raeford Farms of Louisiana, L.L.C. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

238.    Columbia Farms, Inc. is a South Carolina corporation with its headquarters in Columbia, South Carolina and is a wholly-owned subsidiary of Defendant House of Raeford Farms, Inc. During the relevant period, Columbia Farms, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

### 4.    Koch

239.    JCG Industries, Inc., is an Illinois corporation with its headquarters in Chicago, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, JCG Industries, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

240.    JCG Properties, L.L.C. is an Illinois limited-liability company with its headquarters in Chicago, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, JCG Properties, L.L.C. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

241.    JCG Land Holdings, LLC is an Illinois limited-liability company with its headquarters in Park Ridge, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, JCG Land Holdings, LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

242.    JCG Foods LLC is a Delaware limited-liability company with its headquarters in Park Ridge, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, JCG Foods LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

149

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

243.    *Koch Foods of Cumming LLC, formerly known as Greko, L.L.C., is a Georgia limited-liability company with its headquarters in Cumming, Georgia, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Foods of Cumming LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

244.    *Koch Foods of Gainesville LLC, formerly known as Gress Foods LLC, is a Georgia limited-liability company with its headquarters in Gainesville, Georgia, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Foods of Gainesville LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

245.    *JCG Farms of Georgia LLC is a Georgia limited-liability company with its headquarters in Park Ridge, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, JCG Farms of Georgia LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

246.    *Koch Foods of Mississippi LLC is a Mississippi limited-liability company with its headquarters in Morton, Mississippi, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Foods of Mississippi LLC sold broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

247.    *Koch Farms of Mississippi LLC is a Mississippi limited-liability company with its headquarters in Morton, Mississippi, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Farms of Mississippi LLC sold broilers in interstate*

*commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

*248. Koch Freezers LLC is a Mississippi limited-liability company with its headquarters in Morton, Mississippi, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Freezers LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

*249. Koch Properties of Mississippi LLC was (presently dissolved) a Mississippi limited-liability company with its headquarters in Morton, Mississippi, and was a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Properties of Mississippi LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

*250. Koch Foods of Alabama LLC is an Alabama limited-liability company with its headquarters in Montgomery, Alabama, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Foods of Alabama LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

*251. Koch Farms of Alabama LLC is an Alabama limited-liability company with its headquarters in Montgomery, Alabama, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Farms of Alabama LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

252. *JCG Farms of Alabama LLC is an Alabama limited-liability company with its headquarters in Park Ridge, Illinois, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, JCG Farms of Alabama LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

253. *Koch Foods of Ashland LLC is an Alabama limited-liability company with its headquarters in Montgomery, Alabama, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Foods of Ashland LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

254. *Koch Farms of Ashland LLC is an Alabama limited-liability company with its headquarters in Montgomery, Alabama, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Farms of Ashland LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

255. *Koch Farms of Gadsden LLC is an Alabama limited-liability company with its headquarters in Montgomery, Alabama, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Farms of Gadsden LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

256. *Koch Foods of Gadsden LLC is an Alabama limited-liability company with its headquarters in Montgomery, Alabama, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Foods of Gadsden LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

257. *Koch Foods of Cincinnati LLC, f/k/a Preferred Foods, LLC, is an Ohio limited-liability company with its headquarters in Fairfield, Ohio, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Foods of Cincinnati LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

258. *Koch Foods LLC, operating under the assumed names Koch Foods of Chattanooga and Koch Foods of Morristown, is a Tennessee limited-liability company with its headquarters in Chattanooga, Tennessee, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant period, Koch Foods LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

259. *Koch Farms, LLC is a Tennessee limited liability company with its headquarters in Chattanooga, Tennessee, and is a wholly-owned subsidiary of Koch Foods, Inc. During the Conspiracy Period, Koch Farms, LLC sold Broilers in interstate commerce, directly or indirectly through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

260. *Koch Farms of Chattanooga, LLC is a Tennessee limited liability company with its headquarters in Chattanooga, Tennessee, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant time period, Koch Farms of Chattanooga, LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

261. *Koch Foods of Chattanooga, LLC is a Tennessee limited liability company with its headquarters in Chattanooga, Tennessee, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant time period, Koch Foods of Chattanooga, LLC sold Broilers in*

interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

262.   Koch Foods of Morristown, LLC is a Tennessee limited liability company with its headquarters in Chattanooga, Tennessee, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant time period, Koch Foods of Morristown, LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

263.   Koch Farms of Morristown, LLC is a Tennessee limited liability company with its headquarters in Chattanooga, Tennessee, and is a wholly-owned subsidiary of Koch Foods, Inc. During the relevant time period, Koch Farms of Morristown, LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

### 5. **O.K. Foods**

264.   O.K. Broiler Farms Limited Partnership was (presently dissolved) an Arkansas limited partnership with its headquarters in Fort Smith, Arkansas and is a wholly-owned subsidiary of Defendant O.K. Foods, Inc. During the relevant period, O.K. Broiler Farms Limited Partnership sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

### 6. **Peco Foods**

Peco Farms of Mississippi, LLC is a Mississippi limited-liability company with its headquarters in Jackson, Mississippi and is a wholly-owned subsidiary of Defendant Peco Foods, Inc. During the relevant period, Peco Farms of Mississippi, LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

### 7. **Perdue**

265.    *Perdue Foods, Inc. (now dissolved) was a Maryland corporation with its headquarters in Salisbury, Maryland, and a wholly-owned subsidiary of Perdue Farms Inc. During the relevant period, Perdue Foods, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

266.    *Harvestland Holdings, LLC was a Maryland limited-liability company with its headquarters in Salisbury, Maryland and a wholly-owned subsidiary of Perdue Farms Inc. During the relevant period, Harvestland Holdings, LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

267.    *Perdue Food Products, Inc. was a Maryland limited-liability company with its headquarters in Salisbury, Maryland and a wholly-owned subsidiary of Perdue Farms Inc. During the relevant period, Perdue Food Products, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

268.    *Perdue Farms, LLC is a Maryland limited liability company with its headquarters in Salisbury, Maryland and is wholly-owned subsidiary of Perdue Farms, Inc. During the relevant time period, Perdue Farms, LLC sold Broilers in interstate commerce, directly or through its wholly-owned or controlled affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

269.    *Perdue Farms Incorporated (now merged with Perdue Farms LLC) was a Maryland limited-liability company with its headquarters in Salisbury, Maryland and a wholly-owned subsidiary of Defendant Perdue Farms Inc. During the relevant period, Perdue Farms*

*Incorporated sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

### 8. **Pilgrim's Pride**

*270. PFS Distribution Company is a Delaware company with its headquarters in Arlington, Texas and is a wholly-owned subsidiary of Defendant Pilgrim's Pride Corporation. During the relevant period, PFS Distribution Company sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

*271. Merit Provisions, LLC is a Texas limited-liability company with its headquarters in Dallas, Texas and is a wholly-owned subsidiary of Defendant Pilgrim's Pride Corporation. During the relevant period, Merit Provisions, LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

*272. GC Properties, LLC is a Georgia limited-liability company with its headquarters in Powder Springs, Georgia and is a wholly-owned subsidiary of Defendant Pilgrim's Pride Corporation. During the relevant period, GC Properties, LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

*273. Pilgrim's Pride of Nevada, Inc. is a Nevada corporation with its headquarters in Greeley, Colorado and is a wholly-owned subsidiary of Defendant Pilgrim's Pride Corporation. During the relevant period, Pilgrim's Pride of Nevada, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

274.    *PPC Marketing, Ltd. is a Texas company with its headquarters in Pittsburg, Texas and is a wholly-owned subsidiary of Defendant Pilgrim's Pride Corporation. During the relevant period, PPC Marketing, Ltd. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

275.    *Pilgrim's Pride Corporation of West Virginia, Inc. is a West Virginia corporation with its headquarters in Greeley, Colorado and is a wholly-owned subsidiary of Defendant Pilgrim's Pride Corporation. During the relevant period, Pilgrim's Pride Corporation of West Virginia, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

### 9.    **Tyson**

276.    *Tyson Sales and Distribution, Inc. is a Delaware corporation with its headquarters in Springdale, Arkansas, and is a wholly-owned subsidiary of Tyson Foods, Inc. During the relevant period, Tyson Sales and Distribution, Inc. sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Tyson admits that Tyson Sales and Distribution, Inc. is a Delaware corporation with headquarters in Springdale, Arkansas and is a wholly owned subsidiary of Tyson Foods, Inc. Tyson further admits that, during the relevant period, Tyson Sales and Distribution, Inc. sold Broilers in interstate commerce to purchasers in the United States. Tyson denies any remaining allegations in this Paragraph.

### 10.    **Wayne**

277.    *WFSP Foods, LLC is a Georgia limited-liability company with its headquarters in Decatur, Alabama, and is a wholly-owned subsidiary of Defendant Wayne Farms. During the relevant period, WFSP Foods, LLC sold broilers in interstate commerce, directly or through its owned or controlled subsidiaries and affiliates, to purchasers in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

157

## VI.   <u>NON-PRODUCER CO-CONSPIRATORS</u>

*278.   Non-Producer Co-Conspirator Tip Top Poultry, Inc, ("Tip Top") is a Georgia corporation headquartered in Marietta, Georgia and with facilities in other states, including Oklahoma. As alleged below, Tip Top played an active and important role in facilitating and implementing the production-restriction mechanism of the conspiracy detailed in this Consolidated Complaint.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the

truth of the allegations this Paragraph and therefore denies those allegations.

*279.   Non-Producer Co-Conspirator Southern Hens, Inc. ("Southern Hens") is a Mississippi corporation headquartered in Moselle, Mississippi. As alleged below, Southern Hens played an active and important role in facilitating and implementing the production-restriction mechanism of the conspiracy detailed in this Consolidated Complaint.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the

truth of the allegations this Paragraph and therefore denies those allegations.

*280.   Non-Producer Co-Conspirator Utrecht-America Holdings, Inc., a Delaware corporation headquartered in New York, NY, is a commercial bank and financial services provider and the American subsidiary of the Dutch cooperative banks Cooperative Rabobank U.A. and Rabobank International Holding, B.V. Its subsidiaries or affiliates include: Non-Producer Co-Conspirator Rabo AgriFinance LLC, a Delaware limited liability company headquartered in Saint Louis, MO, that provides financial services and insurance to agricultural producers and agribusinesses; Non-Producer Co-Conspirator Rabobank USA Financial Corporation, a Delaware corporation headquartered in New York, NY that is a special purpose entity formed to issue commercial paper notes; and financial services company Non-Producer Co-Conspirator Utrecht-America Finance Co., a Delaware company headquartered in New York, NY. Non-Producer Co-Conspirator Coöperatieve Rabobank, U.A., New York Branch is a cooperative that does business in New York State and maintains offices in New York, NY and Atlanta, GA. Collectively these Non-Producer Co-Conspirators are referred to herein as "Rabobank."*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in this Paragraph and therefore denies those allegations.

*281.   Various other persons, firms, and corporations not named as Defendants have performed acts and made statements in furtherance of the Conspiracy. Defendants are jointly and severally liable for the acts of their co-conspirators whether or not named as Defendants in this Complaint. Throughout this Complaint, the Producer Co-Conspirators, the Defendant family co-conspirators, and the Non-Producer Co-Conspirators identified above, and the other persons, firms, and corporations not named as Defendants that performed acts and made statements in furtherance of the conspiracy are collectively referred to as "Co-Conspirators."*

**ANSWER:** This Paragraph contains Plaintiffs' legal conclusions, to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson admits that Plaintiffs have defined "Co-Conspirators" as described in this Paragraph, but denies any remaining allegations in this Paragraph.

282. *Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs. DAPs reserve the right to supplement or amend this pleading based on, among other things, bid-rigging discovery that the Court has thus far stayed.*

**ANSWER:** This Paragraph contains Plaintiffs' explanation of a defined term used in their Complaint, to which no response is required. To the extent a response is required, Tyson admits that Plaintiffs have defined "any act of any corporation" as described in this Paragraph but denies any remaining allegations in this Paragraph.

283. *Each of the Defendants acted as the agent of or joint-venturer for the other Defendants with respect to the acts, violations and common course of conduct alleged herein.*

**ANSWER:** This Paragraph contains Plaintiffs' legal conclusions, to which no response is required. To the extent a response is required, Tyson denies such conclusions. Tyson denies any remaining allegations in this Paragraph.

284. *The Defendants named in each underlying DAP complaint are jointly and severally liable for the acts of all Defendants and Co-Conspirators named in that DAP complaint.*

**ANSWER:** This Paragraph contains Plaintiffs' legal conclusions, to which no response is required. To the extent a response is required, Tyson denies such conclusions. Tyson denies any remaining allegations in this Paragraph.

## VII. JURISDICTION AND VENUE

285. *The Court has subject-matter jurisdiction of the various federal and state claims under 28 U.S.C. §§ 1331, 1337(a), 1407, and 15 U.S.C. §§ 15, 26. This Court has supplemental*

159

*jurisdiction over the state causes of action asserted herein pursuant to 28 U.S.C. § 1367 because those causes of action arise from the same set of operative facts as the federal causes of action.*

**ANSWER:** Tyson admits that the Court has subject matter jurisdiction over this action.

*286.    Venue is proper in this District under 15 U.S.C. § 15(a), 15 U.S.C. § 22, and 28 U.S.C. §§ 1391(b) because during the relevant period, Defendants resided, transacted business, were found, or had agents in this District, and because a substantial portion of Defendants' alleged wrongful conduct affecting interstate trade and commerce was carried out in this District. In addition, Defendants have already submitted to the jurisdiction and venue of this Court.*

**ANSWER:** Tyson admits that venue properly lies in this District for purposes of this

action only. Tyson denies any remaining allegations in this Paragraph.

*287.    Defendants are amenable to service of process under Fed. R. Civ. P. 4(k)(1)(A) and the Illinois long-arm statute 734 Ill. Comp. Stat. 5/2-209 because each Defendant has transacted business in this state and because the Illinois long-arm statute extends jurisdiction to the limits of Due Process, and each Defendant has sufficient minimum contacts with the state of Illinois to satisfy Due Process.*

**ANSWER:** Tyson admits that it has transacted business in the state of Illinois. Tyson

denies any remaining allegations in this Paragraph.

*288.    This Court has personal jurisdiction over each Defendant because each Defendant has transacted business, maintained substantial contacts, or committed overt acts in furtherance of its illegal scheme and conspiracy throughout the U.S., including in this District. The alleged scheme and conspiracy have been directed at, and had the intended effect of, causing injury to persons and entities residing in, located in, or doing business throughout the U.S., including in this District.*

**ANSWER:** Tyson admits that the Court has personal jurisdiction over Tyson.  Tyson

further admits that it has transacted business in this District. Tyson denies all remaining

allegations in this Paragraph.

*289.    This Court also has personal jurisdiction over the Defendants because each of them knew, or should have known, that because the Georgia Dock index price was used to price chicken bought in Illinois and nationwide, their participation in the collusive manipulation of the Georgia Dock would have effects on the price of chicken purchased in Illinois based on the Georgia Dock benchmark. The alleged scheme and conspiracy have been directed at, and had the intended effect of, causing injury to persons and entities residing in, located in, or doing business in the state of Illinois.*

160

**ANSWER:** Tyson admits that the Court has personal jurisdiction over Tyson. Tyson further admits that it has transacted business in this District. Tyson denies all remaining allegations in this Paragraph.

## VIII. TRADE AND COMMERCE

290.    *According to a 2012 report by Focus Management Group, chicken "is a commodity product with little or no product differentiation based on the processors," and the CEO of Defendant Pilgrim's Pride recently commented that "the chicken business per se is a commodity business."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

291.    *The commodity nature of chicken is evidenced by the fact that, as detailed below, numerous Defendants have during the relevant period purchased chicken from each other (then likely resold it) to buttress their conspiracy by soaking up excess supply in the market.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that at certain times it has purchased chicken products from another broiler producer based on its own business judgment of what was in its independent interest. Tyson denies any remaining allegations in this Paragraph.

292.    *Typically, when a product is characterized as a commodity, competition is based principally on price, as opposed to other attributes, such as product quality or customer service.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

293.    *Chicken producers pay USDA graders to examine their chickens, and almost all companies sell USDA Grade A chicken, meaning that there is very little differentiation amongst sellers.*

**ANSWER:** Tyson admits that chicken producers can pay USDA graders to examine their chicken, and that it sells USDA Grade A chicken, but denies any remaining allegations in this Paragraph.

294. *Due to the lack of product differentiation, Defendants compete on price (absent collusion) such that the supply decisions of each chicken producer impact the market price for chickens. While an individual producer often has the incentive to increase production to maximize profits, any increased production will ultimately reduce the profitability of the industry as a whole. Thus, the commodity nature of the product in the chicken industry makes it attractive to implement a price-fixing scheme and provides industry players with the incentive to agree to reduce overall supply.*

**ANSWER:** Tyson admits that price is one component of competition but denies all remaining allegations in this Paragraph.

295. *The United States chicken market is a national market, valued at nearly $41 billion in 2016. According to the U.S. Poultry & Egg Association, the value of wholesale U.S. Broilers produced in 2014 was $32.7 billion, up 6 percent from 2013. The market value varied between $21.8 and $30.7 billion from 2008-2013.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

296. *During the relevant period, Defendants collectively controlled nearly 90% of the market for chicken in the United States.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. As the term "collectively controlled" is imprecise, Tyson is unable to form a belief as to the truth of the allegations contained in this Paragraph and on this basis denies those allegations. Tyson denies any remaining allegations in this Paragraph.

297. *The chicken industry is almost entirely vertically integrated, with producers (sometimes known as "integrators") owning, or tightly controlling, each of the six stages of the*

*supply chain: breeding, hatching, chick-rearing/feeding, slaughtering mature birds, processing, and selling.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that it has ownership and control over aspects of its production, including processing and selling. Tyson denies the characterization of "vertical integration" in this Paragraph. Tyson denies any remaining allegations in this Paragraph.

298.    *At the top of the supply chain are Defendants' "breeder flocks," which include the hens that lay the eggs that, when hatched, become chickens slaughtered for meat consumption.*

**ANSWER:** Tyson admits that broiler breeder hens produce eggs that may become broiler chickens slaughtered for meat consumption. Tyson denies any remaining allegations in this Paragraph.

299.    *The prices for Plaintiffs' chicken purchases during the relevant period were based in part on prices published by one of three entities: Urner Barry, the Georgia Department of Agriculture (the "Georgia Dock"), and the United States Department of Agriculture (the "USDA Composite").*

**ANSWER:** Tyson admits that Urner Barry, the Georgia Department of Agriculture, and the USDA have published pricing data for certain poultry products. Tyson denies any remaining allegations in this Paragraph.

300.    *The Georgia Dock, USDA Composite, and Urner Barry indices all measure the same (or very similar) size and grade of chicken.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

301.    *The USDA's publicly available Composite index collects and publishes chicken price information on a weekly basis.*

**ANSWER:** Tyson admits that the USDA has reported pricing data for certain poultry products and that some of that data is publicly available for free. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this

Paragraph and therefore denies those allegations.

302.     *Urner Barry collects and publishes daily price information for chicken. This information is subscription-based, and all chicken producers and many chicken purchasers subscribe for a fee.*

**ANSWER:** Tyson admits that Urner Barry has reported pricing data for certain poultry

products and that Urner Barry provides some subscription-based data services. Tyson lacks

knowledge or information sufficient to form a belief as to the truth of any remaining allegations

in this Paragraph and therefore denies those allegations.

303.     *The USDA and Urner Barry chicken price indices are purportedly based upon a system of double verification, which includes telephonic and written surveys of all or nearly all chicken producers. The Georgia Dock index was based on a materially different methodology discussed in more detail below.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in this Paragraph and therefore denies those allegations.

304.     *Published chicken prices from Urner Barry, Georgia Dock, and USDA relate to the spot market for chicken (a spot market purchase is a non-recurring purchase for immediate delivery). Defendants also used the prices for chicken on the spot market, especially as reported by Georgia Dock, to negotiate prices for their contract purchasers.*

**ANSWER:** Tyson denies that the Georgia Dock related to the spot market. Tyson lacks

knowledge or information sufficient to form a belief as to the truth of any allegations in this

Paragraph that relate to other Defendants and/or third parties, and therefore denies those

allegations. As this Paragraph does not indicate to which specific data provided by Urner Barry

and USDA the allegations contained in this Paragraph refer, Tyson is unable to form a belief as

to the truth of those allegations and therefore denies them. Tyson denies any remaining

allegations in this Paragraph.

305.     *As a consequence of the inelasticity of supply and demand in the chicken industry and the availability of the spot market price indices, public price announcements by Defendants were unnecessary. Defendants knew and intended that a decrease in supply pursuant to their*

164

*agreement would increase chicken spot market prices or maintain them at artificially inflated non- competitive levels, and therefore that all chicken prices would increase or be artificially high.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*306.    During the relevant period, Defendants produced, sold, and shipped chicken in a continuous and uninterrupted flow of interstate commerce. The conduct of the Defendants as alleged herein, including the conspiracy in which Defendants participated, was intended to have and had a direct, substantial, and reasonably foreseeable effect on interstate commerce, including commerce in this District.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterization of their claims, arguments subject to proof by expert testimony, and/or legal conclusions, to which no response is required. To the extent that a response is required, Tyson admits that it sold certain broiler products in the United States, but denies any remaining allegations in this Paragraph.

*307.    During the relevant period, each Defendant, or one or more of its affiliates, used the instrumentalities of interstate commerce to join or effectuate their conspiracy.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*308.    During the time period relevant to Plaintiffs' claims, Plaintiffs and/or their assignors, directly purchased chicken in the United States from one or more Defendants and/or their Co-Conspirators, and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint. Plaintiffs are "persons" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions, to which no response is required. To the extent a response is required, Tyson admits that it sold various chicken products to certain Plaintiffs during the relevant period, but denies Plaintiffs sustained any injury as a result of any purchase from Tyson and that Tyson

committed any antitrust violations. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

## IX. FACTUAL ALLEGATIONS REGARDING DEENDANTS' UNLAWFUL CONSPIRACY

309.    *Defendants relied on multiple means and methods to sustain the conspiracy described in this Complaint, which included, among other things, numerous inter-related unlawful contracts, combinations, agreements, and other instances of anticompetitive conduct. Each of these unlawful agreements and anticompetitive actions, in addition to the other overt acts alleged in more detail herein – while actionable in and of themselves – were undertaken in furtherance of the overarching conspiracy and in pursuit of Defendants' common goal of fixing, raising, stabilizing, and maintaining Broiler prices throughout the United States.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson denies any remaining allegations in this Paragraph.

310.    *Defendants' conspiracy began in approximately 2008, when they engaged in a series of coordinated supply reductions at the start of the distribution chain.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

311.    *In the year preceding the beginning of Defendants' conspiracy, the U.S. chicken market was foundering.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

312.    *In 2007, a glut of chicken – the result of significant overproduction by Sanderson Farms, Mountaire Farms, and House of Raeford – began to flood the market, and prices cratered. For decades before then, the chicken industry had followed a predictable pattern of boom-and-bust: when prices for chicken went up, companies flooded the market with chicken, causing prices to crash.*

166

**ANSWER:** Tyson denies Plaintiffs' characterization of its production decisions; Tyson planned and executed its U.S. broiler production based on its own, unilateral business judgment of what is in its independent interest. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations this Paragraph and therefore denies those allegations.

313.    *In 2007, Pilgrim's, Tyson, and a few other chicken producers (Foster, Peco, and Perdue) attempted to cut their production levels enough to cause industry prices to rise.*

**ANSWER:** Tyson denies Plaintiffs' characterization of its production decisions; Tyson planned and executed its U.S. broiler production based on its own, unilateral business judgment of what is in its independent interest. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson denies any remaining allegations in this Paragraph.

314.    *However, despite Pilgrim's and Tyson's combined 40% market share, their production cuts in 2007 were not enough to increase prices through supply cuts because other broiler companies increased their production.*

**ANSWER:** Tyson admits that in 2007, as in every year, Tyson adjusted its U.S. broiler production based on its own business judgment of what is in its independent interest. Tyson lacks knowledge or information sufficient to form a belief as to the truth of the precise figures set forth in this Paragraph, and on this basis denies those allegations. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson denies any remaining allegations in this Paragraph.

315.    *Production cuts in 2007 followed the typical pattern of focusing on short-term reductions in production – such as slaughtering chickens early. Defendants did not, however, make significant cuts at the top of the supply chain – such as by culling of breeder flocks – which would have had longer-term effects on supply.*

167

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

316.     *By the time the Great Recession hit the American economy in 2008, the oversupply and low prices of chickens put Defendants – individually and collectively – in dire financial straits. In 2008, the first year of the Great Recession, Defendants faced what promised to be a historically bad year for the chicken industry. Against this backdrop, Defendants resolved to do whatever it would take to ensure continued profitability. What Defendants chose was to enter into an unlawful agreement and understanding that they would disregard competition, and instead, work together to return to, and maintain, profitability in the broiler industry going forward. As a result, Defendants agreed to depart from the previous industry practice of short-term or medium-term production cuts, which had led to the destructive boom-and-bust cycles that plagued chicken producers for years. Thus began Defendants' conspiracy, which over the next decade, evolved into an overarching, multi-faceted restraint of trade.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. As the terms "dire financial straits," "historically bad year," and "boom-and-bust cycles" in this Paragraph are imprecise, Tyson is unable to form a belief as to the truth of the allegations in this Paragraph and therefore deny those allegations. Tyson denies any remaining allegations in this Paragraph.

317.     *In early 2008, through press releases, earnings and investor calls, at investment bank conferences, at events hosted by Agri Stats, through communications both direct and facilitated by third parties, and at the myriad trade association meetings attended by many of their senior-most executives, Defendants began implementing the conspiracy. Among other acts in furtherance of the conspiracy, Defendants called on one another to heed the mistakes of the past, preaching to one another that oversupply was decimating industry profits, and that increased supply-side "discipline" was needed to halt the downward trajectory of chicken prices.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

318.     *Defendants collectively agreed to the reduction or relative stabilization of industry capacity, particularly at the breeder flock level, where such efforts would be most effective – as a mechanism to increase Defendants' profits.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

319.     *Defendants' efforts were supported by public statements made by their executives, which involved more than an announcement of a Defendant's own conduct. As alleged below, many of Defendants' executives' calls for a new era of "discipline" included explicit statements that signaled deeper production cuts were an industry-wide imperative that would pay dividends for "the industry" as a whole.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

320.     *Defendants, who collectively control nearly 90% of the U.S. chicken market, jointly engaged in this not-easily-reversed production reduction effort.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

321.     *While spearheaded primarily by the CEOs and senior personnel of Defendants Tysons and Pilgrim's – which, as publicly held entities holding sizable but by no means controlling shares of the U.S. chicken market, were well-positioned to rally the entire industry – Defendants' executives' public discussion of industry conditions was not limited to the larger, publicly held Defendants.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

322.     *For example, Mike Welch, CEO of Defendant Harrison, was (along with Sanderson COO, Lampkin Butts) a panelist at a symposium hosted by industry journal WATT PoultryUSA, where the discussion topics included industry consolidation, efficiency, and bird size, with references to information gleaned from Agri Stats (whose vice president, Mike Donohue, was in the audience).[16]*

> *FN 16: Excerpts of comments made by Messrs. Welch and Butts are publicly available on WATT PoultryUSA's YouTube channel. See "Broiler company executives say bird size increase will continue," available at https://www.youtube.com/watch?v= ZBgEecBi7D4 and "Lampkin Butts describes changes in the poultry industry," available at https://www.youtube.com/watch?v=RN1IAphbQXs&t=53s (both last visited July 23, 2020).*

**ANSWER:** To the extent the allegations in this Paragraph and Footnote purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks

knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and Footnote and therefore denies those allegations.

323. *Defendants coordinated their strategy for achieving their desired anticompetitive ends by exchanging confidential and commercially sensitive information regarding production, capacity, and pricing of broilers. As part of this strategy, Defendants exchanged information regarding anticipated future production through Agri Stats.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

324. *As alleged in further detail below, Defendants executed on this strategy and in furtherance of the conspiracy by implementing numerous coordinated production cuts in 2008 and early 2009, which successfully drove up prices (and profits) by late 2009. After this effort proved successful, Defendants enacted another round of coordinated production cuts in 2011, again causing prices (and profits) to rise.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson denies any remaining allegations in this Paragraph.

325. *At the same time that Defendants were coordinating supply cuts, they also – likely emboldened by the success of their previous information sharing and coordination scheme and eager to generate additional supracompetitive profits – began exchanging and agreeing upon prices to charge common customers. This conduct served as the genesis for a new facet of Defendants' conspiracy: a scheme to fix prices and rig and submit artificially high bids to purchasers in order to increase prices, and in turn, profits.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson denies any remaining allegations in this Paragraph.

326. *As alleged in further detail below, Defendants' bid-rigging and price-fixing conspiracy began in earnest in 2011 and continued until at least 2019. Pursuant to that conspiracy, and in furtherance of the overarching conspiracy, Defendants established a network to exchange confidential information for purposes of coordinating on bids, pricing submissions, and negotiation strategies for common customers. Defendants' participation in this network often included salesman, who would serve as the conduits of information and coordination by exchanging e-mails, phone calls, and text messages with their counterparts at other suppliers,*

*and executives, who oversaw, approved and encouraged the information sharing and coordination.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson denies any remaining allegations in this Paragraph.

*327.    Through this network, Defendants monitored bid and pricing information offered by other suppliers and reached agreements to submit aligned bids and offer aligned pricing to customers. Defendants also relied on this network to coordinate on contract negotiations with some customers in order to impose significant price increases on those customers through a take it or leave it approach to negotiations. Indeed, by 2014, the conspiracy had gone into "overdrive" as the Defendants coordinated and colluded to impose double digital price increases on many of their customers. As a result of these anticompetitive actions, Defendants' customers paid artificially high prices for broilers, while Defendants pocketed supracompetitive profits.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

*328.    At the same time that Defendants' bid-rigging and price-fixing conspiracy was going into "overdrive" in 2014, another facet of the overarching conspiracy was taking shape in the form of Defendants' conspiracy to collusively and fraudulently manipulate the Georgia Dock price index.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or

describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

*329.    As alleged in further detail below, the Georgia Dock price index was widely used industry pricing benchmark that served as the basis for pricing in many of Defendants' contracts for the sale of Broilers. The Georgia Dock was published by the Poultry Market News ("PMN") office of the Georgia Department of Agriculture ("GDA"), which calculated the Georgia Dock based on weekly price submissions from nine broiler producers operating in the state of Georgia. Those nine producers also oversaw and controlled the Georgia Dock through the Poultry Market News Advisory Committee ("PMN Advisory Committee").*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson admits that the Georgia Department of Agriculture published the Georgia Dock Index at certain times during the relevant period, but denies any remaining allegations in this Paragraph.

*330.    These producers, the Georgia Dock Defendants, began manipulating the Georgia Dock following a series of unofficial PMN Advisory Committee calls regarding a May 28, 2014 request by one member of the PMN Advisory Committee to reevaluate that week's Georgia Dock price. Prior to these calls, the Georgia Dock had largely tracked with other comparable price indices. However, following the reevaluation, the Georgia Dock began to diverge from those other indices and steadily increased over time with minimal fluctuation until the GDA ceased publishing the Georgia Dock in November 2016 due to questions regarding its reliability. This divergence was the result of a collusive and fraudulent scheme by the Georgia Dock Defendants to submit false and inflated price quotes to the PMN in order to artificially increase the Georgia Dock price, and in turn, customer prices.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson admits that the Georgia Department of Agriculture published the Georgia Dock Index at certain times during the relevant period. Tyson further admits that the Court found that the Georgia Department of Agriculture created the Poultry Market News Advisory Committee, and it was comprised of representatives from certain

of Georgia Dock Defendants. *Broilers*, 702 F. Supp.3d at 682-83. Tyson further admits that the Court found that the Georgia Dock reevaluation process was an established process of the Poultry Market News division, a department of a governmental agency, where Poultry Market News staff had to agree to any request for a revaluation. *Id.* at 685-87. Tyson further admits that the Court found that at the time of the May 28, 2014 meeting, the Georgia Dock price was lower than the Urner Barry price. *Id.* at 685-86. Tyson further admits that the Court found that the May 28, 2014 meeting included only three of the nine Georgia Dock Defendants as well as the primary Poultry Market News staff person. *Id.* at 686. Tyson further admits that summary judgment was granted to Defendants on all Georgia Dock claims. *Id.* Tyson denies any remaining allegations in this Paragraph.

*331. Defendants implemented the Georgia Dock scheme in furtherance of the overarching conspiracy. In fact, when the Georgia Dock scheme began in 2014, it functioned as a complement to Defendants' already successful supply reduction and bid-rigging schemes because the Georgia Dock price index was one of the primary pricing benchmarks used in contracts between Defendants and customers that were not directly affected by Defendants' bid-rigging conduct. Thus, by manipulating the Georgia Dock, Defendants were able to impose artificially inflated prices on numerous additional customers who may not have otherwise been subject to such prices, thereby, generating additional supracompetitive profits. That Defendants were able to identify the synergy between these two schemes is unsurprising, as many of the key individuals involved in Defendants' bid-rigging and price-fixing conduct were also involved in Defendants' manipulation of the Georgia Dock.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson denies any remaining allegations in this Paragraph.

*332. The unlawful agreements and anticompetitive acts alleged above (and more fully alleged below) were examples of the many means and methods that Defendants' relied on to further their overarching conspiracy. Each of these actions had the effect of unreasonably restraining trade, artificially inflating and maintaining prices, and reducing competition in the broiler chicken industry, and was undertaken in advancement of Defendants' common goal of fixing, raising, stabilizing, and maintaining Broiler prices throughout the United States.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson denies any remaining allegations in this Paragraph.

A. **Production Cutting**

1. **In an Early Phase of their Conspiracy, Defendants Departed from Their Historical Practice by Collectively Reducing Breeder Flocks in Unprecedented Amounts**

*333.     In 2008, and throughout the relevant period, the vertically integrated Defendants had the ability to manipulate supply to the chicken market at one or more stages of the supply chain.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*334.     Beginning in early 2008, Defendants began utilizing this ability by making significant production cuts, including unprecedented cuts in their breeder flocks.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*335.     Defendants knew they could effectively manipulate supply by reducing the size of breeder flocks, and retiring or killing breeders at an earlier age than the optimum age.*

**ANSWER:** Tyson admits that it theoretically has several means to adjust production of Broilers in the event it determines doing so is in its independent interest, including reducing or increasing the size of breeder flocks and reducing or increasing egg sets, which impacts chick placements. Tyson denies any remaining allegations in this Paragraph.

*336.     By design, reducing breeder flocks would have significant, and long-lasting, effect on supply of chickens in the market more so than reducing supply down the chain.*

**ANSWER:** Tyson admits that it theoretically has several means to adjust production of Broilers in the event it determines doing so is in its independent interest, including reducing or increasing the size of breeder flocks and reducing or increasing egg sets, which impacts chick placements. Tyson denies any remaining allegations in this Paragraph.

337.     Because breeder flocks are created from a limited pool of so-called "grandparent" chickens from one of only three genetics companies (Aviagen, Hubbard, and Tyson's Cobb-Vantress), it takes substantial time – anywhere from six to eighteen months or more – to re- populate a breeder flock that has been reduced through early culling.

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that it theoretically has several means to adjust production of Broilers in the event it determines doing so is in its independent interest, including reducing or increasing the size of breeder flocks and reducing or increasing egg sets, which impacts chick placements. Tyson admits that Aviagen, Hubbard, and Cobb-Vantress is a Broiler genetics company. Tyson denies any remaining allegations in this Paragraph.

338.     While Defendants continued to use their historic methods to affect their supply-reduction scheme (at the middle or end of the supply chain, such as by reducing eggs placements, killing newly hatched chicks, or idling processing plants), their conspiracy was cemented by the long-term effects of breeder flock reductions that could not be easily reversed by Defendants.

**ANSWER:** Tyson denies the allegations in this Paragraph.

339.     Defendants' calculated decisions to create long-term reductions are clear indicators of a collusive agreement because it would not be in an individual Defendant's economic self-interest to undertake the significant risk of reducing its own long-term production capacity unless it was known that competitors would undertake similar dramatic and long-term cuts to production capacity.

**ANSWER:** Tyson denies the allegations in this Paragraph.

340.     Defendants' collective output-restriction caused a significant, not-easily-reversed, slowing in overall chicken production during the conspiracy – bucking the historic trend of steady annual production increases.

**ANSWER:** Tyson denies the allegations in this Paragraph.

341.     The overall effect of this mechanism of Defendants' conspiracy is shown in the graph below, drawn from USDA data,[17] showing that while chicken production grew a total of 21% from 2000 to 2008 (an average of 2.3% per year, proof that the "3% more broilers" quip is more than anecdotal), it then slowed to a total of roughly 10% from 2008 through 2016 (an average of slightly more than 1% per year) – a significant decrease in the pace, timing and manner of chicken production during the relevant period:

175

*FN 17: NASS, Chickens, Young, Slaughter, FI, Certified, Chilled & Frozen – Production, Measured in LB, available at https://quickstats.nass.usda.gov/results/C33961EC-6D46-31DE-8CCB- 89780E3D1620 (last visited July 23, 2020).*



**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. To the extent the allegations in this Paragraph and Footnote purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson admits that the graphic in this Paragraph and Footnote is purportedly based on USDA data, but Tyson refers to that data for its contents and denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph and Footnote.

2. **Defendants' Executives Publicly Decried the Effect of Oversupply on "Our Industry," Telling their Competitors that Unified Action was Necessary**

*342. On January 23-25, 2008, numerous employees of Defendants, including many of Defendants' senior executives, attended the International Poultry Expo conference in Atlanta.*

176

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. To the extent that the allegations in this Paragraph purport to relate to Tyson, because Tyson does not maintain a centralized list of Tyson employees who attend legitimate industry events, Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations and, therefore, denies those allegations. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

343.    *According to the trade association organizing the annual multi-day event, attendees represented companies responsible for over 99.4% of the production of chicken.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

344.    *On a January 28, 2008 earnings call, Tyson CEO Richard Bond – who in the same call, disclosed that the company had re-joined Agri Stats and had "just recently ... got our first series of data" – stated that "we have no choice [but] to raise prices substantially."*

**ANSWER:** Tyson admits that it held an earnings call for its investors on January 28, 2008. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

345.    *However, the commodity nature of chickens does not allow one producer to successfully raise market prices in the absence of widespread reductions in supply relative to the then-current demand.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

346. *Mr. Bond's comment therefore made no economic sense absent an intention or knowledge on his part that Defendants would coordinate an industry-wide reduction in supply that could not be easily reversed.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

347. *The day after Tyson's statements confirming its renewed participation in Agri Stats and expressing its plans to increase prices, Pilgrim's told its competitors to reduce their production of chickens to allow prices to recover.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

348. *On a January 29, 2008 earnings call, Pilgrim's CFO Rick Cogdill communicated that the industry's oversupply of chickens was hurting market prices.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

349. *Mr. Cogdill explained that Pilgrim's had done its part in 2007 by reducing production 5%, so "the rest [] of the market is going to have to pick-up a fair share in order for the production to come out of the system."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

350. *Mr. Cogdill went on to explain that Pilgrim's alone could not reduce supply enough to help market prices recover, and that its past efforts to reduce supply had merely led to smaller players increasing their market share at Pilgrim's expense.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

351.     Mr. Cogdill noted that "we have walked away from sales in certain cases, where the pricing just did not make any sense. So we are trying to hold the line. We are losing at times the competitive bids ... So we are trying to take a leadership position from a pricing perspective."

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

352.     He then made the following statements urging Pilgrim's competitors to do their part in reducing chicken industry supply: "[A]ctions are going to have to be taken one way or the other through the industry to pass along these costs. We were the leader in cutting production last year to help drive that ... [W]e've got to make sure that we get the supply in line with demand at an acceptable price, not just in line with what the customer wants to buy at a cheap price."

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

353.     When asked by an analyst "do you have an estimate internally of what the state of oversupply in the industry might be? What you would hope to see cut from others that would make you feel like the industry was more rational?" Cogdill replied "It's really hard to say that the faster we get to production adjustment the quicker the recovery could happen…. And if the industry doesn't react soon enough it will have to react stronger in the end."

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

354.    *Cogdill also responded to an analyst's query about the industry's failure to follow Tyson's 2007 cuts by stating that, "I think you kind of hit on it there…. It's not like we had 5% of surplus capacity that we could just reduce our operations and not feel that…. I mean we cannot be the ones that are out there continually reducing production, and let the other producers capitalize on that. I mean if it's 5% last year, 5% this year, 5% next year, you can see that that's a spiral to the demise of our company, which we are not willing to accept."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

355.    *On a January 31, 2008, earnings call, Sanderson Farms CEO Joe Sanderson explained that he, too, anticipated the industry would act in concert to cut production.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

356.    *Asked about production cuts by an analyst, Mr. Sanderson replied "we could see some reductions in production."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this

Paragraph and therefore denies those allegations.

357.     *Asked to expand on his comments by another analyst, Mr. Sanderson said he thought a production cut was "probable," and "if it's bad and ugly and deep in February, March, April, you'll see the production cuts take place during that period of time." He added, "[t]here's still 25% of the industry still making money but I would expect to see those reductions come over the next 90 to 120 days."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this

Paragraph and therefore denies those allegations.

358.     *Defendants also communicated privately.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this

Paragraph and therefore denies those allegations.

359.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

## B. Defendants Begin to Cut Production in Concert

360. *Around March 4, 2008, senior executives from Defendants, including Pilgrim's CEO Clint Rivers, Tyson Senior VP Donnie Smith, Case Foods CEO Tom Shelton, Amick President and CEO Ben Harrison, and Fieldale Farms President Thomas Hensley, met in Washington, D.C., at an Executive Committee meeting of the National Chicken Council's Board of Directors.*

**ANSWER:** Tyson admits that Donnie Smith attended the Executive Committee meeting of the National Chicken Council's Board of Directors around March 4, 2008. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations.

361. *Shortly after that trade association meeting, Pilgrim's again sounded the call to cut overall industry supply, and it proceeded with production cuts.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

362. *On March 12, 2008, Pilgrim's CEO Clint Rivers publicly announced the closure of seven chicken facilities in order to reduce industry oversupply, stating "we believe [these] actions ... are absolutely necessary to help bring supply and demand into better balance.... That portion of the demand for our products that exists solely at pricing levels below the cost of production is no longer a demand that this industry can continue to supply." (emphasis added)*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

363. *Under competitive conditions, other chicken producers would typically respond to Pilgrim's substantial supply cuts by increasing their production. Yet just the opposite occurred.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

364.    *Following the Pilgrim's announcement, a series of production cuts were publicly announced by other Defendants between April 3 and April 11, 2008:*

**ANSWER:** Tyson admits it adjusts its U.S. Broiler production based on its own business judgment of what is in Tyson's independent interest. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson denies any remaining allegations in this Paragraph.

365.    *On April 3, 2008, Fieldale Farms announced a 5% production cut, stating that "We're hoping this cut puts supply and demand back into better balance."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

366.    *Fieldale Farms is not a publicly traded company, and there was no reason – other than signaling to its fellow producers that it was following through on its conspiratorial agreement – why it would publicly disclose its production plans.* ████████████
████████████████████████████████████████████████████
████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

367. ███████████████████████████

████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

368. *On April 9, 2008, Simmons announced in a press release a 6% reduction in production throughout its processing plants, a move heralded by Wall Street analysts, who noted that production cuts across smaller companies in the chicken industry, like Simmons, would be positive for chicken prices.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

369. *Simmons is not a publicly traded company, and there was no reason – other than signaling to its fellow producers that it was following through on its conspiratorial agreement – why it would publicly disclose its production plans.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

370. *On April 10, 2008, Cagle's Inc. (later acquired by Koch Foods) announced in a press release a 4% reduction in processing of chickens, noting that the cut "will reduce product being sold through less profitable commodity outlets."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

371.    On April 3-11, 2008, Wayne Farms, O.K. Foods, and Koch Foods each announced 2-8% reductions in production.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

372.    Neither Wayne, nor O.K. Foods, nor Koch is publicly-traded, and there was no reason – other than signaling to their fellow producers that they were following through on their conspiratorial agreements – why they would publicly disclose their production plans.

**ANSWER:** Tysons lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

373.    Several other chicken producers cut their production between April 1, 2008 and May 15, 2008 but did not publicly announce the cuts.

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

374.    For example, at the BMO Capital Markets Agriculture & Protein Conference presentation on May 15, 2008 at the Millennium Broadway Hotel in New York City, Sanderson Farms CEO Joe Sanderson stated – in the presence of several competitors attending the conference, including Pilgrim's CEO Clint Rivers and CFO Richard Cogdill and Tyson CEO Richard Bond – that "we have seen for the last 6 or 7 weeks … some companies in our industry announce cutbacks. There have been I think six companies have announced cutbacks. I know some companies have cut back and have not announced." (emphasis added)

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that

185

relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that Richard Bond attended the BMO Capital Markets Third Annual Agriculture & Protein Conference on May 15, 2008 in the ordinary course of his responsibilities as CEO. Tyson denies any remaining allegations in this Paragraph.

375.     *Such knowledge of non-public production cuts by competitors is highly suggestive of communication among chicken companies, either secret direct communications among themselves, or using Agri Stats as a facilitator, or both.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

376.     *After seeing many of its competitors abide by capacity reductions between April 3-11, on April 11, 2008, Pilgrim's realized that other Defendants were contributing to a widespread reduction in industry supply and decided it could now take further steps to reduce supply.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

377.     ████████████████████████████████████
████████████████████████████████████████
████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

378.     *On April 11, 2008, Pilgrim's suggested it might close its large El Dorado, Arkansas processing plant, which employed 1,620 workers.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

379. ████████████████████████████████████████████████

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

380. ████████████████████████████████████████████████
████████████████████████████████████████████████ *On April 29, 2008, Tyson CEO Dick Bond told a Wall Street analyst, "I think the industry has changed … I don't think the industry will be up [in production] that much anymore, we have seen some sizable declines here lately in egg sets and placements. So, we're going to be up a little bit but probably not a significant amount, not as much as we might have once anticipated."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

381. *Despite the large number of coordinated production cuts announced by producers in April 2008, Pilgrim's CEO, Clint Rivers, encouraged further action by other chicken producers to curtail supply.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

382. *Clint Rivers encouraged further industry-wide cuts at a May 15, 2008 speech at the BMO Capital Markets conference at the Millennium Broadway Hotel. According to an industry publication, Rivers announced that he hoped to see the chicken industry continue to cut production to help the industry return to profitability, stating that "he would like the industry to trim total production by 3%-4%, calling it a prudent move in light of recent price volatility in the grain markets." He also noted that "[t]he cuts need to be fairly deep."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies

187

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*383.    This conference was attended by Tyson CEO Richard Bond, and it is the same conference where Sanderson Farms CEO Joe Sanderson disclosed his knowledge of non-public, unannounced production cuts by competitors. The conference was also attended by Pilgrim's CFO Richard Cogdill.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that Richard Bond attended the BMO Capital Markets Third Annual Agriculture & Protein Conference on May 15, 2008 in the ordinary course of his responsibilities as CEO, but denies any remaining allegations in this Paragraph.

*384.    A June 2008 Agri-Stats report noted that "[b]eginning in April [2008], the weekly hatchery data started to show declines in egg sets and chick placements relative to year-earlier, which confirms the announced intentions to reduce broiler production and will result in slaughter falling below year-ago by mid-June." The same report also noted that "[i]t is unclear how long the slaughter declines will continue, and if other companies will choose to cut production as well making them deeper than initially thought. Those who have announced cutbacks indicate they will continue until margins normalize. At this time we expect to see the declines continue until at least late 2009, and cuts could be deeper than now projected."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

385.    A May 21, 2008, Wall Street Journal article noted that conditions in the industry were starting to change: "Three things are making analysts more optimistic: Companies are cutting production, weekly egg-set numbers are declining (egg sets are fertile eggs placed in incubators), and prices are responding positively to the thinning supply lines." The article also noted "[i]t is unusual for egg sets to decline at this time of year."

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

386.    The reason such a reduction was unusual in May is that egg sets result in chickens that are ready for market approximately 10 weeks later, which in this case would have been first week of August – still the peak of the high-demand summer grilling season.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

387.    During an earnings call on May 22, 2008, Sanderson Farms CEO Joe Sanderson was asked if he thought industry cuts were sufficient to keep the industry profitable in the autumn. Sanderson responded: "[w]e don't know yet. We will make a cut as we always do after Labor Day. We will make a 4-5% cut following Labor Day as we always do going into Thanksgiving, Christmas, and January [and] we reduce our egg sets and around Thanksgiving, Christmas, New Years and Martin Luther King. That is a period of slow demand for us, and we don't announce that, but we always do it. It is just a period when we take downdays and we will do that. But if we think more is needed, we will evaluate that sometime in August, and if need be will do it. We cut back in 2006, we cut back in '97-98. I don't know if we announced it or not, but we will do what we need to do." Mr. Sanderson provided no explanation why Sanderson Farms chose to publicly disclose its "regular" production cut if it had never done so in the past. The reason was obvious – to signal the other Defendants to follow suit. In early June 2008, Pilgrim's CEO Clint Rivers noted in a June 4, 2008, presentation that "[o]ur supply in chicken, we are oversupply ... we need to see some balance in the supply.... Simply put, at this time there is still too much breast meat available to drive market pricing significantly higher."

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

388.    *Other Defendant CEOs soon picked up on Rivers' call for further action. On June 19, 2008, chicken industry executives participated in a media conference call intended to lobby the federal government to limit the ethanol mandate, a federal program requiring the production of corn-based ethanol, which Defendants claimed drove up their corn costs by lessening the amount of corn they could buy to feed their chickens. According to one report, Mark Hickman, Chairman of the National Chicken Council and CEO of Peco Foods, told participants that "the poultry industry is entering a second phase of production cutbacks, following a 1 percent to 2 percent cutback in production earlier this year" and that "we are hearing talk that this was not nearly enough, so liquidation is in round two." This statement referred to the need for Defendants to reduce chicken breeder flocks to affect longer-term supply restraint in the industry, rather than the short-term production cuts like breaking eggs or slaughtering chickens earlier to reduce weight.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

389.    *On June 23, 2008, shortly after Peco Foods' CEO publicly suggested that further production cuts were needed, Wayne Farms announced a 6% production cut. Wayne Farms President & CEO Elton Maddox said in a statement that "[s]oaring feed ingredient costs aggravated by the government's food for fuel mandate has created the need for us to rationalize our business." Like many other executives, Maddox cited ethanol subsidies as the reason for the production cuts. Wayne Farms' announcement came only three days after Agri Stats suggested further cuts were needed and four days after Peco Foods CEO Hickman suggested further cuts were needed.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

390. ████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

391. On June 23-25, 2008, the industry organization USPOULTRY held its annual Financial Management Seminar. Defendants' senior executives attended the seminar.

**ANSWER:** Tyson assumes that when Plaintiffs refer to "USPOULTRY," they mean to refer to the U.S. Poultry & Egg Association.[3] To the extent that the allegations in this Paragraph purport to relate to Tyson, because Tyson does not maintain a centralized list of Tyson employees who attend legitimate industry events, Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations and, therefore, denies those allegations. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

392. On July 2, 2008, Foster Farms announced it was abandoning plans to build a new chicken plant in northeastern Colorado that it had previously announced in April 2008 would employ about 1,000 people.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies

---

[3] Plaintiffs abbreviate the U.S. Poultry & Egg Association as "U.S. Poultry." Therefore, Tyson assumes that when Plaintiffs refer to "USPOULTRY," they mean to refer to the U.S. Poultry & Egg Association. Tyson answers under that assumption whenever Plaintiffs refer to "USPOULTRY."

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

393.    *In a statement, Foster Farms CEO, Don Jackson, noted "[i]n these difficult conditions with costs escalating primarily due to grain and fuel prices and chicken prices lagging it does not make economic sense to go forward with expansion at this time."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

394.    *Mr. Jackson's purported justifications for decreasing production capabilities were pretextual.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

395.    *On July 7, 2008, O.K. Foods announced a 7.5% reduction in egg sets, citing "record high prices for corn and soybean meal, which it attributes to the U.S. government's mandated ethanol policies along with recent flooding in the Midwest 'Corn Belt' region."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

396.    *O.K. Foods' purported justifications for decreasing production were pretextual.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

397.    On July 20-22, 2008, the National Chicken Council held a three-day "Chicken Marketing Seminar" attended by Defendants' senior executives. The event was billed as a marketing seminar that "includes social networking events and recreational opportunities, including a golf tournament."

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. To the extent that the allegations in this Paragraph purport to relate to Tyson, because Tyson does not maintain a centralized list of Tyson employees who attend legitimate industry events, Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations and, therefore, denies those allegations.

398.    On August 11, 2008, Pilgrim's announced the closure of its Clinton, Arkansas, processing plant and a facility in Bossier City, Louisiana. Pilgrim's press release noted the closures "are part of the company's ongoing effort to operate more efficiently and return to profitability amid high feed costs and an oversupply of chicken on the market."

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

399.    The closure of the Clinton processing plant represented an additional 1.25% incremental increase of the company's previously announced production cuts.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this

Paragraph and therefore denies those allegations.

400.    *Pilgrim's stated that it would keep both plants idled until "industry margins can be sustained at more normalized levels of profitability." Pilgrim's also noted that "[w]ith Labor Day approaching and no indication that the actions taken to date by Pilgrim's Pride or other industry members are having a positive effect on selling prices for our products, it is now clear that more significant decisive action is necessary."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize,

or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this

Paragraph and therefore denies those allegations.

*401.*



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize,

or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this

Paragraph and therefore denies those allegations.

402.    *In August 2008, Raeford (a non-public company) announced publicly, as reported by newspaper The Charlotte Observer, that it would begin reducing its chicken production by 5 percent. The company said in a statement to industry publication WATT PoultryUSA that "[t]he current obstacles that face our industry require that supply be brought in line with demand."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize,

or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this

Paragraph and therefore denies those allegations.

403.    *A production cutback was remarkable for Raeford, which had pursued a strategy of aggressive production growth that resulted in the company doubling its chicken production from 2001 to 2007.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in this Paragraph and therefore denies those allegations.

*404.*    ██████████████████████████████████

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in this Paragraph and therefore denies those allegations.

405.    *On an August 26, 2008, earnings call, Sanderson Farms CEO Joe Sanderson stated that "[s]o long as this weakness continues, the poultry industry will need to cut production further until supply is in line with demand." When asked later whether the industry had already made enough production cuts, he noted "we kind of thought we were going to see reductions in July ... [based on] 213/214 [million] egg sets back in April and that really did not materialize. When you look at USDA slaughter numbers in July, they were 100% and 101% and now we're looking at egg sets of 206 and 207 million that are going to show up sometime in October or November. We'll see when we get there. Those are barely impressive cuts. My suspicion is, as I've told you in May, the industry typically make the cut [sic] and it's tentative. We'll have to see if it works…. I'm very skeptical that those cuts are going to be enough to return us margins to cover these grain costs."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize,

or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this

Paragraph and therefore denies those allegations.

406.    *By September 2008, chicken industry publication WATT PoultryUSA reported that "[m]ost U.S. chicken integrators ha[d] announced plans to close small operations, consolidate complexes and further processing plants and to reduce output by 3 percent to 5 percent to 'maximize efficiency.'"*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

407.     On October 3, 2008, Defendants' senior executives attended the National Chicken Council's Annual Meeting in Washington, D.C. Agri Stats CEO, Blair Snyder – elected the day before as a "director-at-large" to the National Chicken Council's board – moderated a CEO panel that included the CEOs of Pilgrim's, Tyson, Perdue and Sanderson Farms. Explaining Pilgrim's desire to push through an industry-wide price increase, Pilgrim's CEO Clint Rivers told panel members and the audience "[w]e need to get those [input] costs pushed through, but we've yet to see that happen."

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that its former CEO attended the National Chicken Council's Annual Meeting on October 3, 2008 in the ordinary course of his duties as CEO of Tyson, which was a member of the National Chicken Council. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

408.     On October 10, 2008, in response to a USDA report of falling egg sets in the chicken industry, Pilgrim's told the Associated Press that "[t]his is very positive news for the industry and may signal that the industry is taking a more rationalized approach to production heading into the fall."

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

409. *Indeed, an industry analyst noted that at the time "the industry has cut about 10 to 12 percent of its production."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

410. *During Fall 2008, Sanderson Farms also implemented its previously announced "fall cuts" a month early and delayed the opening of a new deboning facility.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

411. *On October 18, 2008, Wayne Farms President & CEO Elton Maddox released a statement (even though Wayne Farms was not a publicly traded company) announcing the closure of the company's College Park, Georgia plant, resulting in the layoff of over 600 employees.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

412. *Maddox cited "changing market conditions" and a need to "maximize efficiencies" as justification for the plant closure.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

413. ████████████████████████████████████
████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

414. *On a November 10, 2008 earnings call, Tyson CEO Richard Bond claimed that Tyson would not be making additional production cuts because it had already done its part to reduce industry supply with prior production cuts, citing the company's focus on "supply and demand."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson admits it held an earnings call on November 10, 2008 for its investors who expect Tyson to provide information relevant to the company's financial performance including observations about the supply of, and demand for, Tyson's products. Tyson denies any remaining allegations in this Paragraph.

415. *Despite Tyson's representations to the contrary, Tyson, in fact, substantially reduced production in December 2008.*

**ANSWER:** Tyson admits that in 2008, as in every year, Tyson adjusted its U.S. Broiler production based on its own business judgment of what is in its independent interest. Tyson denies any remaining allegations in this Paragraph.

    *416.* ████████████████████████████████████████████
████████████████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

    *417. On December 18, 2008, Tyson announced the canceling of a deboning contract with Petit Jean Poultry at Petit's Little Rock, Arkansas processing plant that resulted in the layoff of 700 Petit employees.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson admits that in 2008, as in every year, Tyson adjusted its U.S. Broiler production based on its own business judgment of what is in its independent interest. Tyson denies that the referenced cancellation of the deboning contract with Petit Jean Poultry in Little Rock constituted a production cut. Petit Jean's president, Rick Milsap, is quoted in an article that appeared in the Arkansas Democrat Gazette on December 18, 2008 as saying "They've [Tyson] decided to do more of their own products in house." Tyson denies any remaining allegations in this Paragraph.

    *418. By December 23, 2008, it was reported that Tyson had cut its production by 5%.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson admits that in 2008, as in every year, Tyson adjusted its U.S. Broiler production based on its own business judgment of what is in its independent interest. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

419.    *Asked by a reporter about the cuts, Tyson spokesman Gary Mickelson stated that "[w]hile we would rather not share details of our current poultry production levels, we can tell you we continue to closely evaluate market conditions in an effort to match customer demand with our supply." Tyson also noted that it had reduced production "in recent years through the closing or sale of poultry plants and by running the company's remaining operations at reduced capacity utilization."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson admits that in 2008, as in every year, Tyson adjusted its U.S. Broiler production based on its own business judgment of what is in its independent interest. Tyson denies any remaining allegations in this Paragraph.

420.    █████████████████████████████████
████████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

421.    *During this time period, Defendants also utilized Urner Barry as a conduit for the sharing of information and ensuring compliance with the production cuts.* ██████████████
████████████████████████████████████████████
██████████████████████

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

422.     *As further detailed below, these numerous collusive communications between O'Shaughnessy at Urner Barry and the Defendants furthered the conspiracy to limit output and resulted in higher prices than would have existed in the absence of such efforts. And prices reflected in the indexes published by Urner Barry itself were also therefore necessarily inflated as a result of the conspiracy. Both O'Shaughnessy and the Defendants knew that these inflated prices were the logical – and intended – result of their efforts to further the output limitation conspiracy.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

423.     *On January 28-30, 2009, Defendants' senior executives attended the 2009 International Poultry Expo in Atlanta, Georgia.*

**ANSWER:** To the extent that the allegations in this Paragraph purport to relate to Tyson, because Tyson does not maintain a centralized list of Tyson employees who attend legitimate industry events, Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations and, therefore, denies those allegations. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

424.     *In a February 18, 2009, interview, Tyson Senior Group Vice President Donnie Smith noted that "[a]cross our industry, we're down about six percent versus where we were a year ago. We're seeing an impact from that on market prices ... the industry fundamentals are improving."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson admits that Donnie Smith participated in the February 18, 2009 press briefing in the ordinary course of Tyson's business. Tyson denies any remaining allegations in this Paragraph.

425. *In late February 2009, a report noted that Pilgrim's had cut another 9-10% of its production.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

426. *According to the same report, Tyson told the audience at a February 2009 investors' conference that it did not intend to reduce its production further because "[u]sing WATT PoultryUSA data on ready-to-cook (RTC) pounds, our numbers have declined 5-7% from 2000 to 2008 on RTC pounds while at the same time the industry has grown 31%. Over time, we have done plenty of cutting back." In other words, Tyson felt it had already taken its fair share of needed production cuts, so competitors needed to take any further action.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

427. *Tyson communicated that it felt it had already perilously led the industry on production cuts and was confident that competitors would support through significant cuts of their own. However, as indicated below, Tyson's statements about not reducing production appear to be posturing, because generally Tyson did reduce production during the 2008-2015 time period in line with other producers.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

428. *By February 25, 2009, Sanderson Farms told The Morning News of Northwest Arkansas that it had made cuts to its supply of chickens by processing smaller chickens and running its plants at lower capacity utilization rates. Sanderson Farms also told a group of investors around this time that "[b]ecause we don't expect much help from the demand side, chicken market improvement will have to come from supply cuts."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

429. *Similarly, the CEO of Simmons Foods (a private company), Todd Simmons, noted in a February 25, 2009, interview that "[w]e are seeing lower demand in the food-service customer base. We have made adjustments in bird weights to ensure our production meets with our customer's needs."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

430. *Seeing further cuts from smaller producers in the industry led Pilgrim's to announce historically large cuts to its production on February 27, 2009.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

431.    *In a press release announcing the closure of three processing plants located in Douglas, Georgia, El Dorado, Arkansas, and Farmerville, Louisiana, Pilgrim's stated the plants were "underperforming" and said the closures would "improve the company's product mix by reducing commodity production and to significantly reduce its costs in the midst of an industry-wide oversupply of chicken and weak consumer demand resulting from a national recession." Pilgrim's also stated that the idling of these three plants would reduce its total pounds of chickens produced by 9-10%.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

432.    *Overall, "[a]t least 11 companies reported reductions in weekly ready-to-cook production in 2008," including Defendants Tyson, Pilgrim's, Perdue, Simmons, Raeford, Cagle's (later bought by Koch Foods), George's, O.K. Foods, Harrison, and GNP Company (now owned by Pilgrim's).*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson admits that in 2008, as in every year, Tyson planned and executed its respective U.S. Broiler production based on its own, unilateral business judgment of what is in its independent interest. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

433.    *Other companies reduced their planned production levels or delayed the planned opening of new chicken complexes.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

*434.    During 2009, Defendants also exchanged and agreed upon specific prices to charge common customers.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

### C.    Defendants' First Round of Chicken Production Cuts Included Unprecedented Reductions to Breeder Flocks

*435.    As noted above, in 2008, Defendants ended a decades-long trend of annual additional chicken production, surprising industry observers.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*436.    What made the production cuts in 2008 and early 2009 particularly remarkable is that chicken producers did not just reduce the pounds of chickens they produced – they also went further up their supply chains than ever before to restrict their ability to ramp up production for years into the future.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*437.    While previous downturns had led some producers to use short-term methods to reduce overall pounds of chickens supplied to the market, in 2008, Defendants took their reductions to the next level by substantially reducing their breeder flocks in ways that were not easily reversed and would result in a commitment to longer-term reductions, as shown in the highlighted section of the graph below:*



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

438.    *The effect of the supply cuts on chicken pricing in 2008 and the first months of 2009 was clear. During the worst recession in generations, chicken prices rose through mid to late 2008, staying at or near all-time highs until late 2009.*

**ANSWER:** Tyson admits that the "worst recession in generations" occurred in 2008 and 2009. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

439.    ████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

440.    *By May 28, 2009, Sanderson Farms reported strong profits that were twice the estimates of Wall Street analysts, which according to one industry publication was "aided by production cuts and lower feed costs that offset still-weak demand."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

206

441.     Similarly, at a May 14, 2009, BMO Capital Markets conference in New York City, interim Tyson CEO Leland Tollett noted that "poultry market fundamentals had improved. Pullet placements, an[] indication of future broiler supplies, have been down the past five months compared to the same period last year. Egg sets continue to run six percent or more below year ago levels and cold storage inventories of poultry have declined about 20 percent since peaking in November 2008." Pullet placement data was collected from Defendants and their Co-Conspirators by Agri Stats, and sent monthly in reports to Agri Stats subscribers, and used by the chicken industry to monitor and control future supply.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson admits that, at certain times during the relevant period, Agri Stats collected information from Tyson, and that Agri Stats reported anonymized and historical information to Tyson for pro-competitive benchmarking purposes. Tyson refers to Agri Stats reports for their contents and denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties and therefore denies those allegations. Tyson admits that Leland Tollett attended the BMO Capital Markets conference on May 14, 2009 in the ordinary course of Tyson's business. Tyson denies any remaining allegations in this Paragraph.

442.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

443.     During 2009 and 2010, Defendants' senior executives continued to meet with one another at trade association meetings and industry events, such as the National Chicken Council and the International Poultry Expo.

207

**ANSWER:** While Tyson admits that its personnel have attended events held by the National Chicken Council and International Poultry Expo, Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

444. *Defendants also continued to utilize Mr. O'Shaughnessy of Urner Barry to communicate the plan to limit production.* ████████████████████████████████████
████████████████████████████████████████████

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

445. *In another example, at the National Chicken Council's October 2009 Annual Conference,* ████████████████████████████████████████████
████████████████████████ *one industry analyst wrote that participants had emphasized continued "production discipline," Defendants' euphemism for limiting chicken supply.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson admits that Plaintiffs purport to define and characterize "production discipline" in this Paragraph, but denies that the term has the meaning that Plaintiffs ascribe to it. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

446. *However, as prices continued to rise during late 2009 and early 2010, producers started increasing production in response to the higher prices just as they had done in previous decades.*

**ANSWER:** Tyson admits that Tyson plans and executes its Broiler production each year based on its own, unilateral business judgment of what is in its independent interest. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

447.    *Because of 2008 and 2009's unprecedentedly deep and early breeder flock culls, this temporary spike in production took months to effectuate, rather than the few weeks it would have taken had producers killed off their breeder flocks at the rates and times at which they had done so in the past.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

448.    *The rising production by producers in early 2010 led to a reported oversupply of chickens that began to depress prices by late 2010.*

**ANSWER:** Tyson admits that Tyson plans and executes its Broiler production each year based on its own, unilateral business judgment of what is in its independent interest. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

449.    *Defendants faced an incentive to revamp their conspiracy to make it more effective. Defendants had learned the value of coordinated supply reductions in 2008; they were quick to react with a new round of production cuts in the first half of 2011. Those cuts caused prices to recover.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. Tyson admits that Tyson plans and executes its Broiler production each year based on its own, unilateral business judgment of what is in its independent interest. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

450.    

███████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

### D. Defendants Continued Their Conspiracy with a Second Massive Breeder Flock Cull in 2011

451.    *As before, Defendants communicated their efforts through Mr. O'Shaughnessy of Urner Barry.* ████████████████████████████████████

████████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

452.    *On January 24-26, 2011, Defendants' senior executives attended the International Poultry Expo in Atlanta, Georgia, including Tyson CEO Donnie Smith. The IPE featured an annual market intelligence panel with Mike Donohue from Agri Stats and industry-insider Paul Aho. According to one report, Donohue noted that "'2008 was the worst year financially for the (U.S.) broiler industry that most people have ever seen'…. The industry's response in 2008 was a 5 to 6% reduction in pounds produced. He said that the broiler industry is currently at record high weekly slaughter volumes." Aho noted "[t]his could be a very difficult year with cutbacks, rationalization, and consolidation…. The market is calling for around a 5% reduction in chicken production."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that Donnie Smith attended the January 2011 International Poultry Expo on behalf of Tyson in the ordinary course of his duties as CEO. Tyson denies any remaining allegations in this Paragraph.

453.    On a February 4, 2011, Tyson earnings call, COO James Lochner noted that *"until industry supply more closely aligns with demand" Tyson's broiler business would "be challenged." Tyson CFO Dennis Leatherby also referred to a supply-demand imbalance in the chicken industry.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson admits that it held an earnings call on February 4, 2011 for its investors who expect Tyson to provide information relevant to the company's financial performance including observations about the supply and demand for Tyson's products. Tyson denies any remaining allegations in this Paragraph.

454.    *On a February 16, 2011, Cagle's (acquired by Koch) earnings call, Cagle's reportedly said it had begun a 20% reduction in production at a deboning operation in an effort to balance supply and demand. Cagle's told one publication that it was "optimistic that the industry will exhibit the production restraint necessary to support higher pricing for Cagle's products allowing for return to profitable margins."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*455.    On or around February 25, 2011, Sanderson Farms CEO, Joe Sanderson, announced on an earnings call that Sanderson would be delaying the development and construction of a second North Carolina broiler complex.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*456.    On March 7, 2011, House of Raeford announced a 10% reduction in egg sets that began in early February. CEO Bob Johnson noted in an accompanying press release that "we decided that acting now was a responsible action for our company in light of continuing unstable economic conditions…. Hopefully the chicken prices will begin to increase later this year. In addition, if Congress will take action to cut unreasonable government support for the ethanol industry, then grain prices should decrease to a more manageable pricing level."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*457.*  

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

458.     On March 15, 2011, Simmons announced it was laying off 180 workers at its *Siloam Springs, Arkansas processing plant "[d]ue to economics specific to our industry, resulting from high grain prices predominantly caused by corn being used in ethanol, we have decided to realign some of our production resulting in the elimination of 180 positions as of April 15."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

459.     *On April 13-15, 2011, the Georgia Poultry Federation held its annual meeting at the Brasstown Valley Resort in Georgia. Defendants' senior executives attended the meeting. Among other positions that Defendants' employees were elected to at the meeting, Donnie Wilburn (Director Live Operations, Harrison Poultry) was elected Vice Chairman of the Board of Directors and Phillip Turner (Plant Manager, Mar-Jac) was elected to the Board of Directors.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. To the extent that the allegations in this Paragraph purport to relate to Tyson, because Tyson does not maintain a centralized list of Tyson employees who attend legitimate industry events, Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations and, therefore, denies those allegations. Tyson denies any remaining allegations in this Paragraph.

460.     ████████████████████████████████████████

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

461.     *On April 15, 2011, Defendant Mountaire disclosed, in a press report, the abandonment of a planned capacity increase, with Mountaire President Paul Downes explaining*

that *"the only way to higher prices is less supply. The only way to less supply is chicken companies will shut down or cut back…. I think that's what we're going to see."* (emphasis added)

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

462. *Downes' view of the state of the chicken industry was echoed, and amplified, by Joe Sanderson, CEO of Defendant Sanderson Farms, who stated on a May 24, 2011 earnings call that "the deal is that the industry – forget Sanderson – the industry cannot sustain losses like they are sustaining for a long period of time. They will – they can't do it and you have been observing this for years and years and the industry has been losing money since Novemberish and balance sheets deteriorate and losses have to stop. The only way to stop losses with $7 corn is to reduce production and get prices up. That is the rule and the law of the jungle." Sanderson continued, "my judgment is that there will be some others that are going to have to make some adjustments that I believe cuts will be forthcoming in our industry based on the losses we see in Agri Stats."* (emphasis added)

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

463. *Sanderson's comments came roughly one week after he and Lampkin Butts, Sanderson's President and COO, attended the BMO Farm to Market Conference in New York City, along with the CEOs of Defendants Pilgrim's Pride (Bill Lovette) and Tyson (Donnie Smith).*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that Donnie Smith attended the BMO

Farm to Market Conference on May 17-18, 2011 in the ordinary course of Tyson's business.

Tyson denies any remaining allegations in this Paragraph.

464.     *The conference included a presentation by Lovette that noted Pilgrim's new focus on matching production to meet demand, including by adjusting "head," i.e., breeder flocks, to better balance supply and customer demand.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*465.*



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*466.*



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

467. ████████████████████████████████████████
████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

468. *On a June 6, 2011 earnings call announcing it would not increase capacity in the foreseeable future, Cagle's – a Georgia-based integrator whose assets were bought by Defendant Koch Foods in 2012 following Cagle's bankruptcy – said that "the industry must lower supply in order to offset reduced demand and to support higher market prices." (emphasis added)*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

469. *Other Defendants and Co-Conspirators, including Fieldale Farms and Mar-Jac, also began reducing production by cutting breeder flocks in the middle of 2011.* ████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any allegations in this Paragraph that

relate to other Defendants and/or third parties, and therefore Tyson denies those allegations.

Tyson denies any remaining allegations in this Paragraph.

470. *Keystone Foods, like many of the Defendants, relied on Urner Barry as a conduit for information regarding the supply reduction aspect of the Defendants' conspiracy.*



*Numerous communications such as these show how Defendants used Urner Barry to facilitate the flow of communication among them regarding production cuts.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. To the extent the

allegations in this Paragraph purport to quote, characterize, or describe documents or other

sources, such sources speak for themselves, and Tyson denies any characterization or description

that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief

as to the truth of any remaining allegations in this Paragraph and therefore denies those

allegations.

471. *Keystone Foods also utilized Urner Barry as a conduit for sharing information regarding current broiler pricing and plant operations by other Defendants.*



**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. To the extent the

allegations in this Paragraph purport to quote, characterize, or describe documents or other

sources, such sources speak for themselves, and Tyson denies any characterization or description

that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief

as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

472.    *In approximately June 2011, Tyson pulled eggs from its incubators to reduce Broiler volumes.*

**ANSWER:** Tyson admits that pulling eggs from incubators is an activity that commonly occurs at one or more of the dozens of hatcheries that Tyson operates throughout the United States. Without more specific allegations as to the hatchery in question or the significance of the June 20, 2011 date, Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

473.    *Communications of cutbacks continued to spread among Defendants.* █

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

474.    *In June and July 2011, Defendants' senior executives attended industry events, including a seminar held by the U.S. Poultry & Egg Association and the 2011 Food Media Seminar, which included a panel made up of the CEOs of Defendants Tyson (Donnie Smith), Peco Foods (Mark Hickman), and Perdue (Jim Perdue), and Defendant Sanderson Farms' President and COO (Lampkin Butts).*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that Bernard Leonard and Donnie King

218

attended the 2011 Food Media Seminar on behalf of Tyson in the ordinary course of their duties, but denies any remaining allegations in this Paragraph.

475.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

476.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

477.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

478.  ████████████████████████████████████

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

479.  *On July 29, 2011, Pilgrim's announced the closure of its Dallas, Texas processing plant and the layoff of 1,000 employees. Pilgrim's President & CEO Bill Lovette explained that "[w]hile the decision to close a plant and eliminate jobs is always painful, we must make better use of our assets given the challenges facing our industry from record-high feed costs and an oversupply of chicken…. A key component of that effort is improving our capacity utilization through production consolidation and other operational changes. By closing the Dallas facility, we can consolidate that production volume at three other plants and help those sites run closer to full capacity."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

480.  *On an August 1, 2011 earnings call, Sanderson Farms CEO, Joe Sanderson, informed analysts that the company's normal fall production cut of 4% beginning in November would remain in place beyond January 2012 or until such time as demand improved. Sanderson also stated that it "wouldn't surprise me if the industry makes further, deeper reductions in egg sets in October or November…. Nobody knows what cuts might be needed until we get to October, but I think that the cutbacks may need to be more than the 6% in head that the industry has in place." (emphasis added)*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

220

*481. A week later, on August 8, 2011, Tyson's CEO said on an earnings call that "domestic availability must be in balance with demand before industry economics can improve. Tyson continuously strives to match our supply to demand and as a result we made a production adjustment in the third quarter…. Our goal is to match supply to demand. And following over-production the industry experienced, we cut production in the third quarter, but those cuts have not yet impacted the market." (emphasis added)*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe a document or source, Tyson denies any characterization or description that is inconsistent therewith. Tyson admits that it held an earnings call on August 8, 2011 for its investors who expect Tyson to provide information relevant to the company's financial performance including observations about the supply of, and demand for, Tyson's products. Tyson denies any remaining allegations in this Paragraph.

*482.*



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*483. On August 18, 2011, Cagle's, now a subsidiary of Koch Foods, announced it was reducing 20% of its production at its large Pine Mountain Valley, Georgia plant.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

484. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

485. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

486. *In early October 2011, Defendants' senior executives attended the National Chicken Council's 57th Annual Conference in Washington, D.C. Among the discussion panels at the event was one about the "new paradigm" in the chicken industry. The panel included senior executives from Defendants Perdue (Clint Rivers, by then Perdue's President of Foodservice and*

222

*Supply Chain, after having been Pilgrim's CEO), Keystone (William Andersen, Senior Vice President) and Koch Foods (Mark Kaminsky, COO and CFO). Panelists said that "the industry is accustomed to cycles, but not one quite like the latest, and companies are going to need to adjust. Discipline on the supply side was one suggestion. Getting better prices from retailers was another." (emphasis added)*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. To the extent that the allegations in this Paragraph purport to relate to Tyson, because Tyson does not maintain a centralized list of Tyson employees who attend legitimate industry events, Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations and, therefore, denies those allegations. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

487.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

488.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

489.     *On November 17, 2011, Wayne Farms issued a press release announcing the closure of its Decatur, Alabama plant and layoffs of 360 employees.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

490.     *On a November 21, 2011, earnings call, Sanderson Farms CEO, Joe Sanderson, responded to a question about a production decrease that "when we talk about the 4% number, that is what we project the industry to be. Obviously, we're going to be a part of that."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

491.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this

Paragraph and therefore denies those allegations.

*492.*



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize,

or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this

Paragraph and therefore denies those allegations.

*493.    Throughout 2012, Defendants continued to meet at trade association meetings and industry events, giving them the opportunity to discuss the impact of their collective production cuts and otherwise monitor their conspiracy.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. Tyson admits that its

employees have attended legitimate trade association meetings and industry events, but denies

any remaining allegations in this Paragraph.

*494.    In the first quarter of 2012, for example, Defendants' top executives attended the National Chicken Council's board of directors meeting in Atlanta, which was held in conjunction with the January 25-26, 2012 International Poultry and Processing Expo.*

225

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. To the extent that the allegations in this Paragraph purport to relate to Tyson, because Tyson does not maintain a centralized list of Tyson employees who attend legitimate industry events, Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations and, therefore, denies those allegations. Tyson denies any remaining allegations in this Paragraph.[4]

495.    *On March 20-21, 2012, the National Chicken Council's board of directors, which included many of Defendants' senior executives, met again in Washington, D.C.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. To the extent that the allegations in this Paragraph purport to relate to Tyson, because Tyson does not maintain a centralized list of Tyson employees who attend legitimate industry events, Tyson lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations and therefore denies those allegations. Tyson denies any remaining allegations in this Paragraph.

496.    *In early 2012, Sanderson Farms cut its production by 4%, which included a reduction in breeder flocks.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

497.    *At USPOULTRY's Hatchery-Breeder Clinic in January 2012 in Atlanta, Agri Stats Vice President, Mike Donohue, noted the importance of reducing breeder flocks, stating that "if the industry chose to do so, it could ramp up production within a 10-week period of time. The industry could blow apart any recover[y] in the short term by filing up incubators again." But he also noted that the Agri Stats data indicated that the industry was slaughtering breeder*

---

[4] Tyson assumes that when Plaintiffs refer to the "International Poultry and Processing Expo," they mean to refer to the International Production & Processing Expo. Tyson answers under that assumption.

*flocks at 59 to 60 weeks, instead of the typical 65 weeks. The kind of early slaughter of breeder flocks – including, for example, the bird-age data included in the "Growth Rate Report" described above – meant that Defendants subsequently were unable to increase production for at least eighteen months, as they would have been able to do had they not made cuts at the top of the supply chain.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

498. *The shift in the way the industry supplied chicken was summarized in a March 2012 report published by agricultural lender, CoBank.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

499. *Entitled "The U.S. Chicken Industry: Re-invented and Revitalized" with sections captioned "'Same-Old, Same-Old' – No More" and "It's a New Ballgame," the report noted that the:*

*"U.S. chicken industry has gone through the proverbial wringer, but last year appears to have been the low point. In recent years, the chicken companies have all lost money, some more than others. And five U.S. companies have exited the industry since 2008. As the losses mounted, the industry realized that its standard business practices sorely needed to be reformed. The surviving chicken companies found it to be not just prudent, but absolutely essential to revise those practices. The poultry industry today operates much differently than it did just a few years ago."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of the allegations in this Paragraph and

therefore denies those allegations in this Paragraph.

*500.    The CoBank report highlighted one of the reasons for this sea-change: the Defendants' reduction of breeder flocks that began in mid-2011, noting that "the recent cuts in the hatchery flock will prevent a quick response," with "U.S. chicken production [...] on track to fall to its lowest level in 5 years by mid-2012." (emphasis added)*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize,

or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any allegations in this Paragraph that

relate to other Defendants and/or third parties, and therefore Tyson denies those allegations.

Tyson denies any remaining allegations in this Paragraph.

*501.    The highlighted section of the following graph shows that these cuts bucked the historical trend of breeder flock reductions, going even deeper than the then-unprecedented 2008-2009 cuts:*



228

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

502.    *The sentiment of CoBank's March 2012 report was echoed by Pilgrim's CEO, Bill Lovette, on an April 27, 2012 earnings call, where he reported that "the die is cast for 2012," and that "we're comfortable that the industry is going to remain constrained." (emphasis added)*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations in this Paragraph.

503.    *Trade association meetings and industry events in the middle of 2012 gave the Defendants additional opportunities to meet and discuss the effect of their collusive efforts to reduce production. Examples of these opportunities to conspire included the National Chicken Council Board of Directors meeting in Washington D.C. on March 20-21, 2012; Urner Barry's annual marketing seminar, from April 29 - May 1, 2012; the National Chicken Council's board of directors meeting in Lake Tahoe on June 21, 2012; and the July 15, 2012 meeting of the National Chicken Council's marketing committee in Stowe, Vermont. Each of these meetings were attended by a number of Defendants' senior executives.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. To the extent that the allegations in this Paragraph purport to relate to Tyson, because Tyson does not maintain a centralized list of Tyson employees who attend legitimate industry events, Tyson lacks knowledge or information sufficient to form a belief as to the truth

229

of the allegations in this Paragraph and, therefore, denies those allegations. Tyson denies any remaining allegations in this Paragraph.

504. █████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

505. █████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

506. █████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

507. *On August 28, 2012, Sanderson Farms announced a further 2% production cut that it blamed on corn and soybean prices.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

508. *By September 2012, Defendants' 2011 production cuts, particularly their reduction of breeder flocks, had resulted in increased prices for Plaintiffs.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

509. *The higher chicken prices seen in the market by September 2012 were not justified by the costs of Defendants' primary inputs, corn and soybean meal, which by the fourth quarter of 2012, had dropped significantly in price following near-record highs in the summer of 2012.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

510. *On October 10-11, 2012, the National Chicken Council held its annual meeting in Washington, D.C.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

511. *Among Defendants' senior executives attending the meeting were the President of Fieldale Farms (Thomas Hensley) and CEO of O.K. Foods (Paul Fox).*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

*512.    Messrs. Hensley and Fox participated in an "Industry Outlook Panel" where participants discussed the question of what the industry "learn[ed] from 2011 and how will the industry apply those lessons in 2012 and 2013." (emphasis added)*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*513.    Defendants also continued to directly communicate confidential pricing and production information to one another throughout 2013 and 2014, including, for example:*



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

### E.    Drastically-Reduced Breeder Flocks Boosted Chicken Prices and Raised Defendants' Profits to Record Levels

*514.    For most of the remainder of 2012 through at least 2016, Defendants reaped the benefits of their coordinated supply restraints as prices rose and profits soared to record levels.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*515.    During this time, Defendants' executives repeatedly heralded the industry's newly found supply "discipline."*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*516.    For example, on a May 3, 2013 investor call, Pilgrim's Pride CEO, Bill Lovette, touted the chicken industry's collective discipline:*

> *Obviously, revenue is going to be a function of price, in part, and in this case a big part; and obviously, price is going to strengthen as supply continues to be disciplined and constrained…. So I think the industry is doing an admirable job in being disciplined on the supply side and I think we've got a combination where we combine that discipline with strong demand for product and that's why you've seen the pricing environment that we're now enjoying…. I believe the industry has learned over the past three to five years that chicken economics is going to be driven by the supply and demand of chicken and not necessarily what corn or soybean meal costs. I think I'm confident to say, we've figured that out and we're doing a good job of balancing supply and demand. (emphasis added)*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*517.    On the May 3, 2013 investor call, Lovette specifically referenced the continued importance of restraining the industry's breeder flocks:*

> *I only know what we've seen happen in the past. Now, certainly, this summer if the industry chooses to grow the breeder supply significantly, that's definitely going to impact 2014. What I'm saying is, so far, we've seen no indication that the industry plans to grow the breeder supply and as a matter of fact, it's actually shrunk…. I'll reiterate that I think the industry has learned that the economics of our business is tied very closely to the supply of chickens and we've done a good job so far of maintaining discipline such that even paying nearly $8.50 for corn, we've been able to be profitable as an industry. (emphasis added)*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

518.    *On October 4, 2013, Defendants' CEOs and other senior executives met at the annual meeting of the National Chicken Council in Washington, D.C., where a panel, including the CEOs of Defendants Tyson (Donnie Smith) and Simmons Foods (Todd Simmons), was "chipper about the prospects for their industry in the next few years."* ███████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that Donnie King attended the National Chicken Council meeting in October 2013 on behalf of Tyson in the ordinary course of Tyson's business, but denies any remaining allegation in this Paragraph.

519.    ████████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

520.    ████████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

521.     *Defendants had reason to be positive. For example, on a February 21, 2014 earnings call, Pilgrim's Pride CEO, Bill Lovette, reflected on what had led to the company's record earnings. Lovette noted that "I think the one thing that creates ... has created the stability is the discipline of the industry to not allow profitability in the past to drive supplies in the future.... And I think that discipline really ... is the one ingredient that has made for more stable earnings that we have seen." (emphasis added)*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

522.     *At a March 12, 2014 industry conference, Tyson CEO, Donnie Smith, told attendees that a "meaningful change" in chicken production would not occur until the second half of 2015, a statement he could confidently make because Defendants' unprecedented 2011-2012 cuts in breeder flocks made it impossible for them to "meaningfully change" chicken production any sooner.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Because the Complaint does not identify the conference referenced in this Paragraph, Tyson lacks knowledge or information sufficient to form a belief as to the truth of those allegations and therefore denies those allegations and any remaining allegations in this Paragraph.

523. ████████████████████████████████████████████████████████████████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

524. *An October 2014 CoBank analysis noted that Defendants' strategy of targeting breeder flocks paid dividends during 2013 and 2014. According to the report:*

> *[P]roduct demand should remain robust through the rest of this year and well into 2015, bolstered by a gradually improving domestic economy, continued strength in export demand, and the towering prices of beef and pork. Broiler production, however, has been slow to respond, with integrators having had problems expanding the number of chicks placed for growout. Broiler meat production is on track to grow just 1.5 percent in 2014 from a year ago, with a similarly modest gain expected for 2015. Producers have been somewhat constrained in their attempts to expand the nation's chicken flock by the limited supply of broiler hatching eggs. When the broiler-producing industry reduced production in 2011 and 2012, the hatchery supply flock was also reduced, and it has not yet been rebuilt to prior levels. Following seven months of [Year-over-Year ("YoY")] declines, the number of chicks placed for growout finally posted a modest 1 percent YoY gain in August. However, it will take another 6-9 months for integrators to rebuild the supply of broiler hatching eggs in preparation for expanding the overall flock, so significant growth in broiler production will not materialize until late 2015 or early 2016.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

525. *The October 2014 CoBank report also noted the effect of these production cuts, stating that wholesale prices for chicken "have risen to unusually high levels."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

526.    *Defendants also continued to directly communicate confidential pricing and production information to one another throughout 2013 and 2014.*



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

527.    *On October 29, 2014, Simmons Foods announced the closure of its Jay, Oklahoma spent hen processing plant. Spent hens are broiler breeders that have reached the end of their productive life cycle. The Simmons facility processed spent hens on behalf of many Defendants, providing Simmons with opportunities to monitor changes in other Defendants Broiler breeder supplies. The closure of Simmons' Jay, Oklahoma facility is indicative of the reduced broiler breeder capacity resulting from Defendants' initiatives to cut broiler breeder capacity across the industry.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson admits that Broiler breeders that have reached the end of their productive life cycle sometimes are referred to as "spent hens." Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

528.    *During a February 12, 2015, earnings call, Pilgrim's President & CEO Bill Lovette summed up the restriction of supply which Defendants had implemented since 2008: "I looked at some numbers supplied by Agri Stats earlier in the week and found some interesting facts. If you go back to 2008, the industry slaughtered 8.35 billion head. And by 2011, that slaughtered head had declined by approximately 8% to 7.7 billion. And it's actually remained about that same level through 2014 at about 7.7 billion. If you look at live weight pounds produced, it was 47.1 billion in 2008. It declined to 45.06 billion in 2011. And in 2014, for the first time since 2008, it reached 47.3 billion, so only 200 million more pounds above 2008 levels. And then on the average weight side, the average weight in 2008 was 5.64, and it's averaged just above 6 from 2011 through 2014. So with all of that data in mind, what it tells me is the industry remains fairly disciplined on the supply side and demand has been increasing for chicken against the backdrop of increasing beef and pork supplies."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

529.    ████████████████████████████████████████

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize,

or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any allegations in this Paragraph that

relate to other Defendants and/or third parties, and therefore Tyson denies those allegations.

Tyson denies any remaining allegations in this Paragraph.

530.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize,

or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this

Paragraph and therefore denies those allegations.

531.    *The year 2015, like 2014, was a banner year for Defendants' profits resulting from their conspiracy.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

532.    *WATT PoultryUSA's March 2016 issue noted, for example, that Tyson had achieved "record earnings and sales in fiscal year 2015 ... posting $40.6 billion in sales, including ringing up higher chicken sales. Yet, Tyson lowered chicken production in 2015. What's at work here? This paradoxical performance, in part, reflects the fact that Tyson, along with other top U.S. broiler companies, is redefining its business model to achieve profitable growth."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize,

or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any allegations in this Paragraph that

relate to other Defendants and/or third parties, and therefore Tyson denies those allegations.

Tyson denies any remaining allegations in this Paragraph.

533.    *The true explanation for the 2015 performance of Tyson and its competitors, however, was the conspiracy alleged in this Complaint.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

534.    *This trend continued into 2016. With the notable exception of the Georgia Dock, chicken prices declined in 2016, but significantly less than input costs.*

**ANSWER:** The allegations in this Paragraph are imprecise and therefore Tyson lacks

knowledge or information sufficient to form a belief as to the truth of the allegations in this

Paragraph and therefore denies those allegations.

535.    *Defendants proactively maintained artificially high chicken prices and high profitability during 2016 by exercising "discipline" on the supply-restriction.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

536.    *For instance, during an April 2016 earnings call, an analyst noted that Pilgrim's CEO, Bill Lovette, "mentioned that you think the industry domestically has been much more disciplined than they have been in the past, I'm wondering if you could just elaborate a little bit more on what sort of drives that view and then maybe what gives you confidence that this discipline will hold." Lovette responded, "[w]hat drives the view is the actual numbers that we see, ready to cook pounds are up about 3.1% year to date. If you look at placements year to date, they're up 1%, egg sets up 0.7%, hatchery utilization actually declined in Q1 to 91%. So in the phase of coming off two of the most profitable years in the industry, we're not seeing, not realizing large amount of production increases."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize,

or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith.

Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

537.    *Tellingly, Pilgrim's CFO Fabio Sandri added immediately after Lovette's comments that "what drove that I believe it is that [the] industry is more geared towards profitability rather than just market share or field growth." (emphasis added)*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

538.    *Defendants were no longer competing with one another to gain market share by growing their companies as one would expect in a competitive market, but instead, worked collectively to increase profitability by being "disciplined" in terms of supply growth.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

539.    *Defendants also kept up the regular use of signaling one another to perpetuate their collusion during 2016 by using the code word "discipline" to note their continued adherence to the supply-restriction dimension of their conspiracy by keeping breeder flocks low.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

540.    *For instance, during a February 2016 earnings call, Pilgrim's CEO, Bill Lovette, noted that:*

> *[T]he industry continues to be disciplined in terms of U.S. supply. Although monthly pullet data tend to be volatile and have occasionally been at the high end of our expectations, we see modest growth of the breeder flock, and more importantly, little to no increase in egg sits [sic] and chick placements as a positive. We believe that at least part of the reason is because chicken producers are being disciplined and are much quicker to react than in the past and in adjusting supply growth to the actual market conditions. (emphasis added)*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

541.    *Other CEOs also had to try to explain the marked shift in the chicken industry's profitability in recent years, after the decades-long pattern of boom and bust regarding chicken pricing and profitability.*

241

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

542.   *Defendants again utilized Mr. O'Shaughnessy of Urner Barry to communicate the capacity at which their plants were running.* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

543.   *During a February 2016 Sanderson Farms earnings call, BMO Capital Markets analyst Ken Zaslow noted the industry's history of volatility in pricing and profitability for chicken companies, questioning if there was "any changing of the industry dynamic" that had occurred. Sanderson Farms CEO Joe Sanderson replied "we might be at a capacity wall, you know?…. Since back in 2007 … there are three or four plants shuttered.… It does feel different."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

544.   *On an analyst call on May 26, 2016, Mr. Sanderson echoed his earlier statements about how much the industry had changed since 2007, noting that "when you go back and look and see how many eggs are being set right now and you go back and look at what the industry will [sic] set in 2007 … egg sets in 2007 were 220 million eggs a week, and we're setting 208 million, 209 million, 210 million eggs a week."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

545. *Sanderson's comments about egg sets were amplified by Pilgrim's CEO Bill Lovette later that summer, stating on a July 28, 2016 analyst call that "I think what we have seen with egg sets is absolutely a testament to the discipline of our industry that we've seen in the last really two to three years."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

546. *On the July 28, 2016 call, Lovette also commented on Defendants' continued restraint of breeder flock population, noting that "the breeder flock in total is only up about 0.5%" over the same time period, and ended the analyst call describing the "positive notion [we] have about the discipline that we continue to see exhibited by the entire industry," which "gives us more confidence that we're going to do the right thing with respect to maintaining that discipline… and … gives us confidence that we're going to continue to be disciplined as an industry." (emphasis added)*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

547. *On an August 8, 2016 earnings call, Tyson's former CEO Donnie Smith – who was then transitioning the CEO role to Thomas Hayes, the company's former Chief Commercial Officer who became the CEO in late 2016 – stated that "our chicken business is … it continues to*

*do great," a comment seconded by Hayes, who said about the company's chicken business that "year-over-year, we're doing great ... all that business is very profitable to us."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson admits it held an earnings call on August 8, 2016 for its investors who expect Tyson to provide information relevant to the company's financial performance including observations about the supply of, and demand for, Tyson's products. Tyson denies any remaining allegations in this Paragraph.

### F. Defendants Utilized Urner Barry to Assist Them in Capitalizing on Their Supply Reduction Efforts

548.    *Although Urner Barry prices are intended to be based on a system of double verification, which includes telephonic and written surveys of all or nearly all broiler producers, along with verification of reported prices from broiler purchasers such as brokers and customers, Defendants understood and took advantage of its susceptibility to manipulation.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*549.*    █████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

550. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

551. *With knowledge of Mike O'Shaughnessy's susceptibility to influence, and his control over Urner Barry's prices, Defendants routinely, consistently, and collectively pressured Urner Barry to raise prices.* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

552. *Defendants conspired together to pressure Urner Barry to raise prices.* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

553.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

554.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

555.

███████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*556.* ███████████████████████████████
███████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*557.* ███████████████████████████████
███████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*558.    Mike O'Shaughnessy actively and openly discussed broiler production with Defendants, to which Defendants used Urner Barry to facilitate communications among themselves.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations this Paragraph.

559.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

560.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

561.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

562. █████████████████████████████████████████████
████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

563. █████████████████████████████████████████████
████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

564. █████████████████████████████████████████████
████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

565. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

566. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this
Paragraph and therefore denies those allegations.

567. ██████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize,
or describe documents or other sources, such sources speak for themselves, and Tyson denies
any characterization or description that is inconsistent therewith. Tyson lacks knowledge or
information sufficient to form a belief as to the truth of any remaining allegations in this
Paragraph and therefore denies those allegations.

568. ██████████████████████████████████████████

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the
truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and
therefore Tyson denies those allegations. Tyson denies any remaining allegations in this
Paragraph.

569. ██████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize,
or describe documents or other sources, such sources speak for themselves, and Tyson denies
any characterization or description that is inconsistent therewith. Tyson lacks knowledge or
information sufficient to form a belief as to the truth of any remaining allegations in this
Paragraph and therefore denies those allegations.

570. ██████████████████████████████████████████

[redacted]

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

571.  [redacted]

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

572.  *Defendants improperly kept Urner Barry prices from falling when they should have.* [redacted]

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

573. *And when Urner Barry prices increased, Defendants linked the price increase to their actions.* ███████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

574. *While Defendants were not as successful at eradicating price volatility in Urner Barry as they were the Georgia Dock – they did not have sole control over price inputs with Urner Barry – their collective actions increased prices across all indices.* ████████████████████████████████

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson admits that the Court found that at the time of the May 2014 meeting, the Georgia Dock price was lower than the Urner Barry price. *Broilers*, 702 F. Supp.3d at 685-86. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

575. *Indisputably, Defendants actions were interrelated. Rising prices and price quotes inflated by coordinated pressure benefited each of the Defendants across each index, leading to higher broiler prices for Plaintiff.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

576. *And individual pressure was not always possible, as Urner Barry took into account numerous sales numbers and quotes collectively from multiple Defendants. In those instances, collective action was required.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*577.* ████████████████████████████████████
████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

G. **Defendants Capitalized on Their Actual Reduction of Broilers to Coordinate a False Supply Reduction**

*578. Defendants also were able to take advantage of their coordinated reduction in the supply of broilers in price negotiations with restaurants and other contract purchasers. This was especially the case with Small Birds.[18]*

> *FN 18: Small Birds are generally defined as Broilers weighing 4.25 pounds or less. Upon information and belief, Sanderson Farms, Foster Farms, Harrison Poultry, and Peco Foods did not produce Small Birds during the 2012-2019 time period, and House of Raeford Farms, Inc. has not produced Small Birds since mid-2012.*

**ANSWER:** This Paragraph including the Footnote, contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those

allegations. Tyson admits that Plaintiffs have purported to define "Small Birds" as described in the Footnote. Tyson denies any remaining allegations in this Paragraph.

579. *For example, as part of their collective goal to increase the prices of broilers, Defendants coordinated inflated prices to restaurants and other contract purchasers in the time period beginning at least as early as 2012 and continuing through at least 2017. One of the primary explanations Defendants presented for these inflated prices was what they said was a reduction in the supply of broilers. Defendants were able to point to the actual supply reduction that they orchestrated for broilers in the 2011-2012 timeframe. Yet, at the same time, the number of Small Birds killed increased significantly in the 2011-2013 period and remained elevated throughout the remainder of the relevant period.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

580. *Defendants also used their coordinated false explanation of supply reduction for their elevated prices of broilers even for those restaurants that did not purchase Small Birds. Through these coordinated misrepresentations, Defendants were able to persuade restaurant chains and other purchasers to accept higher prices for broiler products.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson denies any remaining allegations in this Paragraph.

### H.    Rabobank's Role and Participation

581. *Rabobank has been for many years the leading lender to the poultry industry in the United States, and globally.[19] This put Rabobank at financial risk whenever the industry faced downturns and poor performance due to oversupply, and gave it a motive to participate in the conspiracy.*

*FN 19: Deposition of Rabobank's Adriaan Weststrate ("Weststrate Dep.") 336:21-337:10. The broiler producers which have turned to Rabobank for credit and/or*

*transactional work have included Fieldale, House of Raeford, Keystone, Koch, Mountaire, Peco, Perdue, Pilgrim's Pride, Simmons, Tyson, and Wayne Farms.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph and Footnote that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that Tyson had an independent business relationship with Rabobank at certain points in the relevant period but denies any remaining allegations in this Paragraph.

582. *Adriaan Weststrate, the head of Rabobank's poultry business, testified that Rabobank* ███████████████████████████████████████ *Weststrate Dep. 164:23-165:3.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

583. *As of May 2009, Rabobank had* ████████████████████ *Weststrate Dep. 60:14-22. Weststrate testified that in 2009 Rabobank* ████████████████████████████████ *Weststrate Dep. 182:21-22; 350:24-351:2.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

584. *In an August 4, 2014 email to Perdue, Rabobank acknowledged:* ██████ ████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

585.     *Rabobank also offers merger and acquisition-related services, which it regularly pitched to its poultry producer clients and prospective clients. See, e.g., Weststrate Dep. 331:4-10 (Foster Farms); Weststrate Dep. 331:16-17 (Koch); Weststrate Dep. 331:22-23 (Perdue); Weststrate Dep. 331:24-25 (Pilgrim's Pride); Weststrate Dep. 332:25-333:5 (Sanderson); Weststrate Dep. 333:9-12 (Tyson); Weststrate Dep. 333:16-17 (Wayne Farms); Weststrate Dep. 89:10-16* ███████████████████████████████ *It also provides services related to bond issuance for public producers, such as Pilgrim's Pride. Weststrate Dep. 332. The more Rabobank helps producers make money, the more likely they will turn to Rabobank for these services, which generated millions of dollars in revenue for Rabobank.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

586.     *Although Rabobank does not buy, produce or distribute chickens, Rabobank actively facilitated and participated in coordination to achieve supply cuts, making production cuts a shared goal with producers.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

587.     *As Adriaan Weststrate, the head of Rabobank's poultry business, assured Perdue leaders, including CEO Jim Perdue, on February 23, 2011:* ███████████████████ ████ *(emphasis added) Rabobank's* ████████████████ *was unlawful coordination, not conferring fiscal advice to a client.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

588.    *The next day, Weststrate used the same language with Bill Lovette—then President and CEO of Pilgrim's Pride (indicted by the DOJ for violating federal antitrust law)— to describe enlisting industry support for supply reduction. Weststrate told Lovette:* ▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *(emphasis added)*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

589.    *A few weeks later, a consultant retained by Rabobank reported to Weststrate and others at the bank:* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

590.     *Weststrate's* ████████████████████ *aligns with this second round of industry production cuts made in furtherance of the illegal conspiracy, and refers to an effort to continue past conduct dating back to 2008.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

591.     *Weststrate's emails exemplify Rabobank's intentional and active participation in an anticompetitive scheme with the other Defendants. Rabobank's role spreading* ████ ████████████████ *among "poultry companies" was an important mechanism for both securing producer participation in, and monitoring compliance with, the alleged collusive activities of the producer defendants. Even when firms in an industry believe they will all be more profitable if they all raise prices or reduce output, individual firms usually refrain from doing so out of concern that other firms will not follow, and that the "leader" will be at a competitive disadvantage. In an April 30, 2008 internal email, Rabobank's R. Beard conveyed that* ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

592. *One mechanism for Rabobank to spread the* ▮▮▮▮▮▮▮▮▮ *among producers was by suggesting that such cuts were necessary to maintain relationships with Rabobank, as well as other banks operating in syndicates led by Rabobank.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

593. *Industry leaders gathered at a National Chicken Council meeting in October 2011 to discuss* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Following the meeting, on October 7, 2011, Mark Kaminsky, a senior Koch executive, emailed Weststrate:* ▮▮▮▮▮ ▮▮▮▮ *Weststrate responded that same day,* ▮▮▮▮▮▮▮

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. As Tyson does not maintain a centralized list of Tyson employees who attend legitimate industry events, Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations and, therefore, denies those allegations. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

594. *Four days later Weststrate exchanged emails with Rabobank colleague, David Nelson, lamenting that* ▮▮▮▮▮▮▮▮▮▮▮ *Weststrate assured Nelson:* ▮▮▮▮ ▮▮▮▮▮

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

595.    *Six days later Weststrate wrote to others at Rabobank:* █████████████

████████████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

596.    *A few weeks later Rabobank noted its headway in an internal email:* █████ *(emphasis added)*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

597.    *At the January 2012 International Poultry Exposition, Rabobank once again cautioned producers that* ████████████████████████████

████    *eststrate Dep. Tr. at 364:9-14.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

598. *Chicken producers got the message. For example, a Perdue document generated soon after the January 2012 International Poultry Exposition meeting explained:* ███████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations.

599. *Later in 2012, Weststrate reported in an internal Rabobank email that Rabobank had* ██████████████████ *(emphasis added).*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

600. *Rabobank's frequently told producers that* ████████████████


**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

601. *Rabobank believed that all producers should ▮▮▮▮▮▮ (Weststrate Dep. Tr. at 251:23-252:4), and warned that if the industry ▮▮▮▮▮▮ Weststrate Dep. Tr. at 264:25-265:2. For example, Rabobank observed: ▮▮▮▮▮▮*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

602. *Another facet of Rabobank's anticompetitive conduct involved coordination with defendant Agri Stats. In 2008, Rabobank retained as a consultant ▮▮▮▮▮▮ Weststrate worked hand in hand with ▮▮▮▮ for years—and with producers—to manipulate prices of broilers.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

263

603.    For example, during August 2008, Rabobank's Weststrate expressed to Trudell his concern that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ rudell replied to Weststrate's plea to make sure ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

604.    In another August 2008 exchange, Weststrate complained to Trudell: ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Trudell responded by reporting on her recent presentation at the National Chicken Council, explaining: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Trudell's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Weststrate Dep. Tr. at 153:1-5.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

605.    A few weeks later during 2008, Weststrate and Trudell discussed ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (emphasis added)

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this

Paragraph and therefore denies those allegations.

606. *Prior to hiring Trudell, Rabobank was* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮ *because Rabobank was not a processor. By hiring Trudell in 2008 during the initial
round of industry production cuts, Rabobank gained access to valuable information from
Defendant Agri Stats.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize,

or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this

Paragraph and therefore denies those allegations.

607. *Producers* ▮▮▮▮▮▮▮▮▮▮▮▮▮ *from Rabobank. For example, in a September
1, 2008 email, E. Elrod of Fieldale wrote to Rabobank:* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*In an internal, confidential memo from October 2008, Rabobank reported that* ▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize,

or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson denies any remaining

allegations in this Paragraph.

608. *By January 2009, Trudell told Weststrate she was* ▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize,

or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

609.     *Rabobank's role in the anticompetitive conduct also included encouraging communication among broiler producer competitors, and serving as a conduit for communications between and among those competitors. For example, in November 2013, Weststrate had dinner with Jim Perdue, after which Weststrate reported to Perdue:* ███████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ *A few days later Bill Lovette (Pilgrim's indicted executive) reported to Weststrate:* ███████ █████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

610.     *Rabobank also communicated directly with producers as part of an effort to coordinate industrywide action with respect to production and/or pricing. For instance, during a June 2011 earnings call, Pilgrim's Lovette followed his remarks about Pilgrim's production cuts with commentary about competitors,* ███████████████████████████████████████████ *Following that earnings call, Weststrate sent an email to Lovette and Don Jackson (another senior executive at Pilgrim's), with the subject line* █████████████████████████████ ████████████████████████████████

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief

as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third

parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in

this Paragraph.

611. *A few months later, during September 2011, Weststrate suggested to Don Jackson* ███████████████ *emphasis added) In a June 24, 2010 email M. Donegan of Rabobank wrote to* *M. Kaminsky and L. Buckert of Koch:* ███████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize,

or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this

Paragraph and therefore denies those allegations.

612. *Rabobank also used its presentations and publications, shared widely with* *producers, including Defendants, to effectuate producer coordination. For example, at the 2008* *National Chicken Council Winter Meeting, Weststrate made a presentation advising the industry* ███████████ *In December 2011, Weststrate prepared a* ███████████ *The same month, Rabobank issued a report titled, '* ███████████ *(See* *supra ¶ 492.) And Rabobank's Poultry Quarterly Report sent to broiler producers in November* *2012 made clear:* ███████████ *Those reports were sometimes amplified through the* *press.[20]*

FN 20: *See, e.g., https://www.drovers.com/article/chicken-industry-faces-consolidation-* *afterdisastrous-expansion (Dec. 12, 2011) (attributing to Rabobank the assertion that* *"the industry needs to 'consider plant closures more intently'").*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. To the extent the

allegations in this Paragraph and Footnote purport to quote, characterize, or describe documents

or other sources, such sources speak for themselves, and Tyson denies any characterization or

description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to

form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants

and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

613.    *Weststrate never sought* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Weststrate Dep. Tr. at 351:19-352:1.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

614.    *Following press reports about the filing in September 2016 of lawsuits alleging anticompetitive conduct by chicken producers, Rabobank explained in a November 2, 2016 email to Todd Simmons, then-CEO of producer Simmons:* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

615.    *By virtue of Rabobank and all Defendants and Co-Conspirators identified in the DAP Consolidated Complaint actively and intentionally concealing their above-described wrongful conduct, the running of any applicable statute of limitations has been tolled and suspended with respect to Plaintiff's claims and causes of action resulting from the Defendants' unlawful conduct alleged in this Complaint under the fraudulent concealment doctrine and/or doctrine of equitable estoppel.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph

purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

616.     *Pursuant 15 U.S.C. § 16(i), the running of any applicable statute of limitations was also tolled when the Department of Justice instituted a criminal antitrust proceeding by convening a grand jury (which appears to have been in January 2019), and for which the DOJ issued a subpoena on April 2019, seeking "[a]ll discovery" in this civil case.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith.

I.     **The Conspiracy Also Included the Collusive and Fraudulent Manipulation of the Georgia Docket Price Index**

617.     *Defendants buttressed their successful efforts to artificially boost chicken prices by collectively reducing supply by collusively and fraudulently manipulating the Georgia Dock benchmark price index, a chicken-industry pricing benchmark contained in contracts between Defendants and a significant proportion of their customers, including certain Plaintiffs. The Georgia Dock was such an important index that, even when Plaintiffs' contracts were not explicitly indexed to the Georgia Dock, the prices paid by Plaintiffs were materially affected by the Georgia Dock price. As such, the manipulation of the Georgia Dock did not only have an anticompetitive effect on the price for sales of broilers that were quoted based directly and expressly on the Georgia Dock; rather, it also contaminated and artificially raised prices for broilers that were not expressly tied to the Georgia Dock. This contamination occurred because Defendants often used the Georgia Dock as a crosscheck or a baseline for transactions even where the Georgia Dock was not the primary benchmark that suppliers used to provide quotes to customers. For example, Defendant Keystone Foods utilized Georgia Dock as a reference point across the board for pricing even when their agreements with, or quotes to, customers did not call for the price to be based on the Georgia Dock.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson denies any remaining allegations in this Paragraph.

618.    *During the relevant period, broiler chicken prices were reported primarily by three entities: Urner Barry (a commodity price reporting service), the Georgia Department of Agriculture through the Georgia Dock, and the USDA. Additionally, as discussed below, Agri Stats collects detailed pricing information through its subsidiary Express Markets, Inc. ("EMI").*

**ANSWER:** Tyson admits that Urner Barry, the Georgia Department of Agriculture, and the USDA have publicly reported information for certain poultry products during the relevant period. Tyson further admits that EMI collected and reported information for certain poultry products. Tyson denies any remaining allegations in this Paragraph.

619.    *Urner Barry collects and publishes daily price information for broilers. Urner Barry's chicken price information is subscription-based, so all producers and many purchasers subscribe for a fee. The USDA and Urner Barry's broiler price indices are based upon a system of double verification, which includes telephonic and written surveys of all or nearly all chicken producers, but also verification of reported prices from purchasers such as brokers and customers. The Georgia Dock price survey methodology, which contrasts materially with those of the USDA and Urner Barry, is discussed below.*

**ANSWER:** Tyson admits that Urner Barry collects and publishes data on various poultry products, that some data collections are daily, and that Urner Barry subscribers pay a fee for their Urner Barry subscription. Tyson further admits that Plaintiffs refer to the Georgia Dock further into their Complaint, but denies their characterization of the Georgia Dock "methodology." Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

620.    *The most detailed price report is not publicly available and is produced by Agri Stats and its subsidiary, Express Markets, Inc. According to a May 2010 FarmEcon study, EMI's pricing report[21] includes "pricing data on whole birds and chicken parts that is considerably more detailed than the USDA," Urner Barry, or Georgia Dock reports, as it is based on actual sales invoices from broiler companies.*

*FN 21: Agri Stats subsidiary EMI was formed around 2000 to compete with the price reporting service of Urner Barry. Unlike Agri Stats reports for Defendants, EMI releases daily pricing data to both Defendants and potential purchasers of Broilers, though the reporting service costs thousands of dollars and is not publicly available. EMI reports capture all transactions by Broiler producers, who automatically transmit invoice information electronically from each transaction to EMI. The reports include all sales volume information from the previous day, including the size of containers, type of cut,*

*whether the product was chilled with ice or CO2, the price, and numerous other pieces of information.*

**ANSWER:** To the extent the allegations in this Paragraph and Footnote, purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson admits that data from Agri Stats and EMI is subscription based. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and Footnote and therefore denies those allegations.

*621.    Published prices for broilers from Urner Barry, Georgia Dock, and USDA relate to the market for broilers. Prices for chicken, whether sold under contract or on the spot market, generally move with spot market prices as reported by Georgia Dock or Urner Barry.*

**ANSWER:** Tyson admits that Urner Barry, Georgia Dock, and USDA published information related to certain broiler products. Tyson denies any remaining allegations in this Paragraph.

*622.    Statements by chicken company executives and industry experts confirm that chicken sales, whether by contract or on the spot market, are tied to spot market pricing. For instance, Sanderson Farms CEO Joe Sanderson explained in a May 2008 speech that Sanderson Farms' contract sales to retail customers have prices tied to the Georgia Dock price survey and Sanderson Farms' contract sales to food distributors are "based on formulas tied to the Urner Barry." Similarly, expert economist Dr. Colin A. Carter from the University of California (Davis) testified that "internal Pilgrim's documents show that virtually all chicken products, even if they're not sold spot, are tied to the spot prices.... 83 percent of Pilgrim's chicken sales are reflecting the spot price within a given year. So there's only about 16 percent of their sales that are not tied to the spot market over a relatively short period of time." Further, because half of "fixed contracts" actually had terms tied to broiler spot market prices, Dr. Carter concluded that 92% of Pilgrim's broiler sales were tied to broiler spot market prices such as Georgia Dock. Similarly, many of Plaintiffs' purchases of broilers from Defendants were tied to the Georgia Dock price even when those purchases were not spot transactions.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that

271

relate to other Defendants and/or third parties, and therefore Tyson denies those allegations.

Tyson denies any remaining allegations in this Paragraph.

*623.    As a consequence of the inelasticity of supply and demand in the broiler industry (discussed below) and the availability of the spot market price indices (discussed above), public price increase announcements by Defendants were unnecessary. Defendants knew and intended that a decrease in supply pursuant to their agreement would increase broiler spot market prices, and therefore that all broiler prices would increase.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*624.    The Georgia Dock, USDA Composite, and Urner Barry all measure the same (or very similar) size and grade of chicken.[22]*

*FN 22: Unlike the other indices, the Georgia Dock benchmark price did not include freight or transportation costs. At its inception, the Georgia Dock benchmark price was known as the "Georgia F.O.B. Dock" price; the Georgia Dock was "F.O.B." the supplier's shipping dock, meaning that the buyer was responsible for paying the freight.*

**ANSWER:** To the extent the allegations in this Paragraph and Footnote purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and Footnote and therefore denies those allegations.

*625.    The Georgia Dock benchmark price index, like the other two indices, sets prices for both the "whole bird" and various parts of the chicken (wings, tenders, leg quarters, thighs, drumsticks, and breasts) using the same pricing methodology. The "whole bird" price is the baseline for pricing all parts of a chicken.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*626.    Buyers reasonably relied on the Georgia Dock benchmark price index because they believed it accurately reflected the market price for the chicken they bought, especially*

272

*since the Georgia Dock was an industry-accepted benchmark price index for wholesale chicken prices that was meant to reflect the market price of chicken. Many Plaintiffs purchased chicken from Defendants at prices that used the Georgia Dock as a component throughout the relevant period. In some instances, Defendants insisted upon using the Georgia Dock in their pricing with Plaintiffs and/or declined to use another form of pricing with Plaintiffs.*

**ANSWER:** Tyson admits that some of its prices for Broilers sold to some customers were related to benchmark price indices, including the Georgia Dock. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

627. *Much like when the world's largest banks came together to manipulate numerous financial benchmarks (such as LIBOR), the Georgia Dock Defendants came together to manipulate the Georgia Dock benchmark price index.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson denies the any remaining allegations in this Paragraph.

628. *Compared to the other two indices available to chicken buyers, there were significant differences in how the Georgia Dock benchmark price index was compiled that made it highly susceptible to manipulation by the Georgia Dock Defendants. The Georgia Dock Defendants are the nine producers that submitted price quotes that went into the Georgia Dock price index, namely (ranked by their market share in Georgia, which dictated how much weighting each producer's quote was given in compiling the Georgia Dock benchmark price): Pilgrim's Pride (approximately 35% of Georgia market share in 2016); Tyson (15%); Fieldale (15%); Mar-Jac (10%); Claxton (10%); Sanderson Farms (7%); Harrison (5%); and Koch and Wayne Farms (less than 2% each).*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson admits that Plaintiffs refer to the Defendants listed in this Paragraph as "Georgia Dock Defendants" and that they each independently responded to requests for information from the Georgia Department of

273

Agriculture at certain points in the relevant period. Tyson further admits that the Court found that the Georgia Department of Agriculture only collected information from the nine chicken producers listed in this Paragraph, and no other Defendant submitted information. *Broilers*, 702 F. Supp.3d at 682-83. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

629. *The significant difference between the Georgia Dock price index and other broiler price indices in recent years cannot be explained by only one or two outlier companies reporting artificially high broiler prices to the GDA. That is because of the GDA's "one cent rule," as discussed in more detail below. Under this rule, prices that deviate by more than one cent from the average price as initially calculated are excluded from the final Georgia Dock price. Instead, the deviation of the Georgia Dock price index from the prices in the other indices – indices that are themselves based on verified sales by Defendants – can be attributed only to all or nearly all participating broiler producers collectively submitting artificially high and identical or very nearly identical broiler prices to the GDA. In other words, all or most of the Defendants' submissions needed to be roughly within two cents of each other in order to inflate the Georgia Dock price and maintain an artificially inflated Georgia Dock price over time – a price which, for extended periods of time, was 20 or 30 cents higher than the comparable (and also inflated, due to the anticompetitive conspiracy alleged herein) Urner Barry price index. Notably, the Georgia Dock was also higher than the USDA and EMI indices.*

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

630. *To compile the Georgia Dock price index, according to an internal GDA document provided to the New York Times through an open records request, "each participating [Broiler producer] company is called [by the GDA] on Wednesday every week to report the price offered to companies in which they have contracts in place with." A single price is given by each broiler producer company and it is accepted without any verification of actual invoices or any other form of auditing to verify accuracy. In response to a press inquiry, the GDA explained*

*its failure to audit any self-reported data from Defendants by stating, "We don't see any reason they would submit information that wasn't truthful."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*631.    Despite the GDA's public statements about confidence in the Georgia Dock price index, the GDA employee who collected prices each week from broiler companies, Arty Schronce, was deeply concerned. In a September 2016 internal GDA memorandum, disclosed publicly for the first time on November 17, 2016, in a Washington Post article, Schronce wrote that he "continue[d] to have concerns about" the Georgia Dock, had "voiced concerns in the past," and that he thought the Georgia Dock price index was "a flawed product that is a liability to the Georgia Department of Agriculture." Schronce also noted, "I was told that poultry companies know what they are doing and all I need to do is to gather and consolidate the info I am provided. However, I have come to question the validity of some of the information provided."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*632.    Schronce's memorandum confirms the significance of the one cent rule; it noted that after a January 2016 article about the Georgia Dock price index in the Wall Street Journal, one "company appears to basically not take part in the Whole Bird Dock Price process. They seem to deliberately submit a low bid that they know will be kicked out. However, they can claim that they are submitting something lower. In essence, they can take advantage of a high whole bird price while maintaining that they want it to be lower."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

633.    *Until late 2016, the Georgia Dock pricing methodology was not publicly available. Chicken buyers whose transactions with Defendants were tied to the Georgia Dock whole-bird price, reasonably but mistakenly believed it reflected the actual market price of chicken. Moreover, because (until August 2016) the USDA also published the Georgia Dock benchmark price alongside the USDA Composite, many chicken buyers, including Plaintiffs, erroneously believed the Georgia Dock price to be a USDA price.*

**ANSWER:** Tyson admits the USDA independently included in various publications information based on or including the Georgia Dock poultry reports at certain points in relevant period. Tyson lacks knowledge or information sufficient to form a belief as to any remaining allegations in this Paragraph and therefore denies those allegations.

634.    *Plaintiffs were misinformed that the Georgia Dock benchmark was supposed to be based on the Georgia Dock Defendants' actual offering prices for the next week as reported to the GDA. This was false; the Georgia Dock Defendants did not report their true prices to the GDA. Instead, they agreed to, and in fact did, intentionally report false, artificially high (or artificially-stabilized) prices. The reality was that the Georgia Dock price was simply whatever the Georgia Dock Defendants said it was. Hypothetically, if one week the Georgia Dock price was $1.75, and the following week the Georgia Dock Defendants told the GDA that the offering price of their chicken was now $2, the Georgia Dock price would become $2, and the prices that Plaintiffs and others paid for chicken would increase commensurately.*

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

635.    *Once a week, Schronce, his predecessor Greg Pilewitz, and/or their assistants at the PMN would call or email with representatives of the Georgia Dock Defendants to collect*

*price submissions, which were supposed to reflect those Defendants' actual offering prices. The PMN collected the Defendants' price submissions and weighted each of them by the Defendants' above-referenced relative market share (referred to by the PMN as that company's "voice").[23]*

> *FN 23:There was only one change to the weighting formula during the relevant time period.*

**ANSWER:** To the extent the allegations in this Paragraph and Footnote purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph and Footnote that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that Tyson was periodically contacted by various employees of the Georgia Department of Agriculture, including Mr. Schronce, for some period of time, with requests for information either by telephone or by email. Tyson denies any remaining allegations in this Paragraph.

636. *In addition, many of the Defendants submitted price quotes to the PMN via email, and those emails confirm many of the specific false and inflated quotes to the PMN.*

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that, at times, it independently submitted requested information to the Georgia Department of Agriculture. Tyson denies it submitted "false" or "inflated" information. Tyson denies any remaining allegations in this Paragraph.

637. *All parties knew that Defendants were supposed to submit to the PMN their actual offering prices for 2.5 to 3 pound whole chickens, but only a handful of the Georgia Dock Defendants actually processed 2.5 to 3 pound birds in Georgia, so, according to the PMN, the*

*Georgia Dock Defendants were "supposed to adjust their whole bird quote as if they are producing that sized bird." The Georgia Dock Defendants knew that, if they did not sell 2.5 to 3 pound whole birds, they had to reliably convert their offering price each week for the whole birds they sold into a 2.5 to 3 pound bird. Once the final Georgia Dock whole bird price was calculated, the PMN used a formula to calculate prices for different chicken cuts and parts based on the whole bird price the Georgia Dock Defendants provided to the PMN each Wednesday.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that among the information requested by the Georgia Department of Agriculture was information related to 2.5 to 3 pound whole broilers. Tyson further admits that in submitting information to the Georgia Department of Agriculture, Tyson submitted a price at which Tyson projected it could buy and sell product. Tyson denies any remaining allegations in this Paragraph.

638. *In compiling the Georgia Dock benchmark price, there was no team of economists or statisticians surveying buyers and sellers in the national chicken market. Unlike the USDA Composite or Urner Barry poultry indices, which use data from numerous producers and buyers on both sides of the market, the Georgia Dock reflected prices sourced solely from a handful of producers. In essence, from the inception of the Georgia Dock in the 1960s until late 2016, the PMN relied on the "honor system" as to the truthfulness and accuracy of the offering prices submitted by the Georgia Dock Defendants.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

278

*639.    In addition, submission of prices to the PMN was entirely voluntary. There were no regulations, rules, or legislation requiring poultry producers operating in the state of Georgia to submit their prices to the PMN.*

**ANSWER:** Tyson admits that Tyson was not legally required to respond to requests for information from the Georgia Department of Agriculture. Tyson denies any remaining allegations in this Paragraph.

*640.    Schronce, who began compiling the Georgia Dock Defendants' price quotes in 2012 following the death of his predecessor Greg Pilewitz, first made a preliminary calculation of the weighted average using the single price submission from each company. Then "[a]ny company that provides a whole bird quote that is more than one cent above or below the initial dock price calculation will not be included in the calculation for the whole bird dock price that week. Its voice is taken out of the formula and the dock price is recalculated without it." This so-called "one-cent rule" is, according to internal GDA documents, meant "to shield [] one company having the ability to greatly influence the price up or down."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*641.    Because of the GDA's one-cent rule, it was not possible for only one or two broiler companies to report a broiler price that was significantly higher than the actual market price to the GDA without being disregarded as outliers by the GDA. Accordingly, certain Georgia Dock Defendants began reporting prices to the GDA that fell within a very narrow range but were also significantly above the actual market rate. As a result, Georgia Dock prices continued to rise and later stabilized during 2015-2016 at historic highs. It was not until a series of articles was published between November 3, 2016 and November 17, 2016 that information was publicly available to show Defendants may have fixed the Georgia Dock price.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties and therefore denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*642.    Nothing was done to verify or substantiate these numbers. There was no "double-verification;" unlike with the other price indices, customers were never contacted to check to see if the producers' prices were legitimate. The entire process was based on unverified "price*

279

*quotes" from the same set of chicken producers (the Georgia Dock Defendants) submitted each week to one or two GDA employees, a methodology that was susceptible to manipulation.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that it responded to requests for information from the Georgia Department of Agriculture at certain times during the relevant period. Tyson denies that the Georgia Dock was "susceptible to manipulation" and denies any remaining allegations in this Paragraph.

> **J.**  **The PMN, the Georgia Dock, and the PMN Advisory Committee Were Committee Were Created and Sustained for the Benefit of Georgia Dock Defendants and the Broiler Industry**

*643.    The Georgia Dock has been an industry tool ever since it was first created as part of the Poultry Market News Bulletin in 1965. At that time, the GDA created the first Georgia Dock based on a recommendation from the Georgia Poultry Federation (the "GPF") that the GDA begin reporting a "live quotation" (i.e., the price of a live bird). The GPF was – and continues to be – a trade association comprised of Georgia poultry producers.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson admits the Georgia Poultry Federation is an industry association. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*644.    In 1972, the poultry producers, through trade organizations such as the GPF and the Georgia Poultry Processors Association, began to lobby the GDA to discontinue the PMN "live quotation." Instead, the joint industry group recommended that the PMN quote an F.O.B. dock equivalent price. In their recommendations, the joint industry group even set out guidelines for what the PMN should be reporting. As the Georgia Commissioner of Agriculture at that time, Tommy Irvin, stated in a February 11, 1972 letter, the joint industry group had recommended an*

*F.O.B. dock price equivalent that represented "full truck load lots of Ice Pack, USDA Grade A, sized 2.5 to 3 pound broilers and fryers."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

645. *The GDA accepted this recommendation and, on February 22, 1972, transitioned the PMN to reporting the F.O.B. dock price equivalent that is known today as the Georgia Dock. Other than a switch to emailed (rather than telephonic) price submissions for some poultry producers, there have been no further changes to the PMN's methodology for calculating the Georgia Dock since 1972.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

646. *Since the transition in 1972, the stated purpose of the Georgia Dock has always been to report an F.O.B. dock price equivalent. According to an email sent by Arty Schronce on August 2, 2016, "[o]n February 23, 1972, (Wednesday) the opening line of the report was: The Georgia F.O.B. dock price for next week's trading on full truck load lots of ice pack USDA Grade 'A' sized 2.5 to 3 pound broilers and fryers are being sold on the bases (basis) of 27 cents; 32% of the loads offered have been confirmed on the bases (basis) of 27 cents." Indeed, as recently as April 2016, the GDA website page for the Georgia Dock stated that "we report the established prices of dressed f.o.b. dock broilers and fryers."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

647.    *Following the 1972 transition, and in order to facilitate their control over the Georgia Dock price index, the poultry industry had another recommendation for the GDA: the creation of a non-public, non-governmental PMN Advisory Committee. As stated in the minutes from a Georgia Poultry Processors Association meeting from 1972, "[i]t was requested that the Federation recommend to the Department of Agriculture that an appointment of an Advisory Committee be made by the Commissioner to work in close relationship with the Market News Service and with the guidelines which were set forth in establishing the F.O.B. reporting system." Again, the GDA accepted this recommendation and formed an Advisory Committee comprised of representatives from the poultry producers who submitted prices to the Poultry Market News.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson admits that, at times during the relevant period, at the request of the Georgia Department of Agriculture, Tyson would have an employee representative on the Poultry Market News Advisory Committee but denies any characterization of the Committee. Tyson further admits that the Court found that the Georgia Department of Agriculture created the Poultry Market News Advisory Committee. *Broilers*, 702 F. Supp.3d at 682-83. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

648.    *Defendants – through their roles in creating and contributing to the Georgia Dock and serving on the Advisory Committee – had intimate knowledge of the procedures by which the PMN collected, calculated, and reported on the established prices for dressed F.O.B. dock broilers and fryers that the Georgia Dock should have been reporting. Defendants stayed apprised of this knowledge through meetings between the poultry producers and the PMN, during which they would discuss and review the reporting policies and procedures for the Georgia Dock. Defendants' knowledge even extended to the calculation forms used internally at the PMN, which were circulated to members of the PMN Advisory Committee following one of their meetings on January 25, 2007.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

282

information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that, at certain times during the relevant period, at the request of the Georgia Department of Agriculture, Tyson would have an employee representative on the Poultry Market News Advisory Committee and that the Committee rarely met during the relevant period, but denies any characterization of the Committee and its meetings. Tyson denies any remaining allegations in this Paragraph.

649. *As is relevant to Defendants' fraudulent scheme as discussed further below,*

**ANSWER:** Tyson denies the existence of and participation in any "fraudulent scheme." This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations Tyson admits that the Georgia Department of Agriculture requested information related to 2.5 to 3 pound whole broilers. Tyson admits that, at certain times during the relevant period, at the request of the Georgia Department of Agriculture, Tyson would have an employee representative on the Poultry Market News Advisory Committee. Tyson admits that it at various times in the relevant period sold a 2.5 to 3 pound whole bird. Tyson denies any remaining allegations in this Paragraph.

650.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that the Georgia Department of Agriculture requested information related to 2.5 to 3 pound whole broilers. Tyson further admits that, at times during the relevant period, at the request of the Georgia Department of Agriculture, Tyson would have an employee representative on the Poultry Market News Advisory Committee but denies Plaintiffs' characterizations of the Committee. Tyson further admits that Tyson or one or more of Tyson's employees have been members of certain legitimate trade associations for pro-competitive reasons, including the Georgia Poultry Federation. Tyson denies any remaining allegations in this Paragraph.

*651.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

284

652.     *Not only did Defendants have intimate knowledge of what prices should be submitted to the PMN for inclusion in the Georgia Dock, but they also maintained firm control over the Georgia Dock through the Advisory Committee. From its inception, the Advisory Committee was composed of senior executives from the Georgia Dock Defendants, and its mission was to advise the GDA on issues relating to the PMN division's collection of prices from Defendants and setting of the Georgia Dock price.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties and therefore denies those allegations. Tyson admits that, at times during the relevant period, at the request of the Georgia Department of Agriculture, Tyson would have an employee representative on the Poultry Market News Advisory Committee. Tyson further admits that the Court found that the Georgia Department of Agriculture created the Poultry Market News Advisory Committee. *Broilers*, 702 F. Supp.3d at 682-83. Tyson further admits that the Court found that that Poultry Market News Advisory Committee's purpose was only to advise the Poultry Market News division and provide pricing information, and it was not its purpose to inflate the Georgia Dock. *Id.* at 687-88. Tyson denies Plaintiffs' characterization of that Committee and any remaining allegations in this Paragraph.

653.



**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

654.     *From at least September 2012 through 2016, the Advisory Committee included Gus Arrendale (CEO, Fieldale Farms), Mike Welch (CEO and President, Harrison), Jerry Lane (Former CEO, Claxton Poultry), Jayson Penn (EVP Sales and Operations, Pilgrim's), Pete Martin (VP of Operations, Mar-Jac), Vernon Owenby (Manager of Tyson's facility in Cumming, Georgia), Steve Clever (VP of Fresh Sales, Wayne Farms), and Dale Tolbert (VP of Sales, Koch Foods).*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph and Footnote that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations Tyson admits that the manager of its Cumming, Georgia complex, Vernon Owenby, who has no pricing authority, was a representative on the Georgia Dock Advisory Committee. Tyson denies that Mr. Owenby's role on that committee enabled him to control the Georgia Dock price. Tyson denies any remaining allegations in this Paragraph.

655.    *The Advisory Committee therefore consisted entirely of representatives of one side of the transaction: the poultry producers. Despite the fact that the Georgia Dock affected both buyers and sellers of chicken alike, there were no representatives of buyers on the Advisory Committee. There were also no neutral economists or members of academia. The producers, and the producers alone, controlled the PMN, often working hand-in-hand with their current or former lobbyists within the GDA and from the Georgia Poultry Federation, as discussed in more detail below.*

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson denies any remaining allegations in this Paragraph.

656.    *The Advisory Committee controlled the process for calculating and, as set forth in this Complaint, reevaluating the Georgia Dock price. When he was installed as director of the PMN, Arty Schronce was told that he could not make any changes to the Georgia Dock without first clearing them with the Advisory Committee.*

**ANSWER:** Tyson admits that the Court found that the Georgia Dock reevaluation process was an established process of the Poultry Market News division, a department of a governmental agency, where Poultry Market News staff had to agree to any request for a revaluation. *Broilers*, 702 F. Supp.3d at 685-87. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

657. 

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

658. *The existence of the Advisory Committee also helped to ensure that the Georgia Dock Defendants were intimately aware of the process by which the Georgia Dock price was calculated, enabling them to manipulate it. The Advisory Committee met periodically and discussed how the Georgia Dock price was calculated. In addition, because of their familiarity with the underlying guidelines and internal PMN calculations, the Georgia Dock Defendants knew the prices they submitted to the PMN were not subject to verification, and that those submissions would be used to calculate the next Georgia Dock price unless they deviated from the initially-calculated weighted average by one cent or more. (Although it appears there was no representative of Sanderson Farms on the Advisory Committee throughout the entire relevant time period, Sanderson Farms was aware of this fact through communications with other Defendants.)*

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that, at times during the relevant period, the Poultry Market News Advisory Committee would meet

but denies any characterization of these meetings. Tyson denies any remaining allegations in this Paragraph.

*659.*



**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that the Court found that the Georgia Dock reevaluation process was an established process of the Poultry Market News division, a department of a governmental agency, where Poultry Market News staff had to agree to any request for a revaluation. *Broilers*, 702 F. Supp.3d at 685-87. Tyson further admits that the Court found that the May 2014 meeting included only three of the nine Georgia Dock Defendants as well as the primary Poultry Market News staff person. *Id.* at 686. Tyson denies any remaining allegations in this Paragraph.

*660.     The existence and conduct of the Advisory Committee was not known to chicken buyers, including until November 2016 when it was first made public following a press report*

*about a September 2016 memorandum written by Schronce that was highly critical of the Georgia Dock methodology. He wrote in the memorandum that he had QUESTIONs about the 'Advisory Board' and its role over an office of a state regulatory agency that is supposed to be independent."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

### K. <u>The Georgia Poultry Federation's Role in Creating and Sustaining the Georgia Dock for the Benefit of Defendants and the Broiler Industry</u>

661.



**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that one or more of its employees have been members of certain legitimate trade associations for pro-competitive reasons, including the Georgia Poultry Federation. Tyson denies any remaining allegations in this Paragraph.

662.

███████████████████████████████████████████

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

663.    *The GPF also regularly acted as a go-between for the GDA and the Advisory Committee; it would explain to Advisory Committee members the purpose of certain meetings and remind Advisory Committee members of their companies' obligations with respect to the Georgia Dock.* ███████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations and therefore denies those allegations.

664.    *The GPF was another means through which the Georgia Dock Defendants knew that the Georgia Dock was supposed to represent the actual price at which Defendants would sell F.O.B. 2.5 to 3 pound whole birds in the upcoming week.* ███████████████

██████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

## L.     The Georgia Dock Became Ripe for Manipulation

665.    *A number of factors at the beginning of the relevant time period made the Dock more vulnerable to manipulation and ultimately resulted in a marked upward departure of the Georgia Dock from all other poultry pricing indices.*

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

666.    *In or around 2008 and 2009, with the GDA experiencing drastic budget cuts, Georgia Commissioner of Agriculture Tommy Irvin conducted an inquiry into the PMN Division to determine if staffing cuts or other efficiencies were warranted. At the time, the PMN was staffed by four full-time employees: division director Greg Pilewitz, Toni Leslie, Nell Moncus, and Donald Carnes. Over the next three years, the staff of the PMN Department was cut from four full-time employees down to two.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

667.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

668. *Due to budgetary constraints, Commissioner Black further reduced the staff of the PMN Department in 2011 and 2012. When Mr. Pilewitz died unexpectedly in early 2012, Ms. Leslie was left to run the PMN Department alone until a replacement could be found. In October of 2012, Arty Schronce was installed as director, but he only worked for the PMN part time. Schronce also performed other projects at GDA, including authoring a gardening column and working for the press office. Shortly after Mr. Schronce assumed the position, Ms. Leslie was replaced by Demetria Mabry. Mr. Schronce and Ms. Mabry were instructed to continue collecting the poultry producers' price submissions and calculating the Georgia Dock as it had always been calculated, but neither had the foundational knowledge to recognize the ways in which poultry producers began divorcing their price submissions from reality.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

669. *These factors, combined with the Georgia Dock Defendants' knowledge of the Georgia Dock pricing process, enabled them to collectively devise and then execute a simple yet elegant scheme to artificially inflate the Dock price and sustain that inflated Dock price for approximately six years. As discussed in further detail below,* ████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

670. ████████████████████████████████████████████
████████████████████████████████████████████████████

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*671.*

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*672.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

673.



**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any

allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

674.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

675. *But the possibility that any change could be made to the Georgia Dock was illusory. Despite Defendant's knowledge that they were submitting information to the Poultry Market News that was contrary to the guidelines Defendants themselves had created, the system had never changed.*

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties and therefore denies those allegations. Tyson denies any remaining allegations in this Paragraph.

### M. Regulatory Investigation and Demise of the Georgia Dock

676. *The PMN's Director, Arty Schronce, had concerns that the Georgia Dock was unreliable, had been captured by the chicken producers, and was being manipulated by the chicken producers. His concerns grew over time. By September 2016, he articulated concerns in a memorandum, in which he noted that some companies have a "larger, even outsized role in*

*determining the Georgia Whole Bird Dock Price," and that "[i]n essence, they can take advantage of a high whole bird price."*

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

677. *Following the January 2016 Wall Street Journal article, federal governmental officials began to investigate. On July 19 and 20, 2016, high-level USDA officials met with GDA representatives in Atlanta, Georgia to discuss the Georgia Dock price. The USDA officials shared their conclusion that GDA could no longer simply accept broiler prices from Defendants without verification and instead would have to verify invoice-level data to confirm reported prices. On July 20 and 21, 2016, USDA officials requested that the GDA provide the USDA with data from broiler producers to "test and review" the Georgia Dock price for accuracy.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

678. *On July 22, 2016 USDA's weekly BMNR publication noted that beginning on August 5, 2016, GDA "will be issuing a new weekly market report for negotiated Georgia broiler/fryer whole birds and bird parts, which will replace the current [Georgia Dock price]." The GDA did not comply with USDA's August 5 deadline, however, and in the August 5 USDA BMNR, all price information from the GDA and Georgia Dock was removed and only a hyperlink to the GDA's website was included.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

679. *At that time, high level officials within the GDA began to raise antitrust concerns regarding the Georgia Dock. For instance, a July 27, 2016, report from GDA Director of Regulatory Compliance & Budget Alec Asbridge to GDA Commissioner Gary Black concluded that "[t]he top 10 poultry producing companies now control over 80% of the industry output. The combination of vertical integration, limited competition and lowered production periods has led to steady prices that have shown to be fairly resistant to changing market conditions. These factors alone illicit [sic] anti-trust review."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

680. *GDA Director Asbridge's July 27, 2016, report also noted that over time, the GDA became a vehicle for Defendants to "report[] a weighted average price per pound on broilers [Georgia Dock price] based off of contracts that have been determined at the private level and reported without regulatory oversight. The formulas to calculate weighted average prices have been determined on the private level and have not been standardized since the inception of the [GDA Poultry Market News division] in 1968, which there is no written record of." In other words, it was Defendants themselves who wrote the rules and formulas that make up the Georgia Dock price, not the GDA.*

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith.

Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*681.    Director Asbridge's July 27, 2016, report also concluded that "[t]he extent of the use of the [Georgia Dock price] in contract negotiations is presently unknown but inquiries made by media and other governmental entities indicate that it is utilized on a more regular basis than previously expected." In short, the GDA had been publishing the Georgia Dock price for decades, but until this time apparently did not know the scope of reliance on the Georgia Dock price. Significantly, a revised and highly sanitized version of the July 27, 2016 report from Director Asbridge to GDA Commissioner Black was circulated internally at GDA on August 5, 2016. The sanitized August 5 report removed references to the existence of factors in the broiler industry eliciting "antitrust review" and to the fact that the Georgia Dock price was reported for decades by GDA "without regulatory oversight."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith.  Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*682.    On August 12, 2016, GDA Director Asbridge provided Georgia Poultry Federation President Mike Giles with the sanitized version of the report and asked Giles to review it before the GDA sent it to the USDA, "to ensure what I presented is accurate and best represents industry's concern with only reporting a spot price." The Georgia Poultry Federation represents the poultry industry in Georgia, and most Defendants are members. Remarkably, the GDA also noted in a separate email the same day to Giles and the Georgia Poultry Federation that "[t]he GDA is in agreement with the poultry industry that there is no desire to review invoices for verification of data reported," even though the information and means to do so are readily at hand. Defendants already report such invoice information to Agri Stats on a daily basis. According to a subsequent email dated August 24, 2016, Georgia Poultry Federation President Giles called GDA Director Asbridge back and gave "his and industry's sign off on the dock price summary report. We can move forward with sending to USDA." GDA Director Asbridge also proposed another meeting between GDA and the Georgia Poultry Federation to discuss recommendations about verifying Georgia Dock data.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that one or more of its employees were members of certain legitimate trade associations for pro-competitive reasons, including the Georgia Poultry Federation, at certain times during the relevant period, but denies any remaining allegations in this Paragraph.

683.    Under pressure from the USDA, and realizing that the Georgia Dock pricing methodology raised significant antitrust concerns, the GDA considered revising the methodology in late 2016. After the Georgia Dock Defendants balked at the GDA's new methodology – which would have required them to verify and attest to the accuracy of their price quotes – the GDA halted the Georgia Dock benchmark price index altogether. It was no longer receiving sufficient price quotes to compile the index. The last Georgia Dock benchmark price was published by the GDA on November 23, 2016. Yet for several months after the last Georgia Dock price was published by the GDA, certain Defendants, including at least Pilgrim's, continued to use the November 23, 2016 benchmark price of $1.0975/lb. to set their wholesale prices to chicken buyers.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits the Georgia Department of Agriculture explored a substitute pricing index to replace the "Georgia Dock" in 2016 and that the Georgia Department of Agriculture ceased publishing the Poultry Market News in November 2016. Tyson admits that that the Georgia Department of Agriculture considered creating the Georgia Premium Poultry Price Index and that Tyson determined, in its independent business judgment, that participating in a new index did not provide any benefit. Tyson denies any remaining allegations in this Paragraph.

684.    On October 6, 2016, a USDA press release noted the expansion of its National Whole Broiler/Fryer report, which included new weekly price information regarding 2.5 to 3 pound broilers that replaced the same weight broiler previously reported by the Georgia Dock

*price. Importantly, the new USDA price roughly matched the Urner Barry price, suggesting that the Georgia Dock price continued to be subject to manipulation by Defendants.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

685.    *On November 3, 2016, the New York Times published the first account of the USDA's inquiry into the Georgia Dock, based on information received via Freedom of Information Act and open records requests for internal USDA and GDA documents. Subsequently, a November 8, 2016, article by the Washington Post provided additional detail on the inquiry, including a comment from the USDA that "they discontinued publishing the Georgia Dock price 'when data from the source report could not be independently verified.'" In the Washington Post article, Sanderson Farms CFO Mike Cockrell was quoted as saying "the Georgia Dock has come to be a trusted reflection of the supply and demand for retail stores." In a press release cited in a Bloomberg News article on November 17, 2016, Tyson stated that "[w]hen the Georgia Department of Agriculture asks us for pricing data, we provide accurate information based on actual and recent transactions." Sanderson Farms' and Tyson's continued defense of the Georgia Dock price index as one that customers should trust shows that Defendants continued their efforts to conceal the conspiracy alleged in this Complaint.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

### N.    The Georgia Dock Price Index Diverged from the USDA Composite and Urner Barry Price Indices Beginning in 2011

686.    *Beginning in approximately early 2011, the Georgia Dock price index began to behave differently from Urner Barry and USDA indices. Historically, the Georgia Dock benchmark price had been highly correlated with those other two indices; although the Dock price had always been somewhat less volatile, its movement (i.e., volatility) mirrored the patterns of the other two indices (e.g., prices went up or down depending on market forces). But as hindsight now shows, in 2011, the correlation began to dissolve. Over time periods when the*

*Urner Barry and USDA price indices would decrease, the Georgia Dock would stay flat or sometimes increase. This divergence continued and became especially pronounced in 2015.[24]*

> *FN 24: The prices reported in the EMI, Urner Barry, and USDA Composite price indices were also supra-competitive and artificially inflated by the output-restriction aspect of Defendants' scheme.*

**ANSWER:** This Paragraph and Footnote contain Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph and Footnote purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegation in this Paragraph and Footnote and therefore denies those allegations

> *687.    The changes resulted from the conspiracy by the Georgia Dock Defendants to agree on artificial prices quoted to the GDA for inclusion in the Georgia Dock benchmark price, as well as by the fraud perpetrated by the Georgia Dock Defendants.*

**ANSWER:** Tyson denies the conspiracy alleged in this Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

> *688.    Starting in early 2011, the monthly price volatility in the Georgia Dock markedly decreased, particularly with respect to downward price movements (i.e., when prices dropped,*

*they dropped far less drastically than they had in the past). This near-disappearance of price volatility was unique to the Georgia Dock. Both of the other price indices stayed volatile while the Georgia Dock remained stable, as reflected in the following graph, which compares prices of the various indices both before and during the relevant period:*



**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*689.    When the Georgia Dock component of Defendants' conspiracy kicked into high gear, the Georgia Dock price – for the first time ever – began to materially diverge from the other two indices. Although the other two indices continued to move closely together over time, the Georgia Dock price continued to diverge further and further from those prices. By 2015, the gap between the Georgia Dock price and the prices on the other two indices was approximately three times greater than it had ever been in recent history, and approximately five to ten times greater than the typical gap between the prices on the other two indices.*

302

**ANSWER:** Tyson denies the conspiracy alleged in this Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson admits that the Court found that at the time of the May 2014 meeting, the Georgia Dock price was lower than the Urner Barry price. *Broilers*, 702 F. Supp.3d at 685-86. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

### O. Defendants Fraudulently Submitted False and Inflated Quotes to the Poultry Market News, Causing the Index to be Artificially High

690. *The mechanics by which certain Defendants fraudulently manipulated the Georgia Dock price index is now clear.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

691. *The Georgia Dock Defendants fraudulently submitted false and inflated price quotes to the PMN. Moreover, the Georgia Dock Defendants fraudulently failed to inform their counterparties – that is, those Plaintiffs to whom they sold poultry on pricing tied to the Georgia Dock – of the many serious flaws with the Dock, which accrued to their benefit and to the detriment of those counterparty Plaintiffs.*

**ANSWER:** Tyson denies the conspiracy alleged in this Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

303

692. *By way of background, when the PMN calculated the Georgia Dock price each week, it rounded the price to the nearest 0.25 cents. For example, the Dock could increase from 110.25 cents to 110.50 cents, but not any amount in between. Defendants also used increments of 0.25 cents in their submissions. Under the PMN's one-cent rule, any submission that was at least one cent more or less than the initially calculated weighted average would be excluded. As a result, on any given week only seven submissions could affect the Dock price: the submission that happened to equal the initial calculation of the weighted average, and submissions that were +0.25 cents, +0.50 cents, +0.75 cents, -0.25 cents, -0.50 cents, and -0.75 cents when compared to the initial weighted average. All other submissions were excluded. Thus, in order to rig the Dock price, Defendants had to work in concert to make price submissions that fell within a narrow range of each other, yet far from the market price, week after week, for years.*

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*693.*



**ANSWER:** Tyson denies the conspiracy alleged in this Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations

and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

694.



**ANSWER:** Tyson denies the conspiracy alleged in this Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that it made submissions to the Georgia Department of Agriculture via phone and that the employee who made the submissions has been deposed. Tyson denies any remaining allegations in this Paragraph.

695. *Each of the Georgia Dock Defendants' submissions to the PMN made the implicit statement that those Defendants were submitting their actual offering price for 2.5 to 3 pound whole birds for the next week, while in fact those submissions reflected that Defendants were seeking to inflate the Dock price to make money at the expense of their customers.*

**ANSWER:** Tyson denies the conspiracy alleged in this Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

696. *The allegations set forth below are based on the information regarding Defendants' price submissions.*

**ANSWER:** This Paragraph contains no factual allegations to which a response is required. To the extent a response is required, Tyson denies the allegations in this Paragraph.

### 1. Pilgrim's Fraudulently Made False Submissions to the Georgia Dock

697. *Pilgrim's knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for 2.5 to 3 pound birds for the next week. But rather than determining its actual offering price for the next week and submitting it to the PMN, Pilgrim's made false and inflated price submissions as explained below.*

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

698.    Due to its large production capacity, Pilgrim's had a "voice" of 35% (out of a total voice for all Georgia Dock Defendants of 100%) for purposes of the weighted average for the Georgia Dock price. Pilgrim's voice of 35% was by far the weightiest of the Georgia Dock Defendants, and thus its submissions had the greatest influence on setting the Georgia Dock price. Pilgrim's knew that its submissions carried the most weight of any of the Defendants.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

699.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

700. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

701. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

702. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

703. 

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*704.*



**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*705.*



**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

706. 

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

707. 

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

708. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore deny them.

709. 

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information

311

sufficient to form a belief as to the truth of any remaining allegation in this Paragraph and therefore denies those allegations.

710. 

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

711.

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

712.



**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

713.



**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

714. 

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

715. 

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

716. 

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

717. *Pilgrim's submissions were false and inflated. Pilgrim's was supposed to submit its actual offering price for 2.5 to 3 pound whole birds. Because broilers are a commodity, Pilgrim's actual offering price (absent manipulation of the index) should reflect actual market dynamics and Pilgrim's costs of production, rather than simply an attempt to artificially inflate the index. Yet Pilgrim's did not submit its actual or converted offering price for 2.5 to 3 pound whole birds each week.* ███████████████████████████ *rtificially high quotes constitute false statements because manipulated quotes are literally false or insincere responses to the PMN's request for submissions of actual offering prices.*

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

718. *Pilgrim's knew that its submissions were false and inflated. Pilgrim's knew that it was supposed to submit its actual or converted offering price for 2.5 to 3 pound whole birds* ██ ████████████████████████████████████████████ *t the very least, Pilgrim's acted with reckless indifference as to whether its submissions were false and inflated.*

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

719. *Pilgrim's made its submissions with the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index and increased Plaintiffs' prices. Pilgrim's fraudulent submissions were made by interstate wire.*

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for

themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

720. *The intended targets of Pilgrim's fraudulent submissions to the PMN were buyers of chicken, including Plaintiffs. Pilgrim's sold chicken to its customers based on the Georgia Dock price index. Accordingly, as a result of Pilgrim's fraudulent submissions that artificially inflated the Georgia Dock price index, Pilgrim's and the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiffs were harmed.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

721. 

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize,

or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any allegations in this Paragraph that

relate to other Defendants and/or third parties, and therefore Tyson denies those allegations.

Tyson denies any remaining allegations in this Paragraph.

### 2. Koch Fraudulently Made False Submissions to the Georgia Dock

722.    *Koch knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for 2.5 to 3 pound birds for the next week. But rather than determining its actual offering price for the next week and submitting it to the PMN, Koch made false and inflated price submissions as explained below.*

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or

legal conclusions to which no response is required. To the extent a response is required, Tyson

denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph

purport to quote, characterize, or describe documents or other sources, such sources speak for

themselves, and Tyson denies any characterization or description that is inconsistent therewith.

Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining

allegations in this Paragraph and therefore denies those allegations.

*723.*



**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or

legal conclusions to which no response is required. To the extent a response is required, Tyson

denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph

purport to quote, characterize, or describe documents or other sources, such sources speak for

themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

724. 

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

725. 

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph and Footnote contain Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph and Footnote purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph and Footnote that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits Plaintiffs purport to define "stabilizing" and "inflating" as used in the Complaint, but denies any remaining allegations in the Footnote, including the allegations of conspiracy. Tyson denies any remaining allegations in this Paragraph and Footnote.

726. 

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for

themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

727. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

728. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

729. *Koch's submissions were false and inflated. Koch was supposed to submit its actual offering price for 2.5 to 3 pound whole birds. Because broilers are a commodity, Koch's actual offering price (absent manipulation of the index) should reflect actual market dynamics and Koch's costs of production, rather than simply an attempt to artificially inflate the index. Yet*

321

*Koch did not submit its actual or converted offering price for 2.5 to 3 pound whole birds each week.* ████████████████████████████████████████████████████

*Artificially high quotes constitute false statements because manipulated quotes are literally false or insincere responses to the PMN's request for submissions of actual offering prices.*

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

730. *Koch knew that its submissions were false and inflated. Koch knew that it was supposed to submit its actual or converted offering price for 2.5 to 3 pound whole birds* ███████ ████████████████████████████████████████████████████ *At the very least, Koch acted with reckless indifference as to whether its submissions were false and inflated.*

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

731. *Koch made its submissions for the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index. Koch's fraudulent submissions to the PMN were made by interstate wire.*

**ANSWER:** Tyson denies the conspiracy alleged in this Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

732. *The intended targets of Koch's fraudulent submissions to the PMN were buyers of chicken, including Plaintiffs. Koch sold chicken to its customers based on the Georgia Dock price index. Accordingly, as a result of Koch's fraudulent submissions that artificially inflated the Georgia Dock price index, Koch and the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiffs were harmed.*

**ANSWER:** Tyson denies the conspiracy alleged in this Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

### 3. Mar-Jac Fraudulently Made False Submissions to the Georgia Dock

733. *Mar-Jac knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for 2.5 to 3 pound birds for the next week. But rather than determining its actual offering price for the next week and submitting it to the PMN, Mar-Jac made false and inflated price submissions as explained below.*

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph

323

purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

734.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

735.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

736.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

737.

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

738.    *Mar-Jac's submissions were false and inflated. Mar-Jac was supposed to submit its actual offering price for 2.5 to 3 pound whole birds. Because broilers are a commodity, Mar-Jac's actual offering price (absent manipulation of the index) should reflect actual market dynamics and Mar-Jac's costs of production, rather than simply an attempt to artificially inflate the index. Yet Mar-Jac did not submit its actual or converted offering price for 2.5 to 3 pound whole birds each week.* *Artificially high quotes constitute false statements because manipulated quotes are literally false or insincere response to the PMN's request for submissions of actual offering prices.*

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

739.   *Mar-Jac knew that its submissions were false and inflated. Mar-Jac knew that it was supposed to submit its actual or converted offering price for 2.5 to 3 pound whole birds* ███████ ███████████████████████████████████████████ *At the very least, Mar-Jac acted with reckless indifference as to whether its submissions were false and inflated.*

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

740.   *Mar-Jac made its submissions for the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index. Mar-Jac's fraudulent submissions to the PMN were made by interstate wire.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the

truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

741. *The intended targets of Mar-Jac's fraudulent submissions to the PMN were buyers of chicken, including Plaintiffs. Mar-Jac sold chicken to its customers based on the Georgia Dock price index. Accordingly, as a result of Mar-Jac's fraudulent submissions that artificially inflated the Georgia Dock price index, Mar-Jac and the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiffs were harmed.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

### 4.   Harrison Fraudulently Made False Submissions to the Georgia Dock

742. *Harrison knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for 2.5 to 3 pound birds for the next week. But rather than determining its actual offering price for the next week and submitting it to the PMN, Harrison made false and inflated price submissions as explained below.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

327

*743.* 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*744.* 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

745.



**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

746.



**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*747.*



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*748.*



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*749.*



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

750. *Like Koch and Mar-Jac, Harrison's practice stabilized the Georgia Dock price index, imposing an artificial floor that prevented the index from falling, while allowing other Defendants (such as Pilgrim's) to artificially inflate the index through their regularly-inflated submissions. Harrison acted in concert with the other Defendants by playing this role.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

751. *Harrison's submissions were false and inflated. Harrison was supposed to submit its actual offering price for 2.5 to 3 pound whole birds. Because broilers are a commodity, Harrison's actual offering price (absent manipulation of the index) should reflect actual market dynamics and Harrison's costs of production, rather than simply an attempt to artificially inflate the index. Yet Harrison did not submit its actual or converted offering price for 2.5 to 3 pound whole birds each week.* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Artificially high quotes constitute false statements because manipulated quotes are literally false or insincere responses to the PMN's request for submissions of actual offering prices.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

331

752.    *Harrison knew that its submissions were false and inflated. Harrison knew that it was supposed to submit its actual or converted offering price for 2.5 to 3 pound whole birds* ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *At the very least, Harrison acted with reckless indifference as to whether its submissions were false and inflated.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

753.    *Harrison made its submissions for the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index. Harrison's fraudulent submissions to the PMN were made by interstate wire.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

754.    *The intended targets of Harrison's fraudulent submissions to the PMN were buyers of chicken, including Plaintiffs. Harrison sold chicken to its customers based on the Georgia Dock price index. Accordingly, as a result of Harrison's fraudulent submissions that artificially inflated the Georgia Dock price index, Harrison and the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiffs were harmed.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*755.*



**ANSWER:** To the extent that this Paragraph incorporates and re-alleges allegations above, Tyson incorporates and re-alleges any response made to those allegations. Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson further denies that Plaintiffs' chart is accurate and any remaining allegations in this Paragraph.

756.

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

757.    *This is further proof that the Defendants worked together to submit knowingly false price quotes to the PMN as part of a coordinated effort to inflate the Dock price.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

## 5.    Sanderson Farms Fraudulently Made False Submissions to the Georgia Dock

758.    *Sanderson Farms knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for 2.5 to 3 pound birds for the next week. But rather than determining its actual offering price for the next week and submitting it to the PMN, Sanderson Farms made false and inflated price submissions as explained below.*

334

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

759. ███████████████████████████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

760. ███████████████████████████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

761. ███████████████████████████████████████████████████████████████

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

762.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

763.

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson

denies such characterizations and/or conclusions. Tyson lacks knowledge or information

sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other

Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any

remaining allegations in this Paragraph.

764.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize,

or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this

Paragraph and therefore denies those allegations.

765.    *Sanderson's submissions were false and inflated. Sanderson was supposed to submit its actual offering price for 2.5 to 3 pound whole birds. Because broilers are a commodity, Sanderson's actual offering price (absent manipulation of the index) should reflect actual market dynamics and Sanderson's costs of production, rather than simply an attempt to artificially inflate the index. Yet Sanderson did not submit its actual or converted offering price for 2.5 to 3 pound whole birds each week.* ████████████████████████████
████████████ *Artificially high quotes constitute false statements because manipulated quotes are literally false or insincere responses to the PMN's request for submissions of actual offering prices.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or

legal conclusions to which no response is required. To the extent a response is required, Tyson

denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph

purport to quote, characterize, or describe documents or other sources, such sources speak for

themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

766.     *Sanderson knew that its submissions were false and inflated. Sanderson knew that it was supposed to submit its actual or converted offering price for 2.5 to 3 pound whole birds* ███████████████████████████████████████████████████████ *At the very least, Sanderson acted with reckless indifference as to whether its submissions were false and inflated.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

767.     *Sanderson made its submissions for the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index. Sanderson Farms' fraudulent submissions to the PMN were made by interstate wire.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

768.     *The intended targets of Sanderson Farms' fraudulent submissions to the PMN were buyers of chicken, including Plaintiffs. Sanderson Farms sold chicken to its customers based on the Georgia Dock price index. Sanderson Farms used Georgia Dock-based pricing with its retail customers, including Plaintiffs, in two ways: first, pursuant to a Georgia Dock bracketing system, under which prices would move up or down according to whether they fell in*

*various ranges of Georgia Dock pricing, and second, pursuant to straightforward Georgia Dock formula pricing, under which prices would be the Georgia Dock price plus a specified amount. When the Georgia Dock would increase, that would result in an increase of prices to Sanderson Farms' customers.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*769. Accordingly, as a result of Sanderson Farms' fraudulent submissions that artificially inflated the Georgia Dock price index, Sanderson Farms and the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiffs were harmed.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

## 6. Tyson Fraudulently Made False Submissions to the Georgia Dock

*770. Tyson knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for 2.5 to 3 pound birds for the next week. Tyson in fact produced a 2.5 to 3 pound bird. But rather than determining its actual offering price and submitting it to the PMN, Tyson made false and inflated price submissions as explained below.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph

339

purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson admits it has from time to time produced a 2.5 to 3 pound bird. Tyson denies any remaining allegations in this Paragraph.

771.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson admits Rob Costner was responsible for making submissions to the Poultry Market News. Tyson denies any remaining allegations in this Paragraph.

772.



**ANSWER:** Tyson admits that certain of its employees made submissions to the Georgia Department of Agriculture by phone. Tyson denies any remaining allegations in this Paragraph.

773.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*774.*



**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in this Paragraph to the extent that they relate to other Defendants and/or third parties. Tyson denies any remaining allegations in this Paragraph.

*775.*



**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for

themselves, and Tyson denies any characterization or description that is inconsistent therewith.

Tyson denies any remaining allegations in this Paragraph.

776. *Tyson's submissions were false and inflated. Tyson was supposed to submit its actual offering price for 2.5 to 3 pound whole birds. Because broilers are a commodity, Tyson's actual offering price (absent manipulation of the index) should reflect actual market dynamics and Tyson's costs of production, rather than simply an attempt to artificially inflate the index. Yet Tyson did not submit its actual or converted offering price for 2.5 to 3 pound whole birds each week.* ███████████████████████████████████████████ *Artificially high quotes constitute false statements because manipulated quotes are literally false or insincere responses to the PMN's request for submissions of actual offering prices.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or

legal conclusions to which no response is required. To the extent a response is required, Tyson

denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph

purport to quote, characterize, or describe documents or other sources, such sources speak for

themselves, and Tyson denies any characterization or description that is inconsistent therewith.

Tyson denies any remaining allegations in this Paragraph.

777. *Tyson knew that its submissions were false and inflated. Tyson knew that it was supposed to submit its actual or converted offering price for 2.5 to 3 pound whole birds* ███████████████████████████████████ *At the very least, Tyson acted with reckless indifference as to whether its submissions were false and inflated.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or

legal conclusions to which no response is required. To the extent a response is required, Tyson

denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph

purport to quote, characterize, or describe documents or other sources, such sources speak for

themselves, and Tyson denies any characterization or description that is inconsistent therewith.

Tyson denies any remaining allegations in this Paragraph.

778. *Tyson made its submissions for the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index. Tyson's fraudulent submissions to the PMN were made by interstate wire.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

779. *The intended targets of Tyson's fraudulent submissions to the PMN were buyers of chicken, including Plaintiffs. Tyson sold chicken to its customers based on the Georgia Dock price index. Throughout the relevant period, Tyson sold broilers and broiler products to its customers, including Plaintiffs, pursuant to pricing that used the Georgia Dock price index as a benchmark. Like Sanderson Farms, Tyson employed both bracketed and fixed pricing that used Georgia Dock as basis, dating back to at the latest 2010, when its account managers internally discussed that "where certain customers are not tied to the Georgia Dock market with brackets, we must address these situations."*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that at various points in the relevant period a percentage of its contracts included terms related to the "Georgia Dock," but denies any remaining allegations in this Paragraph.

780. *Accordingly, as a result of Tyson's fraudulent submissions that artificially inflated the Georgia Dock price index, Tyson and the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiffs were harmed.*

343

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that the Court found that the Georgia Department of Agriculture, the Poultry Market News division, and the Poultry Market News Advisory Committee are not enterprises engaged in coordinated racketeering activity. *Broilers*, 702 F. Supp.3d at 686-88. Tyson further admits that the Court found that that Poultry Market News Advisory Committee's purpose was only to advise the Poultry Market News division and provide pricing information, and it was not its purpose to inflate the Georgia Dock. *Id.* at 687-88. Tyson denies any remaining allegations in this Paragraph.

### 7. Claxton Fraudulently Made False Submissions to the Georgia Dock

781.    *Claxton knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for 2.5 to 3 pound birds for the next week. But rather than determining its actual offering price and submitting it to the PMN, Claxton made false and inflated price submissions as explained below.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

782.

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies them.

*783.*



**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*784.*



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that

relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

785. 

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

786. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

787.    *Claxton knew that its submissions to the PMN were false and inflated. At the very least, Claxton acted with reckless indifference as to whether its submissions were true or false.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

788. *Claxton's submissions were false and inflated. Claxton was supposed to submit its actual offering price for 2.5 to 3 pound whole birds. Because broilers are a commodity, Claxton's actual offering price (absent manipulation of the index) should reflect actual market dynamics and Claxton costs of production, rather than simply an attempt to artificially inflate the index. Yet Claxton did not submit its actual or converted offering price for 2.5 to 3 pound whole birds each week.* ███████████████████████████████████████████████████████████ *Artificially high quotes constitute false statements because manipulated quotes are literally false or insincere responses to the PMN's request for submissions of actual offering prices.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

789. *Claxton knew that its submissions were false and inflated. Claxton knew that it was supposed to submit its actual or converted offering price for 2.5 to 3 pound whole birds* ████████████████████████████████████████████████████████████ *At the very least, Claxton acted with reckless indifference as to whether its submissions were false and inflated.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph

347

purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

790.    *Claxton made its submissions for the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index. Claxton's fraudulent submissions to the PMN were made by interstate wire.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

791.    *The intended targets of Claxton's fraudulent submissions to the PMN were buyers of chicken, including Plaintiffs. Claxton sold chicken to its customers based on the Georgia Dock price index. Accordingly, as a result of Claxton's fraudulent submissions that artificially inflated the Georgia Dock price index, Claxton and the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiffs were harmed.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

8. **Wayne Farms Fraudulently Made False Submissions to the Georgia Dock**

*792.    Wayne Farms knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for 2.5 to 3 pound birds for the next week. But rather than determining its actual offering price and submitting it to the PMN, Wayne Farms made false and inflated price submissions as explained below.*

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*793.* ███████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*794.* ███████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

795. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

796. *For instance,*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith.

Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

797.  *Wayne Farms' submissions were false and inflated. Wayne Farms was supposed to submit its actual offering price for 2.5 to 3 pound whole birds. Because broilers are a commodity, Wayne Farms' actual offering price (absent manipulation of the index) should reflect actual market dynamics and Wayne Farms' costs of production, rather than simply an attempt to artificially inflate the index. Yet Wayne Farms did not submit its actual or converted offering price for 2.5 to 3 pound whole birds each week.* ██████████████████████████

██████████████████ *rtificially high quotes constitute false statements because manipulated quotes are literally false or insincere responses to the PMN's request for submissions of actual offering prices.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

798.  *Wayne Farms knew that its submissions were false and inflated. Wayne Farms knew that it was supposed to submit its actual or converted offering price for 2.5 to 3 pound whole birds* ██████████████████████████

██████████████████ *At the very least, Wayne Farms acted with reckless indifference as to whether its submissions were false and inflated.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith.

351

Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

799.    *Wayne Farms made its submissions for the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index. Wayne Farms' fraudulent submissions to the PMN were made by interstate wire.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

800.    *The intended targets of Wayne Farms' fraudulent submissions to the PMN were buyers of chicken, including Plaintiffs. Wayne Farms sold chicken to its customers based on the Georgia Dock price index. Accordingly, as a result of Wayne's fraudulent submissions that artificially inflated the Georgia Dock price index, Wayne Farms and the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiffs were harmed.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

### 9. Fieldale Farms Also Fraudulently Made False Submissions to the Georgia Dock

801.    *Fieldale knew that, when submitting its price quotes to the PMN, it was supposed to provide its offering price for 2.5 to 3 pound birds. But rather than determining its actual offering price and submitting that price to the PMN each week, Fieldale knowingly made false and inflated price submissions as explained below.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

802.    *Due to its large production capacity in Georgia, Fieldale had a "voice" of 15% (out of a total voice of all Georgia Dock Defendants of 100%) for purposes of the weighted average for the Georgia Dock price. Fieldale's voice of 15% put it among the top three weightiest voices among the Georgia Dock Defendants, and thus its submissions had a significant influence on setting the Georgia Dock price. Fieldale knew that its submissions carried significant weight compared to other Defendants' submissions.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

803. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

804.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

805.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this
Paragraph and therefore denies those allegations.

806. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize,
or describe documents or other sources, such sources speak for themselves, and Tyson denies
any characterization or description that is inconsistent therewith. Tyson lacks knowledge or
information sufficient to form a belief as to the truth of any allegations in this Paragraph that
relate to other Defendants and/or third parties, and therefore Tyson denies those allegations.
Tyson admits that the Court found that the Georgia Dock reevaluation process was an established
process of the Poultry Market News division, a department of a governmental agency, where
Poultry Market News staff had to agree to any request for a revaluation. *Broilers*, 702 F. Supp.3d
at 685-87. Tyson further admits that the Court found that the May 2014 meeting included only
three of the nine Georgia Dock Defendants as well as the primary Poultry Market News staff
person. *Id*. at 686. Tyson denies any remaining allegations in this Paragraph.

807. 

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or
legal conclusions to which no response is required. To the extent a response is required, Tyson
denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph
purport to quote, characterize, or describe documents or other sources, such sources speak for
themselves, and Tyson denies any characterization or description that is inconsistent therewith.

Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

808. 

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

809. *Fieldale knew that its submissions to the PMN were false and inflated. At the very least, Fieldale acted with reckless indifference as to whether its submissions were true or false. Fieldale made its submissions for the purpose of artificially inflating the Georgia Dock price index and, acting in concert with other Defendants, in fact inflated the Georgia Dock price index. Fieldale's fraudulent submissions to the PMN were made by interstate wire.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

356

information sufficient to form a belief as to the truth of any remaining allegations in this

Paragraph and therefore denies those allegations.

810.     *The intended targets of Fieldale's fraudulent submissions to the PMN were buyers of chicken, including Plaintiffs. Fieldale sold chicken to its customers, including Plaintiffs, based on the Georgia Dock price index. Accordingly, as a result of Fieldale's fraudulent submissions that artificially inflated the Georgia Dock price index, Fieldale and the other members of this scheme and enterprise were able to charge customers higher prices than they otherwise would have and therefore made more money, and Plaintiffs were harmed.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or

legal conclusions to which no response is required. To the extent a response is required, Tyson

denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph

purport to quote, characterize, or describe documents or other sources, such sources speak for

themselves, and Tyson denies any characterization or description that is inconsistent therewith.

Tyson lacks knowledge or information sufficient to form a belief as to the truth of any

allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore

Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

**P.**     **The Georgia Dock Defendants Fraudulently Failed to Inform the Plaintiffs with Which They Did Business of Their Control Over the Georgia Dock, Their Ability to Manipulate the Georgia Dock, and Their Actual Manipulation of the Georgia Dock**

811.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize,

or describe documents or other sources, those sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any allegations in this Paragraph that

relate to other Defendants and/or third parties, and therefore Tyson denies those allegations.

Tyson admits in certain instances, it sold chicken products to customers at prices based off of the Georgia Dock during the relevant period. Tyson denies any remaining allegations in this Paragraph.

812.

███████████████████████████████████████████████████████████████████
██████████████████████████████████████████████

**ANSWER:** Tyson admits that some of its prices for Broilers sold to some customers were related to benchmark price indices, including the Georgia Dock whole-bird price. Tyson denies any remaining allegations in this Paragraph.

813.    *As another example,* ████████████████████████████████████████

██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
███████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

814.

██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

815.    *Thus, not only did the Georgia Dock Defendants knowingly make false submissions to the PMN for the purpose of inflating the Georgia Dock price index, but all of the Georgia Dock Defendants that did business with Plaintiffs failed to disclose significant, non-public information to Plaintiffs about the Georgia Dock price index and the Poultry Market News.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

816.    *Just as Defendants' role on the PMN Advisory Committee enabled Defendants to devise a scheme to manipulate the Georgia Dock, Defendants' role on the Advisory Committee created an information asymmetry that kept chicken buyers like Plaintiffs in the dark. Unlike Defendants, which had intimate knowledge of the way in which the PMN operated and the Georgia Dock price was calculated, Plaintiffs knew only what all buyers of chicken knew and believed: that the Georgia Dock price index represented the actual offering prices of chicken producers for the next week – in other words, an actual market price for broilers based on verified, reliable, and objective information.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson admits that at times during the relevant period and at the request of the Georgia Department of Agriculture, it had an employee representative on the "Poultry Market News Advisory Committee," but denies Plaintiffs' characterization of that Committee and any remaining allegations in this Paragraph.

817.    *All of the Georgia Dock Defendants knew they were submitting price quotes to the PMN each week, and that those quotes were being used by the PMN to calculate the Dock price. All of the Georgia Dock Defendants knew how the Georgia Dock price index was calculated and that, unlike with the Urner Barry and the USDA Composite indices, the PMN obtained no information from buyers. All of the Georgia Dock Defendants knew that the PMN was not undertaking any effort to validate their submissions, such as by requiring Defendants to submit copies of their actual price sheets or invoices. Yet none of the Georgia Dock Defendants that did business with Plaintiffs shared this significant, non-public information with Plaintiffs.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

818.    *All of the Georgia Dock Defendants knew of the existence of the PMN Advisory Committee and its control over the PMN and Georgia Dock price index. Specifically, the Georgia Dock Defendants knew that the Advisory Committee had the power to reevaluate the Georgia Dock price, to change the way in which the Dock price was calculated, and to influence who would be hired as the next Director of the PMN. The Georgia Dock Defendants also knew that the Advisory Committee consisted exclusively of representatives of chicken producers and not buyers or neutral third parties and that Defendants' then-current and former lobbyists supported the Advisory Committee and independently exercised control and influence over the PMN. Yet none of the Georgia Dock Defendants that did business with Plaintiffs shared this significant, non-public information with Plaintiffs.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

819.    *All of the Georgia Dock Defendants knew they were conspiring with each other and part of an enterprise of Defendants that were associated in fact and did in fact submit false and inflated price quotes to the PMN for the purpose of inflating the Georgia Dock price index for their benefit and Plaintiffs' detriment. Yet none of the Georgia Dock Defendants that did business with Plaintiffs shared this significant, non-public information with Plaintiffs.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that the Court found that the Georgia Department of Agriculture, the Poultry Market News division, and the Poultry Market News Advisory Committee are not enterprises engaged in coordinated racketeering activity. *Broilers*, 702 F. Supp.3d at 686-88. Tyson further admits that the Court found that that Poultry Market News Advisory Committee's purpose was only to advise the Poultry Market News division and provide pricing information, and it was not its purpose to inflate the Georgia Dock. *Id.* at 687-88. Tyson denies any remaining allegations in this Paragraph.

820.    *The Georgia Dock Defendants gave buyers of chicken, including Plaintiffs, the false impression that those Defendants were submitting their actual offering prices for 2.5 to 3*

*pound whole birds for the next week, instead of making submissions to the PMN to benefit their position as sellers of chicken.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

821.



**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

822.



**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that current or former employees Mike Shinstine, Tim Price, Ken Orr, and Mark Niece communicated with the Plaintiff listed in this Paragraph, but denies any remaining allegations in this Paragraph.

823. *The Georgia Dock Defendants intentionally failed to disclose this significant, non-public information in their communications with their customers regarding their transactions for the purchase and sale of chicken, including Plaintiffs. By intentionally failing to disclose this information, the Georgia Dock Defendants were attempting to induce a false belief by buyers of chicken, including Plaintiffs, about the reliability of the Georgia Dock price index. Defendants intended to induce this false belief by customers for the benefit of the Georgia Dock Defendants.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

824. *The Georgia Dock Defendants that did business with Plaintiffs knew that Plaintiffs believed the Georgia Dock was a reliable price index and intentionally perpetuated that belief by failing to disclose this significant, non-public information. The Georgia Dock Defendants knew that their customers had little to no knowledge regarding how the Georgia Dock price index worked, because their customers had no ability to obtain such knowledge.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

362

825.    The Georgia Dock Defendants that did business with Plaintiffs were successful in inducing a false belief by Plaintiffs about the reliability of the Georgia Dock price index; the Plaintiffs believed the Georgia Dock price index was reliable until information suggesting the Dock price may have been inflated was finally made public in late 2016.

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

826.    The Georgia Dock Defendants made these omissions when they communicated with Plaintiffs; when they bid on, offered, negotiated, and pitched Plaintiffs' business; and also when they contracted with Plaintiffs. Many of the communications in which the Georgia Dock Defendants failed to disclose significant, non-public information to customers were made via interstate wires (both email and phone).

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

827.    Even if the origin and ultimate destination of any Defendants' wire communications referenced in this Complaint were within a single state, those wires were routed through other states. Thus, even such wires constitute interstate wires.

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other

Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

828. 

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

829. 

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*830. Through their fraudulent acts and omissions, the Georgia Dock Defendants were successful in inducing a false belief by buyers of chicken, including Plaintiffs, about the reliability of the Georgia Dock price index. Either through contracts directly indexed to the Georgia Dock price, or through pricing negotiations indirectly (but materially) influenced by the Georgia Dock price, all Plaintiffs paid inflated prices due to Defendants' manipulation of the George Dock index.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*831. The Georgia Dock Defendants' scheme deprived their victims of valuable economic information and depended for its completion on failure to disclose an essential element of the bargain.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

**Q.    The Georgia Dock Defendants Made Fraudulent Misrepresentations to Plaintiffs by Stating that the Georgia Dock Reflected the Broiler Chicken Market**

*832.    In addition to their material omissions, the Georgia Dock Defendants that did business with Plaintiffs also made false statements and affirmative misrepresentations about material facts to Plaintiffs over the relevant period. The Georgia Dock Defendants knew that the Georgia Dock did not represent the broiler market because they did not submit their actual prices to the Poultry Market News. But they told Plaintiffs that the Georgia Dock represented the market price for broiler chicken regardless.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*833.    This practice was widespread: throughout the relevant period, the Georgia Dock Defendants stated, repeated, and maintained that the Georgia Dock represented the market for broilers, and they did so in a deliberate attempt to influence the business decisions made by customers like Plaintiffs.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*834.    The Georgia Dock Defendants made these false statements and affirmative misrepresentations to Plaintiffs via telephone, in person, in writing, and over email in connection with their bids, pitches, offers, negotiations, and contracts with Plaintiffs. Thus, many of these*

*fraudulent misrepresentations were made via interstate wires (both email and phone). As above, even if the origin and ultimate destination of any Defendants' wire communications were within a single state, those wires were routed through other states. Thus, even such wires constitute interstate wires.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

835.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

836.

■■■■■■■■■■■■■■

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

837.    *Additionally, Georgia Dock Defendants often asked for cost adjustments when the Georgia Dock continued to rise, even if the parties had a pricing arrangement that was not expressly tied to the Georgia Dock.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*838.*



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this

Paragraph and therefore denies those allegations.

839.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize,

or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this

Paragraph and therefore denies those allegations.

840.    *The Georgia Dock Defendants knew that buyers of chicken, including Plaintiffs, believed the Georgia Dock to be a reliable price index and intentionally perpetuated that belief by making fraudulent misrepresentations promoting it.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or

legal conclusions to which no response is required. To the extent a response is required, Tyson

denies such characterizations and/or conclusions. Tyson lacks knowledge or information

sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other

Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any

remaining allegations in this Paragraph.

841.    *Plaintiffs relied on the Georgia Dock Defendants' false statements and affirmative misrepresentations about the Georgia Dock representing the broiler "market." As a result, Plaintiffs purchased broiler chicken based on Georgia Dock prices.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or

legal conclusions to which no response is required. To the extent a response is required, Tyson

denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph

369

purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore each Defendant denies the allegations in this Paragraph to the extent that they relate to other Defendants and/or third parties. Tyson denies any remaining allegations in this Paragraph.

R. **Plaintiffs Were Harmed by the Georgia Dock Defendants' Fraudulent Submissions, Omissions, and Misrepresentations**

842. *Plaintiffs bought broiler chicken based on pricing expressly tied to the Georgia Dock from Georgia Dock Defendants.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that, at certain times, Tyson sold chicken on terms related to the Georgia Dock during the relevant period. Tyson denies any remaining allegations in this Paragraph.

843. *Plaintiffs adjusted pricing of broiler products on multiple occasions after being asked to adjust such prices due to increases in the Georgia Dock, even when the Georgia Dock did not form the basis of the pricing agreement with the supplier who asked for an increase.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith Tyson lacks knowledge or information sufficient to form a belief as to the truth of any

allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that it utilized the Georgia Dock in pricing certain products to certain customers, but denies any further characterization thereof. Tyson denies any remaining allegations in this Paragraph.

844. *Buyers of poultry, including Plaintiffs, were the targets of the Georgia Dock Defendants' fraudulent submissions to the PMN, and Plaintiffs reasonably relied on the veracity of those submissions.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

845. *Georgia Dock Defendants falsely submitted prices to Poultry Market News and, as detailed above, artificially inflated the Georgia Dock. The Georgia Dock price index was artificially inflated from no later than early 2011 through 2016 as a result of certain Defendants' fraudulent acts and omissions. Plaintiffs had no reason to know that the Georgia Dock price index was inflated due to Defendants' fraudulent acts, misrepresentations, and omissions.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

846. *Therefore, by using the Georgia Dock as the basis for the price of broiler chickens it purchased, whether pricing was expressly tied to the Georgia Dock or whether a price increase was requested based on an increase in the Georgia Dock, Plaintiffs overpaid and were harmed due to the Georgia Dock Defendants' fraud.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

### S.    Defendants Had Both the Motive and Opportunity to Perpetrate the Fraud and Specifically Intended to Do So

847.    *The broiler chicken industry's long history of boom and bust cycles is well known to Defendants. For example, in 2008, the entire poultry industry was profoundly affected by the bankruptcy filing of Pilgrim's Pride, which was then the largest poultry company in the United States. In its filing, Pilgrim's disclosed that it had lost $998.6 million for the fiscal year, or $14.40 per share, prompting Pilgrim's shares to lose over 46 percent of their value in one day. The collateral effects of this announcement reverberated throughout the industry, with several other leading poultry companies, such as Tyson and Sanderson, also experiencing sizable losses. By the time Pilgrim's emerged from bankruptcy in December 2009, the industry was still struggling to make money, prompting a wave of consolidation and many of the collusive and fraudulent activities outlined in the Complaint.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. As the phrase "boom and bust" in this Paragraph is imprecise, Tyson is unable to form a belief as to the truth of the corresponding allegations and on this basis denies the allegations. Tyson admits

that it was aware that Pilgrim's had filed for bankruptcy. Tyson denies any remaining allegations in this Paragraph.

848.



**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

849.



**ANSWER:** Tyson denies the allegations in this Paragraph.

850.    *As noted above, Defendants knew that the Georgia Dock was vulnerable to manipulation and thus presented Defendants with the unique opportunity to collude and/or defraud their retail grocery customers in pursuit of higher profits, thus ensuring that Defendants had both the motive and opportunity to manipulate the index.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

851.    *The manipulation of the Georgia Dock by Defendants served its intended purpose, enabling Defendants to bolster their financial results at their customers' expense. Indeed, in*

373

*some instances, the manipulation of the Georgia Dock allowed Defendants to recognize a profit instead of a loss. For example, Mike Cockrell, Chief Financial Officer of Sanderson Farms, publicly stated in the New York Times that Sanderson was profitable in the fourth quarter of 2015 "only because we were making money from the chicken we were selling to the retail market." Moreover, according to other published analyses, poultry companies such as Pilgrim's and Sanderson would have realized negative earnings and income in 2016 but for the profits realized from their sales based on the Georgia Dock.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

852.



**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that

performance and profitability were factors in the compensation of certain employees at certain times in the relevant period, but denies any remaining allegations in this Paragraph.

853.    *Defendants acted with fraudulent intent and knew that their manipulation of the Georgia Dock was improper.* ███████████████████████████████████████████
█████████████████████████████████████████████████

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

854.    *But Defendants did not care. Instead, they intentionally pushed the Georgia Dock on unsuspecting retail grocery customers to ensure their own continued profitability (and secure lucrative individual bonuses for themselves).* ███████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

**T.** **Defendants Engaged in a Pattern of Racketeering Activity as Part of the Conduct of an Enterprise's Affairs**

*855.* *The Georgia Dock Defendants' fraudulent acts and omissions were not committed individually, but rather as part of the affairs of an enterprise whose purpose was to obtain excessive poultry proceeds by defrauding chicken buyers, including Plaintiffs.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson denies any remaining allegations in this Paragraph.

*856.* *The enterprise was the group of Georgia Dock Defendants, which were associated in fact through their price submissions to the PMN, their role on the PMN Advisory Committee, their involvement in the Georgia Poultry Federation, and their use of the Dock in selling product. This enterprise was a continuing unit that associated together and acted with a common purpose: to sustain the existence of the PMN and Georgia Dock and to artificially inflate the Dock price for the benefit of the enterprise and the individual Defendants.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that the Court found that the Georgia Department of Agriculture, the Poultry Market News division, and the Poultry Market News Advisory Committee are not enterprises engaged in coordinated racketeering activity. *Broilers*, 702 F. Supp.3d at 686-88. Tyson further admits that the Court found that that Poultry Market News Advisory Committee's purpose was only to advise the Poultry Market News division and

376

provide pricing information, and it was not its purpose to inflate the Georgia Dock. *Id.* at 687-88.

Tyson denies any remaining allegations in this Paragraph.

*857.     There have been many relationships among those associated with the enterprise. Representatives from the Georgia Dock Defendants interacted with each other frequently at industry conferences and trade shows, as discussed throughout this Complaint. All but one of the Georgia Dock Defendants participated on the PMN Advisory Committee, which acted to preserve and enhance the PMN and Georgia Dock as discussed above.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or

legal conclusions to which no response is required. To the extent a response is required, Tyson

denies such characterizations and/or conclusions. Tyson lacks knowledge or information

sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other

Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that

its employees have attended industry conferences and trade shows when it has been in Tyson's

unilateral business interest to do so. Tyson further admits that at various points in the relevant

period, at the request of the Georgia Department of Agriculture, Tyson had an employee

representative on a Poultry Market News Advisory Committee. Tyson admits that the Court

found that the Georgia Department of Agriculture, the Poultry Market News division, and the

Poultry Market News Advisory Committee are not enterprises engaged in coordinated

racketeering activity. *Broilers*, 702 F. Supp.3d at 686-88. Tyson further admits that the Court

found that that Poultry Market News Advisory Committee's purpose was only to advise the

Poultry Market News division and provide pricing information, and it was not its purpose to

inflate the Georgia Dock. *Id.* at 687-88. Tyson denies any remaining allegations in this

Paragraph.

*858.     All of the Georgia Dock Defendants were members of the Georgia Poultry Federation, the largest lobbyist in Georgia for poultry producers. All of the Georgia Dock Defendants had positions on the Board of the Georgia Poultry Federation. Representatives from the Georgia Dock Defendants interacted often with leaders of the Georgia Poultry Federation*

*(such as Abit Massey and Mike Giles). Those same leaders helped to preserve and enhance the power of the PMN Advisory Committee and the Georgia Dock, as discussed herein.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that one or more of Tyson's employees were members of certain legitimate trade associations for pro-competitive reasons, including the Georgia Poultry Federation, at certain times during the relevant period, but denies any remaining allegations in this Paragraph.

*859.    The enterprise had longevity that was sufficient to permit those associated to pursue the enterprise's purpose. There was continuity among the representatives of the Defendants who served on the Advisory Committee, interacted with representatives of the Georgia Poultry Federation, and submitted price quotes to the PMN. The scheme of the Georgia Dock Defendants to manipulate the Georgia Dock price by making false and inflated price quotes, as discussed in this Complaint, began no later than early 2011 and lasted for at least five years.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that the Court found that the Georgia Department of Agriculture, the Poultry Market News division, and the Poultry Market News Advisory Committee are not enterprises engaged in coordinated racketeering activity. *Broilers*, 702 F. Supp.3d at 686-88. Tyson further admits that the Court found that that Poultry Market News Advisory Committee's purpose was only to advise the Poultry Market News division and provide pricing information, and it was not its purpose to

378

inflate the Georgia Dock. *Id.* at 687-88. Tyson denies any remaining allegations in this

Paragraph.

860. *Not only were the Georgia Dock Defendants a part of this enterprise, but they acted in concert with each other in their fraudulent acts and omissions.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or

legal conclusions to which no response is required. To the extent a response is required, Tyson

denies such characterizations and/or conclusions. Tyson lacks knowledge or information

sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other

Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that

the Court found that the Georgia Department of Agriculture, the Poultry Market News division,

and the Poultry Market News Advisory Committee are not enterprises engaged in coordinated

racketeering activity. *Broilers*, 702 F. Supp.3d at 686-88. Tyson further admits that the Court

found that that Poultry Market News Advisory Committee's purpose was only to advise the

Poultry Market News division and provide pricing information, and it was not its purpose to

inflate the Georgia Dock. *Id.* at 687-88. Tyson denies any remaining allegations in this

Paragraph.

861. *The same was true with respect to the Georgia Dock Defendants' fraudulent omissions. If any of the Georgia Dock Defendants had disclosed their knowledge about the lack of verification for their price submissions to the PMN, their ability to manipulate the Georgia Dock price index, or the fact they were manipulating the Georgia Dock price index, then all buyers would have lost confidence in the Georgia Dock earlier than the end of 2016. That was important, non-public information that only the Georgia Dock Defendants had in their*

*possession. Because all of the Georgia Dock Defendants collectively benefited from their non-disclosure, the Georgia Dock Defendants worked in concert not to disclose this information.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

U.    **The Georgia Dock Defendants Did Not Contract with Plaintiffs in Good Faith**

*862.    Throughout the relevant period, the Georgia Dock Defendants entered into contracts and exchanged pricing sheets and invoices with customers, including Plaintiffs, that priced broiler chicken based on the Georgia Dock. Pursuant to these agreements, the prices charged by the Georgia Dock Defendants to Plaintiffs were determined by a few methods, including bracket pricing based on the Georgia Dock and pricing that used the Georgia Dock as a percentage or fixed component of Plaintiffs' cost.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that, at times, Tyson communicated with its customers about pricing and invoices, that Tyson independently sold some chicken products at prices related to the Georgia Dock, and that the prices offered by Tyson varied and were determined by a few methods, including bracket pricing based on the Georgia Dock and pricing

that used the Georgia Dock as a percentage or fixed component of Plaintiffs' cost, but denies Plaintiffs' characterization of these communications or sales terms. Tyson denies any remaining allegations in this Paragraph.

863. *Plaintiffs' broiler chicken contracts came in many forms, including oral agreements, formal written supply agreements, and other written agreements, including agreements made via email, purchase orders, and invoices.* ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊ ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊ *. An implied covenant of good faith and fair dealing was implied in all of the contracts between Plaintiffs and the Georgia Dock Defendants.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. As the term "all of the contracts" is imprecise, Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations. Tyson denies any remaining allegations in this Paragraph.

864. *Agreements that used Georgia Dock bracketing to determine the price of broiler chicken typically included the price at which broiler chicken would be sold to Plaintiffs depending on whether the Georgia Dock fell into one of multiple (usually three) brackets. Contracts that pertained to more than one broiler product typically listed item codes and descriptions in rows, with corresponding prices set out for each bracket. The price Plaintiffs paid for a given sale depended on what the Georgia Dock price was each week, and where it fell in the brackets listed. Throughout the relevant period, the Georgia Dock Defendants who used such bracketing systems had to add new bracket ranges on the high end to account for the "uncharted territory" into which the Georgia Dock entered.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that

relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

865. *Other agreements specified that Plaintiffs would pay a fixed amount over the Georgia Dock pricing index's quotes for a given week. This could take several different forms, whether by adding a percentage or a certain number of cents to the Georgia Dock price.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. As the phrase "other agreements" is imprecise, Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

866. *Even where a contract had a fixed price, those prices were often based off of the Georgia Dock as an indicator.*

**ANSWER:** ATo the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. As the term "often" is imprecise, Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

867. *Regardless of which Georgia Dock pricing arrangement was used, the material pricing terms of the Georgia Dock Defendants' broiler chicken contracts provided that the amount charged to Plaintiffs would be predicated on the Georgia Dock. None of these arrangements allowed the Georgia Dock Defendants to operate and control the Georgia Dock or to use their pricing submissions to PMN to falsely inflate each week's Georgia Dock price above the actual average offering price. Such a scheme undermined all validity to the Georgia Dock pricing system as being reflective of actual average offering prices, and gave the Georgia Dock Defendants the ability to maneuver their prices skyward, so long as on a week-to-week basis they stayed within the two-cent range permitted by the PMN. At the same time, the secrecy behind which the Georgia Dock Defendants kept the Georgia Dock shrouded deprived customers like Plaintiffs of any ability to uncover and detect that their purchases were based on an inflated pricing index.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph. Tyson admits that, at times, certain of its broiler chicken sales were sold on terms related to the Georgia Dock. Tyson denies any remaining allegations in this Paragraph.

## V. Defendants Used the Georgia Dock Manipulation to Impact Prices Charged to Contract Purchasers

868. *Defendants' manipulation of the Georgia Dock not only had an anticompetitive effect on the prices of broilers that were based directly on the Georgia Dock; it also contaminated and artificially raised prices for broilers that were not expressly tied to the Georgia Dock.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

869. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

870. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

871. *Defendants also used the artificial prices reported on the Georgia Dock index to justify price increases to their contract purchasers. This was especially the case during the latter part of the conspiracy when the Georgia Dock index deviated so dramatically from the Urner Berry and USDA Composite indices. It was true, moreover, even with respect to Defendants that did not submit pricing information to Georgia Dock.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

872. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations.

873.     *When Defendants engaged in negotiations with contract purchasers of broilers, and sought to explain why they were "forced" to increase prices, one of the main explanations that they used to justify the price increases was the artificially inflated Georgia Dock index* ███████████ *Defendants independently could not have provided contract purchasers with the same false explanation for price increases without coordinating the messaging.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties and therefore denies those allegations. Tyson denies any remaining allegations in this Paragraph.

## W.     Defendants' Bid-Rigging Conduct

874.     *Beginning at least as early as August 2011 and continuing at least into 2019, certain Defendants ("Bid-Rigging Defendants")[26] and their Co-Conspirators ("Bid-Rigging Co-Conspirators")[27] engaged in a conspiracy to rig bids and fix prices for Broilers, with the intent to artificially inflate the prices paid by these customers (the "Bid Customers").*

*FN 26: The Bid-Rigging Defendants are Tyson, Pilgrim's, George's, Claxton, Mar-Jac, Marshall Durbin, Koch, Perdue, Case, Wayne, Fieldale, House of Raeford, Simmons, and Sanderson.*

*FN 27: The Bid-Rigging Co-Conspirators are Keystone Foods and Foster Farms.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph and Footnotes contain Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

875.    As part of their procurement process, the Bid Customers requested proposals or bids from Bid-Rigging Defendants for the volume of chicken needed. The Bid Customers also engaged in negotiations with Bid-Rigging Defendants both in conjunction with and independent of the bid process.

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

876.    The Bid Customers expected Bid-Rigging Defendants to engage in a competitive bidding process, which when complete would allow the Bid Customers to award their business to the most competitive bidder(s). The Bid Customers also expected that Bid-Rigging Defendants would engage in honest and competitive negotiations, which would allow the Bid Customers to realize fair and competitive prices for their purchases of Broilers.

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

877.    Bid-Rigging Defendants, however, recognized that the Bid Customers offered an additional opportunity for Defendants to artificially inflate the prices of the Broilers Bid-Rigging Defendants sold to Bid Customers.

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for

386

themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*878. Bid-Rigging Defendants' bid-rigging and price-fixing conduct took multiple forms. At its most basic level, Bid-Rigging Defendants established a network to exchange confidential information with each other regarding the bids they were submitting, or intended to submit, to the Bid Customers so that supposedly competitive bids were aligned. Bid-Rigging Defendants also used their network to coordinate and exchange confidential information with each other regarding their negotiations with the Bid Customers. Bid-Rigging Defendants further used their network to (i) reach agreements and understandings to submit aligned bids and offer aligned pricing, (ii) participate in conversations and communications with the shared understanding that the purpose of the conversations and communications was to rig bids and to fix, maintain, stabilize, and raise prices and other price-related terms, (iii) monitor bids and prices and price-related terms offered by suppliers, and (iv) protect the purpose and effectiveness of the conspiracy.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

### 1. The Criminal Proceedings

*879. On June 3, 2020, the Department of Justice issued an Indictment against officers of certain Bid-Rigging Defendants in the District of Colorado (the "June 2020 Indictment"). The June 2020 Indictment charged Jayson Penn (President and CEO of Pilgrim's), Mikell Fries (President of Claxton), Scott Brady (Vice President of Claxton), and Roger Austin (Vice President of Pilgrim's), with conspiring "to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States" in violation of Section 1 of the Sherman Act.[28]*

*FN 28: United States of America v. Jayson Jeffrey Penn et al., Crim. Action No. 20-cr-00152-PAB (D. Colo. June 2, 2020), ECF No. 1.*

387

**ANSWER:** Tyson admits that the Department of Justice issued an Indictment on June 3, 2020. To the extent the allegations in this Paragraph and Footnote purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith.

880.    *The June 2020 Indictment, which implicated Bid-Rigging Defendants Pilgrim's, Claxton, Tyson, Case, Koch, George's, and Mar-Jac, alleged that from at least 2012 through at least 2017, Penn, Fries, Brady, and Austin conspired to:*

- *reach agreements and understandings to submit aligned, though not necessarily identical, bids and to offer aligned, though not necessarily identical, prices, and price-related terms, including discount levels and lines of credit, for broiler chicken products sold in the United States;*

- *participate in conversations and communications relating to nonpublic information such as bids, prices, and price-related terms, including discount levels and lines of credit, for broiler chicken products sold in the United States with the shared understanding that the purpose of the conversations and communications was to rig bids, and to fix, maintain, stabilize, and raise prices and other price-related terms, including discount levels, for broiler chicken products sold in the United States; and*

- *monitor bids submitted by, and prices and price-related terms, including discount levels and lines of credit, offered by, Suppliers and Co-Conspirators for broiler chicken products sold in the United States.[29]*

*FN 29: See Id.*

**ANSWER:** To the extent the allegations in this Paragraph and Footnote purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith.

881.    *The June 2020 Indictment expressly identified as victims of the conspiracy "[r]estaurants, grocery retailers and others who purchased large volumes of broiler chicken" who "received bids from or negotiated prices and other price-related terms, including discount levels, with Suppliers directly."[30]*

*FN 30: Id.*

**ANSWER:** To the extent the allegations in this Paragraph and Footnote purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith.

882.    *The June 2020 Indictment set forth a series of communications between Bid-Rigging Defendants—via phone, email and text messages—in which Bid-Rigging Defendants shared and coordinated confidential bidding and pricing information in connection with multiple Bid Customers.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith.

883.    *On October 6, 2020, the Department of Justice filed a Superseding Indictment in the District of Colorado, again founded on Bid-Rigging Defendants' bid-rigging and price-fixing conduct (the "Superseding Indictment"). The Superseding Indictment charged six additional executives—including Tim Mulrenin (Tyson), Bill Kantola (Koch), Jimmie Little (Pilgrim's), Bill Lovette (Pilgrim's), Gary Brian Roberts (Tyson), and Ric Blake (George's)—with conspiring "to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States" in violation of Section 1 of the Sherman Act.[31]*

*FN 31: Id. at ECF No. 101.*

**ANSWER:** Tyson admits that the Department of Justice issued a Superseding Indictment on October 6, 2020. To the extent the allegations in this Paragraph and Footnote purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

884.    *The Superseding Indictment expanded the criminal conspiracy period from at least as early as 2012 through at least early 2019, and expanded the bid-rigging and price-fixing conduct to implicate three additional suppliers—Perdue, Marshall Durbin and Sanderson—for a total of 10 implicated suppliers.[32]*

*FN 32: See Id.*

**ANSWER:** To the extent the allegations in this Paragraph and Footnote purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith.

885.    On October 13, 2020, the Department of Justice filed an Information against Pilgrim's.[33] The Information charged that "[b]eginning at least as early as 2012 and continuing through at least early 2019 ... [Pilgrim's] and its co-conspirators entered into and engaged in a continuing combination and conspiracy to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States. The combination and conspiracy engaged in by Defendant and its co-conspirators was a per se unlawful, and thus unreasonable, restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1."

FN 33: United States of America v. Pilgrim's Pride Corporation., Crim. Action No. 1:20-cr-00330-RM (D. Col. October 14, 2020), ECF No. 1.

**ANSWER:** To the extent the allegations in this Paragraph and Footnote purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith.

886.    Pilgrim's pleaded guilty to the charges contained in the Information, and on February 23, 2021, judgment was entered adjudicating Pilgrim's guilty of price-fixing and bid-rigging as alleged in the Information. Pilgrim's was fined $107.9 million by the Department of Justice for its criminal violations of the Sherman Act.[34]

FN 34: Id. at ECF No. 60.

**ANSWER:** To the extent the allegations in this Paragraph and Footnote purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith.

887.    On May 19, 2021, the Department of Justice issued an Indictment against Defendant Claxton and on July 28, 2021, the Department of Justice issued an Indictment against Defendant Koch. Claxton and Koch were each charged with one count of conspiring to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.[35] The Indictments each alleged that beginning at least as early as 2012 and continuing through at least early 2019, Claxton and Koch and their co-conspirators "entered into and engaged in a continuing combination and conspiracy to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States."

*FN 35: United States of America v. Norman Fries, Inc. d/b/a Claxton Poultry Farms, Crim. Action No. 1:21-cr-00168-RM (D. Colo. May 19, 2021), ECF Nos. 1 and 30.*

**ANSWER:** Tyson admits that the Department of Justice issued Indictments on May 19, 2021 and July 28, 2021. To the extent the allegations in this Paragraph and Footnote purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith.

*888.    Also on July 28, 2021, the Department of Justice issued another Indictment, this time against four former Pilgrim's executives Jason McGuire, Timothy Stiller, Wesley "Scott" Tucker, and Justin Gay.36 The Indictment charged each of the defendants with one count of conspiring to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The Indictment alleged that beginning at least as early as 2012 and continuing through at least early 2019, the defendants and their co-conspirators "entered into and engaged in a continuing combination and conspiracy to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States."*

*FN 36: United States of America v. Jason McGuire et al., Crim. Action 1:21-cr-00246-DDD (D. Colo. July 28, 2021), ECF No. 1.*

**ANSWER:** Tyson admits that the Department of Justice issued an Indictment on July 28, 2021. To the extent the allegations in this Paragraph and Footnote purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith.

*889.    Plaintiffs incorporate by reference and adopt the allegations of each of the Criminal Indictments, Information, and Judgment.*

**ANSWER:** This Paragraph does not contain any factual allegations to which a response is required. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith.

*890.    The Department of Justice Indictments and Information set forth at least 14 episodes that demonstrate how aspects of the conspiracy worked and the types of actions the Bid-Rigging Defendants took in furtherance of the bid-rigging and price-fixing conspiracy. As the Department of Justice explained, the "episodes demonstrate how the defendants' 'continuing network' was able to exist because of their recurring communications of reliable information,*

391

*and thus allowed for future communications of sensitive, non-public information that the defendants relied on to keep their pricing higher and resist customers' efforts to negotiate lower pricing." [37]*

> *FN 37: No. 20-cr-00152, ECF No. 415 (DOJ Opp'n to Defendants' Motion to Dismiss), at 16.*

**ANSWER:** To the extent the allegations in this Paragraph and Footnote purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

> *891.    Indeed, in its November 10, 2020 Amended Victim Statement, the Department of Justice stated that it "could not inform the Court of the identity and ownership of all [the] potential corporate victims" as "[h]undreds—if not thousands—of companies directly purchased broiler chicken products from the conspirators in this case during the conspiracy." 38 And on September 7, 2021, in its Motion for Alternative Victim Notification, the Department of Justice stated, "[t]o date, the government's investigation has revealed thousands of potential victims who purchased broiler chicken products that were the subject of the conspiracy." 39*

> *FN 38: Id, ECF No. 195.*
>
> *FN 39: No. 21-cr-00246, ECF No. 64.*

**ANSWER:** To the extent the allegations in this Paragraph and Footnote purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith.

> *892.    On September 2, 2021 and September 8, 2021, Chief Judge Philip A. Brimmer of the United States District Court for the District of Colorado convened a James Hearing in advance of the criminal trial against the defendants named in the June Indictment and Superseding Indictment. In connection with its James Hearing briefing, the Department of Justice reiterated its theory of the case that it espoused in its opposition to the criminal defendants' motions to dismiss. Specifically, the Department of Justice stated that the criminal defendants established a communication network that they utilized to coordinate bids and fix prices to bid-rigging victims, which resulted in a conspiracy to rig bids and fix prices from as early as 2012 to as late as 2019 for all Broiler products sold to bid-rigging victims.[40]*

> *FN 40: Although the Superseding Indictment alleges that the conspiracy began "at least as early as 2012," No. 20-cr-00152, ECF No. 101 ¶ 1, Special Agent Taylor testified at the James hearing that he has seen conspiratorial communications dating back to at least 2010, ECF No. 449 (Hearing Tr.) at 13:9-15.*

**ANSWER:** Tyson admits that Chief Judge Philip A. Brimmer of the United States District Court for the District of Colorado convened a James Hearing on September 2, 2021 and September 8, 2021. To the extent the allegations in this Paragraph and Footnote purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith.

893.    *In his Order following the James Hearings and briefing, Judge Brimmer found "by a preponderance of the evidence" that "[t]he government has shown that a conspiracy to rig bids and fix prices for broiler chicken products in the United States did exist and that such conspiracy operated between at least August 2011 and early 2019."[41] Judge Brimmer also found "by a preponderance of the evidence" that "the conspiracy included" Jayson Penn, Mikell Fries, Scott Brady, Roger Austin, Timothy Mulrenin, William Kantola, Jimmie Little, William Lovette, Gary Roberts, Rickie Blake, Jason McGuire, Tim Stiller, Justin Gay, Scott Tucker, Robbie Bryant, Tommy Lane, Larry Pate, Brenda Ray, Walter Cooper, Carl Pepper, Kevin Ilardi, Searcy Wildes, Mitch Mitchell, Joe Grendys, Bruce MacKenzie, Tommy Francis, Kevin Grindle, Peter Martin, and Greg Tench.*

*FN 41: Id., ECF No. 559 (Order).*

**ANSWER:** To the extent the allegations in this Paragraph and Footnote purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith.

894.    *The Court further found that, during the Bid-Rigging Conduct Period, each of the identified individual conspirators were employees of Bid-Rigging Defendants as follows: Jayson Penn, Roger Austin, William Lovette, Jason McGuire, Jimmie Little, Tim Stiller, Justin Gay, Scott Tucker, Brenda Ray, Tommy Lane, Larry Pate, and Robbie Bryant, (Pilgrim's); Mikell Fries, Walter Cooper, and Scott Brady (Claxton); Timothy Mulrenin, Carl Pepper, and Gary Roberts (Tyson), William Kantola, Joe Grendys, and Bruce MacKenzie (Koch), Ric Blake (George's), Kevin Ilardi and Searcy Wildes (Perdue); Tommy Francis, Greg Tench, Peter Martin, and Kevin Grindle (Mar-Jac); and Mitch Mitchell (Case).*

**ANSWER:** Tyson admits that Timothy Mulrenin, Carl Pepper, and Gary Roberts are former employees of Tyson. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith.

*895. On October 25, 2021, the Department of Justice commenced a jury trial against the individuals named in the June Indictment and Superseding Indictment. That trial concluded on December 16, 2021, with the jury unable to return a verdict and Judge Brimmer thereafter declared a mistrial.[42]*

*FN 42: Id., ECF No. 920.*

**ANSWER:** Tyson admits that there was a jury trial that began on October 25, 2021 in the matter of United States v. Penn, No. 20-cr-00152. To the extent the allegations in this Paragraph and Footnote purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith.

*896. On January 13, 2022, Judge Brimmer issued his order denying the criminal defendants' motion for judgment of acquittal. The court stated:[43]*

- *"The Court finds that the evidence is sufficient for a reasonable jury to find that the charged conspiracy existed and that each defendant knowingly joined the conspiracy, knowing of its goal and intending to help accomplish it.*

- *"The testimony of government witness Robbie Bryant, a Pilgrim's Pride ("Pilgrim's") employee, is sufficient to support a finding beyond a reasonable doubt that a conspiracy existed between Pilgrim's, Koch Foods ("Koch"), Claxton Poultry ("Claxton"), Tyson Foods ("Tyson"), Mar-Jac Poultry ("Mar-Jac"), and George's Inc. ("George's") [the corporations that employed the 10 criminal defendants] to rig bids and fix prices." (Emphasis added).*

- *"This evidence shows that Mr. Penn was aware of competitor price information and, taken with the 'collective inferences to be drawn from the evidence as a whole,' and in the light most favorable to the government, is sufficient to support a finding that Mr. Penn knowingly joined the conspiracy to rig bids and fix prices in the broiler chicken industry by August 2012, knowing of its goals and intending to advance them."*

- *"[T]he testimony of Mr. Bryant is sufficient to support a reasonable jury finding that Claxton was a member of the conspiracy. Moreover, a reasonable jury could find that Exhibit 1427 proves that Mr. Fries had knowingly joined the conspiracy by November 13, 2012, knowing of the conspiracy's goal and intending to help accomplish it."*

- *"[T]he Court finds that the evidence, viewed in a light most favorable to the government, is sufficient to find that Mr. Brady knowingly joined the alleged*

*conspiracy by November 2012, knowing of its goal and intending to help accomplish it."*

- *"Mr. Bryant's testimony is sufficient for a reasonable jury to find that Mr. Austin knowingly joined the alleged conspiracy by 2014 with the goal of advancing its goals . . . . and participated in the conspiracy through the 2017 RSCS negotiations."*

- *"The Court finds that the evidence is sufficient for a reasonable jury to conclude that Mr. Mulrenin joined the alleged conspiracy, knowing of its goal and intending to help accomplish it."*

- *"The testimony of Mr. Bryant, viewed in the light most favorable to the government, is sufficient for a reasonable jury to find that Mr. Kantola joined the conspiracy by the time of the 2014 RSCS negotiations…with the intent to advance its goals."*

- *"A reasonable jury could conclude that Mr. Little's communication with competitors preceding a bid submission, where Pilgrim's then had access to competitor pricing information, was made pursuant to an agreement to fix prices"* and *"there is sufficient evidence for a reasonable jury to conclude that Mr. Little joined the conspiracy by 2012 with the intent to advance its goals."*

- *"'Consider[ing] both direct and circumstantial evidence, together with the reasonable inferences to be drawn therefrom' and the 'the collective inferences to be drawn from the evidence as a whole,' a reasonable jury could conclude that Mr. Lovette knowingly joined the charged conspiracy, knowing of its goal and intending to help accomplish it."*

- *"The Court finds that the evidence is sufficient for a reasonable jury to conclude that Mr. Roberts joined the alleged conspiracy, knowing of its goal and intending to help accomplish it."*

- *"The testimony of Mr. Bryant, combined with the other evidence introduced by the government, is sufficient for a reasonable jury to conclude that George's was part of the charged conspiracy. The government's evidence supports reasonable inferences that Mr. Blake shared George's price information with competitors pursuant to an agreement to fix prices."*

*FN 43: Id., ECF No. 932.*

**ANSWER:** To the extent the allegations in this Paragraph and Footnote purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith.

### 2. Bid-Rigging Defendants' Bid-Rigging and Price-Fixing Conduct

897.    *To date, Bid-Rigging Defendants have resisted producing to the civil Plaintiffs in this action any discovery related to their bid-rigging conduct.[44] Nevertheless, through a combination of the limited discovery that has been produced so far and the evidence that has been made public in the course of the criminal trial, Plaintiffs have compiled the following conspiratorial conduct evidencing the continuing conspiracy that Bid-Rigging Defendants and Bid-Rigging Co-Conspirators utilized to coordinate bids and fix prices to the Bid Customers. This evidence demonstrates the extensive and pervasive conduct engaged in by Bid-Rigging Defendants over the span of the Bid-Rigging Conduct Period to raise and stabilize the prices paid by the Bid Customers. Examples of this evidence are set forth below.*

> *FN 44: Plaintiffs reserve the right to amend or supplement this pleading, including, but not limited to adding additional defendants, based on the new and additional discovery that Bid-Rigging Defendants, the Bid-Rigging Co-Conspirator and others will produce in this case.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph and Footnote contain Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson denies any remaining allegations in this Paragraph.

898.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations

899.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations

900. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations

901. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations

902.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

903. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations

904. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith.

905.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations

906.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations

907.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations

908. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

909. 

**ANSWER:** Tyson denies the allegations in this Paragraph.

910.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith.

911. 

*Ray thereafter confirmed under oath that the "friendly competitor" she was referring to was George's.*[45]

*FN 45: 20-cr-152, ECF No. 902 (12/06/21 Trial Tr.) at 134.*

**ANSWER:** To the extent the allegations in this Paragraph and Footnote purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and

Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

912.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

913.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

914.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this

Paragraph and therefore denies those allegations.

915. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize,

or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this

Paragraph and therefore denies those allegations.

916. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize,

or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any allegations in this Paragraph that

relate to other Defendants and/or third parties, and therefore Tyson denies those allegations.

Tyson denies any remaining allegations in this Paragraph.

*917.*



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*918.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*919.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

920. ████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

921. ████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

922. ████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

923. ████████████████████████████████████████



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

924. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

925. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies

405

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations.

926. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

927. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations.

928. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

929. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

930. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

931.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

932.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith.

933.



408

████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that it sold chicken products to Nestlé USA during the relevant period.

934. ████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

935. ████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations.

*936.* ██████████████████████████████████████
████████████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*937.* ██████████████████████████████████████
████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*938.* ██████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*939.* ██████████████████████████████████████
███████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

940.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

941.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations.

942.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations.

943.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

944. *The Bid-Rigging Defendants continued to leverage their information exchange network to achieve artificially high pricing to the Bid Customers in 2014. As the Department of Justice stated in its Post James-Hearing Brief, "[t]he conspiracy was fully operating [in 2014], but the evidence shows that the conspiracy went into overdrive in 2014. The defendants and their co-conspirators coordinated and colluded to impose double digit price increases to small-bird customers across the board—KFC, Chick-fil-A, Boston Market, Pollo Tropical, to name a few."[46]*

*FN 46: 20-cr-152, ECF No. 491 (Brief) at 1-2.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. To the extent the allegations in this Paragraph and Footnote purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or

description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

945.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

946.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

947.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

948.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

949.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

950.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

414

information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

951.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations.

952.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

953.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

954. ███████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

955. ███████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith.

956. ███████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

957. ███████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

958. ▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

959. ▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

**ANSWER:** Tyson denies the allegations in this Paragraph.

960. *Walmart Inc., Wal-Mart Stores East, LP, Wal-Mart Stores Arkansas, LLC, Wal-Mart Stores Texas, LLC, Wal-Mart Louisiana, LLC, Sam's West, Inc., and Sam's East, Inc. (the "Walmart and Sam's Club Plaintiffs") suffered from artificially increased prices due to Bid-Rigging Defendants' conduct. The Walmart and Sam's Club Plaintiffs regularly purchased broiler chicken under contracts with Defendants that were awarded through a bidding process.* ▪▪▪▪▪▪▪ *both the Initial and Amended Statements of Organizational Victims filed by the Department of Justice identify Walmart Inc. as a victim of Bid-Rigging Defendants' conduct.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that it sold chicken products to Walmart during the relevant period. Tyson denies any remaining allegations in this Paragraph.

961.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

962.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

963.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

964. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

965.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

966.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

967.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

968.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

969. ███████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

970. ███████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

971.    *Bid-Rigging Defendants knew that they needed to coordinate pricing and price increase messaging amongst themselves in order to get their intended price increases to stick. As Bryant testified during the criminal trial, right after Pilgrim's informed SMS that it intended to raise prices for 2015 – indeed, immediately after SMS's representatives exited the meeting room – McGuire then instructed the other Pilgrim's representatives in attendance to "put [] out to the industry" Pilgrim's price increasing messaging to SMS. [47] Bryant further testified that the purpose of McGuire's instruction was "to give Pilgrim's justification for a price increase to our competitors" in order to "build pricing support [] with the competitors for a price increase that fall," and that the "ultimate goal" was to raise prices in 2014 to the benefit of "the industry or the competitors…together."[48]*

*FN 47: Id., ECF No. 860 (11/01/21 Trial Tr.) at 240.*

*FN 48: Id. at 240-41.*

**ANSWER:** To the extent the allegations in this Paragraph and Footnotes purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

972.     *In pushing this price increase, the Bid-Rigging Defendants and Co-Conspirators played on their Bid Customer's fears over possible shortages of small chickens. For example, as Bryant testified during the Criminal Trial, during the summer of 2014 Pilgrim's floated the possibility of converting a small bird Louisiana plant to a big bird plant unless Pilgrim's could get the Bid Customers to accept increased prices. But Bryant admitted this was an empty threat, as the suggested conversion "was not a real thing that [Pilgrim's was] going to do."[49]*

*FN 49: Id., ECF No 861 (11/02/21 Trial Tr.) at 68.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. To the extent the allegations in this Paragraph and Footnote purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

973.     *Bid Rigging Defendants believed that in order to successfully implement their conspiracy to raise chicken prices for all of their Bid Customers, it was important that KFC acquiesce to their proposed price increases. As Bryant testified during the criminal trial, Bid-Rigging Defendants used pricing to KFC as the platform for their bid-rigging and price-fixing conduct as to other Bid Customers including, among others, Bojangles, Boston Market, Chick-fil-A, Church's, Golden Corral, Pollo Tropical, and Popeye's.[50]*

*Q: So was there any sort of strategy in terms of which QSRs, which fast-food restaurants to increase with price first?*

*A. Yes.*

*Q. And what was that strategy?*

*A. We wanted to get KFC done first.*

*Q. Why?*

*A. They were the largest customer, anchor customer, and we had a belief that we got the price increases done at KFC, that it would make the rest of the negotiations easier.*

*Q. How so?*

*A. We got the anchor customer done and that there would be momentum out there and that word would spread about the price increase and that it would make the future negotiations easier.*

*Q. Okay. And did that strategy of going after KFC first, was it effective?*

*A. It was.*

*Q. Could you explain that?*

*A. We were able to get KFC done first. And after that intensity level went down and the rest of the negotiations went rather smoothly after that.* [51]

*FN 50: 11/02/21 Trial Tr. at 6-8.*

*FN 51: 51 Id. at 7-8.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. To the extent the allegations in this Paragraph and Footnotes purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*974.    Bryant further testified that using this strategy, Pilgrim's was able to refuse to negotiate with KFC on pricing with the confidence that other Bid-Rigging Defendants "were raising prices similar to what [Pilgrim's was] raising prices and they were not going to concede price either. So there wasn't a need to negotiate."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations.

975. ███████████████████████████████████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

976. ███████████████████████████████████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations.

977. ███████████████████████████████████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations.

978. 

    **ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

979. 

    **ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

980. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

981. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

982.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

983. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

984. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

985. ████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

986. ████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

987. ████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

988. ████████████████████████████████████████

███████████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

989. ████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations.

990. ████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

991.     Bryant (Pilgrim's) testified that these were "some significant price increases that were – that we received in 2014. And I witnessed phone calls between people at Pilgrim's and competitors and I seen [sic] the results of those phones calls transition into increased prices."[52]

FN 52: Id. at 96-97.

**ANSWER:** To the extent the allegations in this Paragraph and Footnote purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

992. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

993. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations.

994.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

995.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

996.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

997. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

998. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

999. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1000.*



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1001.*



*As testified by a Pollo Tropical purchaser during the Criminal Trial, both Claxton and Pilgrim's sent the same message when discussing Pollo Tropical's chicken needs – "the price is the price" – and generally refused to negotiate with Pollo Tropical.[53]*

*FN 53: 20-cr-152, ECF. No. 896 (11/16/21 Trial Tr.) at 76-77.*

**ANSWER:** To the extent the allegations in this Paragraph and Footnote purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

433

1002. The intransigent strategy paid off. Pollo Tropical agreed to a 20-25% price increase with suppliers, including Pilgrim's and Claxton, because they "had no choice. [Bid-Rigging Defendants] would not compromise. [Pollo Tropical] had to book chicken to protect the brand."[54]

FN 54: Id., ECF No. 897 (11/17/21 Trial Tr.) at 10-13.

**ANSWER:** To the extent the allegations in this Paragraph and Footnote purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1003. Bid-Rigging Defendants used exactly the same take it or leave it strategy with Golden Corral. Also in October 2014, Scott Tucker (Pilgrim's) called Telly Smith (Golden Corral) and gave him an ultimatum: either Smith needed to accept Pilgrim's price within the hour, or Pilgrim's would sell the chicken somewhere else.[55]

FN 55: Id., ECF No. 890 (11/8/21 Trial Tr.) at 41-42.

**ANSWER:** To the extent the allegations in this Paragraph and Footnote purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

1004. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1005. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1006. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1007. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1008. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith.

1009. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this

Paragraph and therefore denies those allegations.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize,

or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this

Paragraph and therefore denies those allegations.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize,

or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1012. 

    **ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1013. 

    **ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1014. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

1015. ███████████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1016. ███████████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1017. ███████████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith.

1018.   As Bryant (Pilgrim's) admitted during his testimony at the criminal trial, instead of a "blind bid" in 2014, Pilgrim's had "competitor information that we used during the bid process to influence the outcome of the bid," namely, to "maintain the price increase that [Pilgrims and its competitors] asked for."[56]

FN 56: 11/02/21 Trial Tr. at 11.

**ANSWER:** To the extent the allegations in this Paragraph and Footnote purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1019.   Bryant (Pilgrim's) further testified that he witnessed his boss, Jason McGuire, ask Austin (Pilgrim's) to share information with competitors in order "to build support with competitors to raise prices in the 2014 bid season" and that he witnessed telephone calls between Austin and Brady (Claxton) and Kantola (Koch). Bryant explained:

A: I witnessed my boss Jason McGuire at the time asking Roger [Austin] to provide information to our competitors.

Q. And ultimately what happened in those negotiations?

A. We got a price increase.

Q. Just you?

A. No, the industry got a price increase.

Q. What do you mean by industry?

A. Generally when I say industry, I mean our competitors in that market.[57]

FN 57: 11/01/21 Trial Tr. at 95-98; 113-114.

**ANSWER:** To the extent the allegations in this Paragraph and Footnote purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and

Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1020.*



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1021.*



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this

Paragraph and therefore denies those allegations.

1022.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize,

or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any allegations in this Paragraph that

relate to other Defendants and/or third parties, and therefore Tyson denies those allegations.

Tyson denies any remaining allegations in this Paragraph.

1023.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize,

or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1024. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith.

1025. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1026.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1027. ██████████████████████████████████
████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1028. ██████████████████████████████████
████████████████████████████████████████
████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1029. ██████████████████████████████████
████████████████████████████████████████
██████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1030. ██████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1031.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1032.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

445

1033. ███████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1034. ███████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1035. ███████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1036.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1037.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations.

1038.

*The credit terms Sysco sought to negotiate are "an inseparable part of the price" Sysco pays for broiler chicken products.[58] Sysco expected each Defendant to negotiate with it individually, and not coordinate their responses to Sysco.[59] However, on or about May 1, 2016, Grendys (Koch) and Lovette (Pilgrim's) exchanged emails in which the two agreed not to lengthen Sysco's line-of-credit. Grendys asked Lovette if he heard about Sysco's request to suppliers for longer payment terms. Lovette responded, "Yes, we told them NO!" Grendys then replied, "Ok. Then I am 100 percent on board. If that changes can you please tell me?" Lovette agreed to do so.[60]*

*FN 58: Catalano, Inc. v. Target Sales, Inc., 446 U.S. 643, 648 (1980). "It is virtually self-evident that extending interest-free credit for a period of time is equivalent to giving a discount equal to the value of the use of the purchase price for that period of time. . . . An agreement to terminate the practice of giving credit is thus tantamount to an agreement to eliminate discounts, and thus falls squarely within the traditional per se rule against price fixing." Id.; see also 11/17/21 Criminal Tr. at 175, 178, 180-82, 184-85; No. 20-cr-00152, ECF No. 1069 (Order denying defendant motion in limine to exclude evidence regarding "Sysco payment terms," finding evidence "shows executives at competing chicken suppliers communicated regarding their approaches to a customer's payment terms," which "is relevant to charged conduct and not unfairly prejudicial").*

*FN 59: 11/17/2021 Criminal Tr. at 202.*

*FN 60: 12/8/2021 Criminal Tr. at 64.*

**ANSWER:** To the extent the allegations in this Paragraph and Footnotes purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations.

1039. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1040. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1041. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1042. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

1043. ████████████████████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1044. ████████████████████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1045. ████████████████████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1046.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1047.

*Mr. Bryant testified that he understood this email to mean that "Roger [Austin] and Scott Brady would talk on Friday morning and he would give – provide me with the details of the outcome of that meeting."[61] Mr. Bryant explained that he was interested in the outcome of Claxton's meeting with KFC because, "[w]hatever information we could gain from that, it would help in our preparation with KFC."[62] As Judge Brimmer observed in his January 13, 2022 Order, the 2017 KFC negotiations, like the 2014 KFC negotiations, covered a three year period—in this case the period 2018 through 2020.[63]*

*FN 61: Id. at 174.*

*FN 62: Id.*

*FN 63: 20-cr-152, ECF No. 932 (Order Denying Motions for Acquittal).*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. To the extent the allegations in this Paragraph and Footnotes purport to quote, characterize, or describe documents

or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*1048.   Bryant (Pilgrim's) further testified that in its January 2017 bid negotiations with KFC, Pilgrim's expected that they would have to provide a price reduction due to market factors, such as the fact that there was "more supply available in 2017."[64] As a result, Bryant testified that Pilgrim's, Koch, and Claxton were "working together against [KFC's] best interests and in our best interests, and by ours I mean our competitors' collectively best interest" to "limit[] a price decrease."[65]*

*FN 64: 11/01/21 Trial Tr. at 167.*

*FN 65: Id. at 176.*

**ANSWER:** To the extent the allegations in this Paragraph and Footnotes purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1049.   Bryant (Pilgrim's) confirmed that as part of this effort to rig bids to KFC, Austin (Pilgrim's) relayed competitors' bids, and Tucker (Pilgrim's) shared Mar-Jac's future bids. Bryant testified that in the weeks leading up to the KFC bid submission, his superior Tim Stiller was "upset" that he "didn't already have" competitor information. Bryant stated:*

*"Tim called me and asked me if I had pricing information from Roger and I had not received anything from Roger at that point. Tim got upset with me and Tim's words were: You don't know shit. I'll call and get it myself or I'll find out for myself. And then he hung up the phone."[66]*

*FN 66: Id. at 198.*

**ANSWER:** To the extent the allegations in this Paragraph and Footnote purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and

Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1050. *Bryant (Pilgrim's) testified that following his call with Stiller he then spoke to Austin (Pilgrim's), who said he "had a similar call" with Stiller.[67] Bryant admitted that his "expectation was that [Austin] would use his contacts at other companies . . . like Carl Pepper and Bill Kantola and Scott Brady and come back to me with pricing guidance on where our bid needed to be to be No. 2 in price.[68] Bryant further testified that Austin then called him— possibly the next day—and said "are you ready? I got it. And then he relayed to me pricing and [competitor] names."[69] Bryant continued, "I wrote those, that pricing information and competitor names down in my notebook so I could relay that back to Tim since he was upset that I didn't already have it."[70]*

███████████████████████████████████████████████████████
██████████████████████████████████

FN 67: *Id. at 198-99.*

FN 68: *Id. at 178.*

FN 69: *Id. at 199.*

FN 70: *Id.*

**ANSWER:** To the extent the allegations in this Paragraph and Footnotes purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations.

1051. *Bryant (Pilgrim's) stated that the purpose of obtaining competitors' pricing was either to "increase or limit a decrease in price" to the customer.[71] As Bryant explained, "collectively we could all decrease price a modest amount without the fear of losing business or decreasing our price too much."[72] Bryant further testified that the competitors would not have let KFC know that they were communicating because KFC "would probably perceive that as us undermining their bid process."[73]*

FN 71: *Id. at 147.*

*FN 72: Id. at 211.*

*FN 73: Id. at 175-176*

**ANSWER:** To the extent the allegations in this Paragraph and Footnotes purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1052.*



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1053.*



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1054. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1055. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1056.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1057. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith.

1058. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*1059. Stiller's (Pilgrim's) admonishment to Bryant (Pilgrim's) not to use competitor names in email came after Pilgrim's had arranged with competitor Mar-Jac to jointly raise future prices in their bids to US Foods for boneless breasts.[74] In connection with that US Foods bid, Bryant testified that Scott Tucker of Pilgrim's contacted Mar-Jac, the "primary competitor"[75] of Pilgrim's with respect to the US Foods boneless business, to have "a conversation about raising prices together."[76] According to Bryant, Mar-Jac "agreed that they would raise prices."[77] However, Mar-Jac was concerned about the optics of submitting bids with "a similar price increase" at the same time as Pilgrim's, so Mar-Jac decided "to wait a couple weeks to submit those price increases so there would be the appearance that [Mar-Jac and Pilgrim's] were not working together."[78]*

*FN 74: Id. at 224, 232.*

*FN 75: Id. at 222.*

*FN 76: Id. at 224.*

*FN 77: Id. at 229.*

*FN 78: Id. at 228-29.*

**ANSWER:** To the extent the allegations in this Paragraph and Footnotes purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1060.* 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations.

*1061.* 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that

relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

1062. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

1063. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1064. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

1065. ███████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith.

*1066.   During the criminal trial, Bryant (Pilgrim's) confirmed this anticompetitive activity. Bryant testified that Gay (Pilgrim's) made Bryant "agree to a discount for a customer that our competitors had already aligned around," noting that customer was "Popeye's."[79] Bryant testified, "[Gay] said, well, everybody else is doing it, so we're going to have to fall in line with them," and explained that because "[Pilgrim's] competitors had already agreed to a discount for the promotion and ... we needed to do the same discount or else it would look bad on us from our customer."[80] Bryant testified that Pilgrim's competitors for Popeye's business at the time consisted of Tyson, George's, Claxton, Mar-Jac and Koch.[81]*

*FN 79: 11/01/21 Trial Tr. at 118.*

*FN 80: Id. at 120.*

*FN 81: Id. at 119.*

**ANSWER:** To the extent the allegations in this Paragraph and Footnotes purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations.

1067. ███████████████████████████████████████

**ANSWER:** Tyson denies the allegations in this Paragraph.

1068.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1069.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

1070.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any allegations in this Paragraph that

relate to other Defendants and/or third parties, and therefore Tyson denies those allegations.

### 3. Bid-Rigging Defendants' Conduct Caused Customers to Pay Artificially Higher Prices

*1071. As the Department of Justice explained, these "compilations of the competition's then-current prices furthered the conspiracy because, among other reasons, they enabled: (1) monitoring as a means of ensuring that the competition was adhering to the conspiratorial understanding and not cheating on the price-fixing agreement; (2) the defendants to determine their competitors' absolute pricing for items such as dark meat, which, as defendant Fries's counsel elicited from SA Taylor at the James hearing, Tr. 210:22-211:20, is often priced relative, e.g., '30 back', to the absolute price of 8-piece chicken on the bone; and (3) at least in the case of defendant Austin, who in 2014 'did some checking around' and obtained 'the range of the total increase (margin and costs) folks are going in with [for KFC],' and his co-conspirator Jason McGuire, to calculate the increased price Pilgrim's needed to propose to KFC 'to be the leader' for 2015 prices."[82]*

*FN 82: 20-cr-152, ECF No. 501 (Motion) at 5-6.*

**ANSWER:** To the extent the allegations in this Paragraph and Footnote purport to quote,

characterize, or describe documents or other sources, such sources speak for themselves, and

Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks

knowledge or information sufficient to form a belief as to the truth of any allegations in this

Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those

allegations.

*1072.* 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize,

or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1073. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1074. 

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson denies any remaining allegations in this Paragraph.

1075.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1076.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1077.* 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1078.* 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1079.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

1080.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

1081.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies

465

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1082.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

1083.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

1084. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

1085.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

1086.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

1087. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1088. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith.

1089. 



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

1090.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this

Paragraph and therefore denies those allegations.

*1091.*



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize,

or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any allegations in this Paragraph that

relate to other Defendants and/or third parties, and therefore Tyson denies those allegations.

Tyson denies any remaining allegations in this Paragraph.

*1092.*



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize,

or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*1093.*



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*1094.*



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

1095. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

1096. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1097. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1098. ███████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1099. ███████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1100. ███████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1101. ████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

1102. ████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1103. ████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this
Paragraph and therefore denies those allegations.

1104. ████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize,
or describe documents or other sources, such sources speak for themselves, and Tyson denies
any characterization or description that is inconsistent therewith. Tyson lacks knowledge or
information sufficient to form a belief as to the truth of any remaining allegations in this
Paragraph and therefore denies those allegations.

4.   **Bid-Rigging Defendants Concealed Their Bid-Rigging and Price-Fixing Conduct**

1105. ████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize,
or describe documents or other sources, such sources speak for themselves, and Tyson denies
any characterization or description that is inconsistent therewith. Tyson lacks knowledge or
information sufficient to form a belief as to the truth of any remaining allegations in this
Paragraph and therefore denies those allegations.

1106. ████████████████████████████████████████

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or
legal conclusions to which no response is required. To the extent a response is required, Tyson

denies such characterizations and/or conclusions. Tyson denies any remaining allegations in this Paragraph.

> 1107. 

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

> 1108.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

## X. The Structure and Characteristics of the Chicken Market Make It Highly Susceptible to Collusion

*1109.* ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1110. Highly-Concentrated Market with Vertically-Integrated Producers. A concentrated market, such as the U.S. chicken market, facilitates the operation of a cartel because it is easier to coordinate behavior among possible co-conspirators and more difficult for customers to avoid the effects of collusive behavior.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions.

*1111. According to a November 2013 USDA report, "[d]uring the past 16 years, firms in the Broiler industry continued to decrease in number and grow in size, thereby gaining further economies of scale and scope in processing and marketing. According to the National Chicken Council, 55 federally inspected Broiler companies operated in 1995, compared with 41 companies in 2010." By 2014, there were only 35 such companies.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1112. In fact, the trend towards consolidation among all segments of the Broiler industry goes back decades, as shown below. This consolidation has largely squeezed out the*

*large number of smaller Broiler companies that used to represent a significant portion of Broiler industry production.*



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1113. As of 2015, Defendants controlled 88.8% of Broiler production in the United States. Since the start of the relevant time period, there has been surprising stability in market share for each Defendant, as shown by the graph below:*



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1114. Defendants now collectively control nearly 90 percent of the U.S. wholesale chicken market.*

**ANSWER:** As the term "collectively control" is imprecise, Tyson is unable to form a belief as to the truth of the allegations contained in this Paragraph and on this basis denies those allegations.

*1115. The U.S. chicken industry is almost entirely vertically integrated, with Defendants (known as "integrators") owning, or tightly controlling, each aspect of breeding, hatching, chick- rearing, feeding, processing, and selling.*

**ANSWER:** Tyson admits that Tyson has ownership and control over aspects of its production, including processing and marketing. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*1116. Inelastic demand means that increases in price result in limited declines in quantity sold in the market. In order for a cartel to profit from raising prices above competitive levels, demand must be inelastic at competitive prices, which allows cartel members to raise prices without seeing a decline in sales revenue.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

*1117. Industry studies show that in the U.S. chicken market, not only is the demand for chicken inelastic, it has become increasingly more inelastic over the past 40 years.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

1118.   *In connection with a joint DOJ-USDA workshop on the poultry market in 2010, agriculture economist Michael Dicks presented research demonstrating how vertical integration incentivizes chicken producers to implement supply restrictions. He stated that in the U.S. poultry industry "vertical coordination allows integrators to manage excess capacity to manage price. Integrators can minimize the effect on producers by increasing the time between collection and delivery of birds or reducing the number of flocks per year ... Because of the inelastic nature of the supply and demand a reduction in supply will produce an outcome more preferable to the industry than maintaining supply with a lower price."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

1119.   ***Existence of Numerous Trade Associations and Access to Competitors' Data through Agri Stats.*** *The existence of industry trade associations makes a market more susceptible to collusive behavior because such associations provide a pretext under which co-conspirators exchange sensitive company information, such as pricing and market allocation. Industry trade associations also provide mechanisms for sharing information, and monitoring, deterring, detecting, and punishing cheating.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson denies any remaining allegations in this Paragraph.

481

*1120.   The following U.S. chicken industry trade associations, all of which count all or nearly all Defendants as members, allowed Defendants to coordinate their price-fixing and supply restriction conspiracy: National Chicken Council ("NCC"), United States Poultry & Egg Export Council, U.S. Poultry & Egg Association, Georgia Poultry Federation, North Carolina Poultry Federation, Poultry Federation (representing chicken producers in Arkansas, Missouri, and Oklahoma), and the International Poultry Council.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson admits that some of its personnel are members of certain legitimate trade associations for pro-competitive reasons. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*1121.   According to Communication in Poultry Grower Relations: A Blueprint to Success, a book written by a management consultant affiliated with the U.S. Poultry & Egg Association, "representatives from the various [chicken producers] readily share information while attending the numerous seminars offered by the U.S. Poultry & Egg Association, National Chicken Council" and other trade groups. The book notes that "industry leaders realize the industry's tremendous potential, and their spirit of cooperation is based on knowing that which is good for individual companies is good for the industry."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*1122.   Regular and frequent attendance by Defendants' CEOs and top level executives at trade association meetings is customary. For example, NCC "represents integrated chicken producer-processors, the companies that produce, process and market chickens. [The 40]*

member companies of NCC account for approximately 95 percent of the chicken sold in the
United States."

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize,
or describe documents or other sources, such sources speak for themselves, and Tyson denies
any characterization or description that is inconsistent therewith. Tyson admits that at times its
executives attended trade association meetings for pro-competitive reasons. Tyson lacks
knowledge or information sufficient to form a belief as to the truth of any allegations in this
Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those
allegations. Tyson denies any remaining allegations in this Paragraph.

1123.   The CEOs of the top integrated broiler producers are routinely on the board of
directors and meet at least quarterly with one another through the NCC.

**ANSWER:** Tyson admits that certain of its personnel have served on the NCC's Board
of Directors, but denies that NCC Board of Directors meetings occurred quarterly. Tyson lacks
knowledge or information sufficient to form a belief as to the truth of any allegations in this
Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those
allegations. Tyson denies any remaining allegations in this Paragraph.

1124.   The NCC has three annual board meetings attended by Defendants' senior
executives, including most or all Defendants' CEOs and other top executives. Every Defendant
and Co-Conspirator is a member of the NCC, including Mar-Jac, Claxton Poultry, Harrison
Poultry, Keystone, and Allen Harim. Amick President and CEO Ben Harrison, who served on the
NCC Board of Directors throughout the relevant time period, was NCC's Chairman in 2018.
CEOs generally always attend the following three NCC meetings each year, in addition to
special committee meetings or other special NCC events: (a) the January meeting of the NCC
held along with the International Poultry Expo, (b) the mid-year Board of Directors meeting,
and (c) the NCC Annual Meeting in October.

**ANSWER:** While Tyson admits that certain of its personnel have attended meetings or
events held by the National Chicken Council or served on its Board of Directors, Tyson lacks
knowledge or information sufficient to form a belief as to whether its personnel attended the
specific events described in this Paragraph, and therefore denies such allegations. Tyson lacks

483

knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*1125. Generally, CEOs arrive the night before an NCC meeting and socialize with their colleagues, then have small private dinners with one or more of their competitors' CEOs or top executives. The next day, the formal NCC meetings are held and executives from Agri Stats and other allied industry organizations make presentations at the meeting. A formal lunch is held during the meeting and provides CEOs and top executives and opportunity to talk casually with their competitors. Following the meeting, Defendants' CEOs and top level executives often meet, socialize, and golf, hunt, or fish together. Defendants and Co-Conspirators also hold positions of power within the NCC. For example, Amick President and CEO Ben Harrison, served on the NCC Board of Directors throughout the relevant period, and subsequently served as NCC Chairman. Thomas Shelton, Chairman and CEO of Case Foods, has continuously been a member of NCC since 1988 through the relevant period serving on the Board of Directors and as President during that time. Numerous executives of Keystone Foods, including Jeff Bailey (Director of National Account Sales), Jenelle Duncan (Domestic Sales Manager), Chuck Cooper (Senior Director Supply Chain), Charles Hill (VP Sales & Marketing), and Keith Lewis (former Senior Vice President for U.S. Poultry and Fish), were also members of the NCC during the relevant period. William Andersen of Keystone Foods was also appointed to the board of directors for a three year term during the 2010-11 NCC cycle. Andersen was heavily involved with the NCC, assisting in preparation of annual reports and management reports, and preparing and sharing market reports including graphs on chicken production, eggs set, chick placements, hatching layers, and egg production.*

**ANSWER:** While Tyson admits that certain of its personnel have attended meetings or events held by the National Chicken Council or served on its Board of Directors, Tyson lacks knowledge or information sufficient to form a belief as to whether its personnel attended the specific events described in this Paragraph, and therefore denies such allegations. Tyson denies the characterization of National Chicken Council events in this Paragraph. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*1126. Similarly, Defendants and Co-Conspirators, and their senior executives, regularly attend the Georgia Poultry Federation's meetings (usually held in April, August and September). The Georgia Poultry Federation's mission is "[t]o protect and improve the competitive position of the poultry industry in Georgia, the nation's leading poultry producing state." Defendants*

*and Co-Conspirators House of Raeford, Perdue, Fieldale Farms, Wayne Farms, Tyson, Sanderson Farms, Pilgrim's, Mar-Jac Poultry, Harrison Poultry, and Claxton Poultry, and Keystone Foods are members of the Georgia Poultry Federation. Keystone Foods' Clay Banks served as Chairman of the Georgia Poultry Federation during 2014-2015.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson admits that it or one or more of its employees have been members of certain legitimate trade associations for pro-competitive reasons, including the Georgia Poultry Federation; Tyson further admits that the Georgia Poultry Federation has meetings from time to time. Tyson denies any remaining allegations in this Paragraph.

*1127.   Defendants also accessed each other's above-described data through co-Defendant Agri Stats to monitor cheating, if any, in the conspiracy. Agri Stats acted as an active facilitator of Defendants' cartel.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1128.   Investor Conferences. Defendants' CEOs and senior executives participate in numerous investor conferences organized by Wall Street analysts, providing further opportunities to meet and communicate with one another. Such conferences are held on an annual and/or ad hoc basis including, but not limited to, the Goldman Sachs Global Staples Forum (held every May), Bank of America Merrill Lynch Global Agriculture Conference (held every February), BMO Capital Markets Annual Ag & Protein Conference (held every May), BMO Capital Markets Conference (held every May), BMO Farm to Market Conference (held every May), Urner Barry Annual Executive Conference and Marketing Seminar (held every April or May), and JP Morgan Basic Materials Conference (held every June).*

**ANSWER:** While Tyson admits that certain of its personnel have attended events held by analyst firms, Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations that "CEOs and senior executives" participated in the specific conferences listed in this Paragraph, or that they occurred with the frequency described in this Paragraph, and therefore denies those allegations. Tyson further denies any characterization of those meetings and conferences. Tyson lacks knowledge or information sufficient to form a belief as to the truth

485

of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*1129.   Competitor Plant Tours. Defendants also permitted one another to tour each other's Broiler plants, which revealed confidential business methods employed by a company. While such tours were often framed as "best practices" information exchanges, they permitted the opportunity to conspire among senior executives.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. While Tyson admits that certain personnel from other Defendants/third parties have visited certain of Tyson's facilities for pro-competitive purposes, Tyson denies any characterization of those visits. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*1130.   As additional examples of Defendants sharing competitive and sensitive information with each other,*



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

1131.   *Defendants also permit employees to regularly move between companies without non-compete limitations or confidentiality agreements that would protect a company's (seemingly) proprietary business knowledge and customer base. For example, Dr. Don Jackson was President of Foster Farms' Poultry Division until December 2008, but then immediately took a position as CEO of Pilgrim's. Similarly, Clint Rivers, Pilgrim's former President and CEO until December 2008, left the company and became Senior VP of Operations and Supply Chain Management for Perdue in 2009. Rivers then moved to Wayne Farms in 2012, where he became Chief Operating Officer. Greg Tatum served as CFO for Claxton Poultry, before moving to Pilgrim's in 2009 to serve as Senior VP of Business Development. Numerous other high level and well as lower level executives move freely between Broiler companies with little or no provision by Defendants to protect their confidential information.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that Bill Lovette worked at Tyson, that Tyson has widely used non-compete and confidentiality agreements and has taken legal action on many occasions to enforce the restrictions in those agreements against former employees and competitors, including competitors named as Defendants in this Complaint. Tyson denies any remaining allegations in this Paragraph.

1132.   ***Mergers and Acquisitions.*** *Senior executives from Defendants had numerous opportunities to directly communicate with one another regarding various mergers and acquisitions between 2008 and 2016. These merger and acquisition discussions include both completed agreements, such as those described in Section VI(E)(4) of this Complaint, as well as proposed transactions that were never completed. In connection with mergers and acquisition discussions, due diligence materials regarding confidential business information were shared between Defendants.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations. To the extent that this Paragraph incorporates and re-alleges allegations contained in Section VI(E)(4),

Tyson incorporates and re-alleges its answers to each allegation contained in Section VI(E)(4).

Tyson denies any remaining allegations in this Paragraph.

*1133.   In addition, Defendants all rely on debt financing and merger and acquisition services from the same small group of financial institutions. In the course of providing such services, financial institutions obtain unusually detailed access to Defendants' non-public operational information, including production and pricing information, which provides another opportunity for Defendants to share confidential business information.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*1134.* █████████████████████████████████████████████████████████████████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

*1135.* █████████████████████████████████████████████████████████████████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

1136.


**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

1137. ***Further Restricting Breeder Flock Supply and Sharing of Future Plans Through So-Called Strategic Alliances and Joint Ventures.*** *Defendants and their Co-Conspirators facilitated the sharing of future plans for the slaughter of so called "fowl" including spent hens through a so-called "strategic alliances" and joint ventures, which also gave the Defendants and Co-Conspirators additional opportunities to implement the supply-restriction mechanism of their conspiracy, and achieve additional profits, by sending "spent hens," which are breeder hens that can no longer lay eggs, as well as roosters (which along with spent hens, are sometimes collectively referred to as "fowl,") to so-called "hen houses" for slaughter for meat consumption.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

1138. *Because, unlike the broilers produced by the Defendants and Co-Conspirators, hen houses had the capacity and equipment necessary to slaughter larger birds – often called "heavy fowl," which are spent hens and roosters weighing up to eight pounds – hen houses became a critical part of the Defendants' supply-restriction mechanism of their conspiracy by allowing them to send their breeder hens to slaughter at younger and younger ages, further reducing supply at the very top of the supply chain. Sending breeder hens to hen houses for*

*slaughter while they were still capable of laying eggs – that is, before 65 weeks of age – allowed the Defendants and Co-Conspirators to use information provided by both Agri Stats (which tracked average slaughter age, as detailed above) and the hen houses (which tracked and disseminated to their members similar information) to project their own supply and also gain insight into the supply reductions of their ostensible competitors who were also members of such "strategic alliances."*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*1139.   Discovery to date has uncovered the participation of the Defendants and their Co-Conspirators in two such entities, Non-Producer Co-Conspirator Tip Top and Non-Producer Co-Conspirator Southern Hens.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations. Tyson admits that Tip Top and Southern Hens are spent hen processors, but denies any characterization of these entities. Tyson denies any remaining allegations in this Paragraph.

*1140.   The Tip Top Alliance was formed in 2009 by Defendants Case Farms, House of Raeford, Keystone, Mar-Jac, Mountaire, Perdue, Harrison, and Wayne Farms, and Co-Conspirators Amick Farms and Fieldale Farms, who were later joined by Defendants Pilgrim's and Simmons.* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *embers of the Tip Top Alliance held quarterly conference calls, and met in person at least once a year during the annual International Chickens Conference in Atlanta. Brad Respess, the president of Tip Top, regularly sent emails, as well as quarterly performance reports, to all members of the alliance, and Mr. Respess also regularly received industry information from Agri Stats' Mike Donahue.*

490

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1141.*

*Rendering hens for non-food use has next to no value compared to slaughtering them for food, which means that the Tip Top alliance members gave up a profit from Tip Top in order to cut back on broiler production by sending breeder hens to slaughter far earlier than they would otherwise have done in a truly competitive market.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*1142. Communications between Mr. Respess and alliance members allowed each alliance member to know that its fellow alliance members were, consistent with the supply-restriction mechanism of their conspiracy, cutting broiler production by increasing their shipments of younger and younger breeder hens to Tip Top, taking supply out of the market at the very top of the supply chain.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description

491

that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1143.*



**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1144.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief

as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1145. 

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1146. 

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief

as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1147. 

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1148.   In addition to providing information by which its alliance members could (and did) coordinate their collusive supply-restriction scheme, Tip Top readily gave such information to non-alliance members,*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith.  Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1149.   Southern Hens, based in Moselle, Miss., was a joint venture formed by Defendants that facilitated the sharing of confidential information. Southern Hens is described in*

494

*its corporate filings as a poultry processing business. It processes spent breeder hens for chicken producers including its joint owners. Southern Hens' Board has included representatives from Aviagen, as well as Defendants Sanderson Farms, Koch, Foster Farms, OK Industries, Pilgrim's Pride, Mar-Jac, Peco Foods, and George's.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1150.   The Board representatives have infrequently changed over the years. For example, Bob Rosa (Sanderson Farms), served on the Board from at least 2007 through 2017. Lance Buckert and Mark Kaminsky (Koch) also served during this same time-period, as did Denny Hickman (Peco Foods) and Ben Thompson (Aviagen). Melissa Durbin (Marshall Durbin) served on the Board from at least 2008 until 2014 when Mar-Jac replaced Marshall Durbin after its acquisition. Bob Kenney (George's) served on the Board from 2010 through 2017. Other Board members have included Monty Henderson (George's); Bob Hendrix, Walt Shafer and Randy Stroud (Pilgrim's); Pete Martin (Mar-Jac); and Tim Garber and Terry Thompson (Foster Farms).*

**ANSWER:** As the term "infrequently changed" is imprecise, Tyson is unable to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1151.   Southern Hens has also had the same General Manager, John Comino, since 1998. Comino regularly communicated with board members and helped to facilitate Defendants' sharing of information with each other. For example, Comino attended NCC meetings on behalf of Southern Hens, and served on the Board of Directors with representatives from several Defendants, including Pete Martin (Mar-Jac), Gary George (George's), and Trent Goins (OK Foods).*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1152.   Comino also shared plans for production cuts among Defendants who used Southern Hens as a means to achieve these coordinated activities.*



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1153.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1154.   High Barriers to Entry. The intended effect of a conspiracy to fix prices, either explicitly (as is the case here with the Georgia Dock benchmark price index) and through restricting supply (which Defendants also did) is to generate higher profits for the participants. The normal impact of the artificially higher profits is to draw other profit seeking companies into the market. In industries with substantial barriers to entry, such as the U.S. chicken market, however, companies – such as Defendants – are able to raise prices above competitive levels and still earn above-normal levels of profits.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterization of their claims, arguments subject to proof by expert testimony, and/or legal conclusions, to which no response is required. To the extent a response is

required, Tyson denies such characterizations and/or conclusions. Tyson denies any remaining allegations in this Paragraph.

*1155.   The existence of high entry barriers in the U.S. chicken market is demonstrated by the trend of increasing consolidation, with larger vertically integrated companies increasing their control over the industry. Beyond the issue of vertical integration, there is a wide range of government food safety, worker safety, and environmental regulations that must be addressed by any new entrant into the chicken market. The existence of low, and highly variable, profit margins also act as significant barriers to entry. With such barriers to entry, companies that have the available resources and significant start-up capital to enter the market and benefit from economies of scale are able to reduce their average cost by producing more. Companies already in the market such as Defendants – are motivated to exclude other companies from the market to maintain their coordinated supply restriction conspiracy, and ultimately keep prices at artificially inflated levels. These high entry barriers also extend to large foreign meat conglomerates that have acquired U.S. broiler producers in the past decade, including Brazil's JBS S.A. (Pilgrim's), Mexico's Industrias Bachoco (O.K. Foods), Belgian company Continental Grain Company (Wayne Farms), Marfig Alimentos S.A. (Keystone Foods), and South Korea's Harim Group Corporation (Allen Harim). Each of these foreign meat conglomerates were already large players in the global meat industry and simply continued operating their pre-existing U.S. broiler company as a subsidiary. Ownership of U.S. broiler subsidiaries by such large, well-financed conglomerates deter entry by smaller, non-globalized companies that might want to enter the U.S. broiler production business.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*1156.   History of Government Investigation and Collusive Actions. In response to a Federal Trade Commission investigation in 1919 which found oligopoly domination and anti-competitive monopolistic behavior in the meat-packing industry, Congress passed the Packers and Stockyards Act ("PSA"). See 7 U.S.C. § 193(a), § 209. Congress amended the law to include the poultry industry in 1935.*

**ANSWER:** Tyson admits that Congress passed the PSA in 1921, and amended the law to include the poultry industry in 1935. Tyson denies any characterization or description that is inconsistent with that source and legislative history. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

497

*1157. In 1922, the Supreme Court upheld the constitutionality of the PSA in Stafford v. Wallace, finding that "the object of the PSA was to secure the flow of livestock from the farms and ranges to the slaughtering center and into meat products unburdened by collusion that unduly lowered the prices to the shipper and unduly increased the price to the consumer."*

**ANSWER:** Tyson admits that the Supreme Court upheld the constitutionality of the PSA in 1922 in *Stafford v. Wallace*, 258 U.S. 495, but denies that the Court's opinion contains the quote in this Paragraph; Tyson denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

*1158. In April 1973, the United States Department of Justice filed a civil antitrust action against the National Broiler Marketing Association ("NBMA") alleging the NBMA and its members conspired to fix Broiler prices and restrict Broiler production in violation of Section 1 of the Sherman Act. The DOJ sought to enjoin the NBMA and its dozens of members from continuing a conference call program where members (and even some non-members) coordinated the pricing and production of Broilers. In response, numerous private civil antitrust actions were filed against the NBMA and 42 individual defendants in the In re Chicken Antitrust Litigation case. The NBMA and Broiler producers eventually settled the case, resulting in a settlement of roughly $30 million.*

**ANSWER:** Tyson admits that the Department of Justice filed an antitrust action against the National Broiler Marketing Association in 1973. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*1159. Beginning in 2010, the USDA undertook a series of public workshops to explore competition issues in the upstream, contract-farmer Broiler market. A workshop held in Normal, Alabama, on May 21, 2010, focused on corporate concentration and lack of competition in the Broiler industry. The workshops led to the proposal of new rules aimed at encouraging competition in the meat industry, but extreme political pressure from Defendants and their allies eventually watered down the rule and led to the resignation of the official charged with imposing tougher regulations.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and

therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*1160.   In 2011, George's Inc. acquired the Harrisonburg, Virginia processing plant from Tyson Foods. The DOJ brought an action to stop the acquisition (United States v. George's, Inc.), which alleged the purchase would impermissibly reduce the available options for contract farmers to sell their grower services. The DOJ eventually settled with George's in June 2011 after obtaining an agreement to require George's to make capital improvements to the facility that would increase its capacity and permit contract farmers to sell more grower services to the processing plant.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson admits that George's Inc. acquired a processing plant located in Harrisburg, Virginia from Tyson Foods in 2011 and agreed in doing so to increase capacity at that facility. Tyson denies any remaining allegations in this Paragraph.

*1161.   According to a June 2014 USDA Report, "the [Broiler] industry faces a range of public policy issues, [including] competition ... [c]oncerns[, including] the exercise of market power by Broiler integrators have prompted merger litigation, USDA regulatory initiatives, congressional proposals, and investigations by Federal agencies."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

## Y.   Collusively Adopted Additional Strategies to Reinforce Their Conspiracy

*1162.   Defendants Collusively Adopted Additional Strategies to Reinforce Their Conspiracy. Defendants collectively adopted several strategies to buttress and sustain their conspiracy.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions.

1163. ***Collective Shift Away From Long-Term Fixed-Price Contracts For Some Customers.*** *First, particularly with respect to certain distributor and grocer customers, starting in 2008, the Defendants moved away from long-term fixed-price contracts to shorter-term contracts with variable pricing pegged to one of several publicly-available price indices (including the USDA composite Urner Barry, and the Georgia Dock). A coordinated move away from fixed price contracts to contracts permitting prices to fluctuate with an indexed public market price helped facilitate a market-wide antitrust conspiracy with respect to some customers. See In re High Fructose Corn Syrup Antitrust Litig., 295 F.3d 651, 659 (7th Cir. 2002).*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations. Tyson admits that the pricing mechanisms under contracts with customers are negotiated vigorously and change over time based upon the interests of the customer and Tyson's own judgment of its independent business interests. Tyson denies that its pricing mechanisms and any changes thereto were "coordinated" with its competitors. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

1164. *Defendants' shift indicates that they anticipated higher, or artificially inflated non-competitive, prices resulting from their production cuts, and wanted the flexibility to take advantage of such prices without being locked in to longer-term, lower-pricing commitments to certain distributor and grocer customers.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1165. *Starting around January 2008, senior executives from Koch Foods, Pilgrim's, Perdue, Sanderson Farms, and Tyson publicly announced an effort to reduce annual fixed-price contracts for some customers.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*1166.   This change coincided with Defendants' efforts to reduce chicken industry supplies to drive chicken market prices higher.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1167.   On January 28, 2008, Tyson CEO Richard Bond announced on an earnings call that Tyson was looking at shortening its fixed price contracts, and by June 2009 Tyson reported it had "dramatically" shortened the amount of fixed-price contracts over 90 days.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that it held an earnings call on January 28, 2008 for its investors, but denies any remaining allegations in this Paragraph.

*1168.   The next day, on January 29, 2008, Pilgrim's CFO Rick Cogdill reported on an earnings call that Pilgrim's had started moving away from fixed-price contracts, noting that "in a situation like where we are now where we need to drive commodity prices up, that [i.e., having less fixed price contracts] is going to give us the opportunity for more immediate benefit to our P&L than what we would have had say, historically three year[s] ago, when a higher percentage was fixed price." Pilgrim's later reported that by March 2012, it had reduced its exposure to fixed price contracts, with most contracts now market-based or including a reset provision linked to the underlying commodity. By 2014, Pilgrim's reported that less than 5% of all its contracts were 12-month fixed price contracts.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1169.   On July 28, 2008, Perdue spokesperson Julie DeYoung told an industry publication that Perdue was looking to shorten its contract terms, stating, "the company is also seeking to raise prices and shorten its contracts."

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1170.   Sanderson Farms' CEO Joe Sanderson noted in a July 31, 2008, earnings call that the industry may move towards "shorter term agreements."

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1171.   On an August 6, 2012 earnings call, Tyson CEO Donnie Smith stated that "[o]ver the past couple of years we have substantially reduced a number of fixed price contracts we have with customers and currently have less than 15% of our Poultry volume [on] annual fixed price contracts. The vast majority of our contracts are tied to specific markets or allow for conversations about adjusting prices to move – prices to offset higher input and we will continue to push for even more of these types of contracts. I believe supply will begin to rationalize as well, making it easier for us to have those pricing conversations."

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson admits that it held an earnings call on August 6, 2012 for its investors who expect Tyson to provide information relevant to the company's financial performance including observations about the nature of Tyson's contracts with customers. Tyson denies any remaining allegations in this Paragraph.

1172.   *This collusive and coordinated shift toward reducing the number of longer-term fixed-price contracts had the intent and effect of creating supra-competitive market prices for broilers to some customers.*

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions.

1173.   **Inter-Defendant Sales.** *Third, the Defendants use direct purchases of chickens from one another and from smaller producers to meet each company's own sales needs.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that at certain times it has purchased chicken products from another broiler producer based on its own business judgment of what was in its independent interest. Tyson denies any remaining allegations in this Paragraph.

1174.   *In addition to exemplifying the commodity nature of the chicken market, these inter-Defendant sales allowed Defendants to soak up excess supply that could potentially depress prices in the market and facilitated the opportunity to expressly discuss prices with competitors. Such purchases also permitted companies to maintain market share despite reducing their production. In many instances large inter-Defendant purchases were negotiated by CEOs or other senior level executives of Defendants, thereby providing additional opportunities to conspire.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and

therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*1175.* ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1176.* ████████████████████████████████████████████
████████████████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*1177.   In 2011, Tyson began using what was described as a "very unique strategy," called "Buy vs. Grow."*

**ANSWER:** Tyson admits that it used a Buy vs. Grow program based on its own business judgment of what is in its independent interest, but denies any remaining allegations in this Paragraph.

*1178.   Tyson's strategy essentially treated the industry supply as though it were for a single unified company, rather than competing businesses that would rather sell self-produced*

*product to a customer than a competitor. Tyson's adoption of this strategy was indeed "unique," because only a few years prior to adopting the "Buy vs. Grow" strategy, it had derided a similar strategy as a "stupid" subsidization of competitors' growth, with a Tyson executive explaining on an April 29, 2008 earnings call that "I think what we said along is we're going to match our supply and demand. We're not going to cut beyond that and then go out and buy open market meat to subsidize other people's growth."*



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson admits it held an earnings call on April 28, 2008 for its investors, but denies any remaining allegations in this Paragraph.

*1179.   Tyson's strategic shift in 2011 to buying chicken on the open market is evidence that by that time, it was confident that its fellow conspirators would maintain their production levels as they were and not increase them.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1180.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

1181.



**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

1182.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1183.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1184. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1185. *In a November 5, 2012, interview, Fieldale President Thomas Hensley noted his company was also pursuing a strategy to purchase excess supply from its competitors, stating that "[i]f you don't have a home for your chickens on Monday morning, you shouldn't have those chickens. Now we know where all our chickens are going. So we are buying chickens in that lower price area instead of selling them. So, no expansion for us."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies them.

1186.  *In a July 9, 2012 article, Donnie Smith of Tyson was quoted as saying "the company will not over produce chicken at these expensive grain levels, preferring to buy commodity pieces in the secondary market to fill orders where necessary."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

1187.  ███████████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies them.

1188.  *On a January 31, 2014, earnings call, Smith reported that through Tyson's "buy versus growth strategy we continue to keep our supply short of demand ...."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson admits that it held an earnings call on January 31, 2014 for its investors who expect Tyson to provide information relevant to the company's financial performance including information about strategies used by Tyson to properly balance the demand for its products with available supply, but denies any remaining allegations in this Paragraph.

1189.  *By the end of 2014, Tyson reported it was buying over four million pounds of chickens on the open market each week. Four million pounds of chicken per week is more than any of the 24th-30th largest chicken companies produce on a weekly basis, so the amount of Tyson's purchases was quite significant.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson admits that it bought Broilers on the open market in 2014, and other years, based on its own business judgment of what is in its independent interest. Tyson denies any remaining allegations in this Paragraph.

1190. *During the first part of 2015, Tyson increased its Buy vs. Grow purchases by 50 percent, expanding its purchases from competitors to unprecedented levels. Tyson announced plans in May 2015 to increase its Buy vs. Grow strategy to 10 percent of its sales in the second half of 2015 and 2016. Ten percent of Tyson's 2014 ready-to-cook pounds was 17.6 million pounds per week, a volume that by itself would dwarf the entire average weekly production of any of the 15th-30th largest chicken producers.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson admits that it adjusts the level of purchases under its Buy vs. Grow program every year, and throughout the year, based on its own business judgment of what is in its independent interest. Tyson denies any remaining allegations in this Paragraph.

1191. *Notably, Tyson also announced in May 2015 that it planned to reduce its production after July 2015 and keep it flat through 2016 by increasing its Buy vs. Grow purchases.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson admits that it adjusts the level of purchases under its Buy vs. Grow program every year, and throughout the year, based on its own business judgment of what is in its independent interest. Tyson denies any remaining allegations in this Paragraph.

1192.

[REDACTED]

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1193.* [REDACTED]

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1194.* [REDACTED]

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1195.* ████████████████████████████████

**ANSWER:** Tyson admits that at certain times it has purchased chicken products from another broiler producer based on its own business judgment of what was in its independent interest. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1196.* ████████████████████████████████

**ANSWER:** Tyson admits that at certain times it has purchased chicken products from another broiler producer based on its own business judgment of what was in its independent interest. Tyson otherwise lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph and therefore denies those allegations.

*1197.* ████████████████████████████████

**ANSWER:** Tyson admits that at certain times it has purchased chicken products from another broiler producer based on its own business judgment of what was in its independent interest. Tyson otherwise lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1198. Atypical Increases in Exporting of Chickens. Fourth, during 2013 and into 2014, Defendants found new ways to actively depress the size of breeder flocks, such as using the pretext of avian flu in Mexico to justify exporting flock chickens to Mexico to repopulate flocks rather than use such chickens to increase domestic production levels.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1199. Indeed, Defendants continued their program of exporting chicken hens and eggs to Mexico in 2015, with Tyson explicitly noting in a May 4, 2015, earnings call that it was sending 3 percent of its eggs to Mexico to "fill incubators."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson admits it held an earnings call on May 4, 2015 for its investors who expect Tyson to provide information relevant to the company's financial performance including observations about the supply of, and demand for, Tyson's products, but denies any remaining allegations in this Paragraph.

*1200. Similarly, during a July 2016 earnings call, Pilgrim's CEO Bill Lovette noted his "confidence that we're going to do the right thing with respect to maintaining [] discipline. We've certainly had the hatching egg supply to grow much more if we chose not to export those eggs. I think in May we exported 81 million hatching eggs or so outside of the country. The industry could have chosen to set some of those eggs domestically, but that was not the choice that was made. And so again that gives us confidence that we're going to continue to be disciplined as an industry."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*1201. Tyson and other Defendants exported hatching eggs to Mexico and other foreign countries from 2013-2016 with the intent to artificially reduce the supply, and artificially inflate the price, of chickens in the U.S. The revenues Tyson and others received for exporting hatchery eggs to Mexico was far less than they would have generated hatching those same eggs and selling the chicken meat in the U.S. market.*

**ANSWER:** Tyson admits that it occasionally exported hatching eggs to Mexico in Tyson's independent business interest. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies the remaining allegations in this Paragraph.

1202.   Thus, but for Defendants' agreement and conspiracy as alleged in this Complaint, it would have been against Tyson's independent economic self-interest to export hatching eggs to Mexico and forego higher hatching egg prices in the U.S. But Defendants' new-found "discipline" ameliorated any remaining risk and resulted in supra-competitively higher overall U.S. chicken prices.

**ANSWER:** Tyson denies the allegations in this Paragraph.

### Z.   Agri Stats Actively Facilitated Defendants' Conspiratorial Communications and Provided Data Necessary to Effectuate, Monitor, and Enforce the Conspiracy

1203.   The USDA and various other entities publicly published aggregated weekly, monthly, and annual supply and pricing information concerning the U.S. chicken industry. But only Agri Stats received from Defendants, and then provided to Defendants, detailed information to accurately determine producer-specific production, costs, and general efficiency.

**ANSWER:** As the term "various other entities" in this Paragraph is imprecise, Tyson is unable to form a belief as to the truth of the allegations contained in this Paragraph and therefore denies those allegations. Tyson admits that, at certain times during the relevant period, Agri Stats collected information from Tyson, and that Agri Stats reported anonymized and historical information to Tyson for pro-competitive benchmarking purposes. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

1204.   Agri Stats is a company that generated confidential chicken industry data considerably more detailed than any similar types of available reports, including the following data categories:

- Breeder flock size and age, hatchery capacity, and the costs associated with breeder flocks, including feed and housing expense;

- Data about the production, delivery and formulation of feed, including corn and soybean meal costs, which are two of Defendants' most significant input costs;

- Grow-out information for chicken "flocks" provided to contract farmers, including the number of chickens placed, chick mortality by week and overall percentage, chick cost, days between flocks provided to contract farmers (i.e., "down time"), feed conversion rate (pounds of feed per pound of chicken),

*average daily weight gain by chicks, live pounds produced per square foot of grower house, grower compensation, including average grower payment in cents per pound and cents per square foot, breed composition of flock (breed or cross-breed of flocks), detailed information on numerous mechanical aspects of chicken housing, and numerous other detailed cost, mortality, and operational information about disease, transportation, labor, and other grow out related information;*

- *Slaughter, processing, and further processing information, including pay for processing plant workers, total production volume, market age of chickens at slaughter, weight of chickens at slaughter, birds per man hour, processing line speeds, and labor hours per pound;*

- *Inventory levels of chickens; and*

- *Financial information, such as monthly operating profit per live pound, sales per live pound, and cost per live pound.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*1205. Agri Stats collected data from Defendants, audited and verified the data, and ultimately reported back to Defendants detailed statistics on nearly every operating metric within the industry, including the size and age of breeder flocks. Agri Stats' survey methodology involved – from and to Defendants – direct electronic data submissions of financial, production, breeder flock size and age, capacity, cost, and numerous other categories of information by each chicken producer on a weekly and monthly basis.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that, at certain times during the relevant period, Agri Stats collected information from Tyson, and that Agri Stats reported anonymized

and historical information to Tyson for pro-competitive benchmarking purposes. Tyson denies any remaining allegations in this Paragraph.

*1206. At each of Defendants' chicken complexes, certain employees, typically in the accounting department, were responsible for submitting the data to Agri Stats once a week (historically, on Thursdays) using an AS400 data link system. Agri Stats used a detailed audit process to verify the accuracy of data from each complex, often directly contacting Defendants to verify data before issuing reports to Agri Stats subscribers.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that, at certain times during the relevant period, Agri Stats collected some information from Tyson, that this information was submitted weekly by certain employees at Tyson, and that Agri Stats reported anonymized and historical information for pro-competitive benchmarking purposes. Tyson denies any remaining allegations in this Paragraph.

*1207. Agri Stats described itself as a "benchmarking" service that "allows organizations to develop plans on how to adopt best practice, usually with the aim of increasing some aspect of performance."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1208. Sanderson Farms CEO Joe Sanderson claimed, "[w]e use Agri Stats, which some of you are probably familiar with. Agri Stats is a benchmarking service that we submit data to. Almost everyone in our industry does as well. And we get the data back. It's anonymous – the data is anonymous, so we don't know whose numbers the numbers belong to, but we can see performance indicators all over the industry."*

**ANSWER:** To the extent the allegations in this Paragraph purports to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1209. However, contrary to these assertions, Defendants were at all material times able to (and did) readily determine "whose numbers the numbers belong to." Indeed, each Defendant knew that when it provided its internal, confidential information to Agri Stats, the other producers would be able to access that information and identify the Defendant that submitted it.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1210.* 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1211.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1212. 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1213.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1214.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1215.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1216.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*1217.   There was no legitimate purpose to provide this specific, competitively-sensitive information to Agri Stats, nor was there any legitimate purpose for Agri Stats to disseminate the information in the detailed, readily-decipherable form in which it is sent to Defendants. Instead, it was provided, compiled and transmitted for anti-competitive purposes.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1218.   Agri Stats' critical importance for a collusive production-restriction scheme in the chicken market lies not only in the fact that it supplies data necessary to coordinate production limitations and manipulate prices, but also in its market-stabilizing power. Price-fixing or output-restricting cartels, regardless of industry, are subject to inherent instability in the absence of policing mechanisms, as each individual member has the incentive to "cheat" other members of the cartel – for example, by boosting chicken production to capture higher prices even as other cartelists heed their conspiratorial duty to limit production, which is what happened in the chicken industry for a short period in 2010, when Defendants' conspiracy temporarily faltered.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1219.   Agri Stats' detailed statistics – coupled with its regular, in-person meetings with each Defendant and routine participation in trade association events widely attended by*

*Defendants' senior executives – serve an indispensable monitoring function, allowing each member of Defendants' cartel to police each other's production figures (which are trustworthy because they have been audited and verified by Agri Stats' team) for any signs of "cheating."*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1220. Agri Stats claimed to maintain the confidentiality and anonymity of individual companies' data by giving each company a report identifying only that company's specific chicken complexes by name, but not identifying by name other chicken producers' complexes described in the report, but rather, listing competitors' complexes by number.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson admits that Agri Stats purported to maintain the confidentiality and anonymity of individual companies in its reports, and reported anonymized and historical information to Tyson for pro-competitive benchmarking purposes. Tyson denies any remaining allegations in this Paragraph.

*1221. But, by design, Agri Stats reports were so detailed that any reasonably-informed producer could easily discern the identity of its competitors' individual chicken complexes. It is common knowledge among producers that others could do so, with some Defendants referring to the task of determining the identity of individual competitor's data as "reverse engineering."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*1222. After Tyson rejoined Agri Stats in 2008 and Perdue joined with all of its plants also in 2008, at least 95% of the Broiler Producers in the United States subscribed to Agri Stats providing most of its revenues and providing and receiving the detailed Agri Stats reports which were easily deciphered by the various producers so that they all knew the detailed information set forth hereafter about each other.*

**ANSWER:** Tyson admits that it subscribed to Agri Stats at certain times during the relevant period, and that Agri Stats, reported anonymized and historical information for pro-competitive benchmarking purposes. Tyson admits that it had rejoined Agri Stats in 2008. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

1223.   *Agri Stats reports identified each complex with unique numbers, including a coding system identifying the region and sub-region, for each chicken complex, with the cover pages of each sub-regional report identifying by name the companies whose complexes are covered in the report itself.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that Agri Stats reports contained anonymized and historical data for broilers, and that certain Agri Stats reports organized certain data geographically. Tyson denies any remaining allegations in this Paragraph.

1224.   *Specific complexes were easily identifiable from their codes. Agri Stats' coding system made it easy for Defendants' employees – some of whom, including senior executives at both Wayne Farms and Pilgrim's, used to work at Agri Stats – to decipher production, feed, sales and other competitively-sensitive metrics for their competitors' facilities.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that

relate to other Defendants and/or third parties, and therefore Tyson denies those allegations.

Tyson denies any remaining allegations in this Paragraph.

1225.   *In fact, Agri Stats' coding system, coupled with the insular nature of an industry where "everybody knows everybody," allowed for Defendants' employees to identify individual producers' data by eyeballing the rows in any Agri Stats report. The coding system has never changed (e.g., the Tyson complex in Cummings, Georgia has always been identified as complex "222"), meaning that once a Defendant deciphered the numeric code for a given competitor's complex, that Defendant had the ability to know their competitor's data in perpetuity.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore deny those allegations.

1226.   *Agri Stats played a particularly important role in Defendants' signaling practices and policing efforts. The specific type or size of breeder flock housing, breed of chick, average bird size, and production levels listed in Agri Stats data for Defendants' complexes allowed any given Defendant to "reverse-engineer" and interpret the public statements and other publicly available information about its competitors to determine which complexes were cutting back, and by how much.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

1227.   *For example, if in January, a Defendant publicly states its intention to reduce production – even generically, without specifying which complexes will cut back, or by how much – all of their fellow cartel members will be able to tell from the February and March Agri Stats reports whether that Defendant is following through on its conspiratorial agreement. Further, Defendants Tyson, Pilgrim's, and Sanderson are public companies that report some aggregated data publicly, which executives from other companies could use to match up against the far more detailed information in the Agri Stats' reports to identify other specific data from their competitors.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that it is a publicly traded company, but denies any remaining allegations in this Paragraph.

1228.   *Each Defendant and other Co-Conspirators received numerous types of Agri Stats reports, including separate targeted reports for each major area of operations, such as breeding, hatching, hauling, feeding, processing, selling, and administration.*

**ANSWER:** Tyson admits that Agri Stats reported anonymized and historical information to Tyson for pro-competitive benchmarking purposes, but otherwise denies any characterization of Agri Stats reports in this Paragraph. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

1229.   *Defendants' complex managers typically received the targeted reports for the specific aspects of chicken operations for which they have responsibility, and the CEO, CFO, and a few other of Defendants' and co-conspirators' top executives received Agri Stats' monthly "Bottom Line Report" (which, for a portion of the relevant period, was called the "Executive*

*Report") geared to top level executives. The Bottom Line Reports contained one row for each chicken company reporting to Agri Stats with columns for certain categories of information, such as operating profit dollars, profit percentage, corporate SG&A (aka overhead), interest expense, and other key operational information related to sales, revenues and costs.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson admits that Agri Stats reported anonymized and historical information to Tyson for pro-competitive benchmarking purposes. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*1230.   Within each Agri Stats report (including the Bottom Line Report), unique information referring to supposedly "anonymous" data permitted Defendants and Producer Co-Conspirators to identify their competitors' information contained within each category of report. For example, Agri Stats data on "Actual Live Production Cost," one of many important industry metrics listed in the Bottom Line Report, included line-items for each of the "sub-regions" (described above) that shows, for each particular sub-region, the weighted average figures for "chick cost," "grower cost," "feed ingredient cost," "[feed] mill delivery cost," and "vaccination and medical cost."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson admits that Agri Stats reported anonymized and historical information to Tyson for pro-competitive benchmarking purposes.  Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*1231.   Information helping Defendants and Producer Co-Conspirators to assess the size and age of breeder flocks was available in the "Growth Rate Report" section of Agri Stats, which included complex-by-complex numbers showing the average age, in weeks (e.g., "63.22" or "51.76") of the hens whose eggs, when hatched, became the chickens later killed for meat consumption and supplied to Plaintiffs and other chicken buyers.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson admits that for a certain period of time during relevant period, Tyson received various reports from Agri Stats, including the "Growth Rate Report," that contained anonymized benchmarking information, certain of which included complex-by-complex data. Tyson admits that breeder hens generally produce eggs, certain of which hatch into chickens ultimately sold for meat consumption, and that their age impacts their fertility. Tyson denies any remaining allegations in this Paragraph.

1232.   *The hens comprising the breeder flocks produce fertile eggs (at a rate of roughly five per week) starting around 20 weeks of age, and are typically slaughtered at 65 weeks of age, when breeder hens lose the ability to consistently lay fertile eggs. A breeder hen killed at 60 weeks lays 25 fewer eggs than a hen killed at 65 weeks, meaning that there are 25 fewer chicks hatched and 25 fewer mature chickens available to Plaintiffs and other chicken buyers.*

**ANSWER:** Tyson admits that breeder hens generally produce eggs, certain of which hatch into chickens ultimately sold for meat consumption, and that their age impacts their fertility. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1233.   *The bird-age data from the "Growth Rate Report" also shows how close a given breeder flock is to the end of its egg-laying lifespan, giving Defendants insight into how much longer that flock's capacity to lay eggs will impact the supply of chickens available for slaughter further down the supply chain. In addition, because the "Growth Rate Report" was available each month, knowing the average age of a given flock from month to month can help determine when flocks were being slaughtered and removed from the supply chain (e.g., if the average hen age drops to 4.00 weeks after being at 48.00 weeks in the prior month's "Growth Rate Report," that is a clear indication a breeder flock was slaughtered at 48 weeks).*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson admits that for a certain period of time during the relevant period, Tyson received various reports from Agri Stats,

including the "Growth Rate Report," that contained anonymized benchmarking information.

Tyson denies any remaining allegations in this Paragraph.

*1234. The "Actual Live Production Cost" section of an Agri Stats report also included (again, by sub-region), the average number and overall weight of the chickens being processed. Other sections of Agri Stats reports included similar, sub-region data for a range of competitively sensitive metrics, such as bird age and mortality, "chick cost per settled flock," and "grower expense."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

*1235. Knowing the number of complexes each Defendant operates in each sub-region – which, as detailed above, appeared by name at the very beginning of the Agri Stats reports – any Defendant could, with relative ease, assess the performance of all competing complexes in a sub-region on a variety of important industry metrics.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson admits that certain Agri Stats reports contained anonymized and historical data for broilers, and that certain Agri Stats reports organized certain data geographically, but denies any remaining allegations in this Paragraph.

*1236. Discovery in this action has confirmed that Defendants often exchanged Agri Stats information directly with one another. For instance, on March 24, 2009, Koch CFO Joe Grendys wrote to Amick VP of Sales and Marketing Steve Kernen, inquiring whether Amick had "Any luck yet on agristats #."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1237. ████████████████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1238. ████████████████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1239. ████████████████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1240.*

██████████████████████████████████████████
██████████████████████████████████████████
███████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1241.*

██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1242.*

██████████████████████████████████████████
████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1243.*

██████████████████████████████████████████
████████████████████████████████████

███████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1244.    Agri Stats' role in the chicken industry extends far beyond the collection and dissemination of competitively sensitive data. It was an active and knowing participant in, and facilitator of, Defendants' scheme, along with the Producer Co-Conspirators.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1245.    Agri Stats' employees would confirm for Defendants and Producer Co-Conspirators the data for a particular company at quarterly meetings with each company, or at the numerous trade association meetings where Agri Stats executives presented on a regular basis.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that it periodically met with Agri Stats representatives for the pro-competitive purpose of increasing the efficiency of its production processes and sales programs, but denies any characterization of those meetings. Tyson denies the remaining allegations in this Paragraph.

*1246.    Nearly all of the Agri Stats Broiler division account managers responsible for Defendant and Co-Conspirator accounts during the relevant period were former employees of one or more Defendants and their Co-Conspirators and at least one senior account manager left Agri Stats to join Pilgrim's. This revolving door among the Defendants, their Co-Conspirators and Agri Stats included current or former Agri Stats employees:*

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████



**ANSWER:** As the term "nearly all" in this Paragraph is imprecise, Tyson is unable to form a belief as to the truth of the allegations contained in this Paragraph and on this basis denies the corresponding allegations. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that Dana Weatherford and Sam LeNarz worked for Tyson, but left the company long before the relevant period. Tyson further admits that Jay Hughes worked for Tyson subsidiary Cobb-Vantress at some point in the relevant period, but denies any further characterization thereof. Tyson denies any remaining allegations in this Paragraph.

1247.    *During the relevant period, Agri Stats offered a service to Defendants and Producer Co-Conspirators whereby each quarter – but oftentimes far more regularly than that, in some instances two or three times per month – personnel from Agri Stats would meet with each Defendant's employees and give presentations about both company- and industry-wide data. These meetings took place at both the production-plant level, where Agri Stats personnel met with Defendants' complex managers, and at the executive level, where Agri Stats personnel met with the leadership of Defendants' hatchery, breeder, and feed departments. The executive-level meetings, referred to "quarterly reviews" or "executive reviews," often lasted several days, and were attended by one or more Agri Stats account managers, often accompanied by Agri Stats vice president Mike Donohue, along with C-suite personnel from the Defendants or Producer Co-Conspirators. These multi-day meetings would touch on a range of competitively-sensitive topics, including the Defendants' and Co-Conspirators' profits, sales, margins, operating rates and capacity, including flock or egg-placement reductions.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that it periodically met with Agri Stats

representatives for the pro-competitive purpose of increasing the efficiency of its production processes and sales programs, but denies any characterization of those meetings. Tyson denies the remaining allegations in this Paragraph.

1248.   *Throughout the relevant time period, Agri Stats executives and account managers fanned out across the chicken-producing regions of the country to meet with their clients and co-conspirators, the Defendants and Co-Conspirators.*



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any inconsistent description therewith. Tyson admits that it periodically met with Agri Stats representatives for the pro-competitive purpose of increasing the efficiency of its production processes and sales programs, but denies any characterization of those meetings. Tyson further admits that certain Agri Stats employees met with certain Tyson employees on January 10, 2011; January 11, 2012; February 12, 2013; March 11, 2014; and March 17, 2015. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations.

*1249. Similar meetings happened day after day, week after week, month after month, year after year, and ensured the success of the production-restriction mechanism of Defendants' conspiracy. In addition, roughly every month, Agri Stats account managers would convene account manager meetings – sometimes at Agri Stats' Fort Wayne headquarters, sometimes closer to Mike Donohue's home office in Rhode Island, and sometimes over the phone – which gave Agri Stats employees the opportunity to share information about their various accounts, which could then be relayed to their clients, the Defendants and their Co-Conspirators, at one or more of their subsequent meetings.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that it periodically met with Agri Stats representatives for the pro-competitive purpose of increasing the efficiency of its production processes and sales programs, but denies any characterization of those meetings. Tyson denies the remaining allegations in this Paragraph.

*1250. Since Agri Stats would travel and present among Defendants regularly, discussing each Defendant's non-public, proprietary data, Agri Stats was in a unique position to share information among Defendants and Producer Co-Conspirators at these regular meetings. And that is exactly what happened.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that it periodically met with Agri Stats representatives for the pro-competitive purpose of increasing the efficiency of its production processes and sales programs, but denies any characterization of those meetings. Tyson denies the remaining allegations in this Paragraph.

1251.   *At these regular meetings with Defendants' executives, Agri Stats led detailed discussions about industry profitability and the key contributing factors, including size and average age of chicken breeder flocks, average hatchability of eggs, mortality rates, average bird rate, feed cost, and other performance factors based on data Defendants provided. Agri Stats also led discussions about the overall profit of the company and industry, including rankings of companies, overall industry average, and the top and bottom third of the industry.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that it periodically met with Agri Stats representatives for the pro-competitive purpose of increasing the efficiency of its production processes and sales programs, but denies any characterization of those meetings. Tyson denies the remaining allegations in this Paragraph.

1252.   *Agri Stats also told Defendants' executives how much the industry was over- or undersupplying the market and estimated demand, and shared other information based on data Defendants provided.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits that it periodically met with Agri Stats representatives for the pro-competitive purpose of increasing the efficiency of its production processes and sales programs, but denies any characterization of those meetings. Tyson denies the remaining allegations in this Paragraph.

1253.   *Agri Stats' presentations to the Defendants were based in part on color-coded data compilations, known as "books," specifically tailored for each Defendant based on the data the Defendant has submitted to Agri Stats. Agri Stats maintained at least six "books" for each Defendant: (1) the light-blue "Live" book, with information on the Defendant's breeders, hatchery feed and grow-out; (2) the red "Sales" book, with information on the Defendant's current and year- to-date sales, which provides competitors with information on the price of their product "mix" of chickens versus the national average prices for the same "mix," ranking companies from "best" to "poorest" in terms of performance; (3) the light-green "Production" book, with information on the Defendant's yields; (4) the brown "Profit" book, with information on the Defendant's profits and losses; (5) the mustard-yellow "Rendering" book, with information on the Defendant's rendering facilities; and (6) the "Bottom Line" book, with information on the totality of the Defendant's sales, revenues, and costs.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies them. Tyson denies any remaining allegations in this Paragraph.

1254.   *Anyone at Agri Stats had the ability to pull one or more Defendant's "books" and relay that information to other Defendants.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore Tyson denies them.

1255.   *Indeed, Agri Stats shipped copies of one Defendant's "books" to other Defendants on a number of occasions.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore Tyson denies them.

1256.   *Despite the impropriety of this practice, when it was discovered following a routine review of shipping information, no one at Agri Stats was held accountable, nor were the "books" returned to Agri Stats.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore Tyson denies them.

1257.   *In addition to its in-person meetings with Defendants, Agri Stats employees, including company Vice President Michael Donohue and Broilers account managers Paul*

*Austin, Paul Bunting, and Dana Weatherford, regularly hosted, or presented at, chicken industry events and investor conferences, often citing Agri Stats data in discussing market, production, and demand trends in the chicken industry.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore Tyson denies them.

*1258.   For example, Agri Stats holds events known as "poultry outlook conferences." At one such conference on April 23, 2015 in Atlanta, Mr. Donohue made a presentation that included "broiler market situation and outlook" as an agenda item.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1259.   Mr. Donohue also helped forecast supply and demand for the chicken industry by using Agri Stats data on breeder placements and inventory. At the U.S. Poultry & Egg Association's Hatchery-Breeder Clinic in January 2012, for example, Donohue noted that chicken breast prices were at a particularly high level and "[i]t's not just cutbacks in production that have already occurred but seasonal demand later this year which may set the industry up for an even better first half of 2012." He said "I hope this carries over into the latter half of 2012 based on some of the production forecasts that can be made based on breeder placements and inventories."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore Tyson denies them.

*1260.* 



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore Tyson denies them.

*1261.* 

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore Tyson denies them.

*1262. Among the thousands of such communications uncovered during discovery to date are the following examples, which are still being compiled in ongoing discovery:*

**ANSWER:** This Paragraph contains no factual allegations to which a response is required. To the extent a response is required, Tyson denies the allegations in this Paragraph.

*1263.* 



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

1264.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations.

1265.



**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

1266.   *Defendants rarely mentioned their exchange of information with one another through Agri Stats.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1267.   *However, on certain public occasions, such as earnings or investor conference calls, executives from Defendants Sanderson and Tyson (two of the three publicly traded Defendants) noted the important role Agri Stats data plays in the industry.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson admits it is a publicly traded company, but denies any remaining allegations in this Paragraph.

1268.   *For example, Defendant Sanderson's CEO, Joe Sanderson, commented on an earnings call that he "look[s] at Agri Stats and see[s] what people are doing and not doing," and similarly stated on a May 2011 earnings call that "my judgment is that there will be some others that are going to have to make some adjustments that I believe cuts will be forthcoming in our industry based on the losses we see in Agri Stats." (emphasis added). Asked later on the May 2011 call by an analyst why Mr. Sanderson made this statement and another statement a few months earlier that he "feel[s] confident that we are going to see cutbacks" based on Agri Stats data, Mr. Sanderson indicated:*

*Industry participants expected that [the market would improve in June and July] and I think they wanted to carry their production into June and July and see if the market would reward them for that it appears right now .... And then once you get past July 4 ... I*

*think then you will start seeing reduced egg sets .... Typically in my experience the first cut is not enough.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1269.* ███████████████████████████████████████████████

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1270. Defendant Tyson similarly noted in a December 2014 investor presentation that:*

*[t]he point being is that when you talk about the chicken cycle, most people will look at the cyclicality. It's very profitable right now. And we will not hit the top of the top, because within the profitability segmentation right now, the most profitable segments are in fact big bird, and secondly, tray pack. We can tell that through Agri Stats. Now at the same time, when there is more poultry available and the industry may not be as profitable, we would not expect to be anywhere close to what the bottom of that cycle would be. (emphasis added)*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

1271.   There is no plausible, non-conspiratorial justification for Defendants to use Agri Stats to secretly share highly confidential and proprietary information about their breeder flock size and age, pricing, capacity, production, and costs at the level of detail at which they do.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1272.   In a competitive market, such proprietary, competitively sensitive information should be a closely guarded secret. Economic principles establish that the routine exchange among competitors of such sensitive internal company information reduces competition.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1273.   One chicken industry expert testified in a case against Defendant Pilgrim's brought under the Packers and Stockyard Act, 7 U.S.C. §§ 181-229, that sharing information through Agri Stats by chicken producers regarding pay for contract farmers creates "a potential vehicle for collusion" and presents a "classical antitrust concern." The same expert also remarked that Agri Stats was unusual even among other price surveys, noting:

> [t]he sharing of price and other market information by so-called competitors is well known as a significant antitrust issue. Grower payout and cost information shared by most integrators is incredibly detailed and comprehensive. As such it could provide critical data for competition investigations and analyses of oligopoly and oligopsonistic behavior far more complex and advanced than available for any other agricultural industry. An intensive inquiry is needed.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1274.   When given access to Agri Stats' reports in connection with litigation where he served as an expert witness, an agricultural economist who, to that point, had only "heard rumors of a secretive poultry industry information-sharing service," said that he "was shocked at the incredible detail" of the information presented in the reports.

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any remaining allegations in this

Paragraph and therefore denies those allegations

1275.   A sworn declaration from a poultry and egg industry expert in Freedom of Information Act litigation seeking disclosure of competitively-sensitive FDA egg-farm reports stated, with respect to Agri Stats, that:

> Individual disclosure is not required when industry participants are familiar enough with the industry to connect the information supplied with the individual companies at issue. My experience is that competitors ... are prolific at quantifying their competitor's business information on their own. For example, industry processors share commercial data through companies such as AGRISTATS (Fort Wayne, IN), a shared business database company ... started for the poultry industry in 1985. AGRISTATS has the following mission statement: "IMPROVE THE BOTTOM LINE PROFITABILITY FOR OUR PARTICIPANTS BY PROVIDING ACCURATE AND TIMELY COMPARATIVE DATA WHILE PRESERVING THE CONFIDENTIALITY OF INDIVIDUAL COMPANIES." Note the mission is to share comparative data while protecting individual companies. I can speak personally that I have seen and read these broiler industry reports, and, based on my familiarity with the industry, I can easily connect the information supplied with the individual companies whose confidentiality is supposedly preserved. Therefore, it is my opinion that virtually everyone in the industry can connect the information supplied in AGRISTATS with the individual companies who supplied the data.

**<u>ANSWER:</u>** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1276.   A 2017 Bloomberg News article titled "Is the Chicken Industry Rigged? Inside Agri Stats, the Poultry Business's Secretive Info-Sharing Service," highlighted the role Agri Stats plays in Defendants' efforts to monitor and police their cartel:

> Peter Carstensen, a law professor at the University of Wisconsin and former Justice Department antitrust lawyer who has studied Agri Statswhile researching the modern poultry industry, casts the level of plant-by-plant detail in the company's reports as "unusual." He explains that information-sharing services in other industries tend to deal in averaged-out aggregated data – for example, insurance rates in a given state. Such services run afoul of antitrust law, he says, when they offer projections or provide data so detailed that no competitor would reasonably share it with another. Getting detailed information is a particularly useful form of collusion, Carstensen says, because it allows

540

*co-conspirators to make sure they're all following through on the agreement. "This is one of the ways you do it. You make sure that your co-conspirators have the kind of information that gives them confidence – so they can trust you, that you're not cheating on them," he says. "That is what creates stability for a cartel."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

### AA. <u>Plaintiffs' Claims are Timely</u>

*1277. Plaintiffs had neither actual nor constructive knowledge of the facts constituting its claims for relief. Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until at least 2016 or later. Defendants engaged in a secret conspiracy that did not reveal facts that put Plaintiffs on inquiry notice that there was a conspiracy to engage in anticompetitive conduct or otherwise harm Plaintiffs.*

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson denies any remaining allegations in this Paragraph.

*1278. And it was not until June 2020 with the Department of Justice's Colorado Indictment of executives of Defendants Claxton and Pilgrim's Pride that further evidence of the conspiracy became publicly known. It was not until October 7, 2020 – when the Department of Justice issued its Superseding Indictment of six additional executives of Defendants Tyson, Koch, Pilgrim's Pride, and George's – that additional elements of Defendants' bid-rigging conduct involving broilers were revealed. The Colorado Indictments revealed that Defendants Claxton and Pilgrim's Pride aided the conspiracy by engaging in direct price fixing and specific bid rigging of broilers, which affected purchasers of large volumes of broiler chickens.*

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson

denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith.

*1279.   With respect to the manipulation of the Georgia Dock, a January 18, 2016 Wall Street Journal article regarding Defendants' possible manipulation of the Georgia Dock benchmark price raised the possibility of collusion to artificially raise, fix, or maintain chicken prices using the Georgia Dock. Subsequently, a series of articles in various publications published between November 3 and 17, 2016, detailed for the first time that the USDA had discontinued its reliance on the Georgia Dock benchmark price because its input prices could not be verified.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*1280.   Yet even when faced with these public revelations, Defendants continued to assert the fairness and accuracy of the Georgia Dock benchmark price.*

**ANSWER:** Tyson admits that it believed any representations made regarding the fairness and accuracy of the Georgia Dock reported price throughout the relevant period. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*1281.   For example, in a November 8, 2016, Washington Post article, Defendant Sanderson Farms represented that the Georgia Dock benchmark price was "reliable," to induce purchasers of chickens to believe the benchmark price was not subject to illegal manipulation by the Georgia Dock Defendants.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations.

1282.   Not until November 10, 2016 was it disclosed publicly that the Georgia Dock Defendants had formed a secret Georgia Dock Advisory Committee that facilitated opportunities for executives to meet and also discuss their scheme to fix the Georgia Dock benchmark price.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1283.   The existence of this committee was not known to Plaintiffs, nor would Plaintiffs have been able to learn of how Defendants' executives conducted themselves in their non-public Georgia Dock Advisory Committee meetings.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1284.   Finally, not until November 17, 2016, was it publicly disclosed that the Florida Attorney General's Office was investigating the Georgia Dock benchmark price and its calculation and manipulation by the Georgia Dock Defendants.

**ANSWER:** Tyson denies Plaintiffs' characterization of any investigation by the Florida Attorney General's Office and lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies them.

1285.   Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. For example, the Agri Stats coordination coupled with direct industry communications (at trade shows and via email/calls) denied Plaintiffs the opportunity to know of the conspiracy. Moreover, chickens are not exempt from antitrust regulation, and thus, before these recent events Plaintiffs reasonably considered the U.S. chicken industry to be a competitive industry. Plaintiffs also reasonably believed its contract partners to be dealing with them on fair and honest terms, and that they could justifiably rely on Defendants' representations regarding the Georgia Dock as being truthful. Accordingly, a reasonable person under the circumstances would not have been alerted to begin investigating the legitimacy of Defendants' chicken prices before these recent events.

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson denies any remaining allegations in this Paragraph.

543

1286.   *Plaintiffs exercised reasonable diligence. Plaintiffs could not have discovered Defendants' alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson denies any remaining allegations in this Paragraph.

1287.   *Throughout the relevant period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson denies any remaining allegations in this Paragraph.

1288.   *Throughout the relevant period, Defendants repeatedly misrepresented to Plaintiffs through fraudulent statements and omissions that the inflated prices of the Georgia Dock reflected actual market conditions.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1289.   *The conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including, but not limited to, (1) secret meetings, (2) surreptitious communications between Defendants via the wires (telephones, emails, text messages and other electronic communications) and in-person meetings at trade association meetings (and elsewhere) in order to prevent the existence of written records, (3) limiting any explicit reference to competitor pricing or supply restraint communications in documents, (4) communicating competitively sensitive data to one another through Agri Stats, a "proprietary, privileged, and confidential" system that kept both the content and participants in the system secret, and (5) concealing the existence and nature of their competitor supply restraint and price discussions from non-conspirators (including customers).*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1290.   *Defendants and Co-Conspirators used code words including "discipline" and "capacity discipline" in their public statements to conceal their conspiracy and signal one other, in furtherance of their conspiracy to restrain production while shielding their conspiracy from detection or suspicion.*

███████████████████████████████████████████████ *(2) on a May 3, 2013, earnings call,*
*Pilgrim's President & CEO Bill Lovette stated that "price is going to strengthen as supply*
*continues to be disciplined and constrained" … and "we've done a good job so far of*
*maintaining discipline;" and (3) on a July 2016 earnings call, Mr. Lovette noted that "I think*
*what we've seen with egg sets is absolutely a testament to the discipline of our industry that*
*we've seen the last really two to three years."*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize,

or describe documents or other sources, such sources speak for themselves, and Tyson denies

any characterization or description that is inconsistent therewith. Tyson lacks knowledge or

information sufficient to form a belief as to the truth of any allegations in this Paragraph that

relate to other Defendants and/or third parties, and therefore Tyson denies those allegations

Tyson denies any remaining allegations in this Paragraph.

1291.  *As alleged above, in 2008, after years of boom and bust cycles of production*
*leading to the regular rise and fall of prices, the price of chickens began an unprecedentedly*
*steady increase that continued at least through 2016.*

**ANSWER:** To the extent that this Paragraph incorporates and re-alleges allegations

above, Tyson incorporates and re-alleges any response made to those allegations. As the phrases

"boom and bust cycles" and "unprecedentedly steady" in this Paragraph are imprecise, Tyson is

unable to form a belief as to the truth of the allegations contained in this Paragraph and therefore

deny them. Tyson denies any remaining allegations in this Paragraph.

1292.  *Defendants affirmatively and falsely attributed rising prices to, among other*
*things, increases in the price of inputs. Defendants used these pretexts used to cover up the*
*conspiracy. In fact, the chicken price increases were the result of Defendants' collusive conduct,*
*which was undisclosed at the time.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1293.  *During the relevant period, Defendants affirmatively made numerous misleading*
*public statements falsely portraying the market for chickens as a competitive one.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1294.   For example, Defendants provided testimony at workshops held by the U.S. Department of Justice and USDA suggesting the chicken industry was competitive and not subject to anti-competitive practices and agreements, including testimony at a May 21, 2010 workshop of a National Chicken Council-commissioned study by Dr. Thomas Elam, which stated that "the chicken industry is competitive and thriving," and has "[i]ntense competition" that promotes "product innovation and lower prices for consumers."

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

1295.   Defendants also repeatedly blamed the Renewable Fuels mandate for increased Broiler prices, both through the NCC, other trade groups, and through press releases, speeches, and other public statements by Defendants' employees, rather than disclosing the existence of an agreement to illegally restrain the supply of Broilers. Some instances of these pretextual explanations by Defendants and their agents include:

- On a January 29, 2008, earnings call, Pilgrim's Interim CEO Clint Rivers claimed that "the U.S. government continues its misguided policy of subsidizing ethanolproduction at the expense of affordable food, and a lower corn yield expectation bypro USDA will contribute to decrease corn suppliers next year."

- On June 23, 2008, Wayne Farms President & CEO Elton Maddox said in a statement that "the government's food fuel mandate has created the need for us to rationalize our business."

- On July 7, 2008, O.K. Foods announced production cuts due to "record high prices for corn and soybean meal, which it attributed to the U.S. government's mandated ethanol policies."

- On June 24, 2009, Harrison Poultry President & CEO Mike Welch and Claxton Poultry President Jerry Lane met in Washington D.C. and encouraged elected officials to end the "mistake" of the ethanol subsidy.

- In 2010, Foster Farms delayed an expansion due, allegedly, to corn prices. Ira Brill, Foster Farm's Director of Market Services, blamed the ethanol mandate for the delay, stating that it "places enormous pressure on our input costs, and for that reason we can't go forward with our expansion plans."

- *On March 7, 2011, House of Raeford announced production cuts due to increased prices. It stated that "if Congress will take action to cut unreasonable government support for the ethanol industry, then grain prices should decrease to a more manageable pricing level."*

- *On March 15, 2011, Simmons announced downsizing at a plant due to economics "resulting from high grain prices predominantly caused by corn being used in ethanol." Simmons cited ethanol policies again on June 27, 2011, when it laid off another 223 employees.*

- *In an April 13, 2011, hearing before a congressional subcommittee, Michael Welch (President and CEO of Harrison Poultry) stated that production of broilers was threatened by the diversion of corn to fuel production. Welch claimed that shifting corn back to feed would "allow consumers of poultry products to continue to enjoy an ongoing, adequate supply of animal protein at reasonable prices." Welch repeated similar claims in 2012 as well, citing increased corn costs resulting in "tens of billions of dollars in increased costs for livestock and poultry producers and food manufacturers."*

- *In September 2011, Phillip Green (Vice President of Commodities, Foster Farms) testified on behalf of the American Feed Industry Association at a public hearing and blamed increasing meat costs on the ethanol mandate.*

- *On October 10, 2014, National Chicken Council President Mike Brown wrote an op-ed citing the Renewable Energy Standard as the primary reason for the poultry industry's inability to increase production. Brown cited the Renewable Fuel Standard again in a May 15, 2015 op-ed in the Wall Street Journal.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore denies those allegations. Tyson denies any remaining allegations in this Paragraph.

1296. *To explain the decreasing supply of chickens since 2012, Defendants have provided a variety of pretextual explanations, including: (1) a breeding issue with chickens during 2014, (2) a Russian ban of U.S. chicken imports starting in 2014, and (3) a 2013 shortage in supply due in part due to an avian flu outbreak in Mexico that caused a surge in demand for hens to repopulate chicken farms in Mexico. These explanations were pretextual in that Defendants sought to hide their conspiracy from discovery by blaming chicken price increases,*

547

*or artificially inflated chicken prices, on these factors rather than on Defendants' own collusive conduct (including their unprecedented cuts to breeder flocks).*

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson denies any remaining allegations in this Paragraph.

*1297.   Throughout the relevant period, Defendants repeatedly also cited increasing input costs as a pretext for their collusion to restrain supply and manipulate prices by anticompetitive means.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1298.   For instance, Defendants repeatedly claimed that input cost increases during 2008 justified chicken price increases. However, while corn was $5/bushel in 2005-2006 and increased to $9 by May or June 2008, it quickly fell back to below $5/bushel by fall 2008.*

**ANSWER:** Tyson admits that input cost increases can lead to Broiler price increases. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

*1299.   Higher chicken prices later in the relevant period also were not justified by increased costs of corn, which, after a temporary spike in the summer of 2012, were not increasing at the level that would have warranted higher chicken prices.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1300.   Defendants, through the National Chicken Council, other trade groups, and press releases, speeches, and other public statements by their employees, also repeatedly and publicly blamed the federal government's ethanol mandate for increased chicken prices, asserting that it increased their corn costs.*

**ANSWER:** To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any allegations in this Paragraph that relate to other Defendants and/or third parties, and therefore Tyson denies those allegations. Tyson denies any remaining allegations in this Paragraph.

1301.   *Defendants made all of these pretextual representations so as to conceal their conspiracy and avoid disclosing their agreement to illegally restrain the supply of chickens.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1302.   *By virtue of Defendants and all of their Co-Conspirators actively and intentionally concealing their above-described wrongful conduct, the running of any applicable statute of limitations has been (and continues to be) tolled and suspended with respect to Plaintiff's claims and causes of action resulting from the Defendants' unlawful conspiracy alleged in this Complaint under the fraudulent concealment doctrine and/or doctrine of equitable estoppel.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1303.   *Pursuant 15 U.S.C. § 16(i), the running of any applicable statute of limitations was also tolled when the Department of Justice instituted a criminal antitrust proceeding by convening a grand jury (which appears to have been in January 2019), and for which the DOJ issued a subpoena on April 2019, seeking "[a]ll discovery" in this civil case.*

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith.

1304.   *Plaintiffs were members of the putative direct purchaser class action complaint asserted against Defendants, including, but not limited to Maplevale Farms, Inc. v. Koch Foods, Inc. et al., No. 1:16CV08637 (ECF No. 1) (N.D. Ill. Sept. 2, 2016).*

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1305. *Plaintiffs' claims were tolled under American Pipe & Construction Co. v. Utah, 414 U.S. 538 (1974), and related case law during the pendency of that direct purchaser class action asserted against Defendants, commencing at least as early as September 2, 2016.*[83]

*FN 83: To the extent certain Plaintiffs bring claims as indirect purchasers, they were members of an indirect purchaser class action complaint asserted against Defendants, including but not limited to Fargo Stopping Center, LLC, et al. v. Koch Foods, Inc., et al., No. 16-cv-08851 (N.D. Ill.) and their claims were tolled under American Pipe & Construction Co. v. Utah, 414 U.S. 538 (1974), and related case law during the pendency of that indirect purchaser class action asserted against Defendants, commencing at least as early as September 2, 2016.*

**ANSWER:** This Paragraph and Footnote contain Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and Footnote and therefore denies those allegations.

## X.  ANTITRUST IMPACT

1306. *The statute of limitations relevant to DAPs' claims has also been tolled because it was not until June 2020 with the Department of Justice's Indictment of executives of Defendants Claxton and Pilgrim's Pride that the nature of Defendants' conspiracy to fix prices and rig bids of broilers was revealed.*

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions.

1307. *During the relevant period, Plaintiffs, and, where applicable, their respective assignors, purchased substantial amounts of chicken from one or more Defendants.*

550

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore deny them.

*1308.   As a direct and proximate result of the Defendants' above-described illegal conduct, Plaintiffs, and, where applicable, their respective assignors, were compelled to pay, and did pay, artificially inflated prices for chickens during the relevant period.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1309.   As a direct and proximate consequence of the Defendants' above-described wrongful conduct, Plaintiffs, and, where applicable, their respective assignors, sustained substantial losses and damage to their businesses and property in the form of overcharges for chickens. The full amount and forms and components of such damages will be calculated after discovery and presented upon proof at trial.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

## XI.   CLAIMS FOR RELIEF AND CAUSES OF ACTION

*1310.   The pertinent and relevant factual allegations set forth herein are incorporated into and re-alleged into each of the foregoing counts as appropriate to state a claim.*

**ANSWER:** To the extent this Paragraph incorporates allegations from earlier paragraphs of the Complaint, Tyson also incorporates its answers to those paragraphs as if fully set forth herein in response to this Paragraph.

*1311.   "The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade," and "the policy unequivocally laid down by the Act is competition." Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 4 (1958). "The Sherman Act adopted the term 'restraint of trade' along with its dynamic potential," and it "refers not to a particular list of agreements, but to a particular economic consequence, which may be produced by quite different sorts of agreements in varying times and circumstances." Business Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 731-32 (1988); see also Mandeville Island Farms v. Am. Crystal Sugar Co., 334 U.S. 219, 236 (1948) ("The [Sherman] Act is comprehensive in its terms and coverage, protecting all who are made victim of the forbidden practices by whomever they may be perpetrated.").*

**ANSWER:** This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. To the extent the allegations in this Paragraph

purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith.

*1312. Among the "quite different sorts of agreements in varying times and circumstances" that can violate the Sherman Act are coordination or collusion concerning output, exchanges of information about output and pricing, manipulation of pricing mechanisms or indexes, and rigging of bids. Here, Defendants did all of this—and more. Count 1 alleges a violation of Section 1 of the Sherman Act. That violation was accomplished by various means, illustrated here, each of which unreasonably restrained trade—with the exact means to be established at trial, with the benefit of full discovery.*

**ANSWER:** Tyson denies the conspiracy alleged in the Complaint. This Paragraph contains Plaintiffs' characterizations of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions.

*1313. Count 2-6, also alleging violations of the Section 1 of the Sherman Act, set forth alternatives to Count 1, covering specific subsets of the allegations covered by Count 1.*

**ANSWER:** This Paragraph contains no factual allegations to which a response is required. To the extent this Paragraph incorporates allegations from unspecified Paragraphs of the Complaint, Tyson also incorporates its answers to those Paragraphs.

## COUNT 1
## VIOLATION OF 15 U.S.C. § 1
## (AGAINST ALL DEFENDANTS)

*Brought by Ahold Delhaize USA, Inc.; ALDI, Inc.; Amigos Meat Distributors, LP; Amigos Meat Distributors East LP; Amigos Meat Distributors West, LP; Amigos Meat & Poultry, LLC; Amory Investments LLC; Anaheim Wings, LLC; Aramark Food and Support Services Group, Inc.; Barbecue Integrated, Inc. (d/b/a Smokey Bones, Inc.; BJ's Wholesale Club, Inc.; Bob Evans Farms, Inc.; Bojangles' Restaurants, Inc. and Bojangles Opco, LLC; Bonita Plaza Wings, LLC; Boston Market Corporation; Buffalo Wild Wings, Inc.; Caesars Enterprise Services, LLC; Cajun Operating Company d/b/a Church's Chicken; Campbell Soup Company; Campbell Soup Supply Company, L.L.C.; Captain D's LLC; Carl Buddig & Co.; Checkers Drive-In Restaurants, Inc.; Cheney Bros., Inc.; Chick-fil-A, Inc.; CKE Restaurants Holdings, Inc.; Compass Group USA, Inc.; Conagra Brands, Inc.; Costa Mesa Wings, LLC; Costco Wholesale Corporation; Darden Restaurants, Inc.; Cracker Barrel Old Country Store, Inc. and CBOCS Distribution, Inc.; Domino's Pizza LLC and Domino's Pizza Distribution LLC; Downtown Wings, LLC; EMA Foods Co., LLC; El Pollo Loco, Inc.; Feeser's Inc.; FIC Restaurants, Inc. (d/b/a Friendly's); Focus Brands, LLC; Gaslamp Wings, LLC; Gibson, Greco & Wood, LTD; Golden Corral*

*Corporation; Gordon Food Service, Inc. & Glazier Foods Company; Hamilton Meat, LLC; Harvest Meat Company, Inc.; Hollywood Wings, LLC; Hooters Management Corporation; Hooters of America, LLC; Independent Purchasing Cooperative, Inc.; Jetro Holdings, LLC; John Soules Acquisitions LLC; John Soules Foods, Inc.; Kinexo, Inc.; Kraft Heinz Foods Company; Krispy Krunchy Foods, LLC; L. Hart, Inc.; LTP Management Group, Inc.; Maximum Quality Foods, Inc.; McDonald's Corporation; McLane Company, Inc.; McLane/Eastern, Inc.; McLane Express, Inc.; McLane Foodservice Distribution, Inc.; McLane Foodservice, Inc.; McLane/Mid-Atlantic, Inc.; McLane/Midwest, Inc.; McLane Minnesota, Inc.; McLane New Jersey, Inc.; McLane Ohio, Inc.; McLane/Southern, Inc.; McLane/Suneast, Inc.; McLane/Western, Inc.; Mission Valley Wings, LLC; Nestlé Purina PetCare Company; Nestlé USA, Inc.; Oceanside Wings, LLC; Ontario Wings, LLC; Panda Restaurant Group, Inc.; Pinnacle Foods, Inc.; PJ Food Service, Inc.; Pollo Operations, Inc.; Poultry Products Company, LLC; Poultry Products Company of New England LLC; Poultry Products of Connecticut LLC; Poultry Products of Maine, LLC; Quality Supply Chain Co-op, Inc.; Quirch Foods, LLC, f/k/a Quirch Foods Co.; R & D Marketing, LLC; Rancho Bernardo Wings, LLC; Red Bird Farms Distribution Company; Restaurants of America, Inc.; Restaurant Services, Inc.; Sam's East, Inc.; Sam's West, Inc.; Services Group of America, Inc.; Shamrock Foods Company; Sherwood Food Distributors, L.L.C.; Sodexo, Inc.; Sodexo Operations, LLC; Sonic Industries Services Inc.; South Gate Wings, LLC; Supply Management Services, Inc.; Sysco Corporation; Target Corporation; The Fresh Market, Inc.; The Cheesecake Factory Incorporated; The Johnny Rockets Group, Inc.; Thurston Foods, Inc.; Timber Lake Foods, Inc.; United Supermarkets, LLC; United Food Service, Inc.; US Foods, Inc.; Walmart, Inc.; Wal-Mart Louisiana, LLC; Wal-Mart Stores Arkansas, LLC; Wal-Mart Stores East, LP; Wal-Mart Stores Texas, LLC; Wawa, Inc.; Western Boxed Meat Distributors, Inc.; Whatabrands LLC and Whataburger Restaurants LLC; White Castle Purchasing Co.; Wings Over Long Beach, LLC; Wood-Fruitticher Grocery Company, Inc.; WZ Franchise Corporation; Zaxby's Franchising LLC*

*1314. Defendants entered into and engaged in a combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1315. Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1316. At least as early as January 1, 2008, and continuing until at least as late as 2019, the exact dates being unknown to Plaintiffs, Defendants entered into a continuing agreement, understanding and conspiracy in restraint of trade to fix, raise, stabilize, and maintain Broiler prices, thereby creating anticompetitive effects.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1317.   Defendants' anticompetitive acts involved United States domestic commerce and import commerce, and had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for Broilers throughout the United States.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1318.   The conspiratorial acts and combinations have caused unreasonable restraints in the market for Broilers.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1319.   As a result of Defendants' unlawful conduct, Plaintiffs have been harmed by being forced to pay inflated, supra-competitive prices for Broilers.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1320.   In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1321.   In particular, Defendants engaged in an multi-faceted, overarching conspiracy comprised of numerous inter-related unlawful contracts, combinations, agreements, and other instances of anticompetitive conduct – each independently actionable and pled in the alternative herein – which had the effect of unreasonably restraining trade, artificially inflating and maintaining prices, and reducing competition in the Broiler industry.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1322.   The means and methods of Defendants' conspiracy included, among other conduct:

- Defendants coordinated unprecedented cuts in the supply of broiler chickens, including the purposeful destruction of breeder hens and eggs;

- Defendants collusively and fraudulently manipulated the Georgia Dock price index in order to raise prices to customers;

- Defendants rigged bids submitted to customers through multiple avenues, including the exchange of confidential information regarding the bids they were submitting, or intended to submit, so that supposedly competitive bids were aligned;

- Defendants shared confidential and competitively sensitive information regarding production, capacity, and pricing through direct communications

*andintermediaries such as Agri-Stats, under the cover of M&A activity, and during discussions about sale/purchase transactions with each other;*

- *Defendants utilized so-called strategic alliances and joint ventures, including the Tip Top Alliance and Southern Hens, to further restrict broiler chicken supply and share confidential and competitively sensitive information;*

- *Defendants coordinated direct purchases of broiler chickens from one another and from smaller producers in order to soak up excess supply that could potentially depress market prices, including the adoption of "Buy vs. Grow" strategies;*

- *Defendants exported hatching eggs to Mexico and other foreign countries against their own self-interest with the intent of artificially reducing supply and increasing the price of broiler chicken in the United States;*

- *Defendants coordinated a move away from annual fixed-price contracts for some customers to contracts that allowed Defendants to take advantage of price fluctuations from market indices that could be manipulated; and*

- *Defendants coordinated denial of letters of credit requested by customers.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1323.  Each of these inter-related acts was undertaken by Defendants' in furtherance of the overarching conspiracy and in pursuit of Defendants' common goal of fixing, raising, stabilizing, and maintaining Broiler prices.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1324.  Moreover, while the conspiracy was multi-faceted and was comprised of certain instances of anticompetitive conduct which could stand alone as a separate conspiracy, it nonetheless exhibits all of the hallmark factors of an overarching conspiracy, namely common goals, methods, and actors.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1325.  Common Goals. Defendants' conspiracy and its component parts were all carried out in pursuit of a single, common goal: to fix, raise, stabilize, and maintain Broiler prices throughout the United States. This is further evidenced by the intended and actual effect of the overarching conspiracy and its component parts, all of which resulted in supracompetitive prices for purchasers of Broilers and supracompetitive profits for Defendants.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1326.  Common Methods. The underlying components of the conspiracy are inter-related and advantageous to the overall success of the overarching conspiracy. For one, each aspect of*

555

*the conspiracy inherently reinforced the other because each aspect was implemented in furtherance of the same goal and effect, namely maintaining supracompetitive prices for Broilers and extracting supracompetitive profits from purchasers. Take Defendants' sharing of competitively sensitive information as an example. This aspect of the conspiracy helped to facilitate the supply restriction and bid-rigging conduct, but was, itself, also facilitated by Defendants' participation in the Tip Top Alliance, which provided an additional forum for sharing and receiving such information. Moreover, while the underlying means of each aspect of the conspiracy may not be similar, each still functions as a means to the same end. For instance, Defendants' move away from annual fixed-price contracts for some customers buttressed the Georgia Dock manipulation conduct by allowing Defendants to extract additional supracompetitive profits from those customers. Other aspects of the conspiracy are interdependent because they are complementary to other conduct, such as how the Georgia Dock manipulation complements the bid-rigging conduct by targeting a different and previously unaffected class of purchasers. In the same vein, Defendants were also able to use the inflated Georgia Dock pricing to justify the higher prices Defendants charged to the Bid-Customers.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1327. Common Actors. While Defendants' conspiracy was multi-faceted, there was substantial overlap in the actors who effectuated each facet of the conspiracy. For many aspects of the conspiracy, including the supply restriction, information sharing, and inter-defendant sales aspects, every Defendant is alleged to have participated. For other aspects, a vast majority of Defendants are alleged to have participated, such as the bid-rigging conduct, participation in the Tip Top Alliance or Southern Hens, and the de-anonymization of Agri-Stats reports. Moreover, looking to the individual level, many aspects of the conspiracy have extensive overlap of participation by key individuals. Taking Pilgrim's Pride as an example, former CEO Jayson Penn and EVP Jason McGuire, both of whom have been indicted, are alleged to have been extensively involved in the bid-rigging and Georgia Dock manipulation aspects of the conspiracy, in addition to the supply restriction and information sharing conduct. This is just one of numerous examples of substantial overlap in actors.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1328. Defendants' conspiracy had the following effects, among others:*

- *Price competition in the market for Broilers has been restrained, suppressed, and/or eliminated in the United States;*

- *Prices for Broilers sold by Defendants, their divisions, subsidiaries, and affiliates, and all of their co-conspirators have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and*

- *Plaintiffs, which directly purchased Broilers from Defendants, their divisions, subsidiaries, and affiliates, and all of their co-conspirators, have been deprived of the benefits of free and open competition in the purchase of broilers.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1329.   *Defendants took all of the actions alleged in this Complaint with the knowledge and intended effect that their actions would proximately cause the price of Broilers paid by Plaintiffs to be higher than it would be but for Defendants' conduct.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1330.   *As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs have been injured in their business or property and will continue to be injured in their business and property by paying more for Broilers than they would have paid and will pay in the absence of the conspiracy.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1331.   *Defendants' anticompetitive conduct described in this Complaint constitutes a per se violation of Section of 1 of Sherman Act, 15 U.S.C. § 1.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1332.   *Defendants' conduct is also unlawful under the Rule of Reason standard of antitrust liability because at all relevant times Defendants possessed significant market power in the market for Broilers and their conduct had actual anticompetitive effects with no or insufficient offsetting pro-competitive justifications.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

## COUNT 2
## VIOLATION OF 15 U.S.C. § 1
## (AGAINST ALL DEFENDANTS FOR CONCERTED OUTPUT RESTRICTIONS)

*Brought by Ahold Delhaize USA, Inc.; ALDI, Inc.; Amigos Meat & Poultry, LLC; Amigos Meat Distributors, LP; Amigos Meat Distributors East LP; Amigos Meat Distributors West, LP; Amory Investments LLC; Anaheim Wings, LLC; Aramark Food and Support Services Group, Inc.; Barbeque Integrated, Inc. d/b/a Smokey Bones Bar & Fire Grill; BJ's Wholesale Club, Inc.; Bob Evans Farms, Inc.; Bojangles' Restaurants, Inc.; Bojangles Opco, LLC; Bonita Plaza Wings, LLC; Boston Market Corporation; Buffalo Wild Wings, Inc.; Caesars Enterprise Services, LLC; Cajun Operating Company d/b/a Church's Chicken; Campbell Soup Company; Campbell Soup Supply Company, L.L.C.; Captain D's LLC; Carl Buddig & Co.; CBOCS Distribution, Inc.; Checkers Drive-In Restaurants, Inc.; Cheney Bros., Inc.; Chick-fil-A, Inc.; CKE Restaurants Holdings, Inc.; Compass Group USA, Inc.; Conagra Brands, Inc.; Costa Mesa Wings, LLC; Costco Wholesale Corporation; Cracker Barrel Old Country Store, Inc.; Darden Restaurants, Inc.; Domino's Pizza LLC; Domino's Pizza Distribution LLC; Downtown Wings, LLC; EMA Foods Co., LLC; El Pollo Loco, Inc.; Feeser's Inc.; FIC Restaurants, Inc. d/b/a Friendly's; Focus Brands, LLC; Gaslamp Wings, LLC; Gibson, Greco & Wood, LTD; Golden Corral Corporation; Gordon Food Service, Inc. & Glazier Foods Company; Hamilton Meat, LLC; Harvest Meat Company, Inc.; Hollywood Wings, LLC; Hooters Management Corporation;*

*Hooters of America, LLC; Independent Purchasing Cooperative, Inc.; Jetro Holdings, LLC; John Soules Acquisitions LLC; John Soules Foods, Inc.; Kinexo, Inc.; Kraft Heinz Foods Company; Krispy Krunchy Foods, LLC; L. Hart, Inc.; LTP Management Group, Inc.; Maximum Quality Foods, Inc.; McDonald's Corporation; McLane Company, Inc.; McLane/Eastern, Inc.; McLane Express, Inc.; McLane Foodservice Distribution, Inc.; McLane Foodservice, Inc.; McLane/Mid-Atlantic, Inc.; McLane/Midwest, Inc.; McLane Minnesota, Inc.; McLane New Jersey, Inc.; McLane Ohio, Inc.; McLane/Southern, Inc.; McLane/Suneast, Inc.; McLane/Western, Inc.; Mission Valley Wings, LLC; Nestlé USA, Inc.; Nestlé Purina PetCare Company; Oceanside Wings, LLC; Ontario Wings, LLC; Panda Restaurant Group, Inc.; Pinnacle Foods, Inc.; PJ Food Service, Inc.; Pollo Operations, Inc.; Poultry Products Company, LLC; Poultry Products Company of New England LLC; Poultry Products of Connecticut LLC; Poultry Products of Maine, LLC; Quality Supply Chain Co-op, Inc.; Quirch Foods, LLC f/k/a Quirch Foods Co.; R & D Marketing, LLC; Rancho Bernardo Wings, LLC; Red Bird Farms Distribution Company; Restaurants of America, Inc.; Restaurant Services, Inc.; Sam's East, Inc.; Sam's West, Inc.; Services Group of America, Inc.; Shamrock Foods Company; Sherwood Food Distributors, L.L.C.; Sodexo, Inc.; Sodexo Operations, LLC; Sonic Industries Services Inc.; South Gate Wings, LLC; Supply Management Services, Inc.; Sysco Corporation; Target Corporation; The Cheesecake Factory Incorporated; The Fresh Market, Inc.; The Johnny Rockets Group, Inc.; Thurston Foods, Inc.; Timber Lake Foods, Inc.; United Food Service, Inc.; United Supermarkets, LLC; US Foods, Inc.; Walmart, Inc.; Wal-Mart Louisiana, LLC; Wal-Mart Stores Arkansas, LLC; Wal-Mart Stores East, LP; Wal-Mart Stores Texas, LLC; Wawa, Inc.; Western Boxed Meat Distributors, Inc.; Whatabrands LLC; Whataburger Restaurants LLC; White Castle Purchasing Co.; Wings Over Long Beach, LLC; Wood-Fruitticher Company, Inc.; <u>WZ Franchise Corporation; Zaxby's Franchising LLC</u>*

1333.   *In collusively restricting, limiting, and curtailing the supply of chicken in the United States, Defendants engaged in an unlawful contract, combination, or conspiracy that unreasonably restrained trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1334.   *Defendants' unlawful contract, combination or conspiracy had the following direct, substantial, and reasonably foreseeable effects on commerce in the United States: (1) prices charged to, and paid by, Plaintiffs for chicken were artificially raised, fixed, maintained, or stabilized at supra-competitive levels; (2) Plaintiffs were deprived of the benefits of free, open, and unrestricted competition in the United States chicken market; and (3) competition in establishing the prices paid for chicken in the United States was unlawfully restrained, suppressed, or eliminated.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1335.   *Defendants' above-described anticompetitive activities directly and proximately caused injury to Plaintiffs in the United States.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1336.   As a direct and proximate result of Defendants' above-described unlawful conduct, Plaintiffs paid artificially inflated prices for chicken.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1337.   As a direct and proximate result of Defendants' above-described anticompetitive conduct, Plaintiffs were damaged in their businesses or property by paying prices for chicken that were higher than they would have been but for Defendants' unlawful conduct, which has resulted in an amount of ascertainable damages to be established at trial.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1338.   Defendants' anticompetitive conduct described in this Complaint constitutes a per se violation of Section of 1 of Sherman Act, 15 U.S.C. § 1.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1339.   Defendants' conduct is also unlawful under the Rule of Reason standard of antitrust liability because at all relevant times Defendants possessed significant market power in the market for broilers and their conduct had actual anticompetitive effects with no or insufficient offsetting pro-competitive justifications.

**ANSWER:** Tyson denies the allegations in this Paragraph.

## COUNT 3
## VIOLATION OF 15 U.S.C. § 1
## (AGAINST THE GEORGIA DOCK DEFENDANTS FOR PRICE-FIXING)

*Brought by Ahold Delhaize USA, Inc.; ALDI, Inc.; Amigos Meat Distributors, LP; Amigos Meat Distributors East LP; Amigos Meat Distributors West, LP; Amigos Meat & Poultry, LLC; Amory Investments LLC; Anaheim Wings, LLC; Aramark Food and Support Services Group, Inc.; Barbeque Integrated, Inc. d/b/a Smokey Bones Bar & Fire Grill; BJ's Wholesale Club, Inc.; Bob Evans Farms, Inc.; Bojangles' Restaurants, Inc.; Bojangles Opco, LLC; Bonita Plaza Wings, LLC; Boston Market Corporation; Buffalo Wild Wings, Inc.; Caesars Enterprise Services, LLC; Cajun Operating Company d/b/a Church's Chicken; Campbell Soup Company; Campbell Soup Supply Company, L.L.C.; Captain D's LLC; Carl Buddig & Co.; CBOCS Distribution, Inc.; Checkers Drive-In Restaurants, Inc.; Cheney Bros., Inc.; Chick-fil-A, Inc.; CKE Restaurants Holdings, Inc.; Compass Group USA, Inc.; Conagra Brands, Inc.; Costa Mesa Wings, LLC; Costco Wholesale Corporation; Cracker Barrel Old Country Store, Inc.; Darden Restaurants, Inc.; Domino's Pizza LLC; Domino's Pizza Distribution LLC; Downtown Wings, LLC; El Pollo Loco, Inc.; EMA Foods Co., LLC; Feeser's Inc.; FIC Restaurants, Inc. d/b/a Friendly's; Focus Brands, LLC; Gaslamp Wings, LLC; Gibson, Greco & Wood, LTD; Golden Corral Corporation; Gordon Food Service, Inc. & Glazier Foods Company; Hamilton Meat, LLC; Harvest Meat Company, Inc.; Hollywood Wings, LLC; Hooters Management Corporation; Hooters of America, LLC; Independent Purchasing Cooperative, Inc.; Jetro Holdings, LLC; John Soules Acquisitions LLC; John Soules Foods, Inc.; Kinexo, Inc.; Kraft Heinz Foods Company; Krispy Krunchy Foods, LLC; L. Hart, Inc.; LTP Management Group, Inc.; Maximum Quality Foods,*

*Inc.; McDonald's Corporation; McLane Company, Inc.; McLane/Eastern, Inc.; McLane Express, Inc.; McLane Foodservice Distribution, Inc.; McLane Foodservice, Inc.; McLane/Mid-Atlantic, Inc.; McLane/Midwest, Inc.; McLane Minnesota, Inc.; McLane New Jersey, Inc.; McLane Ohio, Inc.; McLane/Southern, Inc.; McLane/Suneast, Inc.; McLane/Western, Inc.; Mission Valley Wings, LLC; Nestlé USA, Inc.; Nestlé Purina PetCare Company; Oceanside Wings, LLC; Ontario Wings, LLC; Panda Restaurant Group, Inc.; Pinnacle Foods, Inc.; PJ Food Service, Inc.; Pollo Operations, Inc.; Poultry Products Company, LLC; Poultry Products Company of New England LLC; Poultry Products of Connecticut LLC; Poultry Products of Maine, LLC; Quality Supply Chain Co-op, Inc.; Quirch Foods, LLC f/k/a Quirch Foods Co.; R & D Marketing, LLC; Rancho Bernardo Wings, LLC; Red Bird Farms Distribution Company; Restaurants of America, Inc.; Restaurant Services, Inc.; Sam's East, Inc.; Sam's West, Inc; Services Group of America, Inc.; Shamrock Foods Company; Sherwood Food Distributors, L.L.C.; Sodexo, Inc.; Sodexo Operations, LLC; Sonic Industries Services Inc.; South Gate Wings, LLC; Supply Management Services, Inc.; Sysco Corporation; Target Corporation; The Cheesecake Factory Incorporated; The Fresh Market, Inc.; The Johnny Rockets Group, Inc.; Thurston Foods, Inc.; Timber Lake Foods, Inc.; United Food Service, Inc.; United Supermarkets, LLC; US Foods, Inc.; Walmart, Inc.; Wal-Mart Louisiana, LLC; Wal-Mart Stores Arkansas, LLC; Wal-Mart Stores East, LP; Wal-Mart Stores Texas, LLC; Wawa, Inc.; Western Boxed Meat Distributors, Inc.; Whatabrands LLC; Whataburger Restaurants LLC; White Castle Purchasing Co.; Wings Over Long Beach, LLC; Wood-Fruitticher Grocery Company, Inc.; WZ Franchise Corporation; Zaxby's Franchising LLC*

1340.   *In knowingly coordinating, falsifying, and manipulating prices quoted to the GDA for inclusion in the Georgia Dock benchmark price index for the intended unlawful purpose of fixing, maintaining, raising, and stabilizing the price of broilers sold in the United States, the Georgia Dock Defendants engaged in an unlawful contract, combination, or conspiracy that unreasonably restrained trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1341.   *Defendants' unlawful contract, combination or conspiracy had the following direct, substantial, and reasonably foreseeable effects on commerce in the United States: (1) prices charged to, and paid by, Plaintiffs for chicken were artificially raised, fixed, maintained, or stabilized at supra-competitive levels; (2) Plaintiffs were deprived of the benefits of free, open, and unrestricted competition in the United States chicken market; and (3) competition in establishing the prices paid for chicken in the United States was unlawfully restrained, suppressed, or eliminated.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1342.   *The Georgia Dock Defendants' above-described anticompetitive activities directly and proximately caused injury to Plaintiffs in the United States.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1343.   As a direct and proximate result of the Georgia Dock Defendants' above-described unlawful conduct, Plaintiffs paid artificially inflated prices for chicken.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1344.   As a direct and proximate result of the Georgia Dock Defendants' above-described anticompetitive conduct, Plaintiffs were damaged in their businesses or property by paying prices for chicken that were higher than they would have been but for the Georgia Dock Defendants' unlawful conduct, which has resulted in an amount of ascertainable damages to be established at trial.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1345.   The Georgia Dock Defendants' anticompetitive conduct described in this Complaint constitutes a per se violation of Section of 1 of Sherman Act, 15 U.S.C. § 1.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1346.   The Georgia Dock Defendants' conduct is also unlawful under the Rule of Reason standard of antitrust liability because at all relevant times Defendants possessed significant market power in the market for broilers and their conduct had actual anticompetitive effects with no or insufficient offsetting pro-competitive justifications.

**ANSWER:** Tyson denies the allegations in this Paragraph.

### COUNT 4
### VIOLATION OF 15 U.S.C. § 1
### (BY BID-RIGGING VICTIMS AGAINST BID-RIGGING DEFENDANTS
### FOR BID-RIGGING AND PRICE-FIXING)

*Brought by Ahold Delhaize USA, Inc.; ALDI, Inc.; Aramark Food and Support Services Group, Inc.; Barbeque Integrated, Inc. d/b/a Smokey Bones Bar & Fire Grill; BJ's Wholesale Club, Inc.; Bojangles Opco, LLC; Bojangles' Restaurants, Inc.; Boston Market Corporation; Caesars Enterprise Services, LLC; Captain D's LLC; Carl Buddig & Co; CBOCS Distribution, Inc.; Chick-fil-A, Inc.[84]; Compass Group USA, Inc.; Conagra Brands, Inc.; Costco Wholesale Corporation; Cracker Barrel Old Country Store, Inc.; Darden Restaurants, Inc.; Domino's Pizza Distribution LLC; Domino's Pizza LLC; El Pollo Loco, Inc.; Feeser's Inc.; FIC Restaurants, Inc. d/b/a Friendly's; Glazier Foods Company; Golden Corral Corporation; Gordon Food Service, Inc.; Hamilton Meat, LLC; Harvest Meat Company, Inc.; Jetro Holdings, LLC; Kraft Heinz Foods Company; Maximum Quality Foods, Inc.; McDonald's Corporation; Nestlé Purina PetCare Company; Nestlé USA, Inc.; Panda Restaurant Group, Inc.; Pinnacle Foods, Inc.; PJ Food Service, Inc.; Pollo Operations, Inc.; Poultry Products Company, LLC; Poultry Products of Connecticut, LLC; Poultry Products of Maine, LLC; Poultry Products Company of New England LLC; Quality Supply Chain Co-op, Inc.; Shamrock Foods Company; Sam's East, Inc.; Sam's West, Inc.; Services Group of America, Inc.; Sherwood Food Distributors, L.L.C.; Sodexo, Inc.; Sodexo Operations, LLC; Supply Management Services, Inc.; The Johnny Rockets Group, Inc.; Thurston Foods, Inc.; United Food Service, Inc.; Walmart Inc.;*

561

*Wal-Mart Louisiana, LLC; Wal-Mart Stores Arkansas, LLC; Wal-Mart Stores East, LP; Wal-Mart Stores Texas, LLC; Western Boxed Meat Distributors, Inc.; White Castle Purchasing Co.; Wood-Fruitticher Grocery Company, Inc.; WZ Franchise Corporation;*
<u>*Zaxby's Franchising LLC*</u>

*FN 84: Chick-fil-A, Inc. does not assert this Count against Defendant Simmons.*

*1347.   Plaintiffs incorporate and re-allege the allegations contained in paragraphs 30-32; 36-277; 285-289; 290-308; 578-580; 868-873; 874-1109; 1277-1306; 1307-1309 above.*

**ANSWER:** To the extent this Paragraph incorporates allegations from earlier Paragraphs of the Complaint, Tyson also incorporates its answers to those Paragraphs as if fully set forth herein in response to this Paragraph.

*1348.   Each Plaintiff joining this Count (the "Bid-Rigging Victims") negotiated pricing directly with the Bid-Rigging Defendants for the purchase of Broilers and paid increased prices and suffered direct injury as a result of the Bid-Rigging Defendants' bid-rigging and price-fixing conduct.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1349.   The Bid-Rigging Victims are therefore direct victims of the Bid-Rigging Defendants' bid rigging and price-fixing conspiracy.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1350.   As alleged above, Bid-Rigging Defendants' bid-rigging and price-fixing conduct took multiple forms. At its most basic level, Bid-Rigging Defendants established a network to exchange confidential information with each other regarding the bids they were submitting, or intended to submit, to the Bid-Rigging Victims so that supposedly competitive bids were aligned. Bid-Rigging Defendants also used their network to coordinate and exchange confidential information with each other regarding their negotiations with the Bid-Rigging Victims. Bid-Rigging Defendants further used their network to (i) reach agreements and understandings to submit aligned bids and offer aligned pricing to the Bid-Rigging Victims, (ii) participate in conversations and communications with the shared understanding that the purpose of the conversations and communications was to rig bids and to fix, maintain, stabilize, and raise prices and other price-related terms, (iii) monitor bids and prices and price-related terms offered by suppliers, and/or (iv) protect the purpose and effectiveness of the conspiracy.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1351.   Bid-Rigging Defendants and their co-conspirators entered into and engaged in a contract, combination or conspiracy not to compete in the sale of Broilers in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1352.  *The contract, combination or conspiracy among Bid-Rigging Defendants and their co-conspirators consisted of a continuing course, pattern and practice of conduct regarding the pricing, marketing and/or sale of Broilers in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1353.  *The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding or concert of action among Bid-Rigging Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:*

- *To fix, stabilize, maintain and/or raise prices of Broilers sold to Bid-Rigging Victims in the United States.*

- *To allocate customers, the volume of sales, and/or market shares of Broilers sold to Bid-Rigging Victims in the United States; and/or*

- *To earn supracompetitive profits on the price of Broilers sold to Bid-Rigging Victims in the United States that resulted from Bid-Rigging Defendants' anticompetitive conduct alleged in this Count.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1354.  *In order to formulate and effect the foregoing illegal contract, combination or conspiracy, Bid-Rigging Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above):*

- *They agreed to exchange, and did exchange, current and future price information about Broilers sold in the United States, including the bids and prices quoted and charged to Bid-Rigging Victims for the sale of Broilers; They agreed to coordinate, and did coordinate, price levels, price terms, and/or price movements for the sale of Broilers to Bid-Rigging Victims in the United States;*

- *They agreed on prices and/or price levels of Broilers sold to Bid-Rigging Victims in the United States; and/or*

- *They agreed not to compete for certain customers or sales on Broilers.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1355.  *Bid-Rigging Defendants and their co-conspirators entered into and refined their illegal contract, combination or conspiracy through, among things: the overt acts described above, including, without limitation, participating in conversations and/or meetings to discuss the bids and prices of Broilers sold to Bid-Rigging Victims in the United States; participating in*

*conversations and/or meetings to discuss the supply of Broilers sold to Bid-Rigging Victims in the United States; participating on conversations or meetings concerning implementation of and adherence to their conspiracy; issuing bids and price quotes in accordance with the conspiracy; and/or exchanging confidential information on the bidding, pricing and/or sale of Broilers to Bid-Rigging Victims in the United States.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1356.   As a result of Bid-Rigging Defendants' and their co-conspirator's conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1:*

- *Price competition in the sale of Broilers among Bid-Rigging Defendants and their co-conspirators to Bid-Rigging Victims in the United States has been restrained, suppressed and eliminated:*

- *Prices for Broilers sold by Bid-Rigging Defendants and their co-conspirators to Bid-Rigging Victims have been raised, fixed, maintained and/or stabilized at artificially high and supra-competitive levels throughout the United States; and Bid-Rigging Victims as purchasers of Broilers sold by Bid-Rigging Defendants and their co-conspirators have been deprived of the benefit of free and open competition.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1357.   Each Bid-Rigging Victim has been injured in its business or property by reason of Bid-Rigging Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained. Each Bid-Rigging Victim's injury as a direct purchaser of Broilers is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Bid-Rigging Defendants and their co-conspirator's conduct unlawful.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1358.   Bid-Rigging Defendants' and their co-conspirator's anticompetitive conduct described in this Complaint constitutes a per se violation of Section of 1 of Sherman Act, 15 U.S.C. § 1.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1359.   Alternatively, Bid-Rigging Defendants' and their co-conspirator's conduct is also unlawful under the Rule of Reason standard of antitrust liability because at all relevant times Bid-Rigging Defendants possessed significant market power in the market for Broilers and their conduct had actual anticompetitive effects with no or insufficient offsetting pro-competitive justifications.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

**COUNT 5**
**VIOLATION OF 15 U.S.C. § 1**
**(AGAINST BID-RIGGING DEFENDANTS FOR BID-RIGGING)**

*Brought by Ahold Delhaize USA, Inc.; ALDI, Inc.; Amory Investments LLC; Anaheim Wings, LLC d/b/a Hooters of Anaheim; Aramark Food and Support Services Group, Inc.; BJ's Wholesale Club, Inc.; Bob Evans Farms, Inc.; Bonita Plaza Wings, LLC d/b/a Hooters of Plaza Bonita; Buffalo Wild Wings, Inc.; Caesars Enterprise Services, LLC; Cajun Operating Company d/b/a Church's Chicken; Campbell Soup Company; Campbell Soup Supply Company, L.L.C.; Carl Buddig & Co; Checkers Drive-In Restaurants, Inc.; Cheney Bros. Inc.; CKE Restaurants Holdings, Inc.; Compass Group USA, Inc.; Conagra Brands, Inc.; Costa Mesa Wings, LLC d/b/a Hooters of Costa Mesa; Costco Wholesale Corporation; Darden Restaurants, Inc.; Downtown Wings, LLC previously d/b/a Hooters of Downtown LA; EMA Foods Co., LLC; Feeser's Inc.; Focus Brands, LLC; Gaslamp Wings, LLC previously d/b/a Hooters of San Diego; Gibson, Greco & Wood, Ltd.; Glazier Foods Company; Gordon Food Service, Inc.; Hamilton Meat, LLC; Harvest Meat Company, Inc.; Hollywood Wings, LLC d/b/a Hooters of Hollywood; Hooters Management Corporation; Hooters of America, LLC; Independent Purchasing Cooperative, Inc.; Jetro Holdings, LLC; John Soules Acquisitions LLC; John Soules Foods, Inc.; Kinexo, Inc.; Kraft Heinz Foods Company; Krispy Krunchy Foods, LLC; L. Hart, Inc.; LTP Management Group, Inc.; Maximum Quality Foods, Inc.; McDonald's Corporation; McLane Company, Inc.; McLane Express, Inc.; McLane/Eastern, Inc.; McLane Foodservice, Inc.; McLane Foodservice Distribution, Inc.; McLane/Mid-Atlantic, Inc.; McLane/Midwest, Inc.; McLane Minnesota, Inc.; McLane New Jersey, Inc.; McLane Ohio, Inc.; McLane/Southern, Inc.; McLane/Suneast, Inc.; McLane/Western, Inc.; Mission Valley Wings, LLC d/b/a Hooters of Mission Valley; Nestlé Purina PetCare Company; Nestlé USA, Inc.; Oceanside Wings, LLC previously d/b/a Hooters of Oceanside; Ontario Wings, LLC d/b/a Hooters of Ontario; Panda Restaurant Group, Inc.; Pinnacle Foods, Inc.; PJ Food Service, Inc.; Poultry Products Company, LLC; Poultry Products of Connecticut, LLC; Poultry Products of Maine, LLC; Poultry Products Company of New England LLC; Quality Supply Chain Co-op, Inc.; Quirch Foods, LLC, f/k/a Quirch Foods Co.; R & D Marketing, LLC; Rancho Bernardo Wings, LLC d/b/a Hooters of San Marcos; Red Bird Farms Distribution Company; Restaurant Services, Inc.; Restaurants of America, Inc.; Sam's East, Inc.; Sam's West, Inc.; Services Group of America, Inc.; Sherwood Food Distributors, L.L.C.; Sonic Industries Services Inc.; Sodexo, Inc.; Sodexo Operations, LLC; South Gate Wings, LLC d/b/a Hooters of South Gate; Sysco Corp.; Target Corp.; The Cheesecake Factory Incorporated; The Fresh Market, Inc.; Thurston Foods, Inc.; Timber Lake Foods, Inc.; United Supermarkets, LLC; US Foods, Inc.; Wawa, Inc.; Western Boxed Meat Distributors, Inc.; Walmart Inc.; Wal-Mart Louisiana, LLC; Wal-Mart Stores Arkansas LLC;, Wal-Mart Stores East, LP; Wal-Mart Stores Texas, LLC; Whatabrands LLC; Whataburger Restaurants LLC; Wings Over Long Beach, LLC d/b/a Hooters of Long Beach; Wood-Fruitticher Grocery Company, Inc.*

1360.  Plaintiffs incorporate and re-allege the allegations contained in paragraphs 1 through 1359 above.

**ANSWER:** To the extent this Paragraph incorporates allegations from earlier Paragraphs of the Complaint, Tyson also incorporates its answers to those Paragraphs as if fully set forth herein in response to this Paragraph.

1361. *The Bid-Rigging Defendants' bid-rigging conduct was extensive, but concealed. Some of that conduct has been revealed in the first criminal trial currently being prosecuted by the Department of Justice against numerous former employees of several Bid-Rigging Defendants. But there has been no bid-rigging discovery in this case, and the full extent of bid-rigging uncovered by the Department of Justice in its ongoing investigation remains non-public.*

**ANSWER:** Tyson admits that bid-rigging discovery was stayed pursuant to the Court's September 22, 2020 Order (Dkt. 3835), and denies any remaining allegations in this Paragraph.

1362. *Although the precise nature and the extent of damage to each Plaintiff caused by Bid-Rigging Defendants, their co-conspirators, and all participants in the conspiracy's conduct can only be ascertained through and after discovery, each Plaintiff was injured by the bid-rigging conduct—either as a direct target of bid-rigging,[85] or as a result of elevated prices to Plaintiffs and other customers resulting from the Defendants' bid-rigging and other actions undertaken in violation of Section 1 of the Sherman Act.[86]*

*FN 85: The identity of all direct targets of the Bid Rigging Defendants' bid-rigging, as well as all those broiler purchasers who were also impacted, is not currently known, but on information and belief those impacted includes those alleging this Count. As the Department of Justice has made clear in the criminal cases, "[t]o date, the government's investigation has revealed thousands of potential victims who purchased broiler chicken products that were the subject of the conspiracy." The identity of all those impacted by the Bid Rigging Defendants' conduct will be determined once the parties' bid rigging discovery is completed.*

*FN 86: Economic literature recognizes the effects of bid-rigging can be so substantial they elevate pricing not just among the producers engaged in bid-rigging, but also "non-cartel firms" which "set their prices higher than they otherwise would have been able under competitive conditions." El Hadi Caoui, A Study of Umbrella Damages from Bid-Rigging (Feb. 4, 2021); see also Areeda & Hovenkamp, Antitrust Law ¶ 347 (recognizing discrete acts of collusion can "cause[ ] market prices to rise and thereby [ ] injure consumers").*

**ANSWER:** Tyson denies the allegations in this Paragraph and Footnotes.

1363. *As a direct result of the conduct of Bid-Rigging Defendants, their Co-Conspirators, and all participants in the Conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, the exact time period to be determined through the completion of bid rigging discovery, Plaintiffs suffered injury in the form of paying prices higher than what a free market*

566

*price would have been, regardless of whether Plaintiffs were direct targets of the Bid Rigging Defendants because the bid rigging had the following effects on other Broilers customers:*

- *Price competition in the sale of Broilers among all Defendants, including but not limited to Bid-Rigging Defendants and their Bid-Rigging Co-Conspirators, to Plaintiffs and others in the United States was restrained, suppressed or eliminated;*

- *Prices for Broilers sold by Bid-Rigging Defendants and their Bid-Rigging Co-Conspirators to Plaintiffs and others was raised, fixed, maintained and/or stabilized at artificially high and supra-competitive levels throughout the United States, which had an impact on sales of Broilers by Defendants to their Plaintiffs and other customers;[87]*

- *Bid-Rigging Defendants used prices for bid-rigged customers to justify price increases to other purchasers buying Broilers, the dates being unknown to Plaintiffs at this time, but which will be determined as discovery with regard to the Defendants' bid rigging is completed.*

- *Billions of dollars in Broilers purchase transactions from Defendants were tainted by Defendants' coordinated supply reductions, the manipulation of the Georgia Dock, the bid-rigging conduct, and all other actions undertaken in furtherance of the conspiracy. Each of these illegal actions assisted Defendants in implementing, monitoring, and enforcing the overall antitrust conspiracy, and enabled that conspiracy to persist; and*

- *Plaintiffs and other purchasers of Broilers sold by Defendants, including but not limited to the Bid-Rigging Defendants and their Bid-Rigging Co-Conspirators, were deprived of the benefit of free and open competition.*

*FN 87: For example, and without limitation, the Bid Rigging Defendants and their Bid Rigging Co-Conspirators' actions also prevented prices from decreasing as much as they should have in the absence of any bid rigging conduct.*

**ANSWER:** Tyson denies the allegations in this Paragraph and Footnote.

*1364.   Plaintiffs have been injured in their business or property by reason of Bid-Rigging Defendants and their Bid-Rigging Co-Conspirators' antitrust violations in amounts not yet ascertained. Plaintiffs' injury as a direct purchaser of Broilers is an injury of the type the antitrust laws were designed to prevent and flows from Bid-Rigging Defendants and their Co-Conspirators' unlawful conduct. Plaintiffs have been subjected to artificially elevated pricing for broilers above and beyond what would have prevailed in a competitive broiler market.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

## COUNT 6
## VIOLATION OF 15 U.S.C. § 1
## (AGAINST GEORGIA DOCK DEFENDANTS AND
## BID-RIGGING DEFENDANTS FOR PRICE-FIXING)

*Brought by Ahold Delhaize USA, Inc.; ALDI, Inc.; Anaheim Wings, LLC d/b/a Hooters of Anaheim; Aramark Food and Support Services Group, Inc.; Barbeque Integrated, Inc. d/b/a Smokey Bones Bar & Fire Grill; Bob Evans Farms, Inc.; BJ's Wholesale Club, Inc.; Bojangles Opco, LLC; Bojangles' Restaurants, Inc.; Bonita Plaza Wings, LLC d/b/a Hooters of Plaza Bonita; Boston Market Corporation; Buffalo Wild Wings, Inc.; Caesars Enterprise Services, LLC; Cajun Operating Company d/b/a Church's Chicken; Captain D's LLC; Carl Buddig & Co; CBOCS Distribution, Inc.; Checkers Drive-In Restaurants, Inc.; Cheney Bros. Inc.; Chick-fil-A, Inc.[88]; CKE Restaurants Holdings, Inc.; Compass Group USA, Inc.; Conagra Brands, Inc.; Costa Mesa Wings, LLC d/b/a Hooters of Costa Mesa; Costco Wholesale Corporation; Cracker Barrel Old Country Store, Inc.; Darden Restaurants, Inc.; Domino's Pizza Distribution LLC; Domino's Pizza LLC; Downtown Wings, LLC previously d/b/a Hooters of Downtown LA; El Pollo Loco, Inc.; EMA Foods Co., LLC; Feeser's Inc.; FIC Restaurants, Inc. d/b/a Friendly's; Focus Brands, LLC; Gaslamp Wings, LLC previously d/b/a Hooters of San Diego; Gibson, Greco & Wood, Ltd.; Glazier Foods Company; Golden Corral Corporation; Gordon Food Service, Inc.; Hamilton Meat, LLC; Harvest Meat Company, Inc.; Hollywood Wings, LLC d/b/a Hooters of Hollywood; Hooters Management Corporation; Hooters of America, LLC; Independent Purchasing Cooperative, Inc.; Jetro Holdings, LLC; Kraft Heinz Foods Company; Krispy Krunchy Foods, LLC; L. Hart, Inc.; LTP Management Group, Inc.; Maximum Quality Foods, Inc.; McDonald's Corporation; Mission Valley Wings, LLC d/b/a Hooters of Mission Valley; Nestlé Purina PetCare Company; Nestlé USA, Inc.; Oceanside Wings, LLC previously d/b/a Hooters of Oceanside; Ontario Wings, LLC d/b/a Hooters of Ontario; Panda Restaurant Group, Inc.; Pinnacle Foods, Inc.; PJ Food Service, Inc.; Poultry Products Company, LLC; Poultry Products of Connecticut, LLC; Poultry Products of Maine, LLC; Poultry Products Company of New England LLC; Quality Supply Chain Co-op, Inc.; Quirch Foods, LLC, f/k/a Quirch Foods Co.; R & D Marketing, LLC; Rancho Bernardo Wings, LLC d/b/a Hooters of San Marcos; Red Bird Farms Distribution Company; Restaurant Services, Inc.; Restaurants of America, Inc.; Services Group of America, Inc.; Shamrock Foods Company; Sherwood Food Distributors, L.L.C.; Sonic Industries Services Inc.; Sodexo, Inc.; Sodexo Operations, LLC; South Gate Wings, LLC d/b/a Hooters of South Gate; Supply Management Services, Inc.; The Cheesecake Factory Incorporated; The Fresh Market, Inc.; The Johnny Rockets Group, Inc.; Thurston Foods, Inc.; Timber Lake Foods, Inc.; United Food Service, Inc.; United Supermarkets, LLC; Wawa, Inc.; Western Boxed Meat Distributors, Inc.; Whatabrands LLC; Whataburger Restaurants LLC; White Castle Purchasing Co.; Wings Over Long Beach, LLC d/b/a Hooters of Long Beach; Wood-Fruitticher Grocery Company, Inc.; WZ Franchise Corporation; Zaxby's Franchising LLC*

*FN 88: Chick-fil-A, Inc. does not assert this Count against Defendant Simmons.*

1365.  Defendants entered into and engaged in a combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1366. Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1367. At least as early as 2011, and continuing until at least as late as 2019, the exact dates being unknown to Plaintiffs, Defendants entered into a continuing agreement, understanding and conspiracy in restraint of trade to fix, raise, stabilize, and maintain Broiler prices, thereby creating anticompetitive effects.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1368. Defendants' anticompetitive acts involved United States domestic commerce and import commerce, and had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for Broilers throughout the United States.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1369. The conspiratorial acts and combinations have caused unreasonable restraints in the market for Broilers.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1370. As a result of Defendants' unlawful conduct, Plaintiffs have been harmed by being forced to pay inflated, supra-competitive prices for Broilers.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1371. In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1372. In particular, Defendants engaged in an multi-faceted, overarching conspiracy comprised of numerous inter-related unlawful contracts, combinations, agreements, and other instances of anticompetitive conduct – each independently actionable and pled in the alternative herein – which had the effect of unreasonably restraining trade, artificially inflating and maintaining prices, and reducing competition in the Broiler industry.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1373. The means and methods of Defendants' conspiracy included, among other conduct:*

- *Defendants collusively and fraudulently manipulated the Georgia Dock price index in order to raise prices to customers;*

- *Defendants rigged bids submitted to customers through multiple avenues, including the exchange of confidential information regarding the bids they were submitting, or intended to submit, so that supposedly competitive bids were aligned;*

- *Defendants shared confidential and competitively sensitive information regarding pricing and other material terms through direct communications and intermediaries such as Agri-Stats, under the cover of M&A activity, and during discussions about sale/purchase transactions with each other; and*

- *Defendants coordinated a move away from annual fixed-price contracts for some customers to contracts that allowed Defendants to take advantage of price fluctuations from market indices that could be manipulated.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1374. Each of these inter-related acts was undertaken by Defendants' in furtherance of the overarching conspiracy and in pursuit of Defendants' common goal of fixing, raising, stabilizing, and maintaining Broiler prices.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1375. Moreover, while the conspiracy was multi-faceted and was comprised of certain instances of anticompetitive conduct which could stand alone as a separate conspiracy, it nonetheless exhibits all of the hallmark factors of an overarching conspiracy, namely common goals, methods, and actors.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1376. **Common Goals.** Defendants' conspiracy and its component parts were all carried out in pursuit of a single, common goal: to fix, raise, stabilize, and maintain Broiler prices throughout the United States. This is further evidenced by the intended and actual effect of the overarching conspiracy and its component parts, all of which resulted in supracompetitive prices for purchasers of Broilers and supracompetitive profits for Defendants.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1377. **Common Methods.** The underlying components of the conspiracy are inter-related and advantageous to the overall success of the overarching conspiracy. For one, each aspect of the conspiracy inherently reinforced the other because each aspect was implemented in furtherance of the same goal and effect, namely maintaining supracompetitive prices for Broilers and extracting supracompetitive profits from purchasers. Moreover, while the underlying means of each aspect of the conspiracy may not be similar, each still functions as a means to the same end. For instance, Defendants' move away from annual fixed-price contracts for some customers*

*buttressed the Georgia Dock manipulation conduct by allowing Defendants to extract additional supracompetitive profits from those customers. Other aspects of the conspiracy were interdependent because they were complementary to other conduct, such as how the Georgia Dock manipulation complemented the bid-rigging conduct by targeting a different and previously unaffected class of purchasers. In the same vein, Defendants were also able to use the inflated Georgia Dock pricing to justify the higher prices Defendants charged to the Bid-Customers.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1378. **Common Actors.** While Defendants' conspiracy was multi-faceted, there was substantial overlap in the actors who effectuated each facet of the conspiracy. For instance, a vast majority of Defendants are alleged to have participated in the bid-rigging conduct, Georgia Dock manipulation conduct, information sharing conduct, and the de-anonymization of Agri-Stats reports. Moreover, looking to the individual level, many aspects of the conspiracy have extensive overlap of participation by key individuals. Taking Pilgrim's Pride as an example, former CEO Jayson Penn and EVP Jason McGuire, both of whom have been indicted, are alleged to have been extensively involved in the bid-rigging and Georgia Dock manipulation aspects of the conspiracy, in addition to the information sharing conduct. This is just one of numerous examples of substantial overlap in actors.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1379. Defendants' conspiracy had the following effects, among others:*

- *Price competition in the market for Broilers has been restrained, suppressed, and/or eliminated in the United States;*

- *Prices for Broilers sold by Defendants, their divisions, subsidiaries, and affiliates, and all of their co-conspirators have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and*

- *Plaintiffs, which directly purchased Broilers from Defendants, their divisions, subsidiaries, and affiliates, and all of their co-conspirators, have been deprived of the benefits of free and open competition in the purchase of broilers.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1380. Defendants took all of the actions alleged in this Complaint with the knowledge and intended effect that their actions would proximately cause the price of Broilers paid by Plaintiffs to be higher than it would be but for Defendants' conduct.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1381. As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs have been injured in their business or property and will continue to be injured in their*

*business and property by paying more for Broilers than they would have paid and will pay in the absence of the conspiracy.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1382. Defendants' anticompetitive conduct described in this Complaint constitutes a per se violation of Section of 1 of Sherman Act, 15 U.S.C. § 1.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1383. Defendants' conduct is also unlawful under the Rule of Reason standard of antitrust liability because at all relevant times Defendants possessed significant market power in the market for Broilers and their conduct had actual anticompetitive effects with no or insufficient offsetting pro-competitive justifications.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

**COUNT 7**
**VIOLATION OF GA. CODE ANN. §§ 16-14-4(a) AND 16-14-6 (GEORGIA RICO) (AGAINST THE GEORGIA DOCK DEFENDANTS FOR ACQUIRING MONEY THROUGH RACKETEERING ACTIVITY)**

*Brought by Ahold Delhaize USA, Inc.; ALDI, Inc.*

*1384. The Georgia Dock Defendants violated the Georgia RICO statute, Ga. Code Ann. § 16-14-4(a), which makes it unlawful for any person to acquire any interest in personal property, including money, as a result of a pattern of racketeering activity.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1385. The application of Georgia RICO is proper because Georgia was the locus for the fraud. The Georgia Dock was compiled and published from the PMN's location in Georgia. Each of the Georgia Dock Defendants had plants in Georgia. The Georgia Dock Defendants knew that their price quotes each week to the PMN were sent into the State of Georgia. The Georgia Dock Defendants' material omissions pertained to their conduct and activities in Georgia.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1386. Each of the Georgia Dock Defendants engaged in racketeering activity as defined by Georgia law. In particular, and as explained below, each of Georgia Dock Defendants engaged in conduct that falls within the scope of three predicate acts: (1) Ga. Code Ann. § 16-14-3(5)(C) (federal wire fraud), (2) Ga. Code Ann. § 16-14-3(5)(A)(xxii) (false statements to government agency), and (3) Ga. Code Ann. § 16-14-3(5)(A)(xii) (theft by deception).*

**ANSWER:** Tyson denies the allegations in this Paragraph.

572

*1387.   Each of the Georgia Dock Defendants committed at least two incidents of such racketeering activity that had the same or similar intents, results, accomplices, victims, or methods of commission or otherwise were interrelated by distinguishing characteristics and were not isolated incidents. In particular, the Georgia Dock Defendants participated in the scheme described in this Complaint to inflate the Georgia Dock price index and thereby defraud people who purchased chicken based on that price index, including the Plaintiffs.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1388.   The Georgia Dock Defendants' racketeering activity falls into two categories of conduct: fraudulent submissions and fraudulent omissions.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1389.   **Fraudulent Submissions.** The Georgia Dock Defendants fraudulently submitted false and inflated price quotes to the Poultry Market News each week from at least 2011 to the end of 2016. As explained in detail in this Complaint, the Georgia Dock Defendants falsely reported on a weekly basis prices that did not take into account their actual or converted quoted prices for sales of 2.5 to 3 pound whole birds. When the Georgia Dock Defendants made their false submissions, they knew their submissions were false or acted with reckless disregard for their falsity. These false submissions were reasonably calculated to deceive Plaintiffs to the Georgia Dock Defendants' gain, because as poultry market participants, the Georgia Dock Defendants had actual knowledge of how the Georgia Dock index was used, specifically in tray pack and retail contracts where prices were often tied to the Georgia Dock.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1390.   **Fraudulent Omissions.** The Georgia Dock Defendants also fraudulently failed to disclose information to the Plaintiffs to whom they sell poultry. The facts that the Georgia Dock Defendants failed to disclose to the Plaintiffs were basic to their transactions with Plaintiffs. For example, the Georgia Dock Defendants failed to disclose to Plaintiffs during contract and sales negotiations the fact that they were manipulating and submitting inaccurate and inflated prices to the Georgia Dock. The Georgia Dock Defendants each had actual knowledge of the falsity of their Georgia Dock price or acted with reckless disregard for their falsity, because they knew the quotes lacked integrity and were higher than the actual prices they could have charged absent the Georgia Dock manipulation. The Georgia Dock Defendants' fraudulent omissions were intended to induce, and did induce, a false belief and action to the advantage of the Georgia Dock Defendants and the disadvantage of the Plaintiffs. Each Georgia Dock Defendant owed a duty to disclose the foregoing to the Plaintiffs to whom they sold poultry, given their superior knowledge and the secretive aspect of the manipulation. Defendants' duty to speak arose from this special relationship and from representations individually made to and/or through the Georgia Dock that it was a reliable indicator of price. The Georgia Dock Defendants benefited from Plaintiffs' trust in the Georgia Dock price index as an impartial, government-issued index. Plaintiffs could not have discovered the truth through reasonable inquiry and/or were prevented from making such an inquiry given the secret nature of the manipulation.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1391.   The Georgia Dock Defendants' conduct falls within the scope of Ga. Code Ann. § 16-14-3(5)(C) (federal wire fraud). The fraudulent submissions and omissions discussed above were part of the Georgia Dock Defendants' scheme to defraud their customers, including the Plaintiffs. The Georgia Dock Defendants intended to defraud those customers, who were the targets of the scheme to rig the index. Each of the Georgia Dock Defendants used multiple interstate wires in furtherance of the fraudulent scheme. The interstate wires included (i) Defendants' false submissions to the Poultry Market News and (ii) Defendants' communications with customers to whom they sold chicken based on the Georgia Dock price index and in which they failed to disclose information basic to their transactions to induce a false belief to their benefit.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1392.   The Georgia Dock Defendants' conduct also falls within the scope of Ga. Code Ann. § 16-14-3(5)(A)(xxii) (false statements to government agency). The fraudulent submissions discussed above were made to the Poultry Market News, a division of the Georgia Department of Agriculture, on a matter within the scope of the GDA's jurisdiction. The Georgia Dock Defendants knew that the information contained in their submissions to the PMN was false.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1393.   The Georgia Dock Defendants' conduct also falls within the scope of Ga. Code Ann. § 16-14-3(5)(A)(xii) (theft by deception). With respect to the fraudulent omissions discussed above, the Georgia Dock Defendants intentionally created and/or confirmed their counterparty Plaintiffs' impressions regarding the reliability of the Georgia Dock price index that were false and which the Georgia Dock Defendants knew to be false. In addition, the Georgia Dock Defendants intentionally failed to correct their counterparty Plaintiffs' false impressions regarding the reliability of the Georgia Dock price index, when they had previously created and/or confirmed those false impressions. Finally, the Georgia Dock Defendants obtained additional property by means of this deceitful means or artful practice with the intention of depriving their counterparty Plaintiffs of that property – specifically, the Georgia Dock Defendants were able to charge their counterparty Plaintiffs higher prices than they otherwise would have charged and therefore made more money from their counterparty Plaintiffs as a result of this conduct.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1394.   As a result of the pattern of racketeering activity as described in this Complaint, each of the Georgia Dock Defendants acquired money that they otherwise would not have received from the sale of poultry that was tied to the Georgia Dock price index.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1395.   The Georgia Dock Defendants' fraudulent submissions and omissions were intended to induce the reliance of the Plaintiffs. Specifically, the Georgia Dock Defendants made these fraudulent statements and omissions with the intent and understanding that that their false statements would be used to calculate the Georgia Dock benchmark price index upon which

*poultry purchasers like Plaintiffs relied when purchasing poultry. The Georgia Dock Defendants therefore acted for the intended, unlawful purpose of inducing Plaintiffs to enter into contracts at inflated prices in reliance on Defendants' material misrepresentations and omissions.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1396.   Plaintiffs purchased chicken based on the Georgia Dock price index. In so doing, the Plaintiffs reasonably relied on the fact that the Georgia Dock Defendants were not making false and inflated price submissions to the Poultry Market News to inflate the Georgia Dock price. Had Plaintiffs known that the Georgia Dock was not a legitimate price index and that the Defendants were manipulating it, Plaintiffs would not have agreed to prices tied to such a benchmark. Plaintiffs reasonably relied on these misrepresentations because the Georgia Dock benchmark price index was held out as a legitimate index and was an industry norm.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1397.   The Plaintiffs were injured as a result of the Georgia Dock Defendants' fraudulent submissions and omissions. In particular, the Plaintiffs paid higher prices for chicken than they would have paid if the Georgia Dock Defendants had not rigged the index and failed to disclose the basic information discussed above.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1398.   As a direct and proximate result of the Georgia Dock Defendants' above-described fraudulent submissions and omissions, Plaintiffs were damaged in their business by paying higher prices for chicken. The ascertainable damages will be established at trial. These damages were the foreseeable and direct result of the false submissions and omissions.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

**COUNT 8**
**VIOLATION OF GA. CODE ANN. §§ 16-14-4(b) AND 16-14-6 (GEORGIA RICO)**
**(AGAINST THE GEORGIA DOCK DEFENDANTS FOR CONDUCTING**
**ENTERPRISE THROUGH RACKETEERING ACTIVITY)**

*Brought by Ahold Delhaize USA, Inc.; ALDI, Inc.*

*1399.   The Georgia Dock Defendants violated the Georgia RICO statute, Ga. Code Ann. § 16-14-4(b), which makes it unlawful for any person associated with an enterprise to participate in the enterprise through a pattern of racketeering activity.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1400.   The application of Georgia RICO is proper because Georgia was the locus for the fraud. The Georgia Dock was compiled and published from the PMN's location in Georgia. Each of the Georgia Dock Defendants had plants in Georgia. The Georgia Dock Defendants knew that their price quotes each week to the PMN were sent into the State of Georgia. The*

*Georgia Dock Defendants' material omissions pertained to their conduct and activities in Georgia.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1401.   *The Georgia Dock Defendants were associated with an enterprise. The enterprise was the group of Georgia Dock Defendants associated in fact through their price submissions to the PMN, their role on the PMN Advisory Committee, their involvement with the Georgia Poultry Federation, and their use of the Georgia Dock price index in selling poultry.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1402.   *The enterprise was a continuing unit that associated together and acted with a common purpose: specifically, to sustain the existence of the Poultry Market News and the Georgia Dock price index and to artificially inflate the Georgia Dock price index through fraudulent acts and omissions for the benefit of the enterprise and the individual Defendants.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1403.   *There were relationships among the associates in the enterprise. Representatives from the Georgia Dock Defendants interacted with each other frequently at industry conferences and trade shows, as discussed throughout this Complaint. All but one Georgia Dock Defendant participated on the PMN Advisory Committee, which acted to preserve and enhance the PMN and Georgia Dock price index as discussed above. All of the Georgia Dock Defendants were members of the Georgia Poultry Federation, the largest lobbying group in Georgia for the poultry producers. Representatives from the Georgia Dock Defendants interacted often with leaders of the Georgia Poultry Federation, such as Abit Massey and Mike Giles, who helped to preserve and enhance the power of the PMN Advisory Committee and the Georgia Dock, as discussed in this Complaint.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1404.   *The enterprise had longevity that was sufficient to permit the associates to pursue its purpose. There was continuity among the representatives of the Defendants which served on the Advisory Committee, interacted with representatives of the Georgia Poultry Federation, and submitted price quotes to the PMN. That continuity allowed the Georgia Dock Defendants to create and execute their scheme to fraudulently manipulate the Georgia Dock price index and conceal its critical flaws from customers, as described in this Complaint. The scheme by Defendants to submit false and inflated prices to the PMN lasted more than three years.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1405.   *The Georgia Dock Defendants participated in the enterprise through a pattern of racketeering activity as defined by Georgia law. In particular, and as explained below, each of Georgia Dock Defendants engaged in conduct that falls within the scope of three predicate acts: Ga. Code Ann. § 16-14-3(5)(C) (federal wire fraud), Ga. Code Ann. § 16-14-3(5)(A)(xxii) (false statements to government agency), and Ga. Code Ann. § 16-14-3(5)(A)(xii) (theft by deception).*

576

**ANSWER:** Tyson denies the allegations in this Paragraph.

1406.   Each of the Georgia Dock Defendants committed at least two incidents of such racketeering activity that had the same or similar intents, results, accomplices, victims, or methods of commission or otherwise were interrelated by distinguishing characteristics and were not isolated incidents. In particular, the Georgia Dock Defendants participated in the scheme described in this Complaint to inflate the Georgia Dock price index and thereby defraud people who purchased chicken based on that price index, including Plaintiffs.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1407.   The Georgia Dock Defendants' racketeering activity falls into two categories of conduct: fraudulent submissions and fraudulent omissions.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1408.   **Fraudulent Submissions.** The Georgia Dock Defendants fraudulently submitted false and inflated price quotes to the Poultry Market News each week from at least 2011 to the end of 2016. As explained in detail in this Complaint, the Georgia Dock Defendants falsely reported on a weekly basis prices that did not take into account their actual or converted quoted prices for sales of 2.5 to 3 pound whole birds. When the Georgia Dock Defendants made their false submissions, they knew their submissions were false or acted with reckless disregard for their falsity. These false submissions were reasonably calculated to deceive Plaintiffs to the Georgia Dock Defendants' gain, because as poultry market participants, the Georgia Dock Defendants had actual knowledge of how the Georgia Dock index was used, specifically in tray pack and retail contracts where prices were often tied to the Georgia Dock.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1409.   **Fraudulent Omissions.** The Georgia Dock Defendants also fraudulently failed to disclose information to Plaintiffs to whom they sell poultry. The facts that the Georgia Dock Defendants failed to disclose to Plaintiffs were basic to their transactions with Plaintiffs. For example, the Georgia Dock Defendants failed to disclose to Plaintiffs during contract and sales negotiations the fact that they were manipulating and submitting inaccurate and inflated prices to the Georgia Dock. The Georgia Dock Defendants each had actual knowledge of the falsity of their Georgia Dock price or acted with reckless disregard for their falsity, because they knew the quotes lacked integrity and were higher than the actual prices they could have charged absent the Georgia Dock manipulation. The Georgia Dock Defendants' fraudulent omissions were intended to induce, and did induce, a false belief and action to the advantage of the Georgia Dock Defendants and the disadvantage of Plaintiffs. Each Georgia Dock Defendant owed a duty to disclose the foregoing to Plaintiffs to whom they sold poultry, given their superior knowledge and the secretive aspect of the manipulation. Defendants' duty to speak arose from this special relationship and from representations individually made to and/or through the Georgia Dock that it was a reliable indicator of price. The Georgia Dock Defendants benefited from Plaintiffs' trust in the Georgia Dock price index as an impartial, government-issued index. Plaintiffs could not have discovered the truth through reasonable inquiry and/or were prevented from making such an inquiry given the secret nature of the manipulation.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1410.   The Georgia Dock Defendants' conduct falls within the scope of Ga. Code Ann. § 16-14-3(5)(C) (federal wire fraud). The fraudulent submissions and omissions discussed above were part of the Georgia Dock Defendants' scheme to defraud their customers, including Plaintiffs. The Georgia Dock Defendants intended to defraud those customers, who were the targets of the scheme to rig the index. Each of the Georgia Dock Defendants used multiple interstate wires in furtherance of the fraudulent scheme. The interstate wires included (i) Defendants' false submissions to the Poultry Market News, and (ii) Defendants' communications with customers to whom they sold chicken based on the Georgia Dock price index and in which they failed to disclose information basic to their transactions to induce a false belief to their benefit.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1411.   The Georgia Dock Defendants' conduct also falls within the scope of Ga. Code Ann. § 16-14-3(5)(A)(xxii) (false statements to government agency). The fraudulent submissions discussed above were made to the Poultry Market News, a division of the Georgia Department of Agriculture, on a matter within the scope of the GDA's jurisdiction. The Georgia Dock Defendants knew that the information contained in their submissions to the PMN was false.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1412.   The Georgia Dock Defendants' conduct also falls within the scope of Ga. Code Ann. § 16-14-3(5)(A)(xii) (theft by deception). With respect to the fraudulent omissions discussed above, the Georgia Dock Defendants intentionally created and/or confirmed their counterparty Plaintiffs' impressions regarding the reliability of the Georgia Dock price index that were false and which the Georgia Dock Defendants knew to be false. In addition, the Georgia Dock Defendants intentionally failed to correct their counterparty Plaintiffs' false impressions regarding the reliability of the Georgia Dock price index, when they had previously created and/or confirmed those false impressions. Finally, the Georgia Dock Defendants obtained additional property by means of this deceitful means or artful practice with the intention of depriving their counterparty Plaintiffs of that property – specifically, the Georgia Dock Defendants were able to charge their counterparty Plaintiffs higher prices than they otherwise would have charged and therefore made more money from their counterparty Plaintiffs as a result of this conduct.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1413.   The Georgia Dock Defendants acted in concert with each other with respect to their fraudulent acts and omissions. Defendants' fraudulent submissions were committed for the benefit of the enterprise. The Georgia Dock Defendants were economically interdependent with respect to their fraudulent submissions and omissions; all of the Georgia Dock Defendants benefited from an inflated Georgia Dock price index through false submissions yet none could manipulate the price index alone. The Georgia Dock Defendants sustained that inflated price index for years by hiding significant, non-public information from buyers.

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1414. The Georgia Dock Defendants' fraudulent submissions and omissions were intended to induce the reliance of Plaintiffs. Specifically, the Georgia Dock Defendants made these fraudulent statements and omissions with the intent and understanding that that their false statements would be used to calculate the Georgia Dock benchmark price index upon which poultry purchasers like Plaintiffs relied when purchasing poultry. The Georgia Dock Defendants therefore acted for the intended, unlawful purpose of inducing Plaintiffs to enter into contracts at inflated prices in reliance on Defendants' material misrepresentations and omissions.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1415. Plaintiffs purchased chicken based on the Georgia Dock price index. In so doing, Plaintiffs reasonably relied on the fact that the Georgia Dock Defendants were not making false and inflated price submissions to the Poultry Market News to inflate the Georgia Dock price. Had Plaintiffs known that the Georgia Dock was not a legitimate price index and that the Defendants were manipulating it, Plaintiffs would not have agreed to prices tied to such a benchmark. Plaintiffs reasonably relied on these misrepresentations because the Georgia Dock benchmark price index was held out as a legitimate index and was an industry norm.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1416. Plaintiffs were injured as a result of the Georgia Dock Defendants' fraudulent submissions and omissions. In particular, Plaintiffs paid higher prices for chicken than they would have paid if the Georgia Dock Defendants had not rigged the index and failed to disclose the basic information discussed above.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1417. As a direct and proximate result of the Georgia Dock Defendants' above-described fraudulent submissions and omissions, Plaintiffs were damaged in their businesses by paying higher prices for chicken. The ascertainable damages will be established at trial. These damages were the foreseeable and direct result of the false submissions and omissions.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

## COUNT 9
## VIOLATION OF 18 U.S.C. §§ 1962(c) AND 1964(c) (FEDERAL RICO)
## (AGAINST THE GEORGIA DOCK DEFENDANTS)

### *Brought by Ahold Delhaize USA, Inc.; ALDI, Inc.*

*1418. The Georgia Dock Defendants violated the Federal RICO statute, 18 U.S.C. § 1962(c), which makes it unlawful for any person associated with an enterprise to conduct or participate in the conduct of an enterprise through a pattern of racketeering activity.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1419.   The Georgia Dock Defendants were associated with an enterprise. The enterprise was the group of Georgia Dock Defendants associated in fact through their price submissions to the PMN, their role on the PMN Advisory Committee, their involvement with the Georgia Poultry Federation, and their use of the Georgia Dock price index in selling poultry.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1420.   The enterprise was a continuing unit that associated together and acted with a common purpose: specifically, to sustain the existence of the Poultry Market News and the Georgia Dock price index and to artificially inflate the Georgia Dock price index through fraudulent acts and omissions for the benefit of the enterprise and the individual Defendants.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1421.   There were relationships among the associates in the enterprise. Representatives from the Georgia Dock Defendants interacted with each other frequently at industry conferences and trade shows, as discussed throughout this Complaint. All but one Georgia Dock Defendant participated on the PMN Advisory Committee, which acted to preserve and enhance the PMN and Georgia Dock price index as discussed above. All of the Georgia Dock Defendants were members of the Georgia Poultry Federation, the largest lobbying group in Georgia for the poultry producers. Representatives from the Georgia Dock Defendants interacted often with leaders of the Georgia Poultry Federation, such as Abit Massey and Mike Giles, who helped to preserve and enhance the power of the PMN Advisory Committee and the Georgia Dock, as discussed in this Complaint.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1422.   The enterprise had longevity that was sufficient to permit the associates to pursue its purpose. There was continuity among the representatives of the Defendants which served on the Advisory Committee, interacted with representatives of the Georgia Poultry Federation, and submitted price quotes to the PMN. That continuity allowed the Georgia Dock Defendants to create and execute their scheme to fraudulently manipulate the Georgia Dock price index and conceal its critical flaws from customers, as described in this Complaint. The scheme by Defendants to submit false and inflated prices to the PMN lasted more than three years.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1423.   The Georgia Dock Defendants conducted and participated in the conduct of the enterprise through a pattern of racketeering activity as defined by federal law. In particular, and as explained below, each of Georgia Dock Defendants conducted and participated in the conduct of the enterprise through conduct that falls within the scope of 18 U.S.C. § 1343 (federal wire fraud) (incorporated through 18 U.S.C. § 1961).*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1424.   The Georgia Dock Defendants' racketeering activity falls into two categories of conduct: fraudulent submissions and fraudulent omissions.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1425.   *Fraudulent submissions. The Georgia Dock Defendants fraudulently submitted false and inflated price quotes to the Poultry Market News each week from at least 2011 to the end of 2016. As explained in detail in this Complaint, the Georgia Dock Defendants falsely reported on a weekly basis prices that did not take into account their actual or converted quoted prices for sales of 2.5 to 3 pound whole birds. When the Georgia Dock Defendants made their false submissions, they knew their submissions were false or acted with reckless disregard for their falsity. These false submissions were reasonably calculated to deceive Plaintiffs to the Georgia Dock Defendants' gain, because as poultry market participants, the Georgia Dock Defendants had actual knowledge of how the Georgia Dock index was used, specifically in tray pack and retail contracts where prices were often tied to the Georgia Dock.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1426.   *Fraudulent omissions. The Georgia Dock Defendants also fraudulently failed to disclose information to Plaintiffs to whom they sell poultry. The facts that the Georgia Dock Defendants failed to disclose to Plaintiffs were basic to their transactions with Plaintiffs. For example, the Georgia Dock Defendants failed to disclose to Plaintiffs during contract and sales negotiations the fact that they were manipulating and submitting inaccurate and inflated prices to the Georgia Dock. The Georgia Dock Defendants each had actual knowledge of the falsity of their Georgia Dock price or acted with reckless disregard for their falsity, because they knew the quotes lacked integrity and were higher than the actual prices they could have charged absent the Georgia Dock manipulation. The Georgia Dock Defendants' fraudulent omissions were intended to induce, and did induce, a false belief and action to the advantage of the Georgia Dock Defendants and the disadvantage of Plaintiffs. Each Georgia Dock Defendant owed a duty to disclose the foregoing to Plaintiffs to whom they sold poultry, given their superior knowledge and the secretive aspect of the manipulation. Defendants' duty to speak arose from this special relationship and from representations individually made to and/or through the Georgia Dock that it was a reliable indicator of price. The Georgia Dock Defendants benefited from Plaintiff's trust in the Georgia Dock price index as an impartial, government-issued index. Plaintiffs could not have discovered the truth through reasonable inquiry and/or were prevented from making such an inquiry given the secret nature of the manipulation.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1427.   *The Georgia Dock Defendants' conduct falls within the scope of 18 U.S.C. § 1343 (federal wire fraud) (incorporated through 18 U.S.C. § 1961). The fraudulent submissions and omissions discussed above were part of the Georgia Dock Defendants' scheme to defraud their customers, including Plaintiffs. The Georgia Dock Defendants intended to defraud those customers, who were the targets of the scheme to rig the index. Each of the Georgia Dock Defendants used multiple interstate wires in furtherance of the fraudulent scheme. The interstate wires included: (i) Defendants' false submissions to the Poultry Market News, and (ii) Defendants' communications with customers to whom they sold chicken based on the Georgia Dock price index and in which they failed to disclose information basic to their transactions to induce a false belief to their benefit.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1428.   The Georgia Dock Defendants acted in concert with each other with respect to their fraudulent acts and omissions. Defendants' fraudulent submissions were committed for the benefit of the enterprise. The Georgia Dock Defendants were economically interdependent with respect to their fraudulent submissions and omissions; all of the Georgia Dock Defendants benefited from an inflated Georgia Dock price index through false submissions yet could not manipulate the price index alone. The Georgia Dock Defendants also sustained that inflated price index for years by hiding significant, non-public information from buyers.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1429.   The Georgia Dock Defendants' fraudulent submissions and omissions were intended to induce the reliance of Plaintiffs. Specifically, the Georgia Dock Defendants made these fraudulent statements and omissions with the intent and understanding that that their false statements would be used to calculate the Georgia Dock benchmark price index upon which poultry purchasers like Plaintiffs relied when purchasing poultry. The Georgia Dock Defendants therefore acted for the intended, unlawful purpose of inducing Plaintiffs to enter into contracts at inflated prices in reliance on Defendants' material misrepresentations and omissions.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1430.   Plaintiffs purchased chicken based on the Georgia Dock price index. In so doing, Plaintiffs reasonably relied on the fact that the Georgia Dock Defendants were not making false and inflated price submissions to the Poultry Market News to inflate the Georgia Dock price. Had Plaintiffs known that the Georgia Dock was not a legitimate price index and that the Defendants were manipulating it, Plaintiffs would not have agreed to prices tied to such a benchmark. Plaintiffs reasonably relied on these misrepresentations because the Georgia Dock benchmark price index was held out as a legitimate index and was an industry norm.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1431.   Plaintiffs were injured as a result of the Georgia Dock Defendants' fraudulent submissions and omissions. In particular, Plaintiffs paid higher prices for chicken than they would have paid if the Georgia Dock Defendants had not rigged the index and failed to disclose the basic information discussed above.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1432.   As a direct and proximate result of the Georgia Dock Defendants' above-described fraudulent submissions and omissions, Plaintiffs were damaged in its businesses by paying higher prices for chicken. The ascertainable damages will be established at trial. These damages were the foreseeable and direct result of the false submissions and omissions.

**ANSWER:** Tyson denies the allegations in this Paragraph.

## COUNT 10
## VIOLATION OF FLORIDA DECEPTIVE AND
## UNFAIR TRADE PRACTICES ACT, FLA. STAT. § 501.201(2), ET SEQ.
## (AGAINST ALL DEFENDANTS)

*Brought by Caesars Enterprise Services, LLC; Checkers Drive-In Restaurants, Inc.;*
*Hooters Management Corporation; LTP Management Group, Inc.*

*1433. The Florida Deceptive & Unfair Trade Practices Act, Florida Stat. §§ 501.201, et seq. (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade. Florida Stat. § 501.204(1).*

**ANSWER:** This Paragraph contains legal conclusions to which no response is required.

To the extent a response is required, Tyson refers to the cited statute and denies any

characterization inconsistent therewith. Tyson denies any remaining allegations in this

Paragraph.

*1434. The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Florida Stat. § 501.202(2).*

**ANSWER:** This Paragraph contains legal conclusions to which no response is required.

To the extent a response is required, Tyson refers to the cited statute and denies any

characterization inconsistent therewith. Tyson denies any remaining allegations in this

Paragraph.

*1435. Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this Complaint. Fla. Stat. § 501.211(a) ("...anyone aggrieved by a violation of this [statute] may bring an action...").*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1436. Plaintiffs purchased broilers within the State of Florida during the relevant period.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in this Paragraph and therefore denies those allegations.

1437.   But for Defendants' conduct set forth herein, the price per pound of broilers would have been lower, in an amount to be determined at trial.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1438.   Defendants entered into a contract, combination or conspiracy between two or more persons in restraint of trade or commerce in the broilers market, a substantial part of which occurred within Florida.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1439.   Defendants established, maintained or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the market for broilers, for the purpose of excluding competition or controlling, fixing or maintaining prices in Florida at a level higher than the competitive market level, beginning at least as early as 2008 and continuing through the date of this filing.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1440.   Accordingly, Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1441.   Defendants' unlawful conduct substantially affected Florida's trade and commerce.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1442.   As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs have been injured in their business or property by virtue of overcharges for broilers and are threatened with further injury.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1443.   By reason of the foregoing, Plaintiffs are entitled to seek all forms of relief, including injunctive relief pursuant to Florida Stat. §501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to Florida Stat. § 501.211.

**ANSWER:** Tyson denies the allegations in this Paragraph.

**COUNT 11**
**VIOLATION OF ARIZONA'S UNIFORM STATE ANTITRUST ACT,**
**ARIZ. REV. STAT. § 44-1401, ET SEQ.**
**(AGAINST ALL DEFENDANTS)**

*Brought by Caesars Enterprise Services, LLC; Restaurants of America, Inc.*

584

1444.   By reason of the conduct alleged herein, Defendants have violated Arizona Rev. Stat. § 44-1401, et seq.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1445.   Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the broilers market, a substantial portion of which occurred within Arizona.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1446.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the relevant markets, a substantial portion of which occurred within Arizona, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the broiler market.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1447.   Defendants' violations of Arizona law were flagrant.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1448.   Defendants' unlawful conduct substantially affected Arizona's trade and commerce.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1449.   As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs have been injured in their business or property and are threatened with further injury.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1450.   By reason of the foregoing, Plaintiffs are entitled to seek all forms of relief available under Arizona Revised Statute § 44-1401, et seq.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1451.   Pursuant to Arizona Revised Statute § 44-1415, with the filing of this Complaint, a copy is being served upon the Attorney General of Arizona.

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

### COUNT 12
### VIOLATION OF ILLINOIS ANTITRUST ACT, 740 Ill. COMP. STAT. ANN. 10/1
### (AGAINST ALL DEFENDANTS)

*Brought by Caesars Enterprise Services, LLC; Carl Buddig & Co.;*
<u>*Hooters Management Corporation*</u>

1452.   *The Illinois Antitrust Act, 740 ILCS 10/1, et seq., aims "to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are secured through monopolistic or oligarchic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade ...." 740 ILCS 10/2.*

**<u>ANSWER:</u>** This Paragraph contains legal conclusions to which no response is required. To the extent a response is required, Tyson refers to the cited statute and denies any characterization inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

1453.   *Plaintiffs purchased broilers within the State of Illinois during the relevant period. But for Defendants' conduct set forth herein, the price per pound of broilers would have been lower, in an amount to be determined at trial.*

**<u>ANSWER:</u>** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1454.   *Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this Complaint. 740 ILCS 10/7(2).*

**<u>ANSWER:</u>** Tyson denies the allegations in this Paragraph.

1455.   *Defendants made contracts or engaged in a combination or conspiracy with each other, though they would have been competitors but for their prior agreement, for the purpose of fixing, controlling or maintaining prices for broilers sold, and/or for allocating customers or markets for broilers within intrastate commerce in Illinois.*

**<u>ANSWER:</u>** Tyson denies the allegations in this Paragraph.

1456.   *Defendants further unreasonably restrained trade or commerce and established, maintained or attempted to acquire monopoly power over the market for broilers in Illinois for the purpose of excluding competition, in violation of 740 ILCS 10/1, et seq.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1457. Defendants' conduct was willful.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1458. Plaintiffs were injured with respect to purchases of broilers in Illinois and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees and costs.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

### COUNT 13
### VIOLATION OF THE MINNESOTA ANTITRUST LAW,
### MINN. STAT. §325D.49, ET SEQ.
### (AGAINST ALL DEFENDANTS)

*Brought by Caesars Enterprise Services, LLC; Restaurants of America, Inc.*

*1459. The Minnesota Antitrust Law of 1971 aims to prohibit any contract, combination or conspiracy when any part thereof was created, formed, or entered into in Minnesota; any contract, combination or conspiracy, wherever created, formed or entered into; any establishment, maintenance or use of monopoly power; and any attempt to establish, maintain or use monopoly power, whenever any of these affect Minnesota trade or commerce.*

**ANSWER:** This Paragraph contains legal conclusions to which no response is required. To the extent a response is required, Tyson refers to the cited statute and denies any characterization inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

*1460. Plaintiffs purchased broilers within the State of Minnesota during the relevant period. But for Defendants' conduct set forth herein the price per pound of broilers would have been lower, in an amount to be determined at trial.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

587

1461.   Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Minn. Stat. § 325D.56.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1462.   Defendants contracted, combined or conspired in unreasonable restraint of trade or commerce in the market for broilers within the intrastate commerce of and outside of Minnesota; established, maintained, used or attempted to establish, maintain or use monopoly power over the trade of commerce in the market for broilers within the intrastate commerce of and outside of Minnesota; and fixed prices and allocated markets for broilers within the intrastate commerce of and outside of Minnesota, in violation of Minn. Stat. § 325D.49, et seq.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1463.   Plaintiffs were injured with respect to purchases of broilers in Minnesota and is entitled to all forms of relief, including actual damages, treble damages, costs and disbursements, reasonable attorneys' fees, and injunctive relief necessary to prevent and restrain violations hereof.

**ANSWER:** Tyson denies the allegations in this Paragraph.

## COUNT 14
## VIOLATION OF SECTION 340 OF THE NEW YORK GENERAL BUSINESS LAW
## (AGAINST ALL DEFENDANTS)

*Brought by Caesars Enterprise Services, LLC; Hooters Management Corporation*

1464.   Article 22 of the New York General Business Law generally prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in New York. N.Y. Gen. Bus. Law. § 340(1).

**ANSWER:** This Paragraph contains legal conclusions to which no response is required. To the extent a response is required, Tyson refers to the cited statute and denies any characterization inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

1465.   Plaintiffs purchased broilers within New York State during the relevant period. But for Defendants' conduct set forth herein, the price per pound of broilers would have been lower, in an amount to be determined at trial.

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson

denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1466.   *Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.Y. Gen. Bus. Law. § 340(6).*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1467.   *Defendants established or maintained a monopoly within the intrastate commerce of New York for the trade or commerce of broilers and restrained competition in the free exercise of the conduct of the business of broilers within the intrastate commerce of New York, in violation of N.Y. Gen. Bus. Law § 340, et seq.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1468.   *Plaintiffs were injured with respect to purchases of broilers in New York and is entitled to all forms of relief, including actual damages, treble damages, costs not exceeding $10,000 and reasonable attorneys' fees.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1469.   *Pursuant to N.Y. Gen. Bus. Law Section 340(5), with the filing of this Complaint, a copy is being served upon the Attorney General of New York.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

**COUNT 15**
**VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILL. COMP. STAT. ANN. 505/10a, ET SEQ. (AGAINST ALL DEFENDANTS)**

*Brought by Caesars Enterprise Services, LLC; Carl Buddig & Co.;*
*Hooters Management Corporation*

1470.   *By reason of the conduct alleged herein, Defendants have violated 740 Ill. Comp. Stat. Ann. 10/3(1), et seq.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1471.   *Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the broilers market, a substantial part of which occurred within Illinois.*

589

**ANSWER:** Tyson denies the allegations in this Paragraph.

1472.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the relevant markets, a substantial part of which occurred in Illinois, for the purpose of excluding competition or controlling, fixing, or maintained prices in the broiler market.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1473.   Defendants conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Illinois.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1474.   Defendants conduct misled consumers, withheld material facts, and resulted in material misrepresentations to Plaintiffs.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1475.   Defendants' unlawful conduct substantially affected Illinois trade and commerce.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1476.   As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs have been injured in their business or property and is threatened with further injury. Plaintiffs' claim falls within the scope of the Illinois statute.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1477.   By reason of the foregoing, Plaintiffs are entitled to seek all forms of relief, including actual damages or any other relief the Court deems proper under 815 Ill. Comp. Stat. Ann. 505/10a, et seq.

**ANSWER:** Tyson denies the allegations in this Paragraph.

## COUNT 16
## VIOLATION OF CALIFORNIA'S CARTWRIGHT ACT,
## CAL. BUS & PROF. CODE §16700, ET SEQ.
## (AGAINST ALL DEFENDANTS)

*Brought by Anaheim Wings, LLC; Bonita Plaza Wings, LLC; Caesars Enterprise Services, LLC; Costa Mesa Wings, LLC; Downtown Wings, LLC; Gaslamp Wings, LLC; Hollywood Wings, LLC; Mission Valley Wings, LLC; Oceanside Wings, LLC; Ontario Wings, LLC; Rancho Bernardo Wings, LLC; South Gate Wings, LLC; Wings Over Long Beach, LLC*

1478.   The California Business & Professions Code generally governs conduct of corporate entities. The Cartwright Act, Cal. Bus. & Prof. Code §§ 16700-16770, governs antitrust violations in California.

590

**ANSWER:** This Paragraph contains legal conclusions to which no response is required. To the extent a response is required, Tyson refers to the cited statute and denies any characterization inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

*1479. California policy is that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace. Cal. Bus. & Prof. Code § 301.*

**ANSWER:** This Paragraph contains legal conclusions to which no response is required. To the extent a response is required, Tyson refers to the cited statute and denies any characterization inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

*1480. Under the Cartwright Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Cal. Bus. & Prof. Code § 16750(a).*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1481. A trust in California is any combination intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of merchandise, or preventing competition in the market for a commodity. Cal. Bus. & Prof. Code § 16720. Every trust is unlawful except as provided by the Code. Id. § 16726.*

**ANSWER:** This Paragraph contains legal conclusions to which no response is required. To the extent a response is required, Tyson refers to the cited statute and denies any characterization inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

*1482. Plaintiffs purchased broilers within the State of California during the relevant period. But for Defendants' conduct set forth herein, the price per pound of broilers would have been lower, in an amount to be determined at trial.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson

denies such characterizations and/or conclusions. Tyson lacks knowledge or information

sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and

therefore denies those allegations.

1483.   *Defendants enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of Cal. Bus. & Prof. Code § 16700, et seq.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1484.   *Plaintiffs were injured in their business or property, with respect to purchases of broilers in California and are entitled to all forms of relief, including recovery of treble damages, interest, and injunctive relief, plus reasonable attorneys' fees and costs.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

<u>**COUNT 17**</u>
<u>**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW,**</u>
<u>**CAL. BUS & PROF. CODE § 17200, ET SEQ.**</u>
<u>**(AGAINST ALL DEFENDANTS)**</u>

*Brought by Anaheim Wings, LLC; Bonita Plaza Wings, LLC; Caesars Enterprise Services, LLC; Costa Mesa Wings, LLC; Downtown Wings, LLC; Gaslamp Wings, LLC; Hollywood Wings, LLC; Mission Valley Wings, LLC; Oceanside Wings, LLC; Ontario Wings, LLC;* <u>*Rancho Bernardo Wings, LLC; South Gate Wings, LLC; Wings Over Long Beach, LLC*</u>

1485.   *The violations of federal antitrust law set forth above also constitute violations of section 17200, et seq. of the California Business and Professions Code.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1486.   *Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the UCL by engaging in the acts and practices specified above.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1487.   *This claim is instituted pursuant to sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated the UCL.*

**ANSWER:** Tyson admits that Plaintiffs purport to plead this claim pursuant to sections

17203 and 17204 of the California Business and Professions code but denies that Plaintiffs are

entitled to restitution thereunder or otherwise. Tyson denies any remaining allegations in this

Paragraph.

1488.   *The Defendants' conduct as alleged herein violated the UCL. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the UCL, including, but not limited to, the violations of section 16720, et seq., of the California Business and Professions Code, set forth above.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1489.   *Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of section 16720, et seq., of California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1490.   *Plaintiffs are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1491.   *The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1492.   *The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs to pay supra-competitive and artificially-inflated prices for broilers sold in the State of California. Plaintiffs suffered injury in fact and lost money or property as a result of such unfair competition.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1493.   *As alleged in this Complaint, Defendants and their Co-Conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to California Business and Professions Code sections 17203 and 17204.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

## COUNT 18
## UNJUST ENRICHMENT
## (AGAINST ALL DEFENDANTS)

*Brought by Anaheim Wings, LLC; Bonita Plaza Wings, LLC; Costa Mesa Wings, LLC; Downtown Wings, LLC; Gaslamp Wings, LLC; Hollywood Wings, LLC; Hooters Management Corporation; LTP Management Group, Inc.; Mission Valley Wings, LLC; Oceanside Wings, LLC; Ontario Wings, LLC; Rancho Bernardo Wings, LLC; Restaurants of America, Inc.; South Gate Wings, LLC; Wings Over Long Beach, LLC*

1494.   *As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched by the receipt of unlawfully inflated prices and unlawful profits of broilers.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1495.   *Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred on them by overpayments by Plaintiffs in Arizona, California, Florida, Illinois, Minnesota, and New Mexico.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

## COUNT 19
## COMMON LAW FRAUD
## (AGAINST THE GEORGIA DOCK DEFENDANTS)

*Brought by Ahold Delhaize USA, Inc.*

1496.   *Each of the Georgia Dock Defendants knowingly made false statements and/or material omissions concerning material facts, as explained below.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1497.   ***Fraudulent Submissions.*** *The Georgia Dock Defendants knowingly submitted false and inflated price quotes to the Poultry Market News each week from at least 2011 to the end of 2016 (the exact dates being unknown to Plaintiffs). As explained in detail in this Complaint, the Georgia Dock Defendants falsely reported on a weekly basis prices that did not take into account their actual or converted quoted prices for sales of 2.5 to 3 pound whole birds. When Defendants made their false submissions, they knew their submissions were false or acted with reckless disregard for their falsity. These false submissions were also reasonably calculated to deceive Plaintiffs to the Georgia Dock Defendants' gain, because as poultry market participants, the Georgia Dock Defendants had actual knowledge of the common uses of the Georgia Dock quotes, specifically their use in tray pack and retail contracts and other sales where prices were often tied to the Georgia Dock.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

594

1498.   The Georgia Dock Defendants are jointly and severally liable to Plaintiffs for the damages Plaintiffs incurred because of purchases it made based on Georgia Dock pricing during the relevant period, whether or not such a purchase was made from one of the Georgia Dock Defendants or another chicken supplier.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1499.   **Fraudulent Misrepresentations.** The Georgia Dock Defendants also made material, fraudulent affirmative misrepresentations to their customers, including Plaintiffs, regarding the nature of and methodology for calculating the Georgia Dock. These misrepresentations were intended to induce, and did induce, the reliance of Plaintiffs on the inflated Georgia Dock prices. These misrepresentations were also reasonably calculated to deceive Plaintiffs to the Georgia Dock Defendants' gain, because as poultry market participants, the Georgia Dock Defendants had actual knowledge of the common uses of the Georgia Dock quotes, specifically their use in tray pack and retail contracts and other sales where prices were often tied to the Georgia Dock.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1500.   **Fraudulent Omissions.** In addition, all of the Georgia Dock Defendants fraudulently failed to disclose information to the Plaintiffs to whom they sold broilers or broiler products. The facts that they failed to disclose to Plaintiffs were basic to their transactions with Plaintiffs. For example, they failed to disclose to Plaintiffs during contract and sales negotiations the fact that they were manipulating and submitting inaccurate and inflated prices to the Georgia Dock, a fact that was basic to their transactions with Plaintiffs. The Georgia Dock Defendants each had actual knowledge of the falsity of their Georgia Dock price quotes from no later than early 2011 through the end of 2016 or had reckless disregard for their falsity, because the Georgia Dock Defendants each knew that the quotes lacked integrity and were higher than the actual prices they could have charged absent Georgia Dock manipulation. The Georgia Dock Defendants' fraudulent omissions were intended to induce, and did induce, a false belief and action to the advantage of the Georgia Dock Defendants and the disadvantage of Plaintiffs.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1501.   Each Georgia Dock Defendant owed a duty to disclose the foregoing to the Plaintiffs to whom they sold broilers or broiler products, given their superior knowledge and the secretive aspect of the manipulation. Defendants' duty to speak arose from this special relationship and from representations individually made to and/or through the Georgia Dock that it was a reliable indicator of price. The Georgia Dock Defendants benefited from Plaintiffs' trust in the Georgia Dock price index as an impartial, government-issued index. Defendants used this to their advantage by pushing Plaintiffs either to incorporate the Georgia Dock into its pricing and contracts, or to justify a change to its non-Georgia-Dock-based pricing by using the Georgia Dock as a point of reference.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1502.   By failing to disclose the unreliability of the Georgia Dock, the Georgia Dock Defendants concealed a material fact, intending to induce a false belief. Plaintiffs could not have discovered the truth through reasonable inquiry and/or was prevented from making such an inquiry given the secret nature of the manipulation.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1503.   The Georgia Dock Defendants' fraudulent submissions, fraudulent misrepresentations, and fraudulent omissions were intended to induce the reliance of Plaintiffs. Specifically, the Georgia Dock Defendants made these false statements and omissions with the intent and understanding that that their false statements would be used to calculate the Georgia Dock price index upon which poultry purchasers like Plaintiffs relied when purchasing broilers and broiler products. The Georgia Dock Defendants therefore acted for the intended, unlawful purpose of inducing Plaintiffs to enter into contracts at inflated prices in reliance on Defendants' misrepresentations and omissions of material fact.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1504.   Plaintiffs purchased chicken based on the Georgia Dock price index, and/or raised its non-Georgia Dock-based pricing by using the Georgia Dock as a point of reference, and in so doing reasonably relied on the fact that the Georgia Dock Defendants were not making false and inflated price submissions to the Poultry Market News to inflate the Georgia Dock price. Had Plaintiffs known that the Georgia Dock was not a legitimate price index and that the Defendants were manipulating it, Plaintiffs would not have agreed to prices tied to such a benchmark. Plaintiffs reasonably relied on these misrepresentations because the Georgia Dock price index was held out as a legitimate index of poultry producers' actual offering prices and was an industry norm.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1505.   Plaintiffs justifiably relied on the inflated Georgia Dock price index and was injured as a result of the Georgia Dock Defendants' fraudulent acts and omissions pertaining to the Georgia Dock price index. Plaintiffs paid higher prices than it would have had the Georgia Dock Defendants submitted accurate price quotes and not caused an artificially inflated Georgia Dock price index.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1506.   As a direct and proximate result of the Georgia Dock Defendants' above-described fraudulent acts and omissions, Plaintiffs' business was damaged by paying higher prices for chicken. The ascertainable damages will be established at trial. These damages were the foreseeable and direct result of the false submissions and omissions.

**ANSWER:** Tyson denies the allegations in this Paragraph.

**COUNT 20**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**(AGAINST ALL GEORGIA DOCK DEFENDANTS)**

*Brought by Ahold Delhaize USA, Inc.*

*1507.   Throughout the relevant period, Plaintiffs contracted to purchase chicken from Defendants at prices based, in whole or in part, on the Georgia Dock. Each of Plaintiffs' contracts with the Georgia Dock Defendants had an implied covenant that the parties would act in good faith and deal fairly with each other. Neither party was to do anything that would have the effect of destroying or injuring the right of the other party to receive the benefits of the contract.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1508.   Plaintiffs acted in good faith, dealt fairly with Defendants, and performed all of its obligations under these contracts. All conditions required for the Georgia Dock Defendants' performance of those contracts were satisfied.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1509.   The Georgia Dock Defendants unfairly interfered with Plaintiff's right to receive the benefits of the contracts by secretly manipulating the Georgia Dock to inflate prices, as alleged above in the foregoing paragraphs.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1510.   By intentionally and falsely inflating their price submissions that were used by the GDA to calculate the Georgia Dock, and by failing to inform Plaintiffs that they were doing so and that they controlled both the manner in which the Georgia Dock was calculated and the prices that were used to calculate it, the Georgia Dock Defendants breached their implied duty*

*of good faith and fair dealing and prevented Plaintiffs from receiving the full benefit of their contractual agreements. Specifically, their inflation of the Georgia Dock price index resulted in Plaintiffs paying more for broiler chicken than they would have had the Georgia Dock Defendants based their GDA submissions on their actual offering prices.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1511. Plaintiffs were directly and proximately harmed by Defendants' actions since Plaintiffs were impoverished by paying more for chicken than Plaintiffs would have absent Defendants' manipulation, and absent the Defendants' breach of the implied covenant of good faith and fair dealing. Defendants were enriched with increased payment for their chicken.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

**COUNT 21**
**NEGLIGENT MISREPRESENTATION**
**(AGAINST THE GEORGIA DOCK DEFENDANTS)**

*Brought by Ahold Delhaize USA, Inc.*

*1512. Each of the Georgia Dock Defendants negligently made false statements and/or material omissions concerning material facts, as explained below.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1513.* ***False Submissions.*** *The Georgia Dock Defendants submitted false and inflated price quotes to the Poultry Market News each week from no later than early 2011 through the end of 2016, as explained in detail in this Complaint. When Defendants made their false submissions, they did not exercise reasonable care or competence in determining whether their submissions were true or false and/or obtaining or communicating the information. Each Georgia Dock Defendant knew and/or had reason to know that Plaintiffs were among the class of businesses that would likely receive and rely on the representations made regarding the Georgia Dock. The Georgia Dock Defendants supplied the inaccurate and inflated price quotes in order to guide Plaintiffs' transactions.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1514. The Georgia Dock Defendants had a special relationship with Plaintiffs; they intended for and knew Plaintiffs relied on the representations in entering contracts or other financial transactions tied to the Georgia Dock, or when factoring the Georgia Dock into their decisions to increase non-Georgia Dock-based prices. They had superior knowledge about the components of and methodology for calculating the Georgia Dock, and their manipulation thereof was conducted in secret and concealed until the end of 2016. The Georgia Dock Defendants owed Plaintiffs a duty to communicate accurate information because of this special relationship. Plaintiffs justifiably relied on the information and suffered loss as a result. It was foreseeable that Plaintiffs would be harmed by the false submissions.*

598

**ANSWER:** Tyson denies the allegations in this Paragraph.

1515. **Negligent Omissions.** *In addition, all of the Georgia Dock Defendants negligently failed to disclose information to Plaintiffs. The price manipulation and other facts that they failed to disclose to Plaintiffs were basic to their transactions with Plaintiffs. The Georgia Dock Defendants had direct dealings with and entered into contracts with Plaintiffs. The relationships imposed a duty on the Counterparty Georgia Dock Defendants to make accurate and good-faith representations to Plaintiffs since the Defendants had superior and exclusive knowledge of the integrity of the Georgia Dock price index. There was a special duty because the Georgia Dock Defendants controlled the Georgia Dock price index by reporting what should have been accurate price quotes but what were, in reality, fake prices.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1516. *The Defendants failed to disclose to Plaintiffs additional facts that would make their representations regarding the Georgia Dock price index not materially misleading. Each Georgia Dock Defendant failed to disclose that it and other poultry producers were manipulating the Georgia Dock to their benefit and that the Georgia Dock did not accurately reflect actual prices absent manipulation. Each Georgia Dock Defendant used the inflated Georgia Dock to their advantage by making material misrepresentations and omissions knowing that they were false and/or with reckless disregard for their truth.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1517. *By failing to disclose the foregoing information, the Georgia Dock Defendants did not exercise reasonable care or competence in determining whether such information should be shared with Plaintiffs. They knew Plaintiffs would look to the Georgia Dock for guidance in contract formation and as a base for other transactions. Plaintiffs were foreseeable victims.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1518. *Plaintiffs reasonably relied on and were injured as a result of the Georgia Dock Defendants' negligent acts and omissions. Plaintiffs entered into contracts and other financial transactions tied to the Georgia Dock, and/or raised their non-Georgia Dock-based prices based on references to the Georgia Dock, and were therefore directly and proximately injured by the Georgia Dock Defendants. Plaintiffs paid more for chicken than they would have absent the Georgia Dock Defendants' negligent acts and omissions. Plaintiffs were injured as a result of the Georgia Dock Defendants' negligent acts and omissions pertaining to the Georgia Dock price index.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

### COUNT 22
### UNJUST ENRICHMENT
### (AGAINST THE GEORGIA DOCK DEFENDANTS)

*Brought by Ahold Delhaize USA, Inc.*

599

1519.   In the alternative to remedies at law, through manipulating the Georgia Dock by submitting false price quotes and then misrepresenting and/or omitting the material fact of this manipulation to Plaintiffs, the Georgia Dock Defendants knowingly acted in an unconscionable, unfair, and oppressive manner toward Plaintiffs, violating the fundamental principles of justice, equity, and good conscience. The Georgia Dock Defendants received higher payment then they were entitled to and acted with conscious disregard for Plaintiffs' rights.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1520.   It would be inequitable for the Georgia Dock Defendants to be permitted to retain the ill-gotten gains they obtained through these fraudulent and manipulative acts. The Georgia Dock Defendants' enrichment resulted directly and proximately from the alleged conduct.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1521.   If Plaintiffs have no adequate remedy at law, the Court can and should compel the Georgia Dock Defendants to disgorge all unlawful or inequitable proceeds. Plaintiffs are entitled to the establishment of a constructive trust impressed upon the benefits to the Georgia Dock Defendants from their inequitable actions and unjust enrichment. Alternatively, each Defendant could pay its own unjust enrichment to Plaintiffs.

**ANSWER:** Tyson denies the allegations in this Paragraph.

## COUNT 23
## VIOLATION OF THE NEW MEXICO ANTITRUST ACT,
## N.M. STAT. ANN. §§ 57-1-15, ET SEQ.
## (AGAINST ALL DEFENDANTS)

### *Brought by Restaurants of America, Inc.*

1522.   The New Mexico Antitrust Act aims to prohibit restraints of trade and monopolistic practices. N.M. Stat. Ann. §§ 57-1-15.

**ANSWER:** This Paragraph contains legal conclusions to which no response is required.

To the extent a response is required, Tyson refers to the cited statute and denies any

characterization inconsistent therewith. Tyson denies any remaining allegations in this

Paragraph.

1523.   Plaintiffs purchased broilers within the State of New Mexico during the relevant period. But for Defendants' conduct set forth herein, the price per pound of broilers would have been lower, in an amount to be determined at trial.

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1524.   *Under New Mexico law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.M. Stat. Ann. § 57-1-3.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1525.   *Defendants contracted, agreed, combined or conspired, and monopolized or attempted to monopolize trade for broilers within intrastate commerce of New Mexico, in violation of N.M. Stat. Ann. § 57-1-1, et seq.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1526.   *Plaintiffs were injured with respect to purchases of broilers in New Mexico and is entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

### COUNT 24
### VIOLATION OF THE MINNESOTA CONSUMER FRAUD ACT,
### MINN. STAT. § 325F.68, ET SEQ.
### (AGAINST ALL DEFENDANTS)

*Brought by Restaurants of America, Inc.*

1527.   *By reason of the conduct alleged herein, Defendants have violated Minn. Stat. § 325F.68, et seq.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1528.   *Defendants engaged in deceptive trade practices with intent to injure competitors and consumers through supra-competitive profits.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1529.   *Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the broilers market, a substantial part of which*

*occurred in Minnesota, for the purpose of controlling, fixing, or maintaining prices in the broilers market.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1530.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Minnesota.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1531.   Defendants conduct, specifically in the form of fraudulent concealment of their horizontal agreement, created a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1532.   Defendants' unlawful conduct substantially affected Minnesota's trade and commerce.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1533.   Defendants' conduct was willful.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1534.   As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs have been injured in their business or property and are threatened with further injury. Plaintiffs' claims fall within the scope of the Minnesota statute.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1535.   By reason of the foregoing, Plaintiffs are entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs under Minn. Stat. § 325F.68, et seq. and applicable case law.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

**COUNT 25**
**VIOLATION OF THE NEW MEXICO UNFAIR PRACTICES ACT,**
**N.M. STAT. ANN. §§ 57-12-3, ET SEQ.**
**(AGAINST ALL DEFENDANTS)**

*Brought by Restaurants of America, Inc.*

*1536.   By reason of the conduct alleged herein, Defendants have violated N.M. Stat. Ann. §§ 57-12-3, et seq.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1537.   Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade of commerce in the broilers market, a substantial part of which occurred within New Mexico.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1538.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the relevant markets, a substantial part of which occurred within New Mexico, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the broilers market.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1539.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Mexico.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1540.   Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to Plaintiffs.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1541.   Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1542.   Defendants' conduct constituted "unconscionable trade practices" in that such conduct, inter alia, resulted in a gross disparity between the value received by Plaintiffs and the price paid by them for broilers as set forth in N.M. Stat. Ann. § 57-12-2E.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1543.   Defendants conduct was willful.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1544.   As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs have been injured in its business or property and is threatened with further injury.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1545.   By reason of the foregoing, Plaintiffs are entitled to seek all forms of relief, including actual damages or up to $300 per violation, whichever is greater plus reasonable attorneys' fees under N.M. Stat. Ann. § 57-12-10.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1546.  Blank*

**ANSWER:** As this Paragraph does not contain any content, no response is required.

**COUNT 26**
**VIOLATION OF THE MICHIGAN ANTITRUST REFORM ACT,**
**MICH. COMP. LAWS § 445.771, ET SEQ.**
**(AGAINST ALL DEFENDANTS)**

*Brought by Caesars Enterprise Services, LLC*

*1547.  The Michigan Antitrust Reform Act aims "to prohibit contracts, combinations, and conspiracies in restraint of trade or commerce ... to prohibit monopolies and attempts to monopolize trade or commerce ... [and] to provide remedies, fines, and penalties for violations of this act." Mich. Act 274 of 1984.*

**ANSWER:** This Paragraph contains legal conclusions to which no response is required. To the extent a response is required, Tyson refers to the cited statute and denies any characterization inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

*1548.  During the relevant period, Plaintiffs conducted a substantial volume of business in the State of Michigan and was registered to do business in Michigan. During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers it received at store locations in Michigan from their locations in Michigan. As a result of Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in Michigan.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1549.  During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiffs' Michigan locations, and not for resale in unaltered form. Plaintiffs then sold prepared chicken meals to customers in Michigan.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1550.   *As a result of Plaintiffs' presence in Michigan and the substantial business it conducted in Michigan – including the submission of purchase orders for, receiving invoices for, and receiving shipment of broilers in Michigan – Plaintiffs are entitled to the protection of the laws of Michigan.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

1551.   *Under the Michigan Antitrust Reform Act, Plaintiffs have standing to maintain an action based on the facts alleged in this Complaint. Mich. Comp. Laws § 452.778(2).*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1552.   *Defendants contracted, combined or conspired to restrain or commerce in the market for broilers, in violation of Mich. Comp. Laws § 445.772, et seq.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1553.   *Defendants' violations of Michigan law were flagrant. But for Defendants' conduct set forth herein, the price of broiler paid by Plaintiffs would have been lower.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1554.   *As a result, Plaintiffs were injured with respect to their and/or their vendors' purchases of broilers in Michigan and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, interest, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

### COUNT 27
### VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT,
### MO. ANN. STAT. § 407.010, ET SEQ.
### (AGAINST ALL DEFENDANTS)

*Brought by Caesars Enterprise Services, LLC*

1555.   Chapter 407 of the Missouri Merchandising Practices Act (the "MMPA") *generally governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization.*

**ANSWER:** This Paragraph contains legal conclusions to which no response is required. To the extent a response is required, Tyson refers to the cited statute and denies any characterization inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

1556.   *During the relevant period, Plaintiffs conducted a substantial volume of business in the State of Missouri and was registered to do business in Missouri. During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers it received at store locations in Missouri from their locations in Missouri. As a result of Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in Missouri.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1557.   *During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiffs' Missouri locations, and not for resale in unaltered form. Plaintiffs then sold prepared chicken meals to customers in Missouri.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

1558.   *As a result of Plaintiffs' presence in Missouri and the substantial business they conducted in Missouri – including the submission of purchase orders for, receiving invoices for, and receiving shipment of broilers in Missouri – Plaintiffs are entitled to the protection of the laws of Missouri.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

1559.   Under Missouri law, Plaintiffs have standing to maintain an action under the MMPA based on the facts alleged in this Complaint.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1560.   Defendants contracted, combined or conspired in restraint of trade or commerce of broilers within the intrastate commerce of Missouri, through agreements to fix prices, rig bids and allocate markets and otherwise control trade, in violation of Mo. Ann. Stat. § 407.010, et seq. But for Defendants' conduct set forth herein, the price per pound of broilers would have been lower.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1561.   As a result, Plaintiffs were injured with respect to their purchases of broilers in Missouri and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

**ANSWER:** Tyson denies the allegations in this Paragraph.

## COUNT 28
## VIOLATION OF THE NEVADA UNFAIR TRADE PRACTICES ACT, NEV. REV. STAT. § 598A.010, ET SEQ. (AGAINST ALL DEFENDANTS)

*Brought by Caesars Enterprise Services, LLC*

1562.   The Nevada Unfair Trade Practice Act ("NUTPA") states that "free, open and competitive production and sale of commodities ... is necessary to the economic well-being of the citizens of the State of Nevada." Nev. Rev. Stat. Ann. § 598A.030(1).

**ANSWER:** This Paragraph contains legal conclusions to which no response is required.

To the extent a response is required, Tyson refers to the cited statute and denies any

characterization inconsistent therewith. Tyson denies any remaining allegations in this

Paragraph.

1563.   The policy of NUTPA is to prohibit acts in restraint of trade or commerce, to preserve and protect the free, open and competitive market, and to penalize all persons engaged in anticompetitive practices. Nev. Rev. Stat. Ann. § 598A.030(2). Such acts include, inter alia, price fixing, division of markets, allocation of customers, and monopolization of trade. Nev. Rev. Stat. Ann. § 598A.060.

**ANSWER:** This Paragraph contains legal conclusions to which no response is required. To the extent a response is required, Tyson refers to the cited statute and denies any characterization inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

1564. *During the relevant period, Plaintiffs conducted a substantial volume of business in the State of Nevada and was registered to do business in Nevada. During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers it received at store locations in Nevada from their locations in Nevada. As a result of Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in Nevada.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1565. *During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiffs' Nevada locations, and not for resale in unaltered form. Plaintiff then sold prepared chicken meals to customers in Nevada.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

1566. *As a result of Plaintiffs' presence in Nevada and the substantial business it conducted in Nevada – including the submission of purchase orders for, receiving invoices for, and receiving shipment of broilers in Nevada – Plaintiffs are entitled to the protection of the laws of Nevada.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

1567. *Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this Complaint. Nev. Rev. Stat. Ann. § 598A.210(2).*

**ANSWER:** Tyson denies the allegations in this Paragraph.

608

*1568. Defendants fixed prices for broilers sold to Plaintiffs and/or their vendors in Nevada, rigged bids and divided Nevada markets, allocated Nevada customers, and engaged in a contract, combination or conspiracy in restraint of trade in violation of Nev. Rev. Stat. Ann. § 598A, et seq.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1569. But for Defendants' conduct set forth herein, the prices of broilers paid by Plaintiffs and/or their vendors for broilers in Nevada would have been lower. Plaintiffs were injured with respect to the broilers purchased in Nevada at supra-competitive prices caused by Defendants' conduct.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1570. Accordingly, Plaintiffs are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1571. In accordance with the requirements of § 598A.210(3), notice of this action was mailed to the Nevada Attorney General by Plaintiffs.*

**ANSWER:** Tyson lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore denies those allegations.

## COUNT 29
## VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT, NEV. REV. STAT. § 598.0903, ET SEQ. (AGAINST ALL DEFENDANTS)

*Brought by Caesars Enterprise Services, LLC*

*1572. During the relevant period, Plaintiffs conducted a substantial volume of business in the State of Nevada and was registered to do business in Nevada. During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers it received at store locations in Nevada from their locations in Nevada. As a result of Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in Nevada.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information

609

sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1573.   During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiffs' Nevada locations, and not for resale in unaltered form. Plaintiffs then sold prepared chicken meals to customers in Nevada.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1574.   As a result of Plaintiffs' presence in Nevada and the substantial business they conducted in Nevada – including the submission of purchase orders for, receiving invoices for, and receiving shipment of broilers in Nevada – Plaintiffs are entitled to the protection of the laws of Nevada.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1575.   By reason of the conduct alleged herein, Defendants have violated Nev. Rev. Stat. § 598.0903, et seq.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1576.   Defendants engaged in a deceptive trade practice with the intent to injure Plaintiffs and to substantially lessen competition.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1577.   Defendants established, maintained, or used or attempted to establish a conspiracy in restraint of trade or commerce in the broilers Market, a substantial part of which*

*occurred within Nevada, for the purpose of excluding competition or controlling, fixing, or maintaining prices of broilers sold to Plaintiffs in Nevada.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1578.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nevada.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1579.   Defendants' conduct amounted to a fraudulent act or practice committed by a supplier in connection with a consumer transaction.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1580.   Defendants' unlawful conduct substantially affected Nevada's trade and commerce.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1581.   Defendants' conduct was willful. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs have been injured in their business or property and are threatened with further injury.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1582.   By reason of the foregoing, Plaintiffs are entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs, and a civil penalty of up to $5,000 per violation under Nev. Rev. Stat. § 598.0993.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

## COUNT 30
## VIOLATION OF THE NORTH CAROLINA UNFAIR TRADE AND BUSINESS PRACTICES ACT, N.C. GEN. STAT. § 75-1, ET SEQ.
## (AGAINST ALL DEFENDANTS)

### *Brought by Caesars Enterprise Services, LLC*

*1583.   During the relevant period, Plaintiffs conducted a substantial volume of business in the State of North Carolina and was registered to do business in North Carolina. During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers it received at store locations in North Carolina from their locations in North Carolina. As a result of Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in North Carolina.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1584.   During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiffs' North Carolina locations, and not for resale in unaltered form. Plaintiffs then sold prepared chicken meals to customers in North Carolina.

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1585.   As a result of Plaintiffs' presence in North Carolina and the substantial business they conducted in North Carolina – including the submission of purchase orders for, receiving invoices for, and receiving shipment of broilers in North Carolina – Plaintiffs are entitled to the protection of the laws of North Carolina.

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1586.   Defendants established, maintained, or used, or attempted to establish, a conspiracy in restraint of trade or commerce in the market for broilers, for the purpose of affecting competition or controlling, fixing, or maintaining prices and rigging bids for broilers sold to Plaintiffs and/or their vendors in North Carolina, a substantial part of which occurred within North Carolina.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1587.   *Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1588.   *As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs have been injured in their business or property and are threatened with further injury.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

1589.   *By reason of the foregoing, Plaintiffs are entitled to seek all forms of relief available, including treble damages, under N.C. Gen. Stat. § 75-1, et seq.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

## COUNT 31
## VIOLATION OF THE KANSAS RESTRAINT OF TRADE ACT,
## KANS. STAT. ANN. § 50-101, ET SEQ.
## (AGAINST ALL DEFENDANTS)

### *Brought by Caesars Enterprise Services, LLC*

1590.   *The Kansas Restraint of Trade Act aims to prohibit practices which, inter alia, "tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state." Kan. Stat. Ann. § 50-112.*

**ANSWER:** This Paragraph contains legal conclusions to which no response is required. To the extent a response is required, Tyson refers to the cited statute and denies any characterization inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

1591.   *During the relevant period, Plaintiffs conducted a substantial volume of business in the State of Kansas and was registered to do business in Kansas. During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers they received at store locations in Kansas from their locations in Kansas. As a result of Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in Kansas.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information

sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1592. During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiff's Kansas locations, and not for resale in unaltered form. Plaintiffs then sold prepared chicken meals to customers in Kansas.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1593. As a result of Plaintiffs' presence in Kansas and the substantial business it conducted in Kansas – including the submission of purchase orders for, receiving invoices for, and receiving shipment of broilers in Kansas – Plaintiffs are entitled to the protection of the laws of Kansas.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1594. Under the Kansas Restraint of Trade Act, Plaintiffs have standing to maintain an action based on the facts alleged in this Complaint. See Kan. Stat. Ann § 50-161(b).*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1595. Defendants combined capital, skill or acts for the purposes of creating restrictions in trade or commerce of broilers, increasing the price of broilers sold to Plaintiffs and/or their vendors in Kansas, preventing competition in the sale of broilers, rigging bids and allocating markets for the sale of broilers to Plaintiffs and/or their vendors in Kansas, in a manner that established the price of broilers and precluded free and unrestricted competition among themselves in the sale of broilers to Plaintiffs and/or their vendors in Kansas, in violation of Kan. Stat. Ann. § 50-101, et seq.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1596. But for Defendants' conduct set forth herein, the price of broilers paid by Plaintiffs would have been lower. As a result, Plaintiffs were injured with respect to their and/or their vendors purchases of broilers in Kansas and are entitled to all forms of relief, including actual damages, reasonable attorneys' fees and costs, and injunctive relief.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

<u>**COUNT 32**</u>
<u>**VIOLATION OF THE NEBRASKA JUNKIN ACT,**</u>
<u>**NEB. REV. STAT. § 59-801, ET SEQ.**</u>
<u>**(AGAINST ALL DEFENDANTS)**</u>

*Brought by Caesars Enterprise Services, LLC*

*1597. Chapter 59 of the Nebraska Revised Statute generally governs business and trade practices. Sections 801 through 831 thereof, known as the Junkin Act, prohibit antitrust violations such as restraints of trade and monopolization.*

**ANSWER:** This Paragraph contains legal conclusions to which no response is required. To the extent a response is required, Tyson refers to the cited statute and denies any characterization inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

*1598. During the relevant period, Plaintiffs conducted a substantial volume of business in the State of Nebraska and were registered to do business in Nebraska. During the relevant period, Plaintiffs submitted purchase orders for all shipments of broilers they received at store locations in Nebraska from their locations in Nebraska. As a result of Defendants' conspiracy, Plaintiffs took delivery of broilers at artificially inflated prices at their store locations in Nebraska.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1599. During the relevant period, Plaintiffs purchased broilers from Defendants, directly and through their vendors, for use in food preparation in Plaintiffs' Nebraska locations,*

*and not for resale in unaltered form. Plaintiffs then sold prepared chicken meals to customers in Nebraska.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1600. As a result of Plaintiffs' presence in Nebraska and the substantial business they conducted in Nebraska – including the submission of purchase orders for, receiving invoices for, and receiving shipment of broilers in Nebraska – Plaintiffs are entitled to the protection of the laws of Nebraska.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1601. Under Nebraska law, Plaintiffs have standing to maintain an action under the Junkin Act based on the facts alleged in this Complaint. See Neb. Rev. Stat. § 59-821.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1602. Defendants contracted, combined or conspired in restraint of trade or commerce of broilers within the intrastate commerce of Nebraska, by agreeing to fix prices and rig bids for broilers sold to Plaintiffs and/or their vendors in Nebraska, and to allocate markets and otherwise control trade, in violation of Neb. Rev. Stat. § 59-801, et seq.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1603. Plaintiffs were injured with respect to their or their vendors' purchases of broilers in Nebraska and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

616

**COUNT 33**
**BREACH OF CONTRACT AND UNJUST ENRICHMENT**
**(AGAINST TYSON AND TYSON SALES AND DISTRIBUTION, INC.)**

*Brought by Caesars Enterprise Services, LLC*

*1604.   Caesars incorporates and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.*

**ANSWER:** This Paragraph does not contain any factual allegations to which a response is required. To the extent a response is required, Tyson denies those allegations. Tyson incorporates by reference its answers to each preceding Paragraph as if fully set forth herein in response to this Paragraph.

*1605.   Caesars entered into a series of contracts with Tyson to supply chicken at a specified price with precise estimate quantities. The contract is governed by Nevada law. Caesars purchased the broiler chickens and components of the chicken pursuant to these agreements on the agreed upon terms to specify the requirements of its restaurants.*

**ANSWER:** Tyson admits that it sold certain chicken products to Caesars during the relevant period, but denies any further characterization thereof. This Paragraph contains Plaintiffs' characterization of their claims, allegations subject to proof by expert testimony, and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations, allegations, and/or conclusions. To the extent the allegations in this Paragraph purport to quote, characterize, or describe documents or other sources, such sources speak for themselves, and Tyson denies any characterization or description that is inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

*1606.   Like all contracts, these agreements contain an implied covenant of good faith and fair dealing pursuant to which Tyson covenanted not to do anything that would frustrate the purpose of the agreement, namely to supply chickens at an agreed price based on the terms of negotiations. Tyson would regularly refer to the Georgia dock to justify its prices. By conspiring with the other defendants to fix supply and manipulate the Georgia Dock, Tyson has manipulated the market price for the chicken and has unlawfully conspired to deprive Caesar of the benefit of the contract, namely chicken at a negotiated, lawful, price driven by the market forces discussed during negotiations. By submitted fraudulent bids to the Georgia Dock and using the Dock*

617

*during negotiations with Tysons, Tysons has further breached the covenant and its obligations to Caesars.*

**ANSWER:** Tyson admits that it utilized the Georgia Dock in pricing its products but denies any further characterization thereof. This Paragraph contains Plaintiffs' characterization of their claims, allegations subject to proof by expert testimony, and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson denies any remaining allegations in this paragraph.

*1607.   Caesars has substantially performed all obligations legally required of it under the agreements.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1608.   Caesars has been damaged by the breach of contract in an amount to be determined at trial but in no event less than: (1) the difference between the actual price and a market price without the influence of Tyson and its conspirators unlawful conduct, (2) the unjust enrichment of Tyson from the unlawful scheme from Caesars business, and (3) all other damages or losses reasonably foreseeable from the breach described here.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1609.   As a direct and proximate cause of these breaches of contracts, including by breaches of the implied covenant of good faith and fair dealing, and of Defendants' frustration of the purposes of these contracts, Plaintiff has been damaged as alleged herein in an amount to be proven at trial.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1610.   Caesars conferred a benefit upon Tyson, Tyson had knowledge of that benefit, and voluntarily accepted it from Plaintiff. It would be inequitable and unjust for Tyson to be permitted to be enriched or to retain the benefit which Tyson obtained from its manipulative acts at the expense of Caesars. Caesars is entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

## COUNT 34
## VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT,
## NEB. REV. STAT. § 59-1602, ET SEQ.
## (AGAINST ALL DEFENDANTS)

*Brought by Caesars Enterprise Services, LLC*

618

1611.   During the relevant period, Plaintiff conducted a substantial volume of business in the State of Nebraska. During the relevant period, Plaintiff submitted orders for shipments of broilers and chicken that were distributed through Nebraska vendors. As a result of Defendants' conspiracy, broilers were delivered at artificially inflated prices from Nebraska.

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1612.   During the relevant period, Plaintiff purchased broilers from Defendants, directly and through their vendors, including through locations in Nebraska.

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

1613.   By reason of the conduct alleged herein, Defendants have violated Neb. Rev. Stat. § 59-1602, et seq.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1614.   Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of trade or commerce in the broilers Market, a substantial part of which occurred within Nebraska.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1615.   Defendants established, maintained, or attempted to establish, conspiracy in restraint of trade or commerce in the broilers Market, for the purpose of excluding or limiting competition or controlling or maintaining prices or rigging bids for broilers sold to Plaintiff and/or their vendors in Nebraska, and allocating markets, a substantial part of which occurred within Nebraska.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1616.   Defendants' conduct was conducted with the intent to deceive Plaintiff regarding the nature of Defendants' actions within the stream of Nebraska commerce.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1617.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1618.   Defendants' conduct misled Plaintiff, withheld material facts, and had a direct or indirect impact upon Plaintiff's ability to protect themselves. Defendants' unlawful conduct substantially affected Nebraska's trade and commerce.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1619.   As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff has been injured in its business or property and are threatened with further injury. Plaintiff is within the scope of the Nebraska statute.

**ANSWER:** Tyson denies the allegations in this Paragraph.

1620.   By reason of the foregoing, Plaintiff is entitled to seek all forms of relief available under Neb. Rev. Stat. § 59-1614.

**ANSWER:** Tyson denies the allegations in this Paragraph.

### COUNT 35
### VIOLATION OF THE MISSISSIPPI ANTITRUST STATUTE,
### MISS. CODE § 74-21-1, ET SEQ.
### (AGAINST ALL DEFENDANTS)

*Brought by Caesars Enterprise Services, LLC*

1621.   Title 75 of the Mississippi Code regulates trade, commerce and investments. Chapter 21 thereof generally prohibits trusts and combines in restraint or hindrance of trade, with the aim that "trusts and combines may be suppressed, and the benefits arising from competition in business [are] preserved" to Mississippians. Miss. Code Ann. § 75-21-39.

**ANSWER:** This Paragraph contains legal conclusions to which no response is required.

To the extent a response is required, Tyson refers to the cited statute and denies any

characterization inconsistent therewith. Tyson denies any remaining allegations in this

Paragraph.

*1622.   Trusts are combinations, contracts, understandings or agreements, express or implied, when inimical to the public welfare and with the effect of, inter alia, restraining trade, increasing the price or output of a commodity, or hindering competition in the production or sale of a commodity. Miss. Code Ann. § 75-21-1.*

**ANSWER:** This Paragraph contains legal conclusions to which no response is required. To the extent a response is required, Tyson refers to the cited statute and denies any characterization inconsistent therewith. Tyson denies any remaining allegations in this Paragraph.

*1623.   Caesars purchased Broilers and chicken components within the State of Mississippi. But for Defendants' conduct set forth herein, the price per pound would have been lower, in an amount to be determined at trial.*

**ANSWER:** This Paragraph contains Plaintiffs' characterization of their claims and/or legal conclusions to which no response is required. To the extent a response is required, Tyson denies such characterizations and/or conclusions. Tyson lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this Paragraph and therefore denies those allegations.

*1624.   Under Mississippi law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Mississippi Code based on the facts alleged in this Complaint. Miss. Code Ann. § 75-21-9.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1625.   Defendants combined, contracted, understood and agreed in the market for Broilers, in a manner inimical to public welfare, with the effect of restraining trade, increasing the price of Broilers and hindering competition in the sale of Broilers, in violation of Miss. Code Ann. § 75-21-1(a), et seq.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1626.   Defendants monopolized or attempted to monopolize the production, control or sale of Broilers, in violation of Miss. Code Ann. § 75-21-3, et seq.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1627.   In addition to being directed at Caesar's business location(s) in Mississippi, Defendants' chicken products are also sold indirectly via distributors throughout the State of*

*Mississippi. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1628. Plaintiffs and members of the Class were injured with respect to purchases of Broilers and chicken products in Mississippi and are entitled to all forms of relief, including actual damages and a penalty of $500 per instance of injury.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

**COUNT 36**
**TRADE PRACTICES ACT, TENN. CODE § 47-25-101, ET SEQ.**
**(AGAINST ALL DEFENDANTS)**

*Brought by Caesars Enterprise Services, LLC*

*1629. The Tennessee Trade Practices Act generally governs commerce and trade in Tennessee, and it prohibits, inter alia, all arrangements, contracts, agreements, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in goods in Tennessee. All such arrangements, contracts, agreements, or combinations between persons or corporations designed, or which tend, to increase the prices of any such goods, are against public policy, unlawful, and void. Tenn. Code, § 47-25-101.*

**ANSWER:** This Paragraph contains legal conclusions to which no response is required.

To the extent a response is required, Tyson refers to the cited statute and denies any

characterization inconsistent therewith. Tyson denies any remaining allegations in this

Paragraph.

*1630. Defendants competed unfairly and colluded by meeting to fix prices, divide markets, and otherwise restrain trade as set forth herein, in violation of Tenn. Code, § 47-25-101, et seq.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1631. Defendant's conduct violated the Tennessee Trade Practice Act because it was an arrangement, contract, agreement, or combination to lessen full and free competition in goods in Tennessee, and because it tended to increase the prices of goods in Tennessee. Specifically, Defendants' combination or conspiracy had the following effects: (1) price competition for Broilers was restrained, suppressed, and eliminated throughout Tennessee; (2) prices for Broilers were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff paid supra-competitive, artificially inflated prices for Broilers.*

622

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1632.   Defendants' illegal conduct had a substantial effect on Tennessee commerce as Broilers were sold in Tennessee.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1633.   Caesars purchased Broilers from the State of Tennessee. But for Defendants' conduct set forth herein, the price per pound of Broilers and chicken products would have been lower, in an amount to be determined at trial. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has been injured in their business and property and are threatened with further injury.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1634.   Under Tennessee law, indirect purchasers have standing under the Tennessee Trade Practice Acts to maintain an action based on the facts alleged in this Complaint.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

*1635.   Caesars was injured with respect to purchases of chicken from Tennessee and is entitled to all forms of relief available under the law, including return of the unlawful overcharges that they paid on their purchases, damages, equitable relief, and reasonable attorneys' fees.*

**ANSWER:** Tyson denies the allegations in this Paragraph.

## PRAYER FOR RELIEF

*WHEREFORE, Plaintiffs respectfully request that the Court:*

*A.      Enter joint and several judgments against Defendants in favor of Plaintiffs;*

*B.      Award Plaintiffs damages against Defendants in a joint and several judgment for an amount to be determined at trial to the maximum extent allowed under the claims stated above as well as treble damages, any other enhancement of damages, attorneys' fees, expenses, and costs as provided by law;*

*C.      Award Plaintiffs bringing claims under full-consideration statutes, including but not limited to under Wisconsin, Tennessee, and South Carolina state antitrust laws, the full amounts paid on the contracts with Defendants;*

*D.      Award Plaintiff damages in an amount to be determined at trial to the maximum extent allowed under Georgia RICO (Ga. Code Ann. § 16-14-1 et seq.) and Federal RICO (18 U.S.C. § 19621 et seq.), and enter a judgment in favor of Plaintiffs against the Georgia Dock Defendants, with the judgment being for joint and several liability, in an amount to be trebled to the extent such laws permit;*

E.  Award Plaintiffs damages or other relief permitted by law or equity for Plaintiff's common law claims in an amount to be determined at trial;

F.  Award Plaintiffs punitive damages as appropriate under applicable law;

G.  Award Plaintiffs their pre- and post-judgment interest as provided by law, with such interest to be awarded at the highest legal rate;

H.  Award Plaintiffs their attorneys' fees, litigation expenses, and costs, as provided by law, including the federal and state antitrust laws, Georgia RICO, and Federal RICO; and

I.  Award Plaintiffs the costs of investigation and litigation pursuant to Ga. Code Ann. § 16-14-6(c);

J.  Enter an order prohibiting and permanently enjoining Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect; and

K.  Grant Plaintiffs such other and further relief that the Court may deem just and proper.

**ANSWER:** Tyson denies any and all allegations contained in Plaintiffs' prayer for relief. Tyson further denies that Plaintiffs are entitled to any relief.  Tyson requests that Plaintiffs take nothing in this suit and that this matter be dismissed with prejudice, with costs and fees awarded to Tyson.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury on all issues so triable.

**ANSWER:** Plaintiffs' Jury Demand contains no factual assertions to which a response is required. Plaintiffs' Jury Demand further states legal conclusions and Plaintiffs' characterizations of this action, with which Tyson disagrees and to which no response is required. To the extent a response is required, Tyson admits that Plaintiffs purport to demand a

jury trial but denies that Plaintiffs have stated claims that are triable. Tyson denies any remaining allegations in Plaintiffs' Jury Demand.

## TYSON'S AFFIRMATIVE DEFENSES

Without assuming any burden that it otherwise would not bear, and reserving the right to assert additional defenses as those defenses become known during discovery, Tyson asserts the following separate and additional defenses pursuant to Federal Rule of Civil Procedure 8:

### FIRST DEFENSE

1.      Plaintiffs' claims are barred, in whole or in part, because any alleged injuries and damages were not legally or proximately caused by any acts or omissions of Tyson and/or were caused, if at all, solely and proximately by the conduct of Plaintiffs or third parties including, without limitations, the prior, intervening or superseding conduct of Plaintiffs or third parties.

### SECOND DEFENSE

2.      Plaintiffs' claims are barred, in whole or in part, because Plaintiffs failed to exercise reasonable care to mitigate any damages they may have suffered.

3.      The facts Plaintiffs cite in support of their claims were made public more than four years ago.

4.      To the extent Plaintiffs believed that Tyson had unfairly increased the price of chicken by agreeing to cut chicken production, Plaintiffs had an obligation to mitigate their damages by seeking other sources of supply, including from other producers.

5.      Moreover, if Plaintiffs believed to the extent Plaintiffs allege the price of chicken was unfairly manipulated through the use of indices, they had an obligation to renegotiate contracts to make use of different indices or no index at all in pricing for chicken products.

6.      Plaintiffs' failure to exercise reasonable care to mitigate damages was the complete or partial cause of any damages Plaintiffs allege to have suffered.

## THIRD DEFENSE

7.    Plaintiffs' claims are barred, in whole or in part, by the doctrine of waiver.

8.    The facts Plaintiffs cite in support of their claims were made public more than four years ago.

9.    Plaintiffs' conduct in continuing to purchase chicken at what they now allege are inflated prices is evidence of an intention to waive any right to bring this suit and was inconsistent with any intention other than to waive their right to bring suit.

10.    Plaintiffs, by their actions, accepted the benefits of an ongoing relationship with Tyson and relinquished their right to bring suit.

## FOURTH DEFENSE

11.    Plaintiffs' claims are barred, in whole or in part, by the doctrine of estoppel.

12.    The set of facts Plaintiffs cite in support of their claims were made public more than four years ago.

13.    Tyson relied in good faith, and to its detriment, on Plaintiffs' actions in continuing to purchase chicken without complaint.

14.    Tyson had no knowledge of Plaintiffs' alleged Complaint or means to discover the Complaint.

15.    Plaintiffs are therefore estopped from pursuing their claims.

## FIFTH DEFENSE

16.    Plaintiffs' claims are barred, in whole or in part, by the state action doctrine.

17.    The state action doctrine exempts from antitrust claims conduct of private parties that is undertaken pursuant to a clearly articulated policy to displace competition with regulation and that is actively supervised by the state.

18.     The Georgia Dock program was undertaken and administered by the Georgia Department of Agriculture ("GDA") pursuant to its statutory authority and a cooperative agreement between the GDA and the United States Department of Agriculture ("USDA"). To the extent Plaintiffs assert or seek to imply that the Georgia Dock Defendants violated the antitrust laws by providing prices to the GDA pursuant to the Georgia Dock program, by an officer's acceptance of the Georgia Commissioner of Agriculture's appointment of him to the Poultry Market News Advisory Committee, or by his participating in activities of such advisory committee undertaken under the supervision of the GDA, such claims are precluded under the state action doctrine.

19.     States in which Producer Defendants grow and process broiler breeder and chicken flocks have statutes and rules that regulate many aspects of these operations, including, without limitation, for wastewater restriction, air permitting, monitoring, detection, medical treatment, processing for slaughter, reporting, and communication with other broiler chicken producers about the health status of broiler breeder and chicken flocks.

20.     Each state actively supervises conduct of private parties pursuant to the state's statutes, regulations, and rules that apply to operations for growing and processing broiler breeder and chicken flocks.

21.     The state action doctrine bars Plaintiffs' claims, in whole or in part, to the extent the claims are based on conduct of Defendants pursuant to these state statutes, regulations, and rules, including without limitation any alleged conduct related to wastewater restriction, air permitting, monitoring, detection, medical treatment, processing for slaughter, reporting, and communication with other broiler chicken producers about the health status of broiler breeder and chicken flocks.

## SIXTH DEFENSE

22.     Plaintiffs' claims are barred by the equitable doctrine of laches.

23.     The laches doctrine dictates that "those who sleep on their rights, lose them." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999). The Seventh Circuit has ruled that laches will bar relief in the face of "(1) an unreasonable lack of diligence by the party against whom the defense is asserted and (2) prejudice arising therefrom." *Id.* (citing *Cannon v. Univ. of Health Sciences/Chi. Med. Sch.*, 710 F.2d 351, 359 (7th Cir. 1983)).

24.     Tyson hereby incorporates Paragraphs 38–40 in support of this defense. Plaintiffs demonstrated an unreasonable lack of diligence in bringing their claims. The challenged conduct that underlies Plaintiffs' claims occurred between twelve and sixteen years ago. *See, e.g.*, Compl. ¶ 16 (alleging "market-changing cuts to breeder flocks . . . from 2008 to early 2009 . . . and [again] from 2011 to 2012"). Likewise, the specific facts Plaintiffs cite in support of their claims were publicly available long ago. *See, e.g., id.* ¶¶ 344, 348-357, 362, 365-366, 368, 370-371, 379, 385, 387, 389, 392-393, 395, 398, 400, 402, 405-406, 411-412, 414, 417-419, 428, 431, 440, 450, 454-456, 458, 461-462, 468, 475, 479-481, 483, 489-490, 502, 507. Yet, Plaintiffs did not file their allegations until 2020. This unreasonable lack of diligence in raising their claims bars them now.

25.     Additionally, Plaintiffs' unreasonable delay in bringing their claims has resulted in economic prejudice to Tyson. Among other things, while Plaintiffs sat on their claims and reaped the benefits of lower costs, more efficient production, and superior products, Tyson invested significant resources to compete in the highly competitive Broiler industry.

26.     Accordingly, the equitable principles embodied by the laches doctrine bar Plaintiffs from seeking relief at this delayed juncture.

## SEVENTH DEFENSE

27.     Plaintiffs' claims are barred, in whole or in part, by the applicable statute of limitations.

28.     The statute of limitations for Plaintiffs' claims is four years. 15 U.S.C. § 15(b). Thus, their claims must be dismissed unless Plaintiffs can sufficiently allege that they could not have discovered the claimed offense within the limitations period exercising reasonable diligence.

29.     Plaintiffs cannot satisfy this burden: The challenged conduct occurred between twelve and sixteen years ago.

30.     Moreover, the facts Plaintiffs cite in support of their claims were made public more than four years ago. For example:

31.     **Publicly Announced Cuts.** As Plaintiffs acknowledge, the supply decisions at issue in this case were no secret. *See, e.g.*, Compl*. ¶* 362 ("On March 12, 2008, Pilgrim's new CEO Clint Rivers, publicly announced the closure of seven chicken facilities . . . ."). Indeed, these cuts were publicly announced years ago. *See, e.g.*, *id.* ¶ 365 ("On April 3, 2008, Fieldale Farms announced a 5% production cut. . . ."); *id.* ¶ 368 ("On April 9, 2008, Simmons announced in a press release a 6% reduction in production throughout its processing plants . . . .").

32.     **Price Increases.** Plaintiffs admit that price information was reported daily by Urner Barry and the GDA and weekly by the USDA. Plaintiffs additionally acknowledges that USDA makes its price information "publicly available." *See, e.g.*, *id.* ¶ 301.

33.     **Alleged Signals.** Similarly, Plaintiffs rely on public statements made as far back as 2008 to allege signaling between Defendants. *See, e.g.*, *id.* ¶¶ 1167-1168 (summarizing comments by Tyson and Pilgrim's Pride in their respective January 28 and 29, 2008 earnings

calls). If these statements were obvious indicators of misconduct, as Plaintiffs claim, then Plaintiffs had a duty to inquire as far back as 2008.

34. **Agri Stats.** Plaintiffs also rely on public statements regarding the use of Agri Stats, many from ten years ago. *See, e.g.*, *id.* ¶ 1208 (quoting Sanderson Farms CEO Joe Sanderson as claiming, in May 2008, that "[a]lmost everyone in our industry" uses Agri Stats).

35. **Trade Associations.** Defendants' participation in trade conferences and meetings was public when it occurred, many years ago. *See, e.g.*, *id.* ¶ 445 ("[A]t the National Chicken Council's October 2009 Annual Conference . . ., one industry analyst wrote that participants had emphasized continued 'production discipline,' . . . .").

36. **Industry Structure.** The nature of the Broiler industry's structure has been known for decades. Plaintiffs cite no new information that was not otherwise available in 2008 or contemporaneously as plants were closed. *See, e.g.*, *id.* ¶ 479 (discussing the closure of Pilgrim's Dallas facility in 2011); *see also id.* ¶ 406 ("By September 2008, chicken industry publication WATT PoultryUSA reported that '[m]ost U.S. chicken integrators ha[d] announced plans to close small operations, consolidate complexes and further processing plants and to reduce output by 3 percent to 5 percent to 'maximize efficiency.'" (brackets in the original)).

37. Put simply, Plaintiffs' attempts to justify their delay by claiming fraudulent concealment fails—they simply recycle their underlying allegations and conclusively assert fraudulent concealment. *Id.* ¶¶ 1287-1302. Accordingly, Plaintiffs' Complaint is time-barred.

## EIGHTH DEFENSE

38. Plaintiffs' claims are barred, in whole or in part, due to the ratification of, and consent to, the alleged conduct of Tyson.

39. Tyson hereby incorporates the above Paragraphs 30–37 in support of this defense.

630

40.     Plaintiffs' Complaint relies on publicly available information—much of which has been available for years—thereby demonstrating their long-standing ratification of and consent to the complained—of conduct.

41.     For example, Plaintiffs have known for more than a decade that certain Broiler producers participate in and receive reports from Agri Stats. *See, e.g., id.* ¶ 344 (alleging that Tyson announced it had "re-joined Agri Stats" in a January 2008 earnings call). Yet, rather than complain of Broiler producers' use of Agri Stats reports, Plaintiffs did the opposite. For years, Plaintiffs silently reaped the benefits of the reports' procompetitive effects: increased competition, lower-cost product, and more efficiently produced Broilers.

42.     Plaintiffs also benefit from Defendants' visits to each other's production complexes. As with the use of Agri Stats reports, these procompetitive visits result in higher efficiency, lower costs and superior products in the Broiler industry.

43.     Likewise, Plaintiffs benefit from Defendants' participation in trade association meetings and other industry events. These meetings and events promote, among other things, lobbying efforts, regulations, industry safety, animal health, and training and education.

44.     To the extent that Plaintiffs purchased Broilers based on the Georgia Dock index or otherwise allege any injury based on Georgia Dock-based pricing, Plaintiffs knew about and consented to industry use of the Georgia Dock index. The Georgia Dock index was publicly accessible online, making any deviation between the Georgia Dock and other price indices—including Urner Barry—readily available to Plaintiffs.

45.     Accordingly, because Plaintiffs have been aware for years of the very same conduct they now challenge—from which they have directly benefitted—Plaintiffs' claims are barred by the doctrine of ratification.

**NINTH DEFENSE**

46.     Plaintiffs' claims are barred, in whole or in part, by the applicable limitations period set out in contracts and/or agreements executed by Plaintiffs.

**TENTH DEFENSE**

47.     Plaintiffs' claims include allegations that one or more Defendants made public statements about changes needed in alternative fuel mandates under federal law. *See, e.g.*, *id.* ¶¶ 389, 1295.

48.     These mandates increased usage of corn and other animal feed used to produce alternative fuels, and thereby greatly increased feed costs incurred by Defendants for live Broiler operations.

49.     Plaintiffs' claims are barred, in whole or in part, to the extent Plaintiffs seek to impose liability on Tyson based on the exercise of any person or entity's right to petition federal, state, and local legislative bodies, including through public statements, because such conduct was immune under the *Noerr-Pennington* doctrine and privileged under the First Amendment to the United States Constitution. Protected activities include, without limitation, participation in trade associations seeking legislative and administrative remedies and lobbying activities related to the establishment of rules and procedures for Georgia Dock reporting and the effect of ethanol requirements on grain prices.

**ELEVENTH DEFENSE**

50.     Plaintiffs' claims are barred, in whole or in part, to the extent the sales contracts pursuant to which Plaintiffs purchased Broilers contain arbitration clauses or clauses providing a different forum for the resolution of their claims. *See, e.g.*, *Cont'l Ins. Co. v. M/V Orsula*, 354 F.3d 603 (7th Cir. 2003) (holding that dismissal of an action is not an abuse of discretion when a valid forum selection clause mandates another venue); *West Shore Pipe Line Co. v. Associated*

*Electric & Gas Ins. Services, Ltd.*, 791 F. Supp. 200 (N.D. Ill. 1992) (finding the mandatory arbitration clause in a contract to be valid and, as a result, dismissing due to a lack of subject-matter jurisdiction).

51.     Plaintiffs' claims are barred, in whole or in part, to the extent to the sales contracts and/or agreements pursuant to which Plaintiffs purchased Broilers contain limitations and/or repose periods during which they must have brought their claims but failed to bring their claims within those periods.

52.     Plaintiffs' claims are barred, in whole or in part, to the extent the sales contracts and/or agreements pursuant to which Plaintiffs purchased Broilers limits damages recoverable on their claims.

### TWELFTH DEFENSE

53.     Upon information and belief, Plaintiffs' claims are barred, in whole or in part, by Tyson's right to set off any amount paid to Plaintiffs by damages attributable to Plaintiffs' conduct, including to the extent Plaintiffs unlawfully coordinated with other purchasers of Broilers regarding the purchase price of Broilers, including by communicating and sharing competitively sensitive information.

### THIRTEENTH DEFENSE

54.     Without admitting the existence of any contract, combination, or conspiracy in restraint of trade, and expressly denying same, Plaintiffs' claims and/or entitlement to damages for their claims are barred, in whole or in part, by non-settling Defendants' right to offset any amounts paid to Plaintiffs by any Defendants who have settled, or do settle, Plaintiffs' claims against it in this or related actions.

## FOURTEENTH DEFENSE

55.     Without admitting the existence of any contract, combination, or conspiracy in restraint of trade, and expressly denying same, Plaintiffs' claims are barred, in whole or in part, to the extent that: (a) any purported overcharge was not absorbed by Plaintiffs but was passed through to others; and (b) Plaintiffs entered into cost-plus contracts with parties who purchased from Plaintiffs before Plaintiffs began paying any purported overcharge.

## FIFEENTH DEFENSE

56.     Plaintiffs' claims are barred in whole or in part, to the extent it seeks improper multiple damage awards, and damage awards duplicative of those sought in other actions, in violation of the Due Process guarantees of the Fifth and Fourteenth Amendments of the United States Constitution.

## SIXTEENTH DEFENSE

57.     Plaintiffs' claims are barred, in whole or in part, by the Filed Rate Doctrine.

58.     Under the Filed Rate Doctrine, rates that are filed with or regulated by state or federal agencies are per se reasonable and unassailable in judicial proceedings brought by ratepayers.

59.     The Georgia Dock index was compiled and issued by the Georgia Department of Agriculture.

60.     To the extent that Plaintiffs seek damages for purchase of Broilers based on the Georgia Dock index or otherwise allege any injury based on Georgia Dock-based pricing, Plaintiffs' claims are barred by the Filed Rate Doctrine.

## SEVENTEENTH DEFENSE

61.     Plaintiffs' claims are barred, in whole or in part, to the extent any Defendants' actions, conduct, or practices including but not limited to its production, line speed, or processing

634

that are the subject of the Complaint were regulated, compelled, and/or mandated by government authority, including, but not limited to, the USDA.

## EIGHTEENTH DEFENSE

62. Plaintiffs' claims, whether held directly or obtained through assignment, are barred, in whole or in part, to the extent those claims have been released as to Defendants.

## NINETEENTH DEFENSE

63. Plaintiffs' claims, whether held directly or obtained through assignment, are barred, in whole or in part, to the extent those claims are barred as to Defendants by *res judicata*.

## TWENTIETH DEFENSE

64. Tyson adopts and incorporates by reference any and all other defenses asserted by any other Defendants to the extent that the defense would apply to Tyson.

## TWENTY-FIRST DEFENSE

65. All possible affirmative defenses may not have been alleged or stated herein insofar as sufficient facts were not available upon the filing of this Answer and, therefore, Tyson reserves the right to amend this Answer to alleged additional affirmative defenses.

## COUNTERCLAIM AGAINST CARINA VENTURES LLC AND
## THIRD-PARTY COMPLAINT AGAINST BURFORD CAPITAL LLC

Tyson Foods, Inc., Tyson Chicken, Inc., Tyson Breeders, Inc., and Tyson Poultry, Inc. (collectively, "Tyson"), by their undersigned counsel, hereby bring this claim against Burford Capital LLC ("Burford") and Carina Ventures LLC ("Carina"; collectively, "Burford"), and allege as follows:

## PRELIMINARY STATEMENT

This claim arises out of the improper conduct of litigation funder Burford and its outside counsel in thwarting a settlement by two parties, Tyson and Sysco Corporation ("Sysco"), that were mutually interested in and close to resolving Sysco's claims in this case. Contrary to the desires of Tyson and Sysco, Burford and its counsel, Scott Gant of Boies Schiller & Flexner LLP ("Boies Schiller")—who was simultaneously representing Sysco in a blatant conflict of interest—worked together to stymie the settlement. Burford's goal in doing so was simple: derailing the settlement gave Burford time to take over Sysco's claims and demand an exorbitant return on its litigation-funding investment, many times higher than what Sysco stated it was willing to accept. The direct and foreseeable result of this interference is not only additional litigation expense and exposure for Tyson, but also the perpetuation of complex and protracted litigation and a waste of judicial resources.

1.      Tyson brings this claim against Burford to recover for the damages Burford has caused—and is causing—by wrongfully interfering with Tyson's resolution of the claims originally asserted by Sysco and consolidated into this action ("*Broilers*").

2.      Burford is a multibillion-dollar litigation funding firm that promotes itself as the world's largest provider of commercial legal finance.

636

3.      Tyson is a multinational protein company that produces and processes chicken, pork, beef, and turkey for consumption.

4.      Sysco is a national food distributor and a Tyson customer and was a litigation-funding client of Burford.

5.      As discussed in more detail below, upon learning that Sysco was nearing a settlement with Tyson that would fully resolve Sysco's claims against Tyson in this case, Burford wrongfully interfered with and thwarted that settlement, causing damage to Tyson.

6.      Contrary to public representations that "[Burford] [doesn't] control settlement" or the legal strategy of its clients, and unknown to Tyson at all relevant times, Burford exercised significant influence over and actively interfered with Sysco's attempt to settle its claims against Tyson.

7.      During the settlement discussions between Sysco and Tyson, Sysco was represented by Mr. Gant. Mr. Gant simultaneously represented (and still represents) Burford both directly and indirectly in this action.

8.      On information and belief, after learning that Sysco was assigning some of its *Broilers* claims to its customers and intended to settle its unassigned claims against Tyson (and other defendants in *Broilers* and other litigations), Burford set out—through Mr. Gant—to block Sysco from continuing to assign its claims and from entering into any settlements, in an effort to increase its anticipated return on its investment in Sysco's claims without regard to Sysco's desire to cease litigating.

9.      By simultaneously representing Burford and Sysco, Mr. Gant subjected himself to conflicting obligations: an obligation to honor Sysco's wishes to settle and Burford's opposing wish to keep litigating in order to maximize its return.

637

10.     At the time of Burford's intentional interference, Tyson and Sysco had made significant progress toward a settlement agreement, and, on information and belief, both companies were interested in reaching a resolution. Sysco and Tyson had exchanged settlement demands and offers and were confirming the total volume of implicated sales Tyson had made to Sysco during the relevant time period, net of assignments from Sysco to its customers.

11.     On information and belief, after learning that Sysco and Tyson were close to resolving Sysco's claims, Burford deployed Mr. Gant to prevent Sysco's settlement with Tyson because it wanted to extract an outsized return on the money it had invested in Sysco's claims, without regard for Sysco's desire to resolve them or Sysco's extant settlement demand to Tyson.

12.     Burford got its way: the settlement discussions abruptly ended, even though the parties were close to a final agreement and Tyson's last offer had become more valuable due to Sysco's recent assignments. On information and belief, Burford's interference through Mr. Gant was the reason.

13.     Burford's role ultimately came to light after it initiated an arbitration against Sysco seeking to enjoin Sysco from settling without Burford's consent. This was followed by public litigation in multiple forums that revealed Burford's interference with Sysco's settlement attempts.

14.     For example, in a public filing, Sysco described how Burford was using the courts as a "casino" in "hopes [of] mak[ing] more money on Sysco's claims and Burford's unrelated investments by forcing Sysco to continue litigating against its will."

15.     The legal proceedings between Sysco and Burford culminated with Sysco assigning to Carina, a Burford entity, its unassigned claims against Tyson and the other defendants in this action.

16.    Having succeeded in taking over Sysco's claims and substituting itself into this action (through Carina), after having blocked Sysco from resolving its claims against Tyson before they were assigned, Burford now seeks to co-opt the judicial system to extract an investment windfall over and above the settlement amount that Sysco was willing to accept.

17.    Burford has tortiously interfered with Tyson's prospective economic advantage and caused actionable damage to Tyson by disrupting Tyson's good-faith settlement efforts with Sysco. Burford's misconduct has caused, and will continue to cause, Tyson to incur significant legal and other expenses in connection with defending against Sysco's claims, and puts Tyson at risk of significant exposure arising out of claims that could have—and, absent Burford's interference, would have—been resolved years ago.

## PARTIES

18.    Tyson Foods, Inc. is a processor and seller of food products, including chicken, beef, pork, and turkey. It is incorporated in Delaware and headquartered at 2200 West Don Tyson Parkway, Springdale, Arkansas 72762.

19.    Tyson Chicken, Inc. is a Delaware corporation headquartered in Springdale, Arkansas and is a wholly-owned subsidiary of Tyson Foods, Inc.

20.    Tyson Breeders, Inc. is a Delaware corporation headquartered in Springdale, Arkansas and is a wholly-owned subsidiary of Tyson Foods, Inc.

21.    Tyson Poultry, Inc. is a Delaware corporation headquartered in Springdale, Arkansas and is a wholly-owned subsidiary of Tyson Foods, Inc.

22.    Burford Capital LLC is a Delaware limited liability company with a principal place of business in Wilmington, Delaware. On information and belief, Burford Capital LLC is wholly owned by Burford Capital Holdings (UK) Limited, which is registered in the United Kingdom. Burford Capital Holdings (UK) Limited, in turn, is owned by Burford Capital Limited,

which, according to filings that Burford Capital Limited has made with the U.S. Securities and Exchange Commission, is a publicly held corporation registered in Guernsey.

23.     Burford Capital LLC is joined as a third-party defendant in accordance with Federal Rules of Civil Procedure 13, 14, and 20.

24.     Carina Ventures LLC is a Delaware limited liability company and a wholly-owned affiliate of Burford Capital LLC.

25.     On information and belief, Carina Ventures LLC is a shell company that Burford Capital LLC created solely to receive the assignment of Sysco's claims in this case.

26.     Carina Ventures LLC is joined as a counterclaim-defendant in accordance with Federal Rules of Civil Procedure 13.

## JURISDICTION AND VENUE

27.     Jurisdiction is proper under 28 U.S.C. § 1367 because this claim arises from the same case or controversy as the litigation originally brought by Sysco and now being prosecuted by Burford (through assignment to Carina), in the above-captioned matter.

28.     The Court also has subject-matter jurisdiction over Tyson's claim against Burford Capital LLC under 28 U.S.C. § 1332 because the parties have complete diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.

29.      This Court has personal jurisdiction over Burford and Carina because each is engaged in business in Illinois, because Burford intentionally directed the conduct alleged herein at obstructing the resolution of a lawsuit in Illinois, and because Burford consented to the jurisdiction of Illinois courts by substituting Carina as a plaintiff in the above-captioned matter.

30.     Venue is proper in this Court because a substantial part of the events giving rise to the claim occurred in this district, as the settlement negotiations at issue relate to the above-captioned action. See 28 U.S.C. § 1391(b)(2).

31.     Additionally, venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(3) because Burford transacts business in this judicial district and is subject to personal jurisdiction in this district with respect to this action.

## FACTUAL ALLEGATIONS

32.     In 2018, Sysco filed a direct action against Tyson and others in this court alleging that the defendants conspired to reduce the supply of broiler chickens and manipulate the Georgia Dock index. *See Sysco Corp. v. Tyson Foods, Inc.*, No. 18-cv-700 (N.D. Ill. Jan. 30, 2018) (Dkt. 1).

33.     Soon after filing, Sysco's Complaint was consolidated into this action, which had been pending since 2016. (*See* Dkt. 708.)

34.     Sysco participated actively in fact discovery, which included the exchange of tens of millions of documents and the taking of hundreds of depositions.

35.     In 2019, Burford provided Sysco with more than $140 million in non-recourse litigation funding in exchange for a portion of any proceeds from Sysco's litigations against Tyson and other suppliers of broiler chickens, beef, pork, and turkey (collectively, the "protein litigations").

36.     The Capital Provision Agreement ("CPA") entered into between Sysco and Burford expressly provided that Sysco would "remain[] in full control of the assertion and resolution of [its] claims."

37.     Burford similarly has proclaimed that it does not interfere with its clients' litigation of claims that Burford funds.

38.     At a 2022 judicial symposium, for example, a Senior Vice President at Burford stated: "I don't know how to say this more clearly, we don't control settlement."

39. Similarly, in its 2020 Form 20-F filed with the U.S. Securities & Exchange Commission, Burford disclosed that "in our legal finance business . . . we are financing a client who retains decision-making authority in the litigation."

40. Despite what Burford promised Sysco and has touted publicly, and unknown to Tyson at all relevant times, Burford obstructed Sysco's prospective settlements with Tyson and others—to the point where Sysco had to litigate with Burford over its right to resolve its claims as it wished.

41. As Sysco's public litigation with Burford in 2023 brought to light, Burford was not willing to allow Sysco to settle its claims on the terms that Sysco had proposed and viewed as favorable.

A. **Sysco & Tyson Had Productive Settlement Discussions Until Burford's Improper Interference**

42. Following the completion of document productions, and as depositions were being taken, Sysco engaged in separate settlement discussions with several defendants in this action, including Tyson.

43. Sysco has stated that it "relied on its outside counsel at Boies Schiller throughout the settlement negotiations: Mr. Gant participated in multiple mediation sessions, consulted regularly with Sysco's in-house counsel on settlement strategy, and assisted in preparing settlement documentation."

44. Sysco ultimately reached a definitive settlement with at least one defendant, which Burford objected to and chose not to recognize.

45. Meanwhile, Sysco started assigning portions of its *Broilers* claims to its customers.

46.     By the fall of 2021, Sysco and Tyson had exchanged multiple rounds of settlement demands and offers, and Sysco and Mr. Gant were working to confirm the total volume of implicated sales Tyson had made to Sysco during the relevant period, net of assignments from Sysco to its customers. On information and belief, Sysco assigned away claims representing ███████████████████████████████████████████.

47.     Sysco's assignments to its customers reduced the value of Sysco's claims, as well as Burford's ability to recoup its investment in those claims.

48.     On information and belief, around that same time, and as a result of Mr. Gant's efforts to determine the volume and value of Sysco's assignments, Burford learned of Sysco's assignments and took steps to put a stop to them. In addition, unbeknownst to Tyson, Burford also took steps to stop Sysco from resolving its claims against Tyson (as well as its claims against certain other defendants in the protein litigations) and to wrest control of the settlement negotiations away from Sysco.

49.     As Sysco's Associate General Counsel later explained, when Burford learned that Sysco had assigned some of its protein claims to its customers, Sysco and Burford began discussing a potential restructuring of the CPA.

50.     To that end, Burford sent Sysco a proposal on October 20, 2021 that would have given Burford express control to direct the prosecution and settlement of Sysco's claims in this case and others.

51.     Around the same time that Burford learned of the assignments and sent Sysco its proposal seeking control over Sysco's settlements, Mr. Gant—who by that point had a conflict in his duty of loyalty to Burford and Sysco—informed Tyson that the last settlement demand would remain unchanged despite the assignments.

52.     Then, less than two weeks after Burford proposed taking control of Sysco's settlements, settlement discussions abruptly ended. On information and belief, this was done due to Burford's interference through Mr. Gant.

53.     At that point, Sysco and Tyson had been very close to agreeing on the settlement amount.

54.     Sysco and Tyson would have reached agreement but for Burford's improper interference.

**B.     Burford's Improper Interference Spawns Separate Litigation with Sysco**

55.     Sysco and Burford ultimately agreed to amend the CPA in March 2022 to give Burford a settlement consent right.

56.     The scope of this settlement consent right quickly became the subject of dispute between Sysco and Burford when Burford informed Sysco that it objected to and would not consent to settlements that Sysco wanted to enter into.

57.     On September 9, 2022, Burford initiated a request for arbitration seeking to enjoin Sysco from entering into any settlements.

58.     Burford sought (i) a temporary restraining order immediately enjoining Sysco from executing nearly-finalized proposed settlements and (ii) a preliminary injunction barring Sysco from settling any of its claims without Burford's consent.

59.     Sysco discovered in arbitration that Mr. Gant was acting on behalf of Burford and contrary to Sysco's interests. Sysco therefore discharged Boies Schiller as its counsel, stating that Boies Schiller's conduct "raise[d] serious concerns" about whether Boies Schiller violated its ethical obligations.

60.     Burford prevailed in the arbitration with Sysco.

61.     On March 8, 2023, Sysco filed a petition in this court to vacate the arbitral tribunal's award in favor of Burford, which blocked Sysco from entering into proposed settlements and negotiating settlements with other defendants, including Tyson.

62.     Shortly thereafter, Burford moved to confirm its award in the U.S. District Court for the Southern District of New York.

63.     As Sysco described in public filings, after years of litigation and lengthy settlement negotiations, Sysco had succeeded in securing "reasonable (indeed, favorable) settlement offers" and believed that "further negotiation or litigation would not result in a higher recovery."

64.     But Burford blocked Sysco from entering into those settlements—and any others—"forcing Sysco to continue to litigate against its will" because "Burford want[ed] to roll the dice on Sysco's claims." On information and belief, this included Sysco's remaining claims against Tyson in this case, which would have been settled more than a year earlier but for Burford's interference.

65.     Sysco went on to criticize the preliminary injunction award for ignoring that the "already overburdened courts that are now forced to manage complex and resource-consuming litigation between parties who want to settle, the other parties to those complex litigations, taxpayers who fund the court system, or the integrity of the judicial process, whose fundamental purpose is to do justice rather than to function as a casino in which investors can gamble in the hopes of achieving a financial windfall."

66.     Sysco's petition explained how Burford "sought to improperly influence Sysco's then-counsel in the ongoing antitrust litigations," including by getting Mr. Gant "to betray [his] fiduciary duties to Sysco and assist Burford in preventing the settlements."

**C.**     **Sysco Assigns Its Claims to Burford After Litigation**

67.     Burford and Sysco subsequently settled their dispute.

68.     On June 28, 2023, and as part of that settlement, Sysco moved this Court to substitute Burford's newly-created, wholly-owned affiliate, Carina, for it as the direct-action plaintiff.

69.     Attached to Sysco's motion was a copy of an assignment agreement, in which Sysco fully assigned its remaining claims and causes of action in this case (and other litigations) to Carina.

70.     On March 21, 2024, the Court granted Sysco's motion, substituting Burford (through Carina) for Sysco.

71.     Since then, Burford (through Carina) has sought to prevent the enforcement of other settlements that Sysco reached.

72.     As this Court knows, Pilgrim's Pride Corporation ("Pilgrim's") moved to enforce its agreement with Sysco after Burford refused to recognize it. The Court held that Sysco and Pilgrim's had reached an agreement on settlement and enforced the settlement despite Burford's objection and the subsequent dispute between Sysco and Burford in 2022-2023. (*See* Dkt. 7272.) Another court similarly concluded that Sysco had also reached settlements with Pilgrim's parent company in other litigations. *See* Rep. & Recommendation, *In re Pork Antitrust Litig.*, 18-cv-01776, ECF 2901 (D. Minn. Feb. 13, 2025); Mem. & Order Adopting Rep. & Recommendation, *In re Pork Antitrust Litig.*, 18-cv-01776, ECF 2925 (D. Minn. Mar. 25, 2025).

73.     As the disputes related to Sysco's other settlements have revealed, Burford and Boies Schiller deliberately concealed Mr. Gant's conflict of interest and engaged in misconduct to interfere with and thwart settlements by Sysco.

**D.    Burford Tries to Extract a Windfall from Tyson**

74.    Since the assignment, Tyson has attempted to engage in settlement discussions with Burford regarding Sysco's claims. But Burford has taken the position that it will only settle for an amount far greater than—and entirely divorced from—the amount of Sysco's last demand.

75.    As a direct result of Burford's tortious conduct, Tyson has incurred and will continue to incur additional legal and other expenses in connection with defending against Sysco's claims in this case.

76.    Burford's tortious conduct also puts Tyson at risk of significant exposure arising out of claims that could have—and, absent Burford's interference, would have—been resolved years ago.

77.    Absent Burford's interference, Tyson would have settled Sysco's claims as both parties intended for no more than the amount of Sysco's last October 2021 offer.

**COUNT I**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC**
**ADVANTAGE (AGAINST BURFORD CAPITAL LLC AND**
**CARINA VENTURES LLC)**

78.    Tyson repeats and realleges the allegations contained in Paragraph 1 through 63 as if set forth fully herein.

79.    Tyson had a reasonable expectation of a prospective agreement with Sysco to resolve its pending claims against Tyson in this case on mutually agreed-upon terms.

80.    Burford knew of Tyson's prospective economic advantage by virtue of its litigation funding relationship with Sysco and its relationship with Boies Schiller and Mr. Gant.

81.    On information and belief, Burford acted willfully and with malice in preventing Sysco from entering into a settlement agreement with Tyson to further its own interests,

647

including by co-opting Sysco's counsel to thwart the negotiations and otherwise causing Mr. Gant to breach his professional obligations to his client Sysco.

82.     As a direct and proximate result of Burford's wrongful interference, Tyson was prevented from entering into a settlement agreement with Sysco, resulting in the loss of Tyson's economic expectancies, which include the resolution of pending litigation claims, reduced litigation expenses, and reduced litigation exposure.

83.     Further, Burford is now attempting to leverage that misconduct by seeking to extract an extortionate settlement amount from Tyson, squandering judicial resources in the process to adjudicate claims that both Sysco and Tyson wanted to resolve.

84.     Burford engaged in conduct adverse to the interests of Sysco and motivated by Burford's own economic self-interest, which overcomes any purported defense that Burford was acting on Sysco's behalf and/or permitted to interfere with the prospective settlement with Tyson.

85.     Tyson is entitled to damages in amounts to be proven at trial, including but not limited to the additional litigation and other expenses Tyson has incurred and will continue to incur due to Burford's actions, as well as any amount Tyson may be required to pay in excess of Sysco's last October 2021 settlement demand to Tyson.

86.     Although entitled to damages, Tyson does not have an adequate remedy at law due to the irreparable harm caused by Burford's tortious conduct. Burford's misconduct has delayed or destroyed Tyson's ability to resolve Sysco's claims on the basis expected by the parties, increased the complexity of the litigation, increased Tyson's litigation exposure, and is forcing Tyson to incur not just additional legal expense but the time, effort, and distraction

associated with defending against Sysco's claims. Tyson therefore is entitled to injunctive relief prohibiting Burford from reaping any benefits from its tortious interference.

87.     Burford's misconduct was intentional, malicious, and in reckless disregard of Tyson's rights, entitling Tyson to punitive damages in amounts to be determined at trial, as necessary to deter Burford from such outrageous and harmful conduct.

88.     Tyson's claim is governed by the laws of the state of Illinois because Burford's conduct obstructed the resolution of Sysco's claims pending in, and has caused Tyson to incur additional legal expense in connection with defending, this case.

## PRAYER FOR RELIEF

WHEREFORE, Tyson prays that this Court will enter judgment in its favor and against Burford and award the following relief:

1.     Damages caused by Burford's tortious interference with Sysco and Tyson's settlement negotiations, in an amount to be determined at trial;

2.     Exemplary and punitive damages, in an amount to be determined at trial;

3.     An order prohibiting or permanently enjoining Carina or its affiliates from seeking or otherwise obtaining total damages from Tyson and/or its affiliates in excess of Sysco's last October 2021 settlement demand to Tyson;

4.     Tyson's costs of suit herein, including without limitation its attorneys' fees and expenses actually incurred as provided by applicable law;

5.     Pre-judgment and post-judgment interest on such monetary relief; and

6.     Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Tyson demands a trial by jury on all issues.

Dated:  April 11, 2025          Respectfully submitted,

AXINN, VELTROP & HARKRIDER LLP

*/s/ Denise L. Plunkett*
Kail J. Jethmalani (*pro hac vice*)
Denise L. Plunkett (*pro hac vice*)
Nicholas E.O. Gaglio (*pro hac vice*)
630 Fifth Avenue, 33rd Floor
New York, NY 10111
T: 212-728-2200
kjethmalani@axinn.com
dplunkett@axinn.com
ngaglio@axinn.com

Daniel K. Oakes (*pro hac vice*)
Kenina J. Lee (*pro hac vice*)
Michael J. O'Mara (*pro hac vice*)
1901 L Street NW
Washington, DC 20036
T: 202-912-4700
doakes@axinn.com
klee@axinn.com
momara@axinn.com

Jarod G. Taylor (*pro hac vice*)
90 State House Square
Hartford, CT 06103
T: 860-275-8100
jtaylor@axinn.com

LIPE LYONS MURPHY NAHRSTADT &
PONTIKIS, LTD.

Jordan M. Tank
230 West Monroe Street, Ste 2260
Chicago, IL 60606
T: 312-702-0586
jmt@lipelyons.com

*Attorneys for Defendants Tyson Foods, Inc.; Tyson Chicken, Inc.; Tyson Breeders, Inc.; and Tyson Poultry, Inc*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 11, 2025, she caused the foregoing to be filed electronically via the Court's CM/ECF system and to be served on all Track 2 DAP and Defendant counsel of record via email.

*/s/ Denise Plunkett*
Denise L. Plunkett