**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| *IN RE BROILER CHICKEN ANTITRUST LITIGATION* | No. 1:16-cv-08637 |
| This Document Relates To: <br> *All End-User Consumer Plaintiff Actions* | Honorable Thomas M. Durkin |

**END-USER CONSUMER PLAINTIFFS' MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR FINAL APPROVAL OF**
**SETTLEMENT WITH AGRI STATS, INC. AND RESPONSE TO OBJECTIONS**

**TABLE OF CONTENTS**

**Page**


I. INTRODUCTION .......... 1

II. BACKGROUND .......... 2

A. Procedural Background of Litigation .......... 2

B. The Settlement Agreement .......... 3

III. THE SETTLEMENT SATISFIES THE STANDARD FOR FINAL APPROVAL. .......... 7

A. The Settlement is fair, reasonable, and adequate. .......... 8

1. Rule 23(e)(2)(A): Class Representatives and Co-Lead Counsel adequately represented the class. .......... 8

2. Rule 23(e)(2)(B): the parties negotiated the Settlement Agreement at arm's length. .......... 10

3. Rule 23(e)(2)(C): the relief for the class is adequate, considering the four factors. .......... 10

a. The costs, risks, and delay of trial and appeal favor settlement. .......... 10

b. The effectiveness of any proposed method of distributing relief to the class, including the method of processing class members' claims. .......... 11

c. Co-Lead Counsel are not requesting an additional fee award for this Settlement Agreement. .......... 12

d. All agreements have been identified in accordance with Rule 23(e)(3). .......... 12

4. Rule 23(e)(2)(D): The proposal treats Class Members equitably relative to one another. .......... 12

5. Experienced counsel recommends the Settlement Agreement. .......... 13

6. The positive reaction of the class supports the Settlement. .......... 13

7. The stage of the proceedings favors granting final approval of the Settlement. .......... 13

B. The Court-approved notice plan is sufficient under both the Class Action Fairness Act and Rule 23. .......... 14

1. Defendant has provided notice that is compliant with the Class Action Fairness Act (CAFA). .......... 14

2. The notice plan satisfies due process under Rule 23 and has been fully implemented. .......... 15

IV. RESPONSE TO OBJECTIONS .......... 16

A. The dearth of objections to the settlement strongly supports final approval. .......... 16

B. Objector Huang's objections to the settlement lack merit. .......... 16

1. The value of the settlement outweighs the value of the appeal. .......... 17

2. The settlement provides meaningful relief. .......... 17

3. The named plaintiffs have standing. .......... 19

C. The other objections similarly lack merit. .......... 20

V. CONCLUSION .......... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*,
2012 WL 651727 (N.D. Ill. Feb. 28, 2012) ....................10

*In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*,
789 F. Supp. 2d 935 (N.D. Ill. 2011) ....................13, 14, 16

*In re Blue Cross Blue Shield Antitrust Litig.*,
85 F.4th 1070 (11th Cir. 2023) ....................18

*In re Cap. One Tel. Consumer Prot. Act Litig.*,
80 F. Supp. 3d 781 (N.D. Ill. 2015) ....................13, 14

*Charvat v. Valente*,
2019 WL 5576932 (N.D. Ill. Oct. 28, 2019)....................10

*Coachman v. Gateway Found., Inc.*,
2026 WL 1533847 (N.D. Ill. June 1, 2026)....................20

*Coleman v. Cannon Oil Co.*,
849 F. Supp. 1458 (M.D. Ala. 1993) ....................18

*In re Currency Conversion Fee Antitrust Litig.*,
263 F.R.D. 110 (S.D.N.Y. 2009), *aff'd sub nom. Priceline.com, Inc. v. Silberman*, 405 F. App'x 532 (2d Cir. 2010)., ....................18

*Dial Corp. v. News Corp.*,
17 F.R.D. 426 (S.D.N.Y. 2016) ....................18

*Henry v. Sears Roebuck & Co.*,
1999 WL 33496080 (N.D. Ill. Jul. 23, 1999)....................8

*Hispanics United of DuPage County v. Village of Addison, Ill.*,
988 F.Supp. 1130 (N.D. Ill. 1997) ....................14

*Isby v. Bayh*,
75 F.3d 1191 (7th Cir. 1996) ....................7, 13

*In re Mexico Money Transfer Litig.*,
164 F.Supp.2d 1002 (N.D. Ill. 2000) *aff'd*, 267 F.3d 743 (7th Cir. 2001)....................16

*New York v. Microsoft Corp.*,
224 F. Supp. 2d 76 (D.D.C. 2002), *aff'd*, 373 F.3d 1199 (D.C. Cir. 2004). ....................18

*In re NASDAQ Market-Makers Antitrust Litig.*,
187 F.R.D. 465 (S.D.N.Y. 1998) ....................................................................................11

*In re Packaged Ice Antitrust Litig.*,
322 F.R.D. 276 (E.D. Mich. 2017). ..............................................................................18

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
2026 WL 1662251 (E.D.N.Y. June 9, 2026) ...............................................................18

*Pearson v. NBTY, Inc.*,
772 F.3d 778 (7th Cir. 2014). .......................................................................................18

*Phemister v. Harcourt Brace Jovanovich, Inc.*,
1984 WL 21981 (N.D. Ill. Sept. 14, 1984) ....................................................................8

*Saltzman v. Pella Corp.*,
257 F.R.D. 471 (N.D. Ill. 2009), *aff'd*, 606 F.3d 391 (7th Cir. 2010) ..........................9

*In re: Sears, Roebuck & Co. Front-Loading Washer Prods. Liab. Litig.*,
2016 WL 772785 (N.D. Ill. Feb. 29, 2016) ..................................................................11

*In re Subway Footlong Sandwich Mktg. & Sales Practices Litig.*,
869 F.3d 551 (7th Cir. 2017) ...................................................................................18, 19

*Sullivan v. DB Invs., Inc.*,
667 F.3d 273 (3d Cir. 2011).........................................................................................18

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*,
463 F.3d 646 (7th Cir. 2006) .......................................................................7, 13, 14, 16

*T.K. Through Leshore v. Bytedance Tech. Co.*,
2022 WL 888943 (N.D. Ill. Mar. 25, 2022)...........................................................8, 9, 11

*In re Toys R Us Antitrust Litig.*,
191 F.R.D. 347 (E.D.N.Y. 2000) ..................................................................................18

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021).......................................................................................................20

*In re Turkey Antitrust Litig.*,
2026 WL 1960792 (N.D. Ill. July 7, 2026)...................................................................17

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
396 F.3d 96 (2d Cir. 2005)............................................................................................11

*Wong v. Accretive Health, Inc.*,
773 F.3d 859 (7th Cir. 2014) ..........................................................................................7

**Statutes**

28 U.S.C. § 1715(b) ........................................................................................................14, 15

**Other Authorities**

Fed. R. Civ. P. 23 ........................................................................................................ *passim*

## I. INTRODUCTION

After a decade of hard-fought litigation, End-User Consumer Plaintiffs (EUCPs) seek final approval of their final settlement in the case, with Agri Stats, Inc. (Agri Stats). The Settlement secures meaningful and immediate conduct reform which halted the information-exchange practices at the center of EUCPs' claims against Agri Stats. Sales reports (containing SKU level pricing) have been halted. Other pricing information will only be exchanged at an aggregate level. Agri Stats has agreed to adopt antitrust compliance training, removing the focal point flags in reports that caused economic concern. And this relief comes after adverse summary judgment ruling for EUCPs, and a fully briefed appeal to the Seventh Circuit. Moreover, EUCPs have continued to work on behalf of the class for no additional attorneys' fees and have agreed to bear the costs of notice to the class ($23,000).

There can be no question but that EUCPs have worked tirelessly on behalf of the class. Final approval is warranted because the settlement corrects the core anticompetitive conduct challenged in this litigation, avoids the substantial risks and delay of continued appellate and trial proceedings, imposes no new fee request, and has generated only minimal objection despite notice to millions of potential class members.

This Court granted preliminary approval of EUCPs' settlement with Agri Stats on April 15, 2026.[1] The Court also ordered dissemination of notice to class members on April 15, 2026.[2] Class Counsel and the settlement administrator, A.B. Data, have now successfully executed the notice plan approved by this Court. EUCPs sent direct email notice to more than 17 million

---

[1] Order Granting End-User Consumer Plaintiffs' Uncontested Motion for Preliminary Approval of Settlement with Agri Stats, Inc. and Motion to Direct Notice Regarding Settlement ("Order Granting Preliminary Approval"), Dkt. No. 8341 (Apr. 15, 2026).

[2] *Id.*

potential class members, accompanied by indirect notice through news releases utilizing PR Newswire's US1 and national Hispanic newlines. Cowen Decl., ¶¶ 7, 9, and Ex. A-C.[3] Class Counsel and the settlement administrator also managed a settlement website (www.overchargedforchicken.com) which has been constantly updated with new events, instructions, and important documents.

This class encompasses millions of consumers. However, despite the class's size, there have only been six objectors. The small number of objectors represents a positive result for the Class and reflects the effectiveness of the notice program, further supporting final approval. In accordance with Rule 23, the Settlement is fair, adequate, and reasonable. Plaintiffs respectfully request that the Court enter an order finally approving the Settlement.

## II. BACKGROUND

### A. Procedural Background of Litigation

This Court is familiar with the background of this litigation; EUCPs have vigorously litigated this case for approximately ten years. The EUCP representatives are a group of individuals who purchased chicken in a state that recognizes standing for indirect purchasers.[4] The Court appointed Hagens Berman Sobol Shapiro LLP (Hagens Berman) and Cohen Milstein Sellers & Toll PLLC (Cohen Milstein) as Co-Lead Counsel for the Class. Dkt. Nos. 144, 248. This Court previously granted EUCPs' motion for class certification, and the parties later extensively briefed and argued summary judgment, which were resolved in June 2023. Dkt. No.

[3] "Cowen Decl." refers to the Declaration of Mark Cowen in Support of End-User Consumer Plaintiffs' Motion for Final Approval of Settlement, filed concurrently herewith.

[4] The class representatives are: Ian Adams, Angela Ashby, Linda Cheslow, Kenneth Cote, Kristin Davis, Abraham Drucker, James Flasch, Jr., Christina Hall, Matthew Hayward, Richard Heftel, Stephen Holt, Joshua Madsen, William David Marino, Dorothy Monahan, Dina Morris, Alison Pauk, Daniel Percy, Catherine Senkle, Diane Spell, Margaret ("Margo") Stack, Marilyn Stangeland, Eric Thomas, David & Leslie Weidner, Natalie Wilbur, and Michael Perry.

6641, *amended* by Dkt. No. 7028; Dkt. No. 8314 at 2. The Court granted summary judgment for Agri Stats and in favor of all defendants on EUCPs' rule of reason claims. EUCPs appealed the dismissal of the rule of reason claims against Agri Stats to the Seventh Circuit, and that appeal was fully briefed and set for argument before the parties reached agreement on settlement terms and obtained a limited remand to seek approval of the Settlement. Dkt. No. 8314-1 at 2-3.

EUCPs have previously settled with all defendants other than Agri Stats, resulting in a total recovery of over $203 million. Dkt. No. 8314 at 3. Against that backdrop, the Settlement resolves EUCPs' remaining claims against the last unsettled defendant and secures forward-looking conduct relief directed at the Agri Stats reporting practices challenged by EUCPs.

## B. The Settlement Agreement

There can be no doubt that, after a decade of litigation, this final Settlement Agreement was the product of confidential, protracted, and intense arm's-length negotiations. The fairness, reasonableness, and adequacy of this Settlement are also supported by the relief obtained on behalf of the EUCP Class. Agri Stats currently sells reports only in the broiler chicken market. Consumers of chicken, the EUCP Class, consume chicken repeatedly. Dkt. No. 4487-3, ¶¶ 188-191; Hall Decl., ¶ 6.[5] This means that the vast majority of Class Members who bought chicken during the class period are likely still buying chicken today. EUCPs believe the Settlement will have substantial pro-consumer benefits in the broilers market. Dkt. No. 8314-1, ¶ 5. The Settlement addresses the concerns that motivated this lawsuit, including the cessation of the sales reports in their entirety. The specific conduct reform provisions include:

a. Retain an experienced outside attorney with responsibility for antitrust compliance.

[5] Hall Decl. refers to the Declaration of Christina Hall in Support of Motion for Final Approval of End-User Consumer Plaintiffs' Settlement with Agri Stats, Inc., filed concurrently herewith.

b. Conduct annual employee antitrust compliance training.

c. Implement a written antitrust compliance policy and training:

(1) Prohibiting Agri Stats and its employees from disclosing to a competitor of a broiler subscriber, orally or in writing (including through custom reports), any non-public information collected from a broiler subscriber other than the anonymized information disclosed in Agri Stats' reports;

(2) Prohibiting any Agri Stats broiler report from containing actual competitor- or plant-level price or production volume data;

(3) Implementing data security measures to prevent broiler customer employees who transition from firm A to firm B from accessing firm A data;

(4) Implementing data security measures to prevent Agri Stats employees who transition to a customer firm from accessing non-public or non-anonymized Agri Stats data;

(5) Prohibiting Agri Stats and its employees from assisting with identifying and/or de-anonymizing broiler subscriber data in Agri Stats' reports;

(6) Ensuring that all data values within all data fields in Agri Stats broiler reports consist of data from at least three entities with no entity representing more than 70% of the data, except for quartile data fields and plant-level data fields (that are not removed as set forth in Exhibit A, as discussed below).

(7) Agri Stats will suppress any fields that have categorical values (for example a field that takes on values of YES and NO, or a plant shift field which lists the shifts a plant operates, or the breed processed at a particular plant) if any given value of that category has fewer than three firms. If, at any time, the number of plants increases or the number of firms that take on a particular value increases, the field no longer needs to be suppressed. Conversely if the number of plants decreases or the number of firms that take on a particular value decreases such that fewer than three firms take on a particular value, the field will be suppressed even if it had not been in the past;

(8) Requiring that, other than data available for anyone to purchase as set forth below, every data field in Agri Stats broiler reports shall be composed of data that is at least 45 days old on average;

d. Implement provisions protecting confidentiality of competitor data in Agri Stats broiler customer contracts.

e. Remove all participant lists in broiler reports.

f. Remove all flags in broiler reports.

g. Remove in the broiler reports made available to a report recipient all plant-level production-related data fields identified in Exhibit A for broiler subscribers other than the report recipient. Notwithstanding the foregoing, Agri Stats may provide to a subscriber a subscriber's rank and percentile for these data fields.

h. Modify the broiler reports as necessary to (1) delete variance fields and/or (2) suppress "linking" of data fields across reports that would otherwise disclose the plant-level data field identified in Exhibit A.

i. Nothing in this Settlement Agreement prohibits or limits EMI's ability to provide nationwide average price data by product category for anyone (including consumers) to purchase. Agri Stats also shall publish a broiler performance report containing the production-related data fields identified in Exhibit B for anyone (including consumers) to purchase. Neither Agri Stats nor EMI may refuse a purchase of such reports on the basis that the purchaser is not a protein producer unless the persons or entities have unresolved claims pending against Agri Stats. The prices for such reports shall be no more than the average price being charged to Agri Stats' or EMI's regular customers as of the date of purchase. Except as set forth in this paragraph, nothing in this Settlement Agreement shall prohibit Agri Stats or EMI from adjusting or altering prices to any customer or adjusting other terms and conditions of purchase from time to time in its sole discretion. Such reports shall be made available without requiring the submission of data from subscribers, except that Agri Stats and EMI may continue to require processors to submit data.

j. Agri Stats will not introduce any averages in any broiler reports or subsections that do not comply with the 3 entity / 70% rule set forth above.

k. No non-public export data collected from a subscriber will be provided to any competitor other than the information disclosed in Agri Stats' regular broiler reports.

l. Agri Stats will provide no forward-looking industry forecasts to broiler processors, including regarding how future industry production decisions might impact future prices or profitability. For the avoidance of doubt, nothing in the Settlement Agreement prohibits or limits EMI's ability to provide forward-looking industry forecasts based on publicly available data for anyone (including consumers) to purchase and EMI may not

refuse such a purchase on the basis that the purchaser is not a protein producer unless the persons or entities have unresolved claims pending against Agri Stats.

m. Agri Stats agrees that it will not re-add the plant-level data fields set forth in Exhibit A for subscribers other than the report recipient under a different numbering system, report, or mechanism for delivery to a report recipient. For the avoidance of doubt, nothing in the Settlement Agreement prohibits or limits 1) subscriber disclosure of data to Agri Stats or Agri Stats' addition of new reports or services, so long as such reports or services incorporate corresponding restrictions to those set forth herein; or 2) the renumbering and reordering of reports or data fields.

n. Agri Stats will not disclose any non-public data collected from a broiler subscriber to any competitor of the subscriber other than the anonymized information disclosed in Agri Stats' regular reports, including through electronic tools like the sales data miner, web application programming interfaces ["API"] services, or other web services provided by Agri Stats and/or its parents, subsidiaries, owners, or contractors. For the avoidance of doubt, nothing in the Settlement Agreement prohibits Agri Stats from providing broiler reports to subscribers in different electronic formats, so long as the format complies with the other provisions of this Settlement Agreement.

o. Agri Stats shall cease, and will not resume in the future, publication of any and all sales reports. Agri Stats shall cease, and will not resume in the future, publication of any and all price data for product categories that are not otherwise available to the public from EMI pursuant to paragraph i.

Dkt. No. 8314-2 at ¶ 2. Agri Stats has agreed not to reintroduce these materials in a different form, or under a different numbering system. *Id.* This conduct reform will remain in place for five years. *Id*.

In consideration for this Settlement, EUCPs agree to release certain claims (as defined in the Settlement Agreement) against Agri Stats which arise out of the facts of this case. *Id.* at ¶¶ 4-5. This release does not extend to unrelated claims. *Id.* EUCPs' counsel are not requesting fees. Each side has agreed to bear their own costs. *Id.* at ¶ 3.

## III. THE SETTLEMENT SATISFIES THE STANDARD FOR FINAL APPROVAL.

There is an overriding public interest in settling litigation, and this is especially true in class actions.[6] Still, settlements of class action litigation must be reviewed to ensure they are "fair, reasonable, and adequate."[7] The Seventh Circuit reviews a district court's final approval determination for abuse of discretion.[8]

To determine whether a proposed class action settlement meets the final approval requirements, Rule 23(e)(2) instructs courts to consider whether: (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided by the settlement is adequate, taking into account (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class; (iii) the terms of any proposed award of attorney's fees, including timing of payment; (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.[9] The Seventh Circuit also instructs courts to consider (5) the strength of the plaintiffs' case compared to the amount of the defendants' settlement offer, (6) the opinion of experienced counsel, (7) the reaction of the class, and (8) the stage of the proceedings and the amount of discovery completed.[10]

The Court must also determine whether the parties have provided sufficient notice to Class Members, both under the Class Action Fairness Act and the requirements of Federal Rule

---

[6] *See Isby v. Bayh*, 75 F.3d 1191, 1198-99 (7th Cir. 1996).

[7] Fed. R. Civ. P. 23(e)(2).

[8] *Wong v. Accretive Health, Inc.*, 773 F.3d 859, 862 (7th Cir. 2014) (citing *Isby*, 75 F.3d at 1196).

[9] Fed. R. Civ. P. 23(e)(2).

[10] *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (citing *Isby*, 75 F.3d at 1199).

of Civil Procedure 23(c)(2)(B). Here, the Settlement meets these standards, and final approval should be granted.

### A. The Settlement is fair, reasonable, and adequate.

The proposed Settlement Agreement satisfies each of the prongs listed under Rule 23(e)(2), as well as the additional four prongs used by the Seventh Circuit. Taken together, the agreement meets the standards required for the Court to grant final approval.

#### 1. Rule 23(e)(2)(A): Class Representatives and Co-Lead Counsel adequately represented the class.

The Class Representatives and Co-Lead Counsel have more than adequately represented the EUCP Class. It is well-established in the Seventh Circuit that the judgment and opinion of experienced and competent counsel should be considered when assessing the fairness, reasonableness, and adequacy of a settlement.[11] Co-Lead Counsel have substantial experience litigating complex antitrust cases and took their work representing the class seriously. Class Counsel has dedicated nearly 90,000 hours to developing and litigating Plaintiffs' claims over the course of a decade. Dkt. No. 7706-2 at 1. During this time, Class Counsel overcame steep obstacles, including a protracted class certification fight, multiple rounds of expert challenges and motions to dismiss, and an exhaustive 100,000-page summary judgment gauntlet. Class Counsel also coordinated more than 180 depositions, pored over the equivalent of 1,300 physical filing cabinets of paper, and prepared extensively for trial. Critically, it is this same body of case-

[11] "What matters here is that experienced counsel—particularly counsel experienced in class action litigation—have reached the settlement and are proposing it. . . . this factor weighs in favor of approval of the Proposed Settlement." *T.K. Through Leshore v. Bytedance Tech. Co.*, 2022 WL 888943, at *16–17 (N.D. Ill. Mar. 25, 2022) (quotation marks and citation omitted); *Henry v. Sears Roebuck & Co.*, 1999 WL 33496080, at *11 (N.D. Ill. Jul. 23, 1999) ('"It is appropriate for the Court to rely on the judgments of the experienced counsel who litigated this case that this settlement is fair."') (quoting *Phemister v. Harcourt Brace Jovanovich, Inc.*, 1984 WL 21981, at *11 (N.D. Ill. Sept. 14, 1984)).

wide work that gave Co-Lead Counsel a uniquely informed basis from which to evaluate and negotiate the Settlement with Agri Stats.

The manner in which the parties reached this settlement reinforces that conclusion. As this Court has recognized, "[w]hat matters here is that experienced counsel—particularly counsel experienced in class action litigation—have reached the settlement and are proposing it,"[12] and, accordingly, this factor supports final approval. Co-Lead Counsel engaged in extensive arm's-length negotiations to reach the Settlement with Agri Stats, at times reaching impasse, only to try again as the appeal of this Court's summary judgment ruling progressed. Dkt. No. 8314 at 3. . Class Counsel spent dozens of hours negotiating, including the assistance of economists on the EUCP team who are deeply familiar with the Agri Stats reports, to reach this Settlement for the EUCP class. Counsel for EUCPs have also paid the costs of these economists out of their own pockets, and are not seeking reimbursement.

Likewise, the named plaintiffs have adequately represented the EUCP Class, as required by the Federal Rules.[13] The adequacy requirement is satisfied where the named representatives have sufficient interest in the outcome of the case to ensure vigorous advocacy, and do not have interests antagonistic to those of the class.[14] The Class Representatives have the same interest in the case as other class members: they each purchased chicken from grocery stores, unaware of Defendant Processors' alleged agreement—facilitated through the exchange of competitively sensitive information via Agri Stats reports—to restrict the supply and raise the price of Broilers,

[12] *T.K. Through Leshore*, 2022 WL 888943, at *16–17.

[13] Fed. R. Civ. P. 23(a)(4).

[14] *Saltzman v. Pella Corp.*, 257 F.R.D. 471, 480 (N.D. Ill. 2009), *aff'd*, 606 F.3d 391 (7th Cir. 2010).

and they all share an interest in obtaining conduct relief from Agri Stats. This Court has repeatedly found the EUCP class representatives to be adequate. Dkt. Nos. 5304, 5644, 7790.

**2. Rule 23(e)(2)(B): the parties negotiated the Settlement Agreement at arm's length.**

There is generally a presumption that a proposed settlement is fair and reasonable when it is the result of arm's length negotiations, as this Settlement was.[15] The Settlement took dozens of hours for EUCPs to negotiate, and it was reached after significant discovery. There are no terms in the Settlement Agreement that would suggest collusion.[16] This consideration weighs in favor of granting final approval.

**3. Rule 23(e)(2)(C): the relief for the class is adequate, considering the four factors.**

Under Rule 23(e)(2)(C), a district court may consider four factors in determining whether the relief awarded for the class is adequate. Each of those factors supports granting final approval in the settlement at issue here.

**a. The costs, risks, and delay of trial and appeal favor settlement.**

The first factor that a court may consider is the costs, risks, and delay of trial and appeal. This case involved high risk at all stages and required significant upfront expenses, with Class Counsel advancing more than $9.9 million in expenses to litigate this case.[17] The Court has already granted summary judgment for Agri Stats and against EUCPs on the rule of reason

---

[15] *See* 2 NEWBERG ON CLASS ACTIONS, § 11.40 at 451 (2d ed. 1985); *Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, 2012 WL 651727, at *10 (N.D. Ill. Feb. 28, 2012) ("A presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.").

[16] *See Charvat v. Valente*, 2019 WL 5576932, at *5 (N.D. Ill. Oct. 28, 2019) (finding "[t]he settlement agreement contains no red flags that would lead the Court to think the settlement agreement resulted from anything other than good faith arm's length negotiations").

[17] Dkt. No. 7856 (Memo. ISO EUCP Renewed Second Mot. for Attorneys' Fees, Expenses, and Class Representative Service Awards) at 20.

claim, and EUCPs' appeal of that ruling to the Seventh Circuit was fully briefed and set for oral argument. Dkt. No. 8314 at 2. Absent this Settlement, EUCPs would have to prevail on that pending appeal, then return to the district court to litigate liability, impact, and damages against Agri Stats—with no guarantee of ultimate recovery—and any judgment would likely trigger further appellate proceedings, further prolonging the case and its expense.[18] The Settlement eliminates these risks and delays for EUCPs by securing conduct relief now, and it eliminates for Agri Stats the risk that the Seventh Circuit could reverse the summary judgment ruling in its favor and expose it to continued litigation. Given the nature of this Settlement as a product of compromise and independent decision-making, the Court should grant final approval.[19]

**b. The effectiveness of any proposed method of distributing relief to the class, including the method of processing class members' claims.**

The Settlement provides conduct relief, so there is no monetary relief to distribute and no claims-processing mechanism to administer for monetary payments. The conduct relief is substantial. Agri Stats has agreed to stop all sales reports. Dkt. No. 8314-2 at ¶ 2(o). In addition, Agri Stats will remove the participant lists on the front of the reports. *Id.* at ¶ 2(e). Agri Stats will also remove competitor- or plant-level price or production volume data from the reports. *Id.* at ¶ 2(c)(ii). Furthermore, Agri Stats has agreed to a new rule that all data fields in the reports include data from at least three entities, with no entity representing more than 70% of the data (the 3 entity / 70% rule). *Id.* at ¶ 2(c)(vi), (j). And Agri Stats has agreed that all data must be over 45

[18] *See, e.g.*, *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 118 (2d Cir. 2005) ("'Indeed, the history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal.'") (quoting *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 476 (S.D.N.Y. 1998)).

[19] *See T.K. Through Leshore*, 2022 WL 888943, at *14 ("[P]arties must compromise to reach a settlement. Accordingly, courts need not—and indeed should not—reject a settlement solely because it does not provide a complete victory to plaintiffs.") (quotation marks and citation omitted); *In re: Sears, Roebuck & Co. Front-Loading Washer Prods. Liab. Litig.*, 2016 WL 772785, at *12 (N.D. Ill. Feb. 29, 2016) (highly adversarial negotiations favor final approval).

days old. *Id.* at ¶ 2(c)(viii). These reforms, together with a robust set of antitrust training and compliance practices, remove the core alleged anticompetitive conduct from this market. This form of relief is indivisible because Agri Stats cannot vary its conduct based on the identity of class members. Thus, this substantial conduct relief will apply to each member of the Settlement Class. This factor favors final approval.

**c. Co-Lead Counsel are not requesting an additional fee award for this Settlement Agreement.**

EUCPs are not requesting any additional award of attorneys' fees. Class Counsel litigated this case against Agri Stats for approximately ten years—through class certification, summary judgment, and a fully briefed appeal to the Seventh Circuit—and are not seeking any compensation for their work on the appeal and this settlement, despite that extensive effort. This factor strongly favors final approval.

**d. All agreements have been identified in accordance with Rule 23(e)(3).**

EUCPs certify that they have identified for the Court all agreements in accordance with Rule 23(e)(3). Plaintiffs publicly filed a copy of this Settlement Agreement with this Court and posted a copy of the Settlement Agreement on the settlement website. There are no other agreements between Plaintiffs and Agri Stats.

**4. Rule 23(e)(2)(D): The proposal treats Class Members equitably relative to one another.**

The conduct relief in the Settlement Agreement treats Class Members equitably to each other. This relief is indivisible by nature. Under the terms of the Settlement Agreement, Agri Stats will restrict the competitively sensitive information in the broiler chicken reports it circulates to subscribers, including by removing competitor- and plant-level price and production-volume data and ceasing its sales reports entirely. Dkt. No. 8413-2 at ¶ 2. These

actions benefit Class Members equally, and this conduct relief does not vary by Class Member. Thus, this factor weighs in favor of approving the Settlement.

**5. Experienced counsel recommends the Settlement Agreement.**

The Seventh Circuit also encourages courts to weigh the opinion of experienced counsel when deciding to approve a settlement.[20] Both Hagens Berman and Cohen Milstein have decades of experience litigating antitrust cases on behalf of consumers, which is why this Court chose to appoint the firms as Class Counsel. Dkt. No. 248; Dkt. No. 5644. In the years since the firms were appointed, Class Counsel have skillfully and enthusiastically fulfilled their roles, leveraging their experience for the benefit of the class. Thus, Class Counsel's recommendation that the Court grant final approval of the Settlement provides significant support for the Court doing so.[21]

**6. The positive reaction of the class supports the Settlement.**

The reaction of the Class has been overwhelmingly positive. Despite the Agri Stats notice program reaching approximately 17 million potential Settlement Class Members via email and over 56,000 visitors via the settlement website, there have only been six objectors. "Such a low percentage of opposition favors a finding that the settlement is fair, reasonable, and adequate under Rule 23."[22] EUCPs address those objections below.

**7. The stage of the proceedings favors granting final approval of the Settlement.**

The final factor that the Seventh Circuit asks courts to assess is the stage of the proceedings and the amount of discovery completed at the time of settlement, both of which

---

[20] *Isby*, 75 F.3d at 1199.

[21] *In re Cap. One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 792 (N.D. Ill. 2015) ("Even though Class Counsel may be considered biased because they stand to benefit from approval, under *Synfuel*, this factor weighs in favor of approval.").

[22] *Id.*; *see also In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 965 (N.D. Ill. 2011) (finding scant opposition to the settlement where 0.01% of class members objected or opted out).

strongly support granting final approval of the Settlement.[23] This information is relevant in determining both whether EUCPs and Class Counsel made informed decisions to approve and recommend the Settlement, as well as how fully the Court can evaluate the merits of EUCPs' claims.[24] This case is ten years old, with over 8,000 docket entries, hundreds of depositions, and millions of documents exchanged. Courts have held that this factor favors settlement when discovery has been much less extensive.[25] Here, the years of robust discovery that occurred before settlement weigh in favor of granting final approval of the Settlement Agreement.[26]

### B. The Court-approved notice plan is sufficient under both the Class Action Fairness Act and Rule 23.

EUCPs' Settlement Agreement must satisfy two additional factors related to the sufficiency of the Court-approved notice plan. Both weigh in favor of granting final approval.

#### 1. Defendant has provided notice that is compliant with the Class Action Fairness Act (CAFA).

Under CAFA, a defendant participating in a proposed class action settlement "shall serve [notice of the proposed settlement] upon the appropriate State official of each State in which a class member resides and the appropriate Federal official" no later than 10 days after the proposed settlement is filed in court.[27] A court is not permitted to grant final approval of the

---

[23] *Synfuel Techs., Inc.*, 463 F.3d at 653.

[24] *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d at 966.

[25] *In re Cap. One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d at 793 (finding six months of discovery to be sufficient); *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d at 966 (finding an exchange of informal discovery to be sufficient).

[26] *Hispanics United v. Village of Addison*, 988 F. Supp. 1130, 1170–71 (N.D. Ill. 1997) (where settlement was entered into only after case had been set for trial and trial preparation was virtually complete, the "advanced stage of the proceedings weigh[ed] heavily in favor of approving the settlement").

[27] 28 U.S.C. § 1715(b).

settlement until these notices have been served.[28] Here, Agri Stats has filed notice on the docket that it served the required CAFA notices. Dkt. No. 8342. EUCPs are unaware of any State Attorney General objecting to the Settlement.

**2. The notice plan satisfies due process under Rule 23 and has been fully implemented.**

Class actions certified under Rule 23(b)(3) must satisfy the notice provisions of Rule 23(c)(2), which includes providing the "best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."[29] Because this Settlement provides for injunctive relief only, Class Members have no right to opt out but retain the right to object.

This Court approved the form of the proposed class notice and notice program. Dkt. No. 8341 at ¶¶ 1, 8. An experienced notice and claims administrator, A.B. Data, Ltd., ran the notice campaign. The campaign included direct email notice to approximately 17 million potential class members, news releases, and the maintenance of a settlement website (www.overchargedforchicken.com) that has generated over 56,000 unique visits thus far. A press release was issued in both Spanish and English, and distributed directly to PR Newswire's US1 and Hispanic National newslines. The notice itself informed class members of the nature of the action, the terms of the proposed settlement, the effect of the action and the release of claims, as well as class members' right to object to the proposed settlement. This notice complies with all the requirements of Rule 23.

---

[28] 28 U.S.C. § 1715(d) ("An order giving final approval of a proposed settlement may not be issued earlier than 90 days after the later of the dates on which the appropriate Federal official and the appropriate State official are served with the notice required under [28 U.S.C. § 1715(b).]").

[29] Fed. R. Civ. P. 23(c)(2)(B).

## IV. RESPONSE TO OBJECTIONS

Six class members have objected, in a notice program that reached millions of potential Settlement Class Members, and none provides a basis to deny final approval. The objections either challenge features inherent in an injunctive-relief settlement, raise issues already addressed by the Settlement Agreement and notice program, or fail to show that the Settlement falls outside the range of fair, reasonable, and adequate results under Rule 23.

### A. The dearth of objections to the settlement strongly supports final approval.

The Claims Administrator provided individual notice of the settlement to approximately 17 million class members. Cowen Decl., ¶ 7. Only six class members objected to the settlement—*less than .00003%* of the number of class members who received direct e-mail notice. The fact that such a negligible percentage of class members objected to the settlement strongly supports final approval.[30]

### B. Objector Huang's objections to the settlement lack merit.

Shiyang Huang ("Huang") objects to the Settlement on three purported bases: (1) that the Settlement undervalues Plaintiffs' chances on appeal; (2) that the Settlement provides no meaningful relief; and (3) that the named Plaintiffs lack standing to settle for injunctive relief. *See* Dkt. No. 8469, at 1. None of these objections have merit.

---

[30] *See Synfuel Techs., Inc.*, 463 F.3d at 653 (courts should consider "the amount of opposition to settlement among affected parties" in evaluating proposed settlement); *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d at 965 (finding 10 objections from roughly 32 million class members to be "remarkably low level of opposition [that] supports the Settlement"); *In re Mexico Money Transfer Litig*., 164 F.Supp.2d 1002, 1021 (N.D. Ill. 2000) (fact that more than "99.9% of class members have neither opted out nor filed objections ... is strong circumstantial evidence in favor of the settlement"), *aff'd*, 267 F.3d 743 (7th Cir. 2001).

**1. The value of the settlement outweighs the value of the appeal.**

Although Plaintiffs' Counsel believe their appeal had some possibility of success, it undeniably faced significant headwinds. Not only did this Court grant Agri Stats's motion for summary judgment, but another district court recently dismissed similar claims against Agri Stats for similar reasons.[31]

Moreover, in the considered opinion of Plaintiffs' experienced antitrust counsel, the Settlement provides most or all of the relief Plaintiffs were likely to obtain had they prevailed on appeal and at trial on remand. The Settlement will likely lower chicken prices by removing the anti-competitive aspects of Agri Stats's industry reports. *See* Dkt. No. 8314, at 4-7. Indeed, the injunctive relief in the settlement closely tracks Dr. Cabral's analysis of the ways in which Agri Stats's reports could be modified to achieve their purported procompetitive effects without harming competition. *Compare* Dkt. No. 8314 at 4-7 *with* Reply Declaration of Dr. Luis Cabral in Support of End-User Consumer Plaintiffs' Merits Case ("Cabral Reply Decl."), Dkt. No. 6226-7, Ex. 15, at 155-164. This significant benefit to the Class far outweighs the value of an appeal in which even a favorable outcome, followed by a victory at trial and in post-trial appeals, might well not have produced more relief for the Class than the Settlement provides.

**2. The settlement provides meaningful relief.**

As demonstrated above, sections II.B and III.A, and in EUCPs' brief in support of preliminary approval, *see* Dkt. No. 8314 at 4-7, 9-10, the Settlement provides substantial benefits to the Class. Huang contends that the five-year duration of most of the Settlement's injunctive

---

[31] *See In re Turkey Antitrust Litig.*, 2026 WL 1960792, at *29 (N.D. Ill. July 7, 2026) (citing *In re Broiler Chicken Antitrust Litig.*, 702 F. Supp. 3d 635, 678–79 (N.D. Ill. 2023)).

provisions renders the injunction "empty" and "worthless." Dkt. No. 8469, at 4. There is no merit to this contention.

*First*, the Settlement's prohibition on "publication of any and all sales reports" will remain permanently in effect. *See* Settlement Agreement, Dkt. No. 8314-2, at ¶ 2(o), (p). Moreover, injunctions in antitrust cases are typically limited in duration, because market conditions change, and the necessity for restrictions on business conduct can change with them. This is particularly true for rule-of-reason cases like this one, in which the anti-competitive effects of the challenged conduct must be balanced against its pro-competitive justifications.[32]

Beginning in 1979, the Antitrust Division of the U.S. Department of Justice "adopted the general practice of including sunset provisions that automatically terminate judgments, usually 10 years from entry." *See* April 25, 2018 Press Release, "Department of Justice Announces Initiative to Terminate 'Legacy' Antitrust Judgments."[33] In private antitrust class actions, injunctions lasting five years or less are common.[34; 35]

---

[32] *See New York v. Microsoft Corp*., 224 F. Supp. 2d 76, 184 (D.D.C. 2002), *aff'd*, 373 F.3d 1199 (D.C. Cir. 2004) ("An antitrust decree should endure only so long as necessary to ensure competition. The Court is unconvinced that the imposition of a decree for greater than five years will further that goal.").

[33] https://www.justice.gov/archives/opa/pr/department-justice-announces-initiative-terminate-legacy-antitrust-judgments

[34] *See, e.g., In re Blue Cross Blue Shield Antitrust Litig*., 85 F.4th 1070, 1086 (11th Cir. 2023) (five years); *Sullivan v. DB Invs., Inc*., 667 F.3d 273, 293 (3d Cir. 2011) (en banc) (five years); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig*., 2026 WL 1662251, at *5 (E.D.N.Y. June 9, 2026) (imposing systemwide limits on credit card interchange rates for five years); *In re Packaged Ice Antitrust Litig*., 322 F.R.D. 276, 284 (E.D. Mich. 2017) (three years); *Dial Corp. v. News Corp*., 317 F.R.D. 426, 429 (S.D.N.Y. 2016) (five years); *In re Currency Conversion Fee Antitrust Litig*., 263 F.R.D. 110, 116 (S.D.N.Y. 2009), *aff'd sub nom. Priceline.com, Inc. v. Silberman*, 405 F. App'x 532 (2d Cir. 2010) (five years); *In re Toys R Us Antitrust Litig*., 191 F.R.D. 347, 350 (E.D.N.Y. 2000) (three years); *Coleman v. Cannon Oil Co*., 849 F. Supp. 1458, 1473 (M.D. Ala. 1993) (three years).

[35] The cases Huang cites are not to the contrary. The settlements in *Pearson v. NBTY, Inc*., 772 F.3d 778 (7th Cir. 2014), and *In re Subway Footlong Sandwich Mktg. & Sales Practices Litig*., 869 F.3d 551 (7th Cir. 2017), were rejected not because their injunctive provisions were too short in duration, but because they offered no substantive relief to the classes and unjustified fees to class counsel. *See Pearson*, 772 F.3d at 787 (rejecting settlement in which allegedly fraudulent drug labeling would be changed only "in trivial respects," only one-fourth of one percent of fraud victims would receive even modest

The five-year duration of much of the significant injunctive relief in this case does not render the settlement "empty" or "worthless." Rather, it simply recognizes that market conditions five years from now may well render the injunction unnecessary. And if Agri Stats resumes the challenged conduct after five years, it does so at the risk of future litigation.

### 3. The named plaintiffs have standing.

Huang's contention that the named plaintiffs lack standing to settle for injunctive relief rests on a demonstrably false premise: that "*no named plaintiff* pleaded any fact or allegation to have Article III standing to seek or obtain prospective injunctive relief: each of them only sued for past purchases in their operative complaint." Dkt. No. 8469, at 1 (emphasis in original). To the contrary, the operative Complaint plainly seeks injunctive relief, including relief specifically to enjoin anti-competitive information-sharing. *See* Dkt. No. 3747, at ¶¶ 494, 784. Similarly, the Complaint plainly alleges that "Plaintiffs . . . *will continue to be injured* in their business and property by paying more for Broilers . . . than they would have paid" absent the alleged conspiracy.[36] And numerous class representatives testified at their depositions that they continue to purchase broiler chickens regularly on an ongoing basis.[37] EUCPs submit further evidence

---

compensation, and class counsel would receive almost $2 million); *Subway*, 869 F.3d at 556-57 (rejecting settlement that would do nothing to increase the length of Subway sandwiches, yielding fees for class counsel and "zero benefits for the class"). Here, conversely, the settlement yields significant benefits for the class, in the form of injunctive provisions carefully tailored to remedy the anti-competitive effects of Agri Stats's conduct, while yielding no fees for class counsel.

[36] *Id*. at ¶ 493 (emphasis added); *see also id*. at ¶ 642 ("The illegal conduct alleged herein is continuing and there is no indication that defendants will not continue such activity into the future.").

[37] Dkt. No. 8495 Ex. A-W, (Drucker Dep Tr. at 62:12-14 (purchases chicken 3-4 times per week); Cote Dep. Tr. at 59:23-60:10 (2-3 times per week); Flasch Dep. Tr. at 106:2-6 (1-2 times per week); Perry Dep. Tr. at 26:25-27:3 (1-2 times per week); Stack dep. Tr. at 47:9-10 (1-2 times per week); Marino Dep. Tr. at 65:13-17 (at least weekly); Cheslow Dep. Tr. at 19:2-4 (weekly); Davis Dep. Tr. at 80:12-13 (weekly); Hayward Dep. Tr. at 61:7-11, 67:15-19 (weekly); Heftel Dep. Tr. at 112:10-19 (weekly); Monahan Dep. Tr. at 30:7-11 (weekly); Morris Dep. Tr. at 38:19-39:4, 66:15-17 (weekly); Pearcy Dep. Tr. at 29:25-30:3 (weekly); Senkle Dep. Tr. at 15:19-16:3 (weekly); Weidner Dep. Tr. at 42:22-43:9 (weekly); Holt Dep. Tr. at 106:14-20 (weekly-monthly); Pauk Dep. Tr. at 24:16-19, 47:8-14 (3-4 times per month); Spell Dep. Tr. at 11:13-17 (every two weeks); ; Stangeland Dep. Tr. at 38:17-19 (1-2 times

from one class representative, Christina Hall, to further make the point that people who ate chicken still eat chicken. Hall Decl., ¶ 6. They will thus benefit from this settlement.

These plaintiffs thus have Article III standing, as they face imminent harm from continuing anti-competitive conduct by Agri Stats that the settlement will redress.[38]

**C. The other objections similarly lack merit.**

In addition to Huang, five other class members objected to the Settlement. Three objectors, Billy [Illegible], Addie Schnurbusch and Andrew Tohmo, object only to the fact that the Settlement lacks a monetary component. Cowen Decl., Ex. D, Dkt. No. 8454. But as counsel for EUCPs stated in a Declaration under penalty of perjury, "Agri Stats is not in a financial position to compensate class members." Dkt. No. 8314-1, ¶ 8. Indeed, "[d]uring the course of litigation, it became clear that *even if* EUCPs prevailed on appeal, returned to the trial court and prevailed at trial, Agri Stats would be bankrupted by any judgment." *Id*. The fact that Agri Stats agreed, subsequent to settling with EUCPs, to pay $350,000 to settle claims brought by the United States does not mean it had unlimited funds to settle cases with the class in this case (and other classes in other cases), but likely rather that it had even less funds to do so.

Moreover, these objectors cite no authority that class members who seek both monetary and injunctive relief must value monetary relief, however meager, over significant injunctive

per month); Thomas Dep. Tr. at 108:23-109:2 (1-2 times per month); Ashby Dep. Tr. at 41:22-24 (every 1-2 months); Madsen Dep. tr. at 211:11-14 (every 3 months)).

[38] *See Coachman v. Gateway Found., Inc.*, 2026 WL 1533847, at *4 (N.D. Ill. June 1, 2026) ("There is an injury to the plaintiff for the purposes of Article III 'as long as there is some nonnegligible, nontheoretical, probability of harm that the plaintiff's suit if successful would redress.'") (quoting *Am. Bottom Conservancy v. U.S. Army Corps of Eng'rs*, 650 F.3d 652, 658 (7th Cir. 2011)). *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), is not to the contrary. In that case, the Court held only that the risk of future harm, standing alone, did not confer standing for a claim for *damages*. *Id*. at 437.

relief that could lead to lower prices in the future. There are millions of class members in this case; indeed, the Settlement Administrator provided direct e-mail notice to approximately 17 million class members. *See* Cowen Decl., ¶ 7. Even assuming that EUCPs' counsel did not seek any attorneys' fees, a settlement of $350,000 would have generated a recovery of *about two cents* for each of approximately 17 million class members. Counsel's judgment that the injunctive relief obtained is preferable to this level of monetary relief is a reasonable one.

Another objector, Brian Henson, simply asks the Court to evaluate the value of the relief, whether the benefit obtained justifies the release of claims against Agri Stats, and whether the settlement is fair, reasonable and adequate – as the Court will undoubtedly do in the course of deciding whether to grant final approval. Cowen Decl., Ex. D.[39] The final objector, Michael Schnaser, submitted an objection that essentially tracks Huang's objection, and is without merit for the same reasons. Cowen Decl., Ex. D.

## V. CONCLUSION

Because the Settlement satisfies the standard for final approval, Plaintiffs request that the Court enter an order finally approving the Settlement Agreement.

[39] Henson also seeks "a clear accounting of the attorney fees, expenses, and costs associated with the litigation as a whole," but that is not a valid objection to the present settlement, which does not involve the payment of attorneys' fees or the reimbursement of costs and expenses. In any event, attorneys' fees in this case have been litigated up to the Seventh Circuit twice. An exhausting account of fees, expenses and costs has been made.

Dated: August 18, 2026

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By: /s/ *Shana E. Scarlett*
SHANA E. SCARLETT
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Tel: (510) 725-3000
shanas@hbsslaw.com

Steve W. Berman
Breanna Van Engelen
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Tel: (206) 623-7292
steve@hbsslaw.com
breannav@hbsslaw.com

COHEN MILSTEIN SELLERS & TOLL, PLLC

By: /s/ *Brent W. Johnson*
BRENT W. JOHNSON
Benjamin D. Brown
Daniel H. Silverman
Alison Deich
Zachary Glubiak
1100 New York Avenue NW
Suite 500, West Tower
Washington, DC 20005
Tel: (202) 408-4600
bjohnson@cohenmilstein.com
bbrown@cohenmilstein.com
dsilverman@cohenmilstein.com
adeich@cohenmilstein.com
zglubiak@cohenmilstein.com

*End-User Consumer Plaintiffs' Co-Lead Counsel*

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that on August 18, 2026 a true and correct copy of the foregoing was electronically filed through the Court's CM/ECF system, which caused notice to be sent to all counsel of record.

Dated: August 18, 2026

*/s/ Shana E. Scarlett*
SHANA E. SCARLETT